UNITED STATES DISTRICT COURT

                    WESTERN DISTRICT OF MISSOURI


UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
          vs.                      )   Case No.
                                   )   16-04068-01-CR-C-RK
BRUCE WAYNE STEPHENS,              )
                                   )
                    Defendant.     )



            TRANSCRIPT OF PROCEEDINGS - VOLUME I
          BEFORE THE HONORABLE ROSEANN KETCHMARK
               UNITED STATES DISTRICT JUDGE
                    DECEMBER 5, 2016
                  JEFFERSON CITY, MISSOURI


FOR THE PLAINTIFF:
     MR. PHILLIP EUGENE PORTER
     MS. EMILY A. ORSINGER
     Assistant United States Attorneys
     Charles Evans Whittaker Courthouse
     400 East Ninth Street, Floor 5
     Kansas City, Missouri 64106

FOR THE DEFENDANT:
     MR. JAMES EDWARD BROWN
     1609 West 92nd Street
     Kansas City, Missouri 64114



     Proceedings recorded by mechanical stenography, transcript
produced by computer


                KATHERINE A. CALVERT, RMR, CRR
                FEDERAL OFFICIAL COURT REPORTER
               CHARLES EVANS WHITTAKER COURTHOUSE
                    400 EAST NINTH STREET
                  KANSAS CITY, MISSOURI 64106

1

I N D E X                          Page

                  DECEMBER 5, 2016

                      VOLUME I

Pretrial conference. . . . . . . . . . . . . . . . . . .  6

Government's opening statement . . . . . . . . . . . . . 30

Defendant's opening statement. . . . . . . . . . . . . . 39

GOVERNMENT'S EVIDENCE

BRIAN DAVID RISLEY
     Direct examination by Mr. Porter. . . . . . . . . . 45
     Cross-examination by Mr. Brown. . . . . . . . . . . 89

                          2

                    I N D E X                    Page
                   (continued)


                  DECEMBER 6, 2016

                    VOLUME II

BRIAN DAVID RISLEY (resumed)
      Cross-examination by Mr. Brown (continued). . . . . . 120
      Redirect examination by Mr. Porter. . . . . . . . . 141
      Questions from the jury by Mr. Porter . . . . . . . 148
      Recross-examination by Mr. Brown. . . . . . . . . . 149
      Further redirect examination by Mr. Porter. . . . . 150

G. PAUL TYREE
      Direct examination by Ms. Orsinger. . . . . . . . . 151
      Cross-examination by Mr. Brown. . . . . . . . . . . 169
      Redirect examination by Ms. Orsinger. . . . . . . . 179
      Recross-examination by Mr. Brown. . . . . . . . . . 185
      Questions from the jury by Ms. Orsinger . . . . . . 202
      Further recross-examination by Mr. Brown. . . . . . 202

RANDALL SINELE
      Direct examination by Mr. Porter. . . . . . . . . . 204
      Cross-examination by Mr. Brown. . . . . . . . . . . 206
      Redirect examination by Mr. Porter. . . . . . . . . 207
      Recross-examination by Mr. Brown. . . . . . . . . . 207
      Questions from the jury by Mr. Porter . . . . . . . 209
      Further redirect examination by Mr. Porter. . . . . 210

JAMES BLACK
      Direct examination by Ms. Orsinger. . . . . . . . . 211
      Cross-examination by Mr. Brown. . . . . . . . . . . 218
      Redirect examination by Ms. Orsinger. . . . . . . . 221
      Questions from the jury by Ms. Orsinger . . . . . . 222

WENDY HOUSTON
      Direct examination by Mr. Porter. . . . . . . . . . 224
      Cross-examination by Mr. Brown. . . . . . . . . . . 242
      Questions from the jury by Mr. Porter . . . . . . . 276
      Recross-examination by Mr. Brown. . . . . . . . . . 282
      Redirect examination by Mr. Porter. . . . . . . . . 283

CODY ABRAM
      Direct examination by Mr. Porter. . . . . . . . . . 285

Case 2:16-cr-04068-RK   Document 90   Filed 07/12/17   Page 3 of 107

I N D E X                                    Page
(continued)

DECEMBER 7, 2016

VOLUME III

CODY ABRAM (resumed)
      Direct examination (continued) by Mr. Porter. . . . . 317
      Cross-examination by Mr. Brown. . . . . . . . . . . . 335
      Redirect examination by Mr. Porter. . . . . . . . . . 347
      Questions from the jury by Mr. Porter . . . . . . . . 359
      Redirect examination by Mr. Porter. . . . . . . . . . 362
      Recross-examination by Mr. Brown. . . . . . . . . . . 364

Instructions conference. . . . . . . . . . . . . . . . . . 374

DEFENDANT'S EVIDENCE

BRUCE WAYNE STEPHENS
      Direct examination by Mr. Brown . . . . . . . . . . . 396
      Cross-examination by Mr. Porter . . . . . . . . . . . 416
      Redirect examination by Mr. Brown . . . . . . . . . . 421
      Questions from the jury by Mr. Brown  . . . . . . . . 429

Government's closing argument. . . . . . . . . . . . . . . 435

Defendant's closing argument . . . . . . . . . . . . . . . 445

Government's rebuttal closing argument . . . . . . . . . . 453

Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . 464

Case 2:16-cr-04068-RK   Document 90   Filed 07/12/17   Page 4 of 107

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| FOR THE GOVERNMENT: | | | |
| 1 | Miranda rights waiver | 287 | 287 |
| 2 | Videotaped interview | 288 | 288 |
| 2(a) | Video clip | 292 | 292 |
| 2(b) | Video clip | 295 | 295 |
| 2(c) | Video clip | 297 | 297 |
| 2(d) | Video clip | 323 | 323 |
| 2(f) | Video clip | 328 | 328 |
| 2(g) | Video clip | 329 | 330 |
| 2(h) | Video clip | 330 | 330 |
| 4 | 9/29/16 voicemail | 81 | 81 |
| 5 | Voicemail transcript | 83 | 83 |
| 6 | Receipt | 86 | 86 |
| 7 | 9/29/16 email | 88 | 88 |
| 15 | Aerial photograph | 75 | 75 |
| 17 | Minute entry | 66 | 66 |
| 19 | Minute entry | 348 | 349 |
| 34 | Stipulation | 367 | 367 |

5

```
 1                        DECEMBER 5, 2016

 2                         MORNING SESSION

 3              THE COURT:  Good morning.

 4              This week we are calling Case No. 16-4068, United

 5    States of America vs. Bruce Wayne Stephens.

 6              Will the parties please enter their appearances.

 7              MR. PORTER:  Your Honor, may it please the Court,

 8    Gene Porter and Emily Orsinger on behalf of the United States.

 9    Joining us at counsel table is Tracy Peters and Ashley Turner

10    and Special Agent Cody Abram is here somewhere.  He will

11    materialize in a moment.  Ms. Peters and Mr. Abram will be at

12    counsel table with us, and Ms. Turner may kind of be in and out

13    a little bit.  She is a new AUSA here in Jefferson City.  Her

14    first day in the office was last Monday.

15              THE COURT:  Welcome.

16              MS. TURNER:  Thank you, Judge.

17              THE COURT:  You said Ashley Turner?

18              MS. TURNER:  Yes.

19              MR. BROWN:  James E. Brown on behalf of Mr. Stephens

20    who's present, Your Honor.

21              THE COURT:  Good morning.  Welcome.

22              Before we get started at nine o'clock, let's go over

23    a few things.  I have on my agenda to review the first 12

24    instructions, and I think my law clerk, Ms. Perry, has copies

25    to give to both counsel tables.
```

1    I also want to go into the motions in limine and get

2    through as many of those as we can and all those that we need

3    to discuss prior to voir dire.

4    I also want to talk about making a record on plea

5    offers or the plea negotiation status. I want to talk about

6    our overflow in 3B courtroom, also that there will be students

7    in the courtroom this week, and that I am going to allow jury

8    questions of the witnesses except for the defendant if he

9    elects to testify. If he does elect to testify, it will be his

10   decision whether I will allow jurors to ask questions.

11   I don't know if you're familiar with the way we ask

12   questions, but each juror will be given a stack of note cards.

13   At the end of each witness I'll have the intern, Ethan Scherer,

14   take a card from each juror whether they have a question on it

15   or not and bring the stack of cards. There will always be 14

16   cards. Have counsel come up. We'll go through the cards. If

17   there are any questions, we will screen the cards and discuss

18   whether those questions or a modification to those questions

19   should be asked. Once I ask the questions that are permitted,

20   I'll give the attorneys another round of asking questions.

21   Ms. Perry, did you pass out the first 12

22   instructions?

23   THE LAW CLERK: Yes. Do you have a copy?

24   THE COURT: Yes.

25   Let's go ahead and just take a look at the first 12

```
 1   instructions.  There's no changes to Instruction -- yes, there
 2   is a few changes to Instruction No. 1.  I've modified this just
 3   to be a little more contemporary with the current state of
 4   electronics.
 5          Instruction No. 2 is plaintiff's Instruction No. 2
 6   that was submitted with no changes.
 7          Instruction No. 3 the Court has modified this, and
 8   what I want -- this won't be read until after opening
 9   statements, but on the third paragraph I want to make sure I
10   understand the government's theory of who was threatened, who
11   is being retaliated against, and who is the participant or
12   witness or party in that charge.  So I'd like to have you guys
13   review what I've submitted, but I know it's the government that
14   needs to be able to tailor that.
15          And I would note in the government's proposed
16   Instruction No. 3 the defense did object to the wording -- I
17   mean government's Instruction No. 4 one of the objections by
18   Mr. Brown was that the last sentence described Stephens as the
19   leader in a drug trafficking organization in Columbia,
20   Missouri.  I am sustaining that objection, but I will allow the
21   government to set forth evidence of that, but I'm not going to
22   find that in the beginning instruction.
23          Does that make sense Mr. Porter?
24          MR. PORTER:  It does, Your Honor.
25          THE COURT:  Turning now to Instruction No. 4, that
```

```
 1    sets forth the elements.  I, again, would like both government
 2    and defense to review element 2 -- well, both elements 1 and 2,
 3    and I want to coordinate with both of you on how best to
 4    articulate the elements.
 5              MR. BROWN:  Excuse me, Your Honor.  Do you want
 6    objections or comments contemporaneously or would you like to
 7    go through these first and then come back?
 8              THE COURT:  Let's go through it first, then come
 9    back.
10              MR. BROWN:  Thank you.
11              THE COURT:  On Instruction No. 5, model instruction
12    1.03, I have left it as plaintiff submitted in their proposed
13    Instruction No. 6.
14              Instruction No. 6 I've left as submitted by
15    plaintiff.
16              Instruction No. 7 is the jurors asking questions, so
17    you can review that to determine if you have any objections.
18              Instruction No. 8 is the same as -- I did not
19    deviate from the plaintiff's proposed Instruction No. 8(a).
20              Instruction No. 9 is no changes to the plaintiff's
21    instruction.
22              Instruction No. 10 I did modify on how I articulated
23    some of the electronics.  You can review that to see if you
24    have any objections.
25              Instruction No. 11 is patterned after 1.09.  I did
```

1    not change the plaintiff's proposed instruction.

2            And Instruction 12 I modified the language just a

3    bit just to my preference.

4            So with that notation that we will probably not be

5    able to complete the wording of Instruction 3 and 4 as to the

6    summary of the offense and the elements of the offense, we may

7    need to do that while you are making your jury selection.

8            Let's start with Mr. Brown.  Do you want to set

9    forth any objections at this point or do you need some time to

10   review them?

11           MR. BROWN:  No.  If I -- if in my written objections

12   to the proposed government's exhibit -- or proposed

13   instructions, if any of those apply to these, and I'm not sure

14   they do, I would like that noted on the record.

15           The only particular objection I have with these

16   so far is the elements that are set out in 4, specifically

17   element 2, and I think you -- or at least it's my understanding

18   we're going to work on that and that's going to change probably

19   before any of these are used.  I think that would be the only

20   objection I have.

21           THE COURT:  Okay.  And I know you have other

22   objections lodged after Instruction No. 12.

23           MR. BROWN:  Right.

24           THE COURT:  I do note your instruction on describing

25   the offense as obstructing justice by threatening to retaliate

1    that you object to the verbiage "obstructing justice," and I
        2    find that the offense -- the spirit of that chapter and the
        3    genre of those crimes under that chapter is obstructing
        4    justice.  So I think that is fair to couch, when we label the
        5    crime, as the government has labeled it in coordination with
        6    how it's labeled in the statute book.
        7            Mr. Porter, do you have any objections outside of
        8    the description summary on Instruction No. 3 and element
        9    description in Instruction No. 4?
       10            MR. PORTER:  We do not, Your Honor.
       11            THE COURT:  Okay.  Let's move forward to motions in
       12    limine.  I'm sure you are aware the motion to dismiss was
       13    denied yesterday.
       14            Did you see that, Mr. Porter and Mr. Brown?
       15            MR. BROWN:  Yes.  And actually we've had some
       16    electronic communication anyway since that took place.
       17            THE COURT:  Very good.
       18            There is another defense motion to exclude video I
       19    am tha Town.  At this point my inclination is to allow that
       20    video and to deny that motion.
       21            Regarding -- and I'm just going to give you a
       22    forecast at this point since we don't have to decide this
       23    definitively until opening statements but regarding the
       24    government's 404(b) notice and the defendant's opposition, I do
       25    not have enough information to make a final determination and I

1  may need some type of proffer by the government.

2          Specifically the standard under 404(b) is the prior

3  convictions in this case relevant to the material issue of

4  intent, and it may be, but I don't have enough information

5  about those prior convictions.  One of the standards is it

6  proved by a preponderance of the evidence?  Yes, those

7  convictions undoubtedly have been proved by a preponderance of

8  the evidence, and I'm assuming the government has those

9  certified copies.

10          Regarding the probative value outweighs any

11  prejudicial effect.  Preliminarily, I believe the robbery in

12  the first degree, the prejudicial effect outweighs the

13  probative value, but I would need more information if I'm

14  missing something in that offense.  The prong of is the bad act

15  similar in kind to the charged offense?  It might be but I

16  don't have enough information.

17          And then, finally, are the bad acts close in time to

18  the crime charged?  Again, the robbery in the first degree

19  felony conviction approximately 50 years ago is not close in

20  time.  The assaults being 12, 13, and 18 years ago possibly

21  could be close enough; but, again, I would need to have more

22  information regarding what the government's intent is in their

23  presentation.  If it is just the actual label of the

24  conviction, the title and the date, that wouldn't be enough to

25  be close enough in time or similar in kind, but that's my

1   forecast.

2           In the government's instructions, proposed

3   Instructions 27 and 28, they set forth proposed instructions

4   regarding summary charts.  One is for just helpful information

5   to the jury but not to be marked as an exhibit and submitted

6   and to go back to the jury room.  One is to be marked as an

7   exhibit and admitted and to go back to the jury room if

8   requested.  I would need to see a proffer on that to know what

9   direction to go with those later instructions.

10          Regarding the voir dire proposed questions by Mr.

11  Brown, snitches belong in ditches, the meaning and the meaning

12  of snitches.  I don't know, Mr. Porter, if you've had a chance

13  to review carefully Mr. Brown's proposed voir dire questions.

14  I am not going to ask those type questions in voir dire.  I

15  note that the government intends to, I believe, put on lay

16  witness expert testimony regarding the street common meaning of

17  those terms, and that I'm assuming Mr. Brown, by his voir dire

18  questions, would like to utilize the Urban Dictionary

19  definitions.  We'll need to work through that.

20          I'm inclined to allow both.  If Mr. Porter has what

21  is the common understanding here in this part of the country

22  and then Mr. Brown to utilize an Urban Dictionary, I'm inclined

23  to let both of those come in.

24          In the government's trial brief -- so that's all the

25  motions in limine that I have that we need to have on our

13

radar.

The other issue is stipulations and the government's trial brief.  On page 7 Mr. Porter sets forth that there will be some stipulations regarding facts.  So I just need to know if those stipulations are ready.

MR. PORTER:  We don't have a written stipulation pertaining to facts between the parties, Your Honor, and what we do have is Mr. Brown has indicated that with respect to Government's Exhibit 6 that that will be stipulated into admission as evidence, and I hope you have the copy, paper copy of those exhibits that were given to you this morning; but if you don't, I can give you another one real quick.

THE COURT:  I have the packet you gave me of the exhibits, and then in your exhibit list you have receipt showing delivery of voicemail from Risley to Oliver.

MR. PORTER:  That's correct, Your Honor.

MR. BROWN:  Yes.

MR. PORTER:  It's marked as Exhibit 6.  That's what we're stipulating as between the parties for the admission of. So there's not a factual stipulation in the sense that we talked about that where the parties agreed that the following facts are true and correct, but we're stipulating to the admission of this exhibit without authenticity or without hearsay or anything like that having to be dealt with.

THE COURT:  So you have no objection to the

foundation?

MR. BROWN:  No.  There's no sense in bringing somebody in to talk about the time stamp that's on their voicemail.  So, yeah, no problem.

THE COURT:  Okay.  There also is a motion in limine regarding jail calls, and if the trial were to play out that the Malcolm Redmon, who I believe is endorsed as a witness, if he is to testify, that call would come in, but it's a little more dicey if none of the voices, the folks on the recording testify.  So the government's witness list No. 6 sets forth Malcolm Redmon is to testify.  So we may -- is that still your intention?

MR. PORTER:  He may testify, Judge, either in the case in chief or in rebuttal.  The same would be true for another witness who was a participant on that phone call who also has been subpoenaed to testify.  That would be Wendy Houston.  So either in the case in chief or in rebuttal she may testify.  So -- then, of course, obviously if the defendant were to testify, he's the third participant on the phone call.

So we recognize and understand the tenor and the context of the Court's ruling.  The admission of that's going to be dependent upon the witness through whom the evidence is offered, and I'm understanding your ruling to say its only chance of coming in is if one of those three participants is on the witness stand for that purpose.

```
 1              THE COURT:  It would easily come in if Wendy Houston

 2    or Malcolm Redmon were to testify.  I'm open to arguments on

 3    other bases.  I don't see them clearly at this point.

 4              MR. PORTER:  I understand.

 5              MR. BROWN:  Well, here's my real objection to that

 6    phone call, and Mr. Porter can enlighten us otherwise.  In his

 7    trial brief he indicated that the conversation between Malcolm

 8    Redmon and Mr. Stephens indicated Redmon's knowledge or belief

 9    of his -- the way he is and what he does.  I suggest that's

10    character evidence and not admissible; and if there is another

11    reason that the government wants that phone call in, I think we

12    should listen to that.  But character evidence is not

13    admissible, and I believe that's what they want to play that

14    phone call for.

15              THE COURT:  Mr. Porter, are you planning to get into

16    the phone call before any of those three folks were to testify;

17    Malcolm Redmon, Wendy Houston, or if the defendant elected to

18    testify?

19              MR. PORTER:  No, Your Honor.

20              THE COURT:  So we can leave it --

21              MR. BROWN:  Except opening statements.  It may be --

22    I intend to address it if the Court is indicating that they're

23    going to let it in in opening statements.

24              THE COURT:  Well, I can tell you I can't make that

25    call at this point.
```

```
 1              MR. PORTER:  Your Honor, if it will help everyone,
 2    we have no intention of referring to that phone call during
 3    opening statement.
 4              THE COURT:  And I can't tell you if that evidence is
 5    going to be admitted yet or not for you to make a comment, so
 6    that's just your judgment call, Mr. Brown.
 7              MR. BROWN:  Okay.
 8              THE COURT:  All right.  I believe there will be a
 9    high school criminal law class that are juniors and seniors,
10    about 12 students, that are going to sit.  We are tight on
11    courtroom space during voir dire so I'm allowing them to sit
12    behind the clerks and the intern.  I think they're from -- I'm
13    trying to think of the high school.
14              MR. PORTER:  I don't remember, Judge.
15              MR. BROWN:  We'll try not to be offensive to their
16    mascot.
17              THE COURT:  I'm going to have all the venire panel
18    sit in the gallery, and Mr. Scherer will assist them with the
19    microphone if need be.
20              On my voir dire my first question is to have them
21    answer the back of their placards giving their basic status,
22    employment, spousal information, and then at that point we'll
23    just play it by ear how we need the microphone for voir dire.
24    And if Ms. Calvert or any of the attorneys are unable to hear,
25    let me know and we'll just work through that with Mr. Scherer.
```

1    I see we have a couple of guests in the courtroom

2  that are not court employees.  You will be allowed to stay if

3  there is an empty bench at the end, but I don't believe there

4  will be so we've made accommodations for an overflow courtroom

5  in I believe -- is it 3B?

6         THE COURTROOM DEPUTY:  Yes.

7         THE COURT:  So there will be a courtroom that you

8  will be able to watch the jury selection.  Once jury selection

9  is completed, then we'll open up the gallery and folks can move

10 from the viewing area in 3B back into this courtroom.

11        Mr. Porter, do you have anything further?

12        MR. PORTER:  Judge, I just wanted to follow up on

13 one or two of the matters that you spoke of.  With respect to

14 the motion in limine on the 404(b) that you've taken under

15 advisement, I can tell the Court and counsel we have no

16 intention of referring to that matter during opening statement

17 either.  So it being reserved and under advisement is not going

18 to create any issues relative to opening statement and what the

19 jury might hear prior to the Court making a ruling on that

20 issue.

21        With respect to the charts that you referenced in

22 instructions -- government's proposed Instructions 27 and 28,

23 the specific chart that is going to be potentially in play

24 would only refer to Instruction No. 27, a demonstrative chart

25 versus the type of instruction that's referred -- or the type

18

1  of chart that's referred to Instruction No. 28, which is

2  substantive evidence itself.  So 28 is no longer even a

3  relevant consideration.

4          THE COURT:  Thank you for that heads up.

5          MR. PORTER:  And you had mentioned at the start of

6  your to-do list covering the Lafler/Frye plea offers.  We're

7  prepared to do that at whatever point the Court wants to take

8  that up.

9          And, finally, under the scheduling order there's a

10  reciprocal Jencks disclosure requirement under the parties.  I

11  don't know if there is no Jencks from the defense, but we've

12  not received any.  So if we could make an inquiry about that,

13  then we know where we're at on that.

14          MR. BROWN:  Well, Gene, my only witness -- or my

15  only potential witness other than the defendant, if he chooses

16  to testify, is Mr. Beckner.  I've got emails between you and I

17  about his convictions.  I noticed up some and you gave me more.

18          MR. PORTER:  That's relative to conviction but

19  Jencks is a statement, not convictions.  I don't know if there

20  are any statements from --

21          MR. BROWN:  There are not.  That should take care of

22  that.

23          THE COURT:  Thank you.

24          Mr. Porter, you can go ahead and put forth the plea

25  negotiation status.

```
 1              MR. BROWN:  Judge, if I may.

 2              THE COURT:  Yes.

 3              MR. BROWN:  While we're still talking about the

 4    motions in limine kind of, the phone calls and also the video,

 5    if the Court allows it to come in, the government has some

 6    transcripts.  Some of those transcripts have been marked as

 7    exhibits.  It's our position transcripts absent some sort of

 8    stipulation as to their accuracy are not evidence, should not

 9    be marked and admitted as evidence.  They're an aid to the

10    Court, aid to the jury.  They might be used but not admitted as

11    an exhibit or as evidence, and I have a citation if you want

12    it.

13              THE COURT:  Mr. Porter, do you intend to mark them

14    and admit them into evidence or just for aiding the jury in

15    listening to the exhibit of the recording?

16              MR. PORTER:  Judge, they are marked as exhibits for

17    purposes of identification during the course of a witness

18    examination; and if an appropriate foundation were to be laid

19    for the reliability and accuracy of the transcript, they

20    certainly could be admitted, and there's also a jury

21    instruction that we've proposed that specifically tells the

22    jury that's not the evidence and you shouldn't use the

23    transcript as the evidence, only as an aid for whatever value

24    you think it has; and if you think the transcript is wrong, if

25    what you're hearing is not what's on the transcript, then you
```

1  ignore the transcript.  So I think that instruction

2  appropriately tells the jury how to treat it; and if it were to

3  be admitted as an exhibit with that instruction, the harm or

4  potential harm of them misusing it I think is gone.

5          MR. BROWN:  United States v. McMillan, 508 F.2d 101

6  Eighth Circuit, 1974.

7          THE COURT:  My preliminary thought is that it could

8  be marked as an exhibit.  The transcript could be utilized

9  during the playing of the video, but that transcript would not

10 go back to the jury room as one of the exhibits, and that they

11 would have to rely on replaying the video as part of their

12 deliberations, and we can make further rulings as we --

13         MR. PORTER:  And I forgot one thing on a different

14 matter, but it's related to these motions in limine.  We also

15 have no intent to make any reference to the rap video during

16 opening statement either, Judge.  So that's not going to become

17 an issue at that stage.

18         THE COURT:  Very well.

19         MR. BROWN:  I will now use mine, Judge.

20         THE COURT:  I don't anticipate having any issues.  I

21 know this is an obstruction of justice retaliation case, but I

22 will out of an abundance of caution once the jury is seated and

23 we break for recess, I will admonish the gallery before the

24 jury comes in of no outbursts or no bodily language, heavy

25 sighs, anything like that.

1    Any other special requests that I'm not thinking of,
2  Mr. Porter?
3          MR. PORTER:  Not with respect to that kind of issue,
4  Judge, but as soon as the jury panel list is available so we
5  could start reviewing that, that would be helpful so that we
6  can make sure the voir dire process goes smoothly.  And for the
7  Court's notice, Ms. Orsinger will be handling the voir dire
8  portion of the proceedings on behalf of the government.  So I
9  know you do most of the questioning but permit the lawyers to
10 have some follow-up, and anything that arises during the voir
11 dire process is going to be handled by Ms. Orsinger.
12         MR. BROWN:  Two things.  I don't know what your
13 practice is about voir dire.  Do you give us an opportunity to
14 explore anything or just follow up on the questions that you
15 have propounded, or what's your procedure, I guess?
16         And then for everybody's information, I was standing
17 out in front of the courthouse waiting for them to open up the
18 doors today and various panel members would ask me questions
19 about, you know, like where they could park or something like
20 that, but I only exchanged pleasantries and told them I had no
21 idea, but it may -- it may come up as to whether they know me
22 or not.
23         THE COURT:  Thank you, Mr. Brown.  I don't see any
24 problem with that.
25         I can tell you that we have 46 panel members.  The

```
1    jury assembly room -- 49.  Okay.  We have 49 venirepersons and

2    the jury assembly room is -- I've asked them to complete a

3    seating chart with the names on them so that you don't have to

4    spend time writing names.

5              Mr. Brown, regarding the procedure, I will ask the

6    majority of the questions and give, then, the parties an

7    opportunity to do two things.  One, to do follow-up questions

8    to individual panel members; and, two, to cover areas that I

9    haven't covered.  In looking at your voir dire there are a few

10   areas that, some I've mentioned some I haven't, that I do not

11   want to get into during voir dire.  The definition of snitches,

12   the definition of snitches get stitches, your question

13   regarding drug problems in America today, which was your

14   proposed Section No. 2.

15             MR. BROWN:  I think that was a cut-and-paste error,

16   Your Honor.

17             THE COURT:  And your Question No. 30, "Is there any

18   member of the panel who has strong feelings regarding the use

19   of informants by law enforcement agencies?"  And I know that

20   the underlying offense of the defendant's son and the

21   cooperator I just didn't know if you still intended to get into

22   informants.

23             MR. BROWN:  Well -- and the reason I ask is there

24   are two areas that I would like to explore.  One of them is the

25   panel's attitude toward snitches or cooperating individuals or
```

```
 1    informants, however you want to characterize that.  And the

 2    other, especially with a preliminary ruling or at least

 3    indication by the Court about the video, is their attitudes

 4    towards gangs to rap and rap in general and that type of thing.

 5              THE COURT:  And what would your proposed question be

 6    regarding rap?

 7              MR. BROWN:  Well, I would -- I mean, if I were

 8    asking, I would ask them along the line, Does anyone listen to

 9    gangsta rap, any of their family members listen to gangsta rap?

10    I don't expect we're going to get too many volunteers for that

11    one.  Then I'll explore rap in general, like who has the

12    soundtrack to the musical Hamilton?  Do their families?  Do

13    they understand it?  Are they like me who might go to the play

14    but wouldn't understand the lyrics unless I saw it on TV and

15    had closed captioning going, those type things.  Because if

16    this video's played for them -- I don't know.  I'm just curious

17    about what their attitude is towards gangsta rap in particular

18    and rap music in general.

19              THE COURT:  Do you want to weigh in, Mr. Porter?

20              MS. ORSINGER:  Your Honor, we have no issues with

21    those questions as long as they're formatted similarly.

22              THE COURT:  I have no qualms with you asking in that

23    manner.  I will try to incorporate a question regarding

24    informants, cooperators, snitches, and I'll use -- try to

25    remember to use the term "snitches" and hopefully that will
```

24

1  take care of that in kind of a neutral.

2          MR. BROWN:  I won't do anything about snitches then

3  unless we get some response.

4          THE COURT:  Okay.  Very well.  So that was the only

5  questions that I noted in your proposed voir dire.  I did see

6  that on Question 32 you did ask about a defendant in a criminal

7  case electing to not testify.  So I did incorporate that since

8  you're requesting that.

9          Regarding the government's voir dire, I cannot think

10 of -- I would not want the government to ask their Questions 28

11 through 33.  28 and 29 is regarding domestic violence and this

12 probably is in reference to the 404(b) conviction, and same

13 with 30 and 31 are both domestic violence questions.  32 is a

14 domestic violence, and I may have incorporated 33.  Yes, I did.

15 I did incorporate 33.  So just no domestic violence then.

16          Any other questions?

17          Ms. Russell, I think Paul is at the exit with the

18 students.  Do you want to see if they want to come on in?  I

19 wanted to have them seated before the panel came in.

20          Mr. Porter, anything else?

21          MR. PORTER:  Just that plea offer issue, Your Honor,

22 that we need to make a record on.  I don't know of anything

23 else.

24          THE COURT:  Mr. Brown.

25          MR. BROWN:  Judge, Mr. Stephens indicated that he

```
 1   needs to use the restroom and could the marshals take him.  And
 2   for the Court's information, he suffers from some prostate
 3   problems.
 4            THE COURT:  Yes.  We'll accommodate him.  Just make
 5   sure you come up at any time and we'll do the best we can with
 6   that.
 7            MR. BROWN:  Okay.
 8            THE COURT:  Can we do a quick proffer -- I mean a
 9   Frye presentation?
10            MR. BROWN:  Can you wait a second?
11            THE DEFENDANT:  Yes.
12            THE COURT:  Welcome.  It's nice to have you.  And
13   let's make sure you all have enough seats.  It's a little
14   scrunched back there but make yourself at home.
15            Mr. Porter.
16            MR. PORTER:  Your Honor, the plea offer that was
17   formally extended to the defendant initially was that in
18   exchange for his plea to the single-count indictment, the
19   government would not charge him with any further offenses
20   arising from the offense of September 29th, nor charge any
21   other persons for any offenses that they may have committed
22   arising from those events on September 29th; that we would
23   recommend that the sentence imposed run concurrent with the
24   presumptive seven-year SES sentence that will be re-imposed as
25   a revocation in Cooper County, Case No. 14CO-CR00562-01, and
```

26

```
 1    that the federal sentence in this case would be treated as the
 2    controlling sentence upon revocation of that probation in
 3    Cooper County.  That offer was declined.
 4              And then there was a subsequent offer that indicated
 5    that if the defendant were to plead guilty as charged, again --
 6    plead guilty as charged, he would be allowed to conditionally
 7    plead and reserving the right to seek appellate review of the
 8    denial of the motion to dismiss, that order having been entered
 9    on Saturday.  So that was the most recent plea offer that was
10    extended and declined.
11              THE COURT:  Is that accurate, Mr. Brown?
12              MR. BROWN:  Yes, Your Honor.
13              THE COURT:  Is there any further record you'd like
14    to make, Mr. Brown?
15              MR. BROWN:  No.  I extended those offers to Mr.
16    Stephens.  We have a factual basis problem so they've been
17    rejected.
18              THE COURT:  Thank you.
19              Mr. Stephens, is that accurate?
20              THE DEFENDANT:  That's right.
21              THE COURT:  Thank you.  Very well.  Let's take a
22    recess and we'll be back in ten or 15 minutes.  Very good.
23    We'll be in recess.
24              (Recess was taken at 9:22 a.m.)
25              (Voir dire examination was had but is not herein
```

27

```
 1   typed.)

 2            (The following proceedings were had in the courtroom

 3   out of the presence of the jury:)

 4            MR. BROWN:  May we approach, Your Honor?

 5            THE COURT:  Yes.

 6            MR. BROWN:  It's unorthodox but I'm going to be

 7   filing a motion for judgment of acquittal at the close of the

 8   government's opening.  I don't expect it to be ruled on.  I'll

 9   be ready to go or whatever.  I've sent one to Gene.  I assume

10   you got it.

11            MR. PORTER:  We received by email at 9:47 last night

12   a courtesy copy of what he --

13            MR. BROWN:  I can provide the Court with what I

14   intend to file.  Like I say, I'm not expecting a ruling.

15            THE COURT:  You can give me a hard copy of it.  That

16   would be great, then file it on ECF.

17            MR. BROWN:  Right.  Gene, I'll give you yours now.

18   Probably the same one.

19            MR. PORTER:  Same typos and everything.

20            MR. BROWN:  Probably the same one.  That's all I've

21   got, Judge.

22            (The following proceedings were had in the presence

23   of the jury:)

24            THE COURT:  Please be seated, if you can.

25            Ms. Wheeler, are you ready to seat the jury?
```

28

```
 1              (A jury of 12 and two alternates were seated.)

 2              THE COURT:  Thank you, Ms. Wheeler.

 3              Ladies and gentlemen of the venire panel, I want to

 4   thank you for your service on behalf of the parties.  Your role

 5   is very important; and as you can see, we cannot select a jury

 6   unless we go through this process.

 7              At this point you are excused and can go back down

 8   to the jury assembly room.  I do think they have some

 9   certificates for employment.

10              (The remaining venire panel was excused.)

11              THE COURT:  You may be seated.

12              Ladies and gentlemen, now that you've been selected

13   to serve as jurors in this case, you will take a second oath.

14   I will have Ms. Wheeler administer that oath at this time.

15              (Courtroom deputy swears in jury of 12 and two

16   alternates.)

17              THE COURT:  Thank you, ladies and gentlemen.

18              Before we start with opening statements, there's a

19   series of instructions that I need to read to you.  I've

20   already read to you the first two.  I'm now going to read to

21   you Instructions 3 through 11.

22              And, Mr. Scherer, if you would put those where the

23   jury can see them on your screens.

24              (The Court reads Instructions Nos. 3 through 11,

25   inclusive.)
```

```
 1          THE COURT:  Mr. Porter, are you ready for opening?

 2          MR. PORTER:  We are, Your Honor.

 3          THE COURT:  You may proceed.

 4          MR. PORTER:  May it please the Court.

 5          THE COURT:  You may proceed.

 6          MR. PORTER:  Counsel.  Mr. Stephens.

 7                  GOVERNMENT'S OPENING STATEMENT

 8          MR. PORTER:  Ladies and gentlemen, the simple and

 9  straightforward trial evidence that you will hear in this case

10  will establish that Bruce Wayne Stephens made a series of

11  threats intended to retaliate against those involved in the

12  prosecution of his son, Malcolm Desean Redmon.

13          The person that the defendant used to communicate

14  those threats and that he used and directed them towards as a

15  way to send his threatening message was Brian Risley, the

16  attorney who represented Vershawn Edwards, and Mr. Edwards was

17  a cooperating codefendant charged in the same case as the

18  defendant's son, Malcolm Desean Redmon.

19          Malcolm Redmon, in addition to being the son of this

20  defendant who's on trial, was one of the lead defendants in a

21  27-defendant narcotics distribution case filed here in

22  Jefferson City.  On December the 1st of 2015 he pled guilty to

23  distributing at least 28 grams of crack cocaine and faced a

24  mandatory minimum sentence of at least ten years and a maximum

25  statutory sentence of life imprisonment.
```

1          The case against the defendant's son was based on

2    the testimony of cooperators, those who are also involved in

3    that drug distribution conspiracy with Malcolm Redmon.  It was

4    based on wiretap evidence.  It was based on controlled buys

5    where persons involved in the drug distribution conspiracy sold

6    narcotics to undercover law enforcement officers and

7    confidential informants that were working with the United

8    States.

9          Mr. Redmon was scheduled to be sentenced here in

10   this very courtroom on September the 29th of this year, and the

11   hearing was scheduled to start at two o'clock in the afternoon.

12   Sentencing hearings for several of the codefendants were also

13   scheduled for that same day, including the sentencing hearing

14   for Vershawn Edwards, the participant in the drug distribution

15   conspiracy that was represented by Brian Risley.

16         Mr. Risley's going to testify and he's going to tell

17   you the story of that day and the events that occurred and the

18   way they directly impacted him in a way that had never happened

19   to him before during the time that he had been practicing law.

20         He's going to tell you that he got here to this

21   courthouse around one o'clock in the afternoon on September

22   the 29th.  The first thing he did was check in because his

23   client was in custody.  Mr. Vershawn Edwards was in custody.

24   Saw him for a few moments and then he came up here to this very

25   floor, to this very courtroom; and while on the outside of the

1   courtroom where you all spent your time milling about in the

2   hallway today, he was met by a number of individuals, one of

3   whom inquired of him, "Who do you represent?"  Mr. Risley

4   responded that he represented Vershawn Edwards.  And at that

5   point the defendant, Mr. Stephens, who Mr. Risley didn't know

6   at that point, didn't even know his name, had never seen him

7   before, had no idea who the person who was about to speak to

8   him was, but this defendant said, "Snitches, snitches, they

9   belong in ditches."

10          Now, Mr. Risley ignored that comment, went on about

11  his business, and actually went down to the first floor of the

12  courthouse to get the family members of Vershawn Edwards who

13  were here to be in the courtroom while Vershawn was being

14  sentenced.

15          He goes down to the first floor, gathers them up,

16  brings them right back up here to this very courtroom.  Brings

17  them into the courtroom and seats them in the gallery where you

18  all spent your time this morning and takes his place at the

19  counsel table getting ready for the sentencing hearing.

20          And, again, during this time period Mr. Stephens,

21  the defendant, is repeatedly stating in a way that appears to

22  be directed towards those family members that same phrase,

23  "Snitches, snitches, they belong in ditches."  The persons

24  hearing that at that point that appeared to Mr. Risley to be

25  the object of Mr. Stephens' statements were Vershawn Edwards'

32

1  fiancee, his mother, and the mother of his fiancee.

2           There's some concern at this point as to what's
3  going on and what's in the mind of the defendant.  Enough has
4  been said to put people on notice that this is not ordinary.
5  This is not normal.  Extra kind of concern needs to be given to
6  what's happening.

7           After the sentencing hearing had concluded, Mr.
8  Risley observes the defendant start moving toward Vershawn
9  Edwards' family members who were seated in the gallery of this
10 courtroom, and fearing that he's going to try to make a direct
11 personal confrontation with them attempts to physically block
12 Mr. Stephens' access by placing himself physically between the
13 area that Mr. Stephens is and the area that the family members
14 are, the three women who appeared to be the object at that
15 point of Mr. Stephens' efforts.

16          And at this point Brian's going to tell you a lot of
17 things were going through his mind.  He's recalling that during
18 the sentencing hearing the discussion about cooperation that
19 had taken place with the judge; that the cooperation that
20 Vershawn Edwards had provided was against Malcolm Redmon, the
21 defendant's son; that Mr. Risley and even Vershawn Edwards had
22 said to the sentencing judge, "That's my family that's here,"
23 and they had been identified as being aligned with Vershawn
24 Edwards, and the concern is what's going to happen to them?
25 The marshals had Vershawn Edwards because he's in custody and

Mr. Stephens can't get to him.  And so as the family leaves the
courtroom, those three women leave the courtroom, Mr. Risley
positions himself between Stephens as the family moves out
those very doors.

And what does Mr. Stephens say to Mr. Risley at that
point?  "Get the fuck out of my way."  Brian Risley's going to
tell you he's continuing to process what's about to happen.  Do
I need to be concerned?  And he also continues to repeat the
phrase, "Snitches, snitches belong in ditches."

So Mr. Risley at this point kind of raises his arms
to physically hold Mr. Stephens back.  Mr. Stephens begins to
curse loudly, vulgarly beyond what he already had.  Accuses Mr.
Risley of pushing him.  And then some court security officers
who had been in the courtroom have moved now towards that
scene, and they confront Mr. Stephens and they tell him,
"You've got to go.  This is not going to be tolerated.  You
need to leave."

Mr. Stephens tells them, "I need to go to the
bathroom."  They take him to the bathroom before they escort
him out of the building.  And along the way he's still talking.
The court security officers who made that confrontation and who
had that encounter with Mr. Stephens are going to say that he
was saying things like, "I'm to going whip your ass."  He was
saying things like, to the court security officers, "I hope you
die.  I hope your whole family dies."  And that's the tenor of

1  the scene that's unfolding at the courthouse, in this building,

2  in this room, in a place where we do law and justice.

3          A few moments later -- a few minutes later Mr.

4  Risley has met with the family members, confirmed that they're

5  all right.  Met with his client briefly at the marshals to

6  confirm that he's going to be okay.  He doesn't know that Mr.

7  Stephens has been kicked out of the courthouse.  All he knows

8  is what happened in this room and in that hallway and that the

9  court security officers had escorted Mr. Stephens away; but

10  after that, he met with the family, met with his client,

11  Vershawn Edwards, and was now leaving the building, going out

12  to his car parked on the street.

13          And, lo and behold, there's Mr. Stephens, a surprise

14  encounter that Mr. Risley was in no way expecting.  Mr.

15  Stephens says, "You want to push me again?  Do you want to push

16  me again?"  Referring to what he had said here, and you'll hear

17  no other witness testify that there was any pushing by Mr.

18  Risley, but that's what was said.

19          Mr. Risley is trying to get away because he's going

20  to tell you what's going through his mind at that point is how

21  did this guy get out here?  What's he done since he left the

22  courthouse?  Did he go to his car?  Did he get a gun?  Did he

23  arm himself in some other way?  What is happening right now and

24  how much danger am I in?  And Mr. Stephens answers his question

25  in his mind and his fears with these words, "Snitches, you're a

motherfucking snitch.  Fuck you.  I will kill you.  I will kill
your wife.  I will kill your family."  Mr. Risley is terrified.
He has no idea how to respond to what's happening at this
point.  All he can think to do is get away from there as
quickly as possible, get in his car, and drive away.  There's
no response made by Mr. Risley.  He gets in his car and he
drives away.

Mr. Risley's going to tell you he got a short
distance away, a block or two.  He's processing what just
happened.  This never happened to him before, that none of us
as lawyers would ever expect to happen and to deal with in that
kind of context.

And he makes a phone call.  He calls the Assistant
United States Attorney who was handling those hearings in court
that day involving Malcolm Redmon and Vershawn Edwards.  And
because he's in the courtroom, he doesn't answer the phone.
But Mr. Risley leaves him a voicemail message and he tells him
what you're going to hear on that voicemail message, which has
been recorded.  It came in at 1:55 p.m. that afternoon.  The
sentencing hearing involving Vershawn Edwards, you will hear,
ended at 1:45.

So the court record, from the evidence you will
hear, has the sentencing hearing with Vershawn Edwards ending
at 1:45.  Everything that happened after that as they move out
of this courtroom, they go into the hallway, Mr. Risley goes

1    down to meet with the family, Mr. Risley goes and meets with
2    his client, and then he has the encounter with defendant
3    Stephens on the street is less than ten minutes.  No more than
4    ten minutes could possibly have elapsed because the phone call,
5    the voicemail message reporting to the other U.S. Attorney what
6    had transpired was received at 1:55.
7           When that prosecutor wasn't able to immediately
8    respond to that voicemail message, Mr. Risley sent a follow-up
9    email message that was sent at 3:37 that same afternoon.
10          And at that point Mr. Risley is still processing,
11   wondering what just happened?  What do I need to do to protect
12   my wife, my family, and myself from the threat that was just
13   made to me on the street by someone who's angry with the fact
14   that cooperators had testified and cooperated against his son
15   and he held them responsible for his son's situation and his
16   son's sentence?  What do I need to do to be safe again?
17          October the 12th of this year, some 13 days after
18   the events that I've just described had occurred, Mr. Stephens
19   was arrested on the charge that you are going to consider
20   during this trial.
21          When he was arrested, he was given his Miranda
22   rights.  He read them.  He understood them.  He agreed to waive
23   them.  He gave a statement to Special Agent Cody Abram with the
24   FBI and they, of course, wanted to talk with him about what
25   happened on September the 29th.

```
 1              You're going to hear portions of that statement
 2   because they were video recording it.  You're going to be able
 3   to judge what was going on in the context of that statement
 4   that Mr. Stephens made.  And you're going to hear him admit
 5   that he spoke the words of the threat to Mr. Risley, to his
 6   wife, and to his kids.
 7              And at the end of the trial, having heard the
 8   evidence, we're going to ask you to find Bruce Wayne Stephens
 9   guilty and hold him accountable for the conduct that he engaged
10   in on September the 29th of 2016.
11              Thank you, Your Honor.
12              THE COURT:  Mr. Brown, do you want to make an
13   opening statement at this time or reserve?
14              MR. BROWN:  I'll make an opening statement, but
15   before making it, can we approach?
16              (Counsel approached the bench and the following
17   proceedings were had:)
18              THE COURT:  Are you planning to follow up with an
19   ECF?
20              MR. BROWN:  I can but it may not be tonight.
21              THE COURT:  That's fine.  And your motion is
22   overruled.
23              MR. BROWN:  I understand.
24              (The proceedings returned to open court.)
25              MR. BROWN:  May it please the Court.
```

Case 2:16-cr-04068-RK   Document 90   Filed 07/12/17   Page 38 of 107

```
 1                    THE COURT:  You may proceed.

 2                    MR. BROWN:  Mr. Porter.

 3                    DEFENDANT'S OPENING STATEMENT

 4                    MR. BROWN:  Ladies and gentlemen of the jury, this

 5       case is about anxiety, anger, anguish.  Those are all the

 6       things Mr. Stephens experienced on September 29th here in this

 7       courtroom.  He was anxious because his son was being sentenced

 8       for a very serious drug felony that he pled guilty to.  He was

 9       so anxious and he wanted to support his son that even though he

10       has prostate problems and was suffering with bladder infection,

11       he wouldn't go see his doctor because he was afraid the doctor

12       would put him in the hospital and he couldn't be at his son's

13       sentencing.

14                    Mr. Redmon's sentencing that day was -- the times

15       were changed.  Originally it was scheduled for nine in the

16       morning.  Eventually started about two in the afternoon.  Mr.

17       Stephens' nephew, Malcolm [sic] Jordan was also getting

18       sentenced that day, same conspiracy.

19                    So Wendy Houston and Mr. Stephens drove down from

20       Columbia where he lives, came to the courthouse.  She had been

21       in contact with Malcolm's lawyer and knew that it had been set

22       off, but they wanted to see Marlon Jordan's sentencing, the

23       nephew, that was taking place at ten o'clock.  So they came

24       down in the morning.  They went to Marlon Jordan's sentencing.

25       They went out to lunch.  They came back about one o'clock and
```

39

1    congregated with other family and friends out in the hallway

2    because the doors to the courthouse -- the courtroom were

3    locked.

4         Mr. Stephens made some comments about snitches.  He

5    doesn't like them.  Eventually he comes in, sits down.

6    Vershawn -- the judge comes in.  Vershawn Edwards was sentenced

7    and the sentencing was over.  Vershawn Edwards' lawyer was

8    leaving this courtroom.  Mr. Stephens needs to go to the

9    bathroom, and he gets up to go to the bathroom.  For whatever

10   reason Mr. Risley blocks his way out of the courtroom, won't

11   let him through the doors so he can get to the bathroom.  He

12   has what the TV called -- or Mr. Stephens has what the TV calls

13   frequency and urgency problems.  But he did cuss him.  He did

14   tell him, "Get the fuck out of my way."  And I think he told

15   him, "I'm going to whip your ass."

16        Mr. Risley's probably half again as big as Mr.

17   Stephens.  Wouldn't let him out.  Eventually he pushes his way

18   through and he's -- in Mr. Stephens's words he's going to tell

19   you he pissed his pants.  Court security's there.  They hear

20   the loud discussion.  They let him go to the bathroom, clean

21   himself up, escort him out, tell him, "Don't come back.  If you

22   do, you're going to get charged with trespassing."

23        At that point he's angry.  He didn't think he did

24   anything wrong.  Mr. Risley was the one who did something wrong

25   and he's getting thrown out of the courthouse and he's not

40

going to see his son's sentencing.  His son isn't going to come
into this courtroom and look out and see his dad.  He's going
to look out and see his mom, his baby, his baby's momma, his
grandma, but it's going to be, Where's dad?  That's when
anguish begins.

He's been thrown out of the courthouse.  He's out
front on the sidewalk.  Mr. Risley walks out to go get to his
car and they have another chance encounter.  Mr. Stephens is
angry and he does start off that confrontation yelling at Mr.
Risley out on the street, "You want to push me again?  You want
to push me again?"  Because he pushed him and wouldn't let him
go through that door so he could go to the bathroom.  And he
says some ugly things to Mr. Risley.  He curses him.  He tells
him, "I hope when you get home, you find your family dead."
But he never threatens him.  He said ugly things but never a
threat.

Mr. Risley gets in his car, drives away.  Mr.
Stephens on the sidewalk waits another three hours or so while
his son's getting sentenced.  He and Wendy Houston drive back
to Columbia.

You're going to have to determine whether or not Mr.
Stephens threatened Mr. Risley, but you're also going to have
to determine why Mr. Stephens threatened him or said ugly words
to him.  Was it because he represented a cooperating
codefendant?  Was it because they got in a shoving match right

1  in this courtroom, right in that doorway and got Mr. Stephens

2  kicked out and he didn't see his son's sentencing?

3         Now, during the course of this trial, I expect you

4  may see a gangsta rap video that Mr. Stephens' son, Malcolm

5  Redmon, performs and produced.  If you do, you're going to see

6  his dad in that video sitting on a car.  But Malcolm Redmon is

7  going to tell you the day they shot that video they had to get

8  his dad out of bed, dress him and basically prop him up against

9  that car.

10         If you see that video, the government's going to

11  give you -- or at least provide to you a supposed transcript of

12  lyrics of that video.  Well, they used that transcript in

13  Malcolm Redmon's sentencing hearing and he'll tell you, They're

14  all wrong.  And he'll be happy to explain to you what the

15  lyrics are and what that song means.  You'll learn that that

16  song is about growing up in Columbia from a boy to a man.

17         You may also hear a telephone conversation between

18  Mr. Stephens and his son, Malcolm Redmon, after Mr. Redmon was

19  back in jail at the Phelps County sheriff's department.  Mr.

20  Redmon will tell you he believed that there was an altercation

21  in the courtroom.  Based on what the prosecutor told the judge

22  at his sentencing, he thought Mr. Stephens had followed

23  Vershawn Edwards out of the courtroom and threatened him.

24         He'll explain the context of that call, and the call

25  was about how he was disappointed with his dad, how his dad

42

```
1    screwed things up, didn't support him, got thrown out of the
2    courtroom, but he'll also tell you it was about what happened
3    in the courtroom.  He didn't know anything about what happened
4    on the street.
5            And the last thing you're going to have to determine
6    is whether or not Mr. Risley is a party in a particular
7    lawsuit.  I'm going to show you that there wasn't any threats
8    by Mr. Stephens to Mr. Risley out on the street.  I'm going to
9    show you that the ugly things that were said out on the street
10   was because of the physical altercation that they had in this
11   courtroom, not because Mr. Risley represented a cooperating
12   codefendant against Mr. Stephens' son.
13           I'm going to show you that Mr. Risley wasn't a
14   party, and at the appropriate time I'm going to ask you to
15   return verdicts of not guilty.
16           Thank you.
17           THE COURT:  Mr. Porter, are you ready to call your
18   first witness?
19           MR. PORTER:  We are, Your Honor.
20           THE COURT:  You may proceed.
21                    GOVERNMENT'S EVIDENCE
22           MR. PORTER:  If the Court please, we call Brian
23   Risley.
24           Before we get started, could we approach for just a
25   moment.
```

```
 1              (Counsel approached the bench and the following

 2    proceedings were had:)

 3              MR. PORTER:  Judge, I just wanted to alert out to

 4    the fact that we have not used this electronic equipment before

 5    and there might be a hiccup or two along the way.  If we're

 6    having problems, we'll let you know.

 7              MR. BROWN:  That's fine.  I haven't either and I'm

 8    going to stick with the Elmo I think.

 9              THE COURT:  We'll all help each other.  Thank you.

10              (The proceedings returned to open court.)

11    BRIAN DAVID RISLEY, being sworn by the courtroom deputy,

12    testified:

13              (Counsel approached the bench and the following

14    proceedings were had:)

15              MR. BROWN:  My client needs to go to the bathroom.

16              MR. PORTER:  That's fine.  It would be better to

17    break now.

18              THE COURT:  It's three o'clock.  How long of a break

19    are you requesting?

20              MR. BROWN:  I don't know.

21              THE COURT:  Fifteen minutes?

22              MR. BROWN:  Fifteen minutes.

23              THE COURT:  Let's take a 15-minute break.  Let

24    everybody catch their breath.

25              (The proceedings returned to open court.)
```

```
 1              THE COURT:  Ladies and gentlemen, it's now three
 2   o'clock.  We typically take an afternoon break at three
 3   o'clock.  So let's break right now for 15 minutes until 3 -- be
 4   back at 3:20.
 5              And, Ms. Wheeler, will you show the jury back to the
 6   jury room?
 7              THE COURTROOM DEPUTY:  Yes.
 8              (Recess was taken at 3:05 p.m.)
 9              (The following proceedings were had in the courtroom
10   out of the presence of the jury:)
11              THE COURT:  Please be seated.  Are we ready to bring
12   the jury back?
13              MR. PORTER:  From the government, yes, Your Honor.
14              THE COURT:  You can go ahead and have your witness
15   take the stand.
16              Go ahead and have a seat and you're still under
17   oath.
18              THE WITNESS:  Sure.
19              (The following proceedings were had in the presence
20   of the jury:)
21              THE COURT:  Please be seated.
22              Mr. Porter, you may proceed.
23              MR. PORTER:  Thank you, Your Honor.
24   BRIAN DAVID RISLEY resumed the stand and testified:
25   DIRECT EXAMINATION BY MR. PORTER:
```

1    Q        Good afternoon, sir.

2    A        Good afternoon.

3    Q        If you could begin by telling the jury your name, your

4    full name, and if you would be so kind to spell your first and

5    last names for the benefit of our court reporter.

6    A        Yes.  My name is Brian David Risley, B-r-i-a-n,

7    R-i-s-l-e-y.

8    Q        Are you employed, sir?

9    A        I'm self-employed.  I'm a practicing attorney.  I've

10   been practicing about 16 years.

11   Q        The practice that you engage in as an attorney, can you

12   give us a general description of what that practice includes?

13   A        Yes.  For the last eight years I've been a solo

14   practicing attorney, and about half of my practice or a little

15   more entails family law or domestic practice.  The other big

16   portion of it is criminal defense, typically federal cases and

17   private hires and some appointed, most appointed actually.

18   Q        Mr. Risley, I want to direct your attention to a

19   specific federal criminal case, the one that was known as

20   United States v. Malcolm Redmon and others.  The case number

21   was 14-4065-01.

22             MR. BROWN:  Your Honor, may we approach?

23             (Counsel approached the bench and the following

24   proceedings were had:)

25             MR. BROWN:  It's USA v. Scott, et al., not Redmon,

```
 1    et al., and I object to the question as being misleading to the
 2    jury.
 3                MR. PORTER:  There are 27 total defendants.  I'm
 4    going to talk about not all of them by name, Your Honor.  I'll
 5    proceed in whatever fashion you wish me to proceed.
 6                MR. BROWN:  It's not Redmon, et al.  It's Scott, et
 7    al.
 8                THE COURT:  He said Redmon and others, I believe.
 9                MR. PORTER:  I did.
10                THE COURT:  If you could clarify that.
11                MR. PORTER:  Would be happy to, Your Honor.
12                (The proceedings returned to open court.)
13    Q     (By Mr. Porter)  Again, Mr. Risley, I want to direct
14    your attention to a specific federal criminal case that had
15    multiple defendants, one of whom was Malcolm Redmon.  There
16    were 27 total defendants.  Do you recall the particular case
17    I'm referring to?
18    A     Yes, I do.
19    Q     Of those 27 defendants they are commonly given a
20    listing in the caption of the case.  You're familiar with how
21    that case caption works?
22    A     I am.
23    Q     And of those 27 defendants, they're each assigned a
24    number so that the Court can keep track of what's going on with
25    respect to each individually named defendant?
```

1    A       Yes.

2    Q       What defendant number was the client that you

3    represented, Vershawn Edwards?

4    A       He was No. 23.

5    Q       What defendant number was Malcolm Redmon?

6    A       My best recollection was he was No. 2.

7    Q       Now, in addition to there being that numbering system

8    in order to keep track of them individually, is there any

9    significance typically in the way in which those numbered

10   defendants appeared, in your experience?

11   A       In my experience and in the case over the last ten

12   years, typically the numbers 1, 2, 3 entail people that are

13   more involved in the case, and lower numbered -- the higher the

14   number, lower down in the order, such as No. 23 are people that

15   have less involvement in the case but still to some extent are

16   involved.

17   Q       So there were 27 total defendants, and your client,

18   Vershawn Edwards, was defendant No. 23?

19   A       Yes.  I took it that he was near the bottom of the

20   order of participation.

21   Q       And Malcolm Redmon was defendant No. 2 towards the top

22   indicating what in terms of the significance you've just

23   described?

24   A       He was heavily involved in the case that was charged by

25   the government in that case.

1  Q      So the jury can have an understanding of what this

2  27-defendant case was all about, can you tell us generally what

3  types of charges were filed in that case?

4  A      There were numerous charges but they typically involved

5  a drug conspiracy.  That was Count 1 and I believe involved all

6  27 defendants.  It was primarily crack cocaine.  There may have

7  been some cocaine also.  But there were numerous other charges.

8  I believe my client had some charges of distribution related to

9  one incident, and then others had other charges, but they were

10  all related to drugs.

11  Q      You mentioned the word "conspiracy."  Without giving us

12  a total treatise on criminal law and conspiracy, criminal

13  conspiracy generally means what?

14  A      Typically when it's charged by the government, it means

15  that one or more persons is involved in some type of crime and

16  acts in concert together, typically over a period of time

17  rather than just on one day at one time.  I believe this

18  conspiracy lasted if not a year, over a year, and involved many

19  different parts and people.  And sometimes, like, for example,

20  my client, Mr. Edwards, was not heavily involved.  He wasn't

21  mentioned very much.  I believe Mr. Redmon was mentioned quite

22  more than he was, and that's probably based on their number of

23  involvement.

24  Q      Was your client charged as being a member of that

25  conspiracy to distribute cocaine and crack cocaine?

1    A        Yes, he was.  In fact, I believe every one of the 27

2    defendants were charged in the conspiracy.

3    Q        So that would have included Mr. Redmon as well?

4    A        That's correct, yes.

5    Q        Now, during the course of representing Vershawn

6    Edwards, were you provided access to the investigative reports

7    and other evidence that would have supported the charges

8    against him?

9    A        Yes.  There being that many people and the length of

10   time, there were quite a few pages of reports in addition to --

11   I think there were wiretaps or phone recordings that had been

12   kept by people.  There was reports on actual surveillance by

13   law enforcement of certain events.  Specifically I recall that

14   because my client was involved in a surveillance, I believe on

15   July 14th, 2014.  I can remember that because his involvement

16   was pretty limited but that day was key in his case, and it

17   also involved Mr. Redmon.

18   Q        Were there controlled buys that took place between law

19   enforcement and some of the defendants that were charged?

20   A        I believe there were some controlled buys and there

21   were also times -- in fact, I guess that would have been a

22   controlled buy the incident I recall involving Mr. Edwards and

23   Mr. Redmon and a couple of other individuals.

24   Q        Having completed your review of the evidence that

25   pertained to the role that Vershawn Edwards had played or was

1  alleged to have played in the conspiracy, did you reach a
2  conclusion as to what the evidence showed his role was in the
3  conspiracy?
4  A      In my review of the evidence was that he had a very
5  limited role but he had enough, and the other issue involving a
6  conspiracy charge is that the evidence comes in and there's
7  typically a concern on going to trial given the evidence
8  reviewed on the chance of taking your chances at trial,
9  especially in his case specifically.
10  Q      After you had an opportunity to confer with him,
11  discuss the evidence and give him your professional advice, did
12  Mr. Edwards decide how he wanted to proceed in trying to
13  resolve the case against him?
14  A      Yes, he did.
15  Q      And what was his decision?
16  A      His decision was to essentially plead guilty and also
17  cooperate.  Typically when I have clients, they have many
18  things but at the end of the day they can go to trial, they can
19  plead guilty without cooperating, or they can plead guilty and
20  cooperate.  The best chance to essentially help himself was to
21  plead guilty and cooperate, and in this case that is what
22  happened.
23  Q      As lawyers who practice in criminal law, when you
24  say -- when we say that someone is going to plead guilty and
25  cooperate, that has meaning to us.  But help the jury

1  understand what that phrase means "to cooperate"?

2  A    In a typical case what is required for cooperation is

3  talking to my client, explaining to him that the government who

4  has charged the case would like them to cooperate or

5  essentially provide information on what they know about their

6  involvement and the involvement with other people.  Sometimes

7  to gain new information, sometimes to just simply corroborate

8  what they already think they know, and to use that information

9  or turn it over and let them know that a person who cooperates

10  may appear at trial and testify, kind of like I'm doing here

11  today.

12  Q    You had that conversation, then, with Mr. Edwards and

13  he continued in his decision to cooperate going forward from

14  that point; is that correct?

15  A    That is correct.  And without getting into our

16  discussion attorney-client, ultimately he entered a plea and he

17  did cooperate.

18  Q    Are you familiar in your practice over the years, Mr.

19  Risley, with the phrase, "If nobody talks, everybody walks"?

20  A    I have heard that, yes.  I think I know what it means.

21  Q    And are you also familiar with the phrase -- from your

22  practice with the phrase, "Snitches belong in ditches"?

23  A    Yes, I am.

24  Q    Tell us, starting with the first one, what those

25  phrases mean.  What does, "If nobody talks, everybody walks"

1  mean?

2  A       That's a common idea or theme of people that typically

3  are charged in a case together that if you -- and they probably

4  discussed it beforehand that they realize if they're engaging

5  in something that may be unlawful and they get caught and if

6  nobody talks, then the government will have a difficult, if not

7  impossible, time proving the case against them all.  So they

8  may not ultimately be convicted or found guilty.  So it's kind

9  of a common agreement to keep quiet if you get caught.

10  Q       And the second phrase, "Snitches belong in ditches,"

11  what's your understanding of what that phrase means in the

12  world of criminal conduct?

13  A       Typically means that -- you obviously decide whether to

14  talk or not to talk.  If you do talk, then you're labeled a

15  snitch, and typically other people in the conspiracy or the

16  common group do not like that and tell people don't be a

17  snitch.  You might be in a ditch.  Meaning that you run the

18  risk of being harmed if you start talking, especially against

19  them.

20  Q       So you had some conversations with Mr. Edwards about

21  the implications of his decision to cooperate?

22  A       I did.

23  Q       Including discussion about those kinds of potential

24  consequences?

25  A       Yes, we did.

53

1    Q      And after having had that discussion with him,
2    understanding that he was kind of breaking the rule about not
3    talking, was he still willing to go forward?
4    A      He did, again, ultimately enter a plea and provided
5    cooperation.
6    Q      To your knowledge, based on your familiarity with the
7    entire criminal case and all of the defendants in it, that
8    included your client, Vershawn Edwards, did Malcolm Redmon
9    cooperate with the government?
10   A      I don't believe so.  I wasn't ever made aware of that;
11   and given what I know of the case, no, I don't think he did.
12   Q      And did your client, Vershawn Edwards, provide
13   information about Malcolm Redmon?
14   A      Yes, he did.
15   Q      In your experience, Mr. Risley, what risks does a
16   client like yours, Mr. Edwards, take when they make a decision
17   to cooperate?
18   A      In general, clients who do cooperate often express
19   concern to me about what may happen to them if it's found out
20   that they cooperated.  They want to know when the reports are
21   going to be turned over to the other defendants or to the
22   people they cooperated against.  They want to know what's going
23   to be reviewed if they ultimately are given a sentence and have
24   to go to the Bureau of Prisons.  They hear lots of things if
25   they happen to be incarcerated at the time and want me to

54

1    confirm that, and they express, frankly, a level of concern

2    about cooperating, and I have to explain to them the pros and

3    cons of cooperating and hoping for a lesser sentence or

4    probation or taking your chances and receiving a higher

5    sentence, and they have to ultimately decide what they want to

6    do.

7    Q      And those risks of retaliation that could potentially

8    come to a cooperator, are those risks that are only ones that

9    are exposed to the individual who's doing the cooperation or

10   does it go beyond that?

11   A      They have concerns about family members and just, yeah,

12   other -- I mean, they express that.  So it does extend beyond

13   the actual person.

14   Q      Were there concerns on the part of Vershawn Edwards

15   about those risks and his exposure to them in his case?

16   A      Yes, there were.

17   Q      And who was the only person that Vershawn Edwards

18   cooperated against?

19   A      Malcolm Redmon was the only person he provided

20   information about.  That is all he knew of the 27 defendants.

21   Q      I want us to turn now, if you would, sir, to the events

22   of September 29th, this year, when Malcolm Redmon and Vershawn

23   Edwards were both scheduled to be sentenced on that same day.

24   Are you familiar with that day, sir?

25   A      Yes, I am.

1    Q      What was your initial reaction when you found out that

2    the sentencing hearings for your client, Vershawn Edwards, and

3    Malcolm Redmon were going to be held on the same day?

4    A      Well, initially I found out about it three weeks prior

5    and I didn't have that much concern given that Mr. Redmon was

6    initially set for about nine o'clock in the morning, nine or

7    ten, and my client was scheduled for 4:30.  So I just knew the

8    way the system worked that typically people were here in the

9    morning and in the afternoon; and given the time gap, I didn't

10   have really much concern at all.

11           About a week prior to the sentencing date there was

12   a revised schedule, and I noticed that some of the people had

13   to be moved such that we were ending at two o'clock, and my

14   client's was moved from 4:30 to 1:30 and Mr. Redmon's was to

15   begin at two o'clock.  So I realized they were back to back,

16   and I pretty quickly emailed the U.S. Attorney assigned to the

17   case and expressed concern, because throughout the entire case

18   both Mr. Redmon and my client frankly had been in custody and

19   there was an effort made to keep them in different facilities,

20   and I realized that they would essentially be here at the same

21   time, so I expressed that concern to the U.S. Attorney.

22   Q      So what other concerns just generally or specifically

23   did you have and what precautions did you think should have

24   been taken at that point?

25   A      At that time the U.S. Attorney got back with me and had

1    informed the marshals who are in charge of both of them at the

2    time that there would be arrangements made such that they

3    wouldn't be in the same place.  So I really thought, okay, I

4    guess that takes care of it and they know what they're doing.

5    When I got here on that date, some other issues arose.

6    Q      Well, that's probably a good time for us to talk about

7    what happened then, Mr. Risley, on September the 29th.  If you

8    would, sir, tell us about what time on September the 29th that

9    you arrived at the federal courthouse?

10   A      I got here roughly 12:40 or so.  I live in Springfield,

11   Missouri, so I have to drive up.  I had actually stopped at the

12   lake on the way and got a little bit to eat and got here about

13   12:40.  I knew my client would be here, and he was placed such

14   that I typically met with him here because to drive and visit

15   where he was at was another two or three hours.  So I had

16   planned to be here early to meet with him to go over some

17   things.  I had had several phone conferences with him prior to

18   that so we pretty well had everything lined out, but I just

19   wanted to visit with him for a few minutes and planned to come

20   up here.  The sentencing was actually in this courtroom.  So I

21   came up here about one o'clock.

22   Q      So having arrived around 12:40 or 12:45, about how many

23   minutes did you spend visiting with your client here at the

24   marshals on the second floor of the courthouse?

25   A      I met with him for about ten to 15 minutes such that I

57

1    recall right about one o'clock I said, Okay, I'll see you

     2    upstairs in a little bit.  I knew also that he had some family

     3    members coming and I needed to track them down, and I

     4    originally told them to meet with me up here on the fourth

     5    floor about one o'clock or so.  So I proceeded up here.

     6    Q       So trying to keep our timeline going for the benefit of

     7    the jury, it's about one o'clock and you are on the fourth

     8    floor of this courthouse just outside this courtroom?

     9    A       That is correct.

    10    Q       What did you encounter as you came to the doors of this

    11    courtroom?

    12    A       I exited the elevators, which are right over here, and

    13    I came down this hallway and there was some individuals sitting

    14    on some benches right outside the doorway.  The courtroom was

    15    actually locked at the time.  And looking at the individuals --

    16    it had been approximately a year since I had met with my

    17    client's family and I actually never met two of the people, and

    18    I wasn't certain that this was the family.  If I had to guess,

    19    it was either my client's family or Mr. Redmon's family.  There

    20    were three or four individuals standing out there.

    21            After a couple seconds, one of them asked me who I

    22    represented.  I informed them that I represented Vershawn

    23    Edwards and gathered quite quickly that this was not my

    24    client's family just given the expression of their face.  I

    25    then heard an individual kind of grunt and say something about

                                        58

| 1 | snitches and snitches belong in ditches.  And I heard him say
| 2 | it two or three times.  That's when I definitely knew that it
| 3 | wasn't my client's family.
| 4 | Q       Is the individual that repeated that phrase multiple
| 5 | times, "Snitches belong in ditches," is that person present in
| 6 | the courtroom today?
| 7 | A       Yes, he is.
| 8 | Q       Can you identify him by describing where he's seated
| 9 | and what he's wearing?
| 10 | A       Yes.  He's seated at the defense counsel next to his
| 11 | attorney.  He's got a white shirt on.
| 12 | MR. PORTER:  Your Honor, may the record reflect an
| 13 | identification of the defendant?
| 14 | THE COURT:  The record will so reflect.
| 15 | Q       (By Mr. Porter)  Now, as best you can, Mr. Risley, help
| 16 | the jury to understand the tenor of those remarks and how they
| 17 | were being expressed to you and how you were interpreting them
| 18 | at that time?
| 19 | A       When I heard them, I also took them to be pretty
| 20 | contemptible that he was not pleased with Mr. Edwards, my
| 21 | client.  He knew since I had told him who I represented that he
| 22 | knew I represented him.  And while I hadn't had discussion --
| 23 | in fact, I had never met Mr. Stephens or never seen him before
| 24 | until that moment.  I gathered that he suspected or knew my
| 25 | client was a cooperator against, I assumed his family member

Case 2:16-cr-04068-RK   Document 90   Filed 07/12/17   Page 59 of 107

1    and he wasn't happy about it.  Based on that I just simply

2    walked back down the hallway and didn't say anything else.  I

3    probably was smiling as I walked away, although he didn't see

4    it, because I realized we were going to have something

5    interesting probably happen.

6    Q      What level of concern did you have at that point?  What

7    level of analysis were you going through in your mind as to how

8    the rest of the day might unfold?

9    A      Well, the smile was just based on that it wasn't going

10   to be easy in and out.  I kind of knew where my client's

11   position was on the case and I didn't think it would take very

12   long, and I was, frankly, getting back on the road within an

13   hour or so, and I just realized at that moment I needed to find

14   my client's family who I assumed were still -- hadn't gotten

15   here yet or were on the first floor, and I needed to keep them

16   away from Mr. Redmon's family.  There was no sense in having

17   words exchanged or any issues like that.

18   Q      So you took the elevator back down to the first floor

19   at that point?

20   A      I did.

21   Q      And were you able to find Vershawn Edwards' family

22   members at that point?

23   A      I did eventually.  Actually I had seen Mr. Oliver.

24   When I left the marshal's office, I saw him on the second

25   floor, then I came up here.  I believe I may have actually went

1    down to the second floor and looked for him again.  I didn't

2    see him so I took the stairs down to the first floor and I

3    called his office to let him know we may have an issue.  I then

4    saw my clients coming through court security.

5              I also, having not dealt with exactly the same issue

6    but similar issues, I saw court security.  I talked to them a

7    couple times, and I let them know that we may have some issues

8    with family members on the fourth floor, and that's all I said

9    to him and I talked to Mr. Edwards' family.

10   Q     So the court security officers that you're referring to

11   now were the ones on the first floor of the courthouse at the

12   entrance of the courthouse itself?

13   A     Yes.  I'm just aware the court security handles people

14   that are checked in.  They also -- I'm sure there's one

15   somewhere in here.  They often sit in the courtroom, and I knew

16   that if I let them know there may be an issue, they might bring

17   an extra one up for the hearing I expected to start about 1:30.

18   Q     And you were able to find Mr. Edwards', your client's,

19   family members at that point?

20   A     I was, yes.  His mother and his fiancee and his fiancee

21   's mother were coming.  I knew that.  I found them and I had a

22   little discussion with them on the first floor just about, Hey,

23   there's some family here.  They were aware that Vershawn had

24   cooperated against Mr. Redmon.  Whether or not they knew Mr.

25   Redmon or his family, I had no idea, but I just told them that

61

1  they were up there.  They didn't seem happy and we just needed
2  to ignore them or stay away from them to avoid having any type
3  of conflict.
4  Q      Did you travel with them, then, from the first floor
5  back up to the fourth floor and this courtroom?
6  A      I did.  It was about 1:15 or so at that point, and I
7  knew I needed to be upstairs.  So I took the fourth floor up.
8  From this hallway out here you can kind of stand over there by
9  the other courtroom where you can come around to these benches.
10  I just -- we just waited over there.
11           I walked a little bit and actually saw Mr. Oliver
12  and Mr. Redmon's attorney, and I made some statement to them
13  about, you know, what had happened earlier.  We discussed that
14  for a few minutes.  And then we were kind of standing by the
15  elevators and my client's family was on the other side of the
16  elevators, and we just sort of stood there for about ten
17  minutes or so.
18  Q      Now, you mentioned Mr. Oliver.  Let's tell the ladies
19  and gentlemen of the jury who Mr. Oliver is.
20  A      Mr. Oliver is the U.S. Attorney.  He was not the U.S.
21  Attorney the entire time of the case, but he had taken over for
22  Mr. Gonzalez, and I had been in discussions with him.  He was
23  the one I emailed about a week prior, and he was the -- he was
24  representing the government on behalf of Mr. Edwards at my
25  sentencing so he was involved in the case.

62

1    Q    About what time were you able to then come actually

2    into this courtroom for the purposes of getting ready for Mr.

3    Edwards' sentencing hearing?

4    A    I actually remember I waited until 1:25 and I knew I

5    needed to be in the courtroom in case the judge was looking for

6    me.  Sometimes they're a little late.  Sometimes they're a

7    little early.  They expect me to be in the courtroom.  I had

8    traveled -- my client or my client's family members were behind

9    me and I told them I would walk in.  I had noticed that the

10   individuals I'd spoken to out here were already in the

11   courtroom because they had just opened the courtroom.  So I

12   walked in.

13            I was actually at that door and I observed Mr.

14   Stephens sitting at that small bench in the front row and then

15   the other family members in the other front row; and after just

16   kind of reviewing everything, I told my client to sit in the

17   back row closest to the door, and I would let them know -- I

18   would let the Court know they were there.

19            One of the things I do at sentencing is let the

20   Court know when I have family members there for my client.  I

21   typically think it helps.  So I told them to sit there, and

22   then I came and sat at the defense counsel table.  My client

23   was not here yet.  In fact, Mr. Oliver was not in the courtroom

24   and the judge was not on the bench.  There were some of the

25   probation officers, I think, and some of the court security but

1   those were the people in the courtroom at the time.

2   Q       So just to help, again, get us oriented in terms of how

3   the scene was set.  The individuals that you had the encounter

4   with when you first came up to the entrance of this courtroom

5   around one o'clock were now inside this courtroom?

6   A       That's correct.

7   Q       And Mr. Stephens, the individual who had made the

8   statement to you, "Snitches, snitches belong in ditches," was

9   seated in what you've indicated is -- describe it from an

10  orientation standpoint how best you can, Mr. Risley, so when

11  somebody reads this in the written record, they'll be able to

12  have a clear understanding of it.

13  A       Well, from my looking at the standpoint from this

14  angle, there's seating in the gallery on the left side and on

15  the right side as I look directly at the clock.  On the left

16  side is in fact the only short bench, I'll call it, in the

17  front and Mr. Stephens was actually sitting in the middle, and

18  I recall specifically he had his arms draped like that was his

19  bench.

20          On the right side in front were the other two or

21  three family members, I assume, of Mr. Redmon.  They were just

22  sitting there.  So I had to choose where to tell my clients to

23  sit.  So I had them sit on the right side, on the right half.

24  Frankly, it's as close to the door as you can get in the back

25  row.

1    Q      So Mr. Edwards' sentencing has not yet begun.  Are you

2    able to hear statements that are made inside the courtroom at

3    that point?

4    A      Yes.  I came -- as soon as they sat down, I came and

5    sat my stuff down.  In fact, I don't think I sat down.  I

6    recall I was a little edgy, I guess you'd say, and I was just

7    standing there kind of looking around to see who was there and

8    I noticed -- I turned and looked at Mr. Stephens and I noticed

9    him sitting like this leaned back looking at the family members

10   of my client and, again, repeating, "Snitches, snitches belong

11   in ditches," and I frankly was shocked that it was going on in

12   the courtroom.

13   Q      So you're overhearing this.  Did it appear to you that

14   those comments were now being directed toward you?

15   A      No.  I felt those comments at that time were directed

16   to my client's family sitting in the back row.  I mean, the

17   only two options were them or the people he was with, and I was

18   pretty sure he wasn't talking to them.

19           MR. PORTER:  Your Honor, if we could have displayed

20   only to the witness and counsel table what's been marked for

21   identification as Government's Exhibit 17 so it's not yet

22   visible to the jury since it hasn't yet been admitted.

23   Q      (By Mr. Porter)  Do you see what's marked for

24   identification as Government's Exhibit 17, Mr. Risley?

25   A      Yes, I do.

65

1    Q        Do you recognize it?

2    A        Yes.  It's -- I forget the exact name but basically

3    it's a docket sheet or summary of the sentencing hearing of my

4    client, Vershawn Edwards, on September 29th.  It's got the case

5    number and it's basically, like I said, a summary of what

6    happened.

7                MR. PORTER:  Your Honor, we offer Exhibit 17.

8                MR. BROWN:  No objection.

9                THE COURT:  Yes.

10               MR. PORTER:  Exhibit 17 admitted, Your Honor?

11               THE COURT:  Did you ask for admittance?

12               MR. PORTER:  I offered 17 and Jim said he had no

13   objection.

14               THE COURT:  Admitted.

15               MR. PORTER:  Now, the jury can see Exhibit 17

16   alongside with us.

17   Q        (By Mr. Porter)  Now, Mr. Risley, if you could, I want

18   us to just focus on the top portion of Exhibit 17 below --

19   excuse me -- above the dotted line.

20   A        Yes.

21   Q        And I'm going to blow that up so it's a little easier

22   for everyone to read.  The time stamp that's on there is a

23   record that's kept by the court staff as to the time the

24   hearing began and ended, correct?

25   A        Yes, it is.

66

1    Q      So the total length of this sentencing hearing,

2    according to the court record, is 15 minutes?

3    A      That's correct.

4    Q      The comments that you heard the defendant make in this

5    courtroom were immediately prior to the start of the hearing at

6    1:30?

7    A      Yes.  I would say they were about two to three minutes

8    prior because I walked in, was standing there, heard them, and

9    frankly was shocked, and then immediately my client came

10   through over here with the marshals, and I had to talk to him

11   just to kind of orient him to what we were doing.  So I talked

12   to him for maybe a minute, and then all of a sudden Mr. Oliver

13   appeared and the judge appeared and we started almost

14   immediately.  It was right at 1:30.

15   Q      Now, during the sentencing hearing itself, the lawyers

16   have an opportunity to speak and address the issue of

17   sentencing, correct?

18   A      Yes, we do.

19   Q      And the defendant who's being sentenced also has the

20   opportunity to speak and address the Court prior to being

21   sentenced, correct?

22   A      Yes.

23   Q      So during the sentencing hearing of roughly 15 minutes,

24   you had some remarks you directed towards the sentencing judge,

25   yes?

1    A      I did.

2    Q      Did your client also choose to speak?

3    A      Yes, he did.

4    Q      During the time that you were speaking to the

5    sentencing judge, did you identify the family members that were

6    present in the courtroom supporting Mr. Edwards?

7    A      Yes, I did.

8    Q      Did you tell them who those persons were in

9    relationship to Mr. Edwards?

10   A      Yes.  I believe I mentioned them by who they were and

11   also their first name.  I don't think I used their last name.

12   Q      During the time that Mr. Edwards spoke to the Court

13   prior to being sentenced himself, did he make reference to the

14   people who were here from his family to support him?

15   A      Yes.  I know he said his family was here.  I don't

16   remember how he identified them but he did.

17   Q      And were the place that they were located in the

18   courtroom pointed out to the judge?

19   A      Yes, it was.

20   Q      So the seating situation that you've described earlier

21   with those three ladies being in this back left-hand corner of

22   the courtroom -- or excuse me -- right-hand corner of the

23   courtroom as you face it, they were identified as being in that

24   portion of the courtroom?

25   A      Yes, they were.

68

Q      The sentencing hearing ended at 1:45 as indicated on
the court record.  And what is happening at that point as you
observe the end of the hearing?

A      My client was being walked out.  He had actually been
granted in this case probation, and so that was important
because he was being taken downstairs and he was going to have
to go back to where he was being held but he was going to be
released.  So the family members would have to go out and pick
him up.  So I was telling him to go downstairs and I would have
to find out exactly when and where he was going and let the
family members know.  And so he's walking out.  I had my stuff
ready and I'm starting out the door.  I see the three ladies
start to head for the door, and then I see Mr. Stephens get up
and start walking toward them.

Q      What was processing in your mind at that point when you
were making that observation?

A      When I saw him get up, in my head I thought he was
going out to continue to talk to them or say, "Snitches belong
in ditches," and get some words in to them.  I did not want
that to happen.  So I -- we met about where the entrance was or
he may have been slightly ahead of me.  I walked around him.
By that time they were out to the second door.  I got to that
door that was just being shut and he's behind me and I stopped.
I stopped because I frankly wanted them to get on down and get
in the elevator, and then I would go talk to them and there

1    wouldn't be any issue with the confrontation.

2    Q        Did it end up without a confrontation?

3    A        No, there was a confrontation.  When I stopped, I

4    stopped for -- it was going on two or three seconds.  I was

5    kind of hoping somebody else would move, but he got right

6    behind me and he muttered, "Get out of my way."  I really don't

7    know why but I said, "I'm good for a minute."  I mean, I know I

8    was wanting to stop him.  And, again, in my mind just keep them

9    separated.  I could see out that door and I could see the

10   ladies and I could see them stopped looking at me and they

11   weren't moving.  So I realized I was going to have to continue

12   on out, so I did.

13            Again, he's still behind me.  And I know I'm pretty

14   big so I didn't want him to get ahead of me.  I got to the

15   second door and opened it.  I was going like this, "Please go

16   to the elevator."  So he's still behind me and he's trying to

17   get around me; and, again, in my mind he's trying to get around

18   me to go talk to them.

19            They finally start moving.  There were a couple

20   other people coming in.  I could feel him going around me and I

21   put my arm out, and at that point he said, "Motherfucker, you

22   pushed me."  At that time I also saw two court security come

23   out, and I could hear them start to have a discussion, and I

24   remember him saying he was just going to the bathroom.  I

25   looked at the court security.  They were talking to him.  They

70

1    didn't do anything to me.  And so by that time the family

 2    members were to the elevator, and I went and joined them

 3    because I just wanted to separate -- keep them separated.

 4    Q        So at that point you have managed to keep Mr. Stephens

 5    separated from those three ladies?

 6    A        Yes.

 7    Q        You've rejoined the three ladies at the elevator?

 8    A        That's correct.

 9    Q        And you've observed Mr. Stephens being detained by the

10    court security officers?

11    A        At that time I didn't know whether he was detained or

12    not.  I know they were talking to him.  I knew that they would

13    take -- if there was an issue, they would take care of it.

14    They weren't talking to me so I thought it best to get off the

15    floor and he would be up here and we'd be down there.

16    Q        So from your perspective and what was processing in

17    your mind at that point was situation over?

18    A        Yes.

19    Q        Did you physically push Mr. Stephens in some kind of

20    way at that point in time as you were all coming out of the

21    courtroom?

22    A        No, I didn't.  I did raise my arm to essentially keep

23    him from going around me.  I felt him kind of brush up on it,

24    not very hard at all.  I think I kind of felt him stumble

25    slightly.  He did not fall down but he kind of stumbled.

1  That's about the time the court security was out there.  I

2  heard him say, "He pushed me," and then I again heard him after

3  that say he was just going to the bathroom.  He wasn't doing

4  anything.

5  Q      And when he was telling you to get out of his way, was

6  he doing that in any kind of vulgar way?

7  A      Yeah.  He said, "Get the fuck out of my way."  He did

8  not have a pleasant tone.

9  Q      And when he was expressing that vulgar statement to

10  you, was he saying anything to you about why he wanted you out

11  of the way?  So that he could go to the bathroom?

12  A      No, he did not.  He didn't tell me he was going to the

13  bathroom.  He just said, "Get the fuck out of my way."  Again,

14  I just had it in my mind that I didn't want those -- I didn't

15  want there to be an interaction.  If I stayed in between them,

16  then that would be avoided.

17  Q      As you got on the elevator with the three ladies, did

18  you have conversation about what had just occurred?

19  A      I did.  I mean, they seemed relieved that they didn't

20  have to deal with him and were thankful.  I told them I needed

21  to go to the second floor and talk to Mr. Edwards real quick

22  and find out where he was going and where they could go pick

23  him up.  So I told them to go down to the first floor and I

24  would be there as soon as I could.

25  Q      Did you have any idea where Mr. Stephens was at that

72

1   point?

2   A       No, I didn't.

3   Q       When you went to see your client, that was again on the

4   second floor of the courthouse?

5   A       Yes.

6   Q       And the three ladies --

7   A       I got off the elevator on the second floor.  They

8   stayed on the elevator.  Then I went into the marshal's office.

9   They knew I was coming.  I was there, at most, a minute or two.

10  They told me he was headed back to the county.  I think it's

11  Maries County, now that I remember it, that he was headed back

12  to.  I can remember him saying, "What was that about?"  I said,

13  "Don't worry about it.  It's fine.  They'll be there to get

14  you."  It wasn't very long because I knew they were downstairs.

15  And, again, at that point I was ready to get out of the

16  courthouse too.

17  Q       As you exited the courthouse out the front door, what

18  was your thought process at that point?

19  A       Well, after I left him, I went downstairs to talk to

20  them for a minute or two.  Again, told them where he was going.

21  And my thought -- originally I thought about sticking around to

22  see what was going to happen in Mr. Redmon's case because my

23  sentencing was only 15 minutes, and I didn't think it would

24  take that long.  After what happened, I was ready to get in my

25  car and go back to Springfield.  And, again, I remember kind of

73

1 breathing a sigh of relief as I walked out the door just

2 thinking, Wow, that was not my typical afternoon.

3 The way the courthouse is designed, there's a

4 parking lot below it. There's also some side parking across

5 the street that's closer, and typically I try to find one of

6 those there because it's a closer spot and I don't have to walk

7 up the hill. That's what I did in this case.

8 And, again, I was about to my car. There's some

9 bushes there so you can't really see. I rounded the corner

10 and on the sidewalk coming up as I'm going to my car is Mr.

11 Redmon -- I'm sorry -- Mr. Stephens and another individual, and

12 I thought -- I mean, I thought damn.

13 Q    All right.

14 MR. PORTER:  Your Honor, if we could have displayed

15 for the witness and counsel what's been marked for

16 identification as Government's Exhibit 15, please.

17 THE COURT:  Yes.

18 Q    (By Mr. Porter)  Do you recognize Exhibit 15, sir?

19 A    Yes, I do.

20 Q    Tell us what it is.

21 A    It's -- I guess you call it an aerial photograph of the

22 federal courthouse with the train tracks behind it and the

23 street -- the intersecting streets of State Street and

24 Lafayette. Of course, it's got the old prison on the bottom of

25 the picture and that's -- I mean, it's just an aerial

1    photograph of this spot right here.

2    Q      Is it a true and accurate reproduction of the scene it

3    depicts?

4    A      Yes, it is.

5            MR. PORTER:  Your Honor, we would offer Exhibit 15.

6            MR. BROWN:  No objection.

7            THE COURT:  Admitted.

8    Q      (By Mr. Porter)  The jury's now looking at Exhibit 15

9    along with us, Mr. Risley.  We're going to try to see if this

10   is going to work.  If you tap in the lower right-hand corner of

11   that screen in front of you, you should be able to have a

12   highlight.  What I'd like you to do is mark where your car was

13   parked on the photograph that's in Exhibit 15.

14   A      I believe I've done that now.

15   Q      And that's a location that's on State Street, correct?

16   A      Yes.  It might be slightly -- it's pretty close.  About

17   right there.  Extend a little bit closer.  But, yes, that's

18   approximately where it was.

19   Q      And not too terribly off of the intersection of the

20   sidewalks that cross in the front lawn of the courthouse?

21   A      That's correct.  It was almost right across the street

22   or slightly down from it but slightly, not very much at all.

23   Q      And the berm that you described or the raised area that

24   you couldn't see over, indicate where that is on the

25   photograph, if you could.

75

1    A       I mean, it extends -- you really can't see around to
2    the street until you get past that marking.
3    Q       When you saw Mr. Redmon -- excuse me.  When you saw Mr.
4    Stephens, were you surprised?
5    A       I was absolutely surprised.
6    Q       Did you know that he had been kicked out of the
7    courthouse?
8    A       No.  In fact, my first thought was that he come looking
9    for me.
10   Q       Did you know where he might have gone since the time
11   you last saw him on the fourth floor and the time you saw him
12   on the street?
13   A       Given the direction where he was coming, my belief was
14   that he had gone down to the parking lot, which is right here
15   where everybody usually parks, and he didn't find me so he was
16   walking back up the sidewalk looking for me.  That was my first
17   thought.
18   Q       What concerns did you have about what he might have
19   been doing or done since the time you last saw him?
20   A       Well, along with seeing him and thinking he was coming
21   to look for me, I also realized he was now outside the
22   courtroom which is secure.  If he had gone down there, I had no
23   idea if he had grabbed something, and I also knew that he was
24   probably pissed off at me.
25   Q       How are you processing that in that moment in time, Mr.

76

1    Risley?  Describe for the jury what you were doing and how you
2    were trying to figure out how to deal with this situation when
3    he's there.  No words had even been spoken yet.  So what's
4    going through your mind?
5    A       The shock and, again, the idea that he was looking for
6    me, and I can remember visually looking at where he was at on
7    the sidewalk and where my car was and if I could get to the car
8    without running and looking like an idiot or if I could just
9    walk to my car and get there before he got to me, and it looked
10   like I would be slightly ahead of him.  I was also looking at
11   the other individual who I didn't recall seeing.  I looked at
12   him for maybe a second, then he looked down, and then my focus
13   was on Mr. Stephens because at that point I heard him start
14   saying something.
15   Q       As between the two individuals that you saw, who was
16   closer to you?
17   A       At the immediate time Mr. -- Mr. Stephens was behind
18   the other individual.  They were pretty close, but it was -- I
19   saw the other individual, then I saw Mr. Stephens.  And, again,
20   I looked at the one guy for a second, then I looked away.  I
21   mean, I was processing their hands, where they were going, you
22   know, if they were grabbing something to come after me or not.
23   Q       Who spoke first?
24   A       Mr. Stephens spoke and said at least two or three
25   times, "You want to push me?  You want to push me again?"  I

77

```
 1   think he said it a third time, "You want to push me?"  And,
 2   again, I'm walking to my car.  And I really don't know why but
 3   I said no.  I said it because I was trying to, you know,
 4   de-escalate the situation or tell him I didn't want to confront
 5   or have any other further confrontation.  I was just trying to
 6   get to my car and go.
 7   Q      After you said no, did he continue walking towards you?
 8   A      Yes, he did.  By that time I'm across to my car and
 9   opened it.  He's basically, then, even with the sidewalk going
10   to the courthouse, which is -- basically he's across the street
11   from me about -- I mean the width of the street.  He's on the
12   side of the sidewalk.  My car is across the street.  I opened
13   the door and he's standing there and the other individual is
14   standing behind him, so I really can't see.
15   Q      Were further words spoken?
16   A      Yes, there were.
17   Q      What was said?
18   A      He looked at me and said, "Snitches" -- "You're a
19   motherfucking snitch.  Fuck you.  I will kill you, kill your
20   wife, kill your family."
21   Q      Ever experience anything like that before?
22   A      No.
23   Q      What was your processing at that point in time?
24   A      I mean, it was -- it was heavy.  I didn't know what was
25   going to happen.  I was watching his hands, and I thought I've
```

1    got to get the hell out of here.

2    Q       Was he continuing to walk towards you?

3    A       No.  He stopped.

4    Q       How did you get your car opened, your car door open?

5    A       I had actually -- I have an '07 car and the battery on

6    my button went out so I have to manually open it.  I had done

7    that and was standing there.  So I hadn't got in the car yet,

8    but I was standing there with the car door open.  When he said

9    that, I stood there and looked at him for maybe a second.  I

10   had the key in my hand.  I got in and shut the door, turned on

11   the key, was out of there.  I mean, he was not in the street so

12   I went -- and, I mean, there's a stop sign there but I doubt I

13   stopped.

14   Q       The stop sign that you're referring to is at the corner

15   of State and Lafayette as shown on Exhibit 15?

16   A       Yes.

17   Q       And you would have made a right turn to go south on

18   Lafayette?

19   A       Yes.

20   Q       Did you look in the rearview mirror?

21   A       I did.  Although I looked briefly, but, I mean, by

22   here, I mean, I frankly gunned it and I knew he couldn't catch

23   me, so I was down the road.

24   Q       How long did you drive before you stopped?

25   A       I didn't stop at all until I got to my office, which

1    was about two hours and 20 minutes away.  But, to be honest, I

2    made it in about two hours.

3    Q    What did you do as you were driving away in the

4    immediate moments after that encounter on the street?

5    A    As soon as I got down here to the stoplight, one of the

6    streets, I don't know, it's either the next block down or two

7    blocks down -- I think the screen just went away -- but the

8    light was red and I grabbed my phone and the last person I

9    called was Mike Oliver's office, U.S. Attorney.  So I just hit

10   redial and it called back to there; and as I'm driving, I

11   believe I had to talk to his secretary, and I knew he was in

12   court, but I wanted to tell somebody what happened.  So I

13   called him and left a voicemail as to what happened.  And then

14   I continued driving down, cross under -- the way I go out of

15   town from here is Lafayette continues down about half mile or

16   mile or so to a high school.  I don't know the name of it.

17   There's a roundabout and you go out and you hit 54.  So I went

18   down there and got on 54.

19   Q    Mr. Risley, I want to direct your attention to what's

20   been marked for identification as Government's Exhibit 4.  You

21   don't have it in front of you because it is an audio file, but

22   you've had occasion prior to coming to court today to listen to

23   that audio file which is the recording of the voicemail that

24   you left for Mr. Oliver, correct?

25   A    Yes, I have.

1  Q      Is that audio file a true and correct recording of the

2  voicemail message that you left for Mr. Oliver?

3  A      Yes, it is.

4              MR. PORTER:  Your Honor, we would offer Exhibit 4.

5              MR. BROWN:  No objection.

6              THE COURT:  Admitted.

7  Q      (By Mr. Porter) And also in conjunction with Exhibit 4

8  you've had a chance -- if I could direct your attention to

9  what's been marked for identification as Exhibit 5, which is a

10  document that all of us except the jury could look at now for a

11  moment.

12             MR. BROWN:  Judge, while we're doing this, could we

13  approach?

14             (Counsel approached the bench and the following

15  proceedings were had:)

16             MR. BROWN:  Mr. Stephens needs to go to the bathroom

17  again.

18             THE COURT:  Okay.  We'll take a 15-minute break.

19             (The proceedings returned to open court.)

20             THE COURT:  Ladies and gentlemen, we're going to --

21  let's just take a ten-minute break so we can hopefully wrap up

22  with this witness today.  We'll be in recess.

23             I'll read you the instruction.  We are about to take

24  a recess and I remind you of the instruction I gave you

25  earlier.  During this recess or any other recess, you must not

```
 1    discuss this case with anyone, including other jurors, members
 2    of your family, people involved in the trial, or anyone else.
 3    We'll be in recess.
 4              (Recess was taken at 4:20 p.m.)
 5              (The following proceedings were had in the courtroom
 6    out of the presence of the jury:)
 7              THE COURT:  Are you ready for the jury to come back?
 8    Are you ready, Mr. Brown?
 9              MR. BROWN:  Yes, Your Honor.
10              MR. PORTER:  We are, Your Honor.
11              THE COURT:  We can only go to about 5:15 today
12    because of security issues.  Mr. Brown, if there is a break --
13    I don't know what time it is now.  4:35.  Let me know if you
14    want to get to a point where you would just rather wait, then
15    start your cross tomorrow morning.
16              MR. BROWN:  How much longer do you have?
17              MR. PORTER:  I'm almost done.
18              THE COURT:  I want to go to at least five.
19              MR. BROWN:  No problem.  We may be done.  I don't
20    have much cross, I don't think.
21              (The following proceedings were had in the presence
22    of the jury:)
23              THE COURT:  Please be seated.
24              MR. PORTER:  May I inquire, Your Honor.
25              THE COURT:  You may.
```

1    BRIAN DAVID RISLEY resumed the stand and testified:

2    DIRECT EXAMINATION (continued) BY MR. PORTER:

3    Q       Mr. Risley, you were discussing the voicemail message

4    that you left for Mr. Oliver, and then when we ended, I was

5    asking you about what's been marked for identification as

6    Government's Exhibit 5, which you have now a physical copy in

7    front of you.  Can you identify that as a transcript of the

8    verbal content of the voicemail you left for Mr. Oliver?

9    A       Yes.  I had reviewed it and it appears to be a

10   transcript of what I said.

11           MR. PORTER:  Now, with the Court's permission, we

12   would offer Exhibit 5.

13           THE COURT:  Any objection?

14           MR. BROWN:  No objection, Your Honor.

15           THE COURT:  Admitted.

16           MR. PORTER:  If we could now display for the jury

17   the transcript that would be Exhibit 5 while we listen to the

18   voicemail that's in Exhibit 4; and if we pull up Exhibit 4 and

19   begin that, it should --

20           (Government's Exhibit No. 4 was played.)

21   Q       (By Mr. Porter)  How long after the encounter with Mr.

22   Stephens when he said he was going to kill you and your wife

23   and your family, again made reference to snitches, how long

24   after that did that voicemail message get left?

25   A       Within a minute to a minute and a half.

1    Q      Now, you make reference in the voicemail message to the

2    fact that he saw your car.  Why was that a concern to you?

3    A      Well, he knew what I was driving, and so I don't know

4    it.  It just dawned on me as I'm processing all of that, that

5    he sees me -- he knew my name and now he's seen my car.  I

6    think that's part of what alerted me to call somebody because I

7    didn't know anything about him.  I mean, all of that

8    interaction happened in the hour I had seen him, and I didn't

9    know anything about him other than the case we were involved

10   with and things that were going on with that, and I was just

11   concerned that I was now a target.

12   Q      Had there been concerns or allegations about

13   obstruction of justice contact in the case involving Vershawn

14   Edwards and Malcolm Redmon?

15   A      Yes, there had been.

16   Q      You knew that at the time?

17   A      I did.

18   Q      And tell the jury what you were thinking about on your

19   drive home about your wife and your kids.

20   A      I was thinking how in the world am I going to tell her

21   what just happened.  I mean, obviously I'm married.  I have two

22   children under the age of five.  And, in fact, I had referenced

23   them in the sentencing of Mr. Edwards.  The reason I had done

24   that was he had a child born while he was in custody, and my

25   argument to the Court was that he needs a chance to figure out

1  how to be a father, things change.  I knew that personally.  So
2  I was trying to relay that personally to the judge.  Then it
3  dawned on me as I was driving that he knew that because he
4  heard me say it.

5          And, you know, I went to law school and I signed up
6  to do this stuff, and, I mean, I guess I don't really think
7  this comes with the job, but it is my part, but they had
8  nothing to do with this, and I was concerned for, one, my wife
9  and family if something would happen to them and how in the
10  world to tell her that just because she's married to me she's
11  now got a target on her back.

12  Q     Mr. Risley, you left the voicemail.  You knew Mr.
13  Oliver was in court doing Malcolm Redmon's sentencing hearing.
14  Was he able to respond to your voicemail message as quickly as
15  you would have liked?

16  A     No.  Again, I knew where he was at, but I didn't hear
17  anything, and I -- in fact, I know about where I was at from
18  here to Springfield.  You go through the lake.  You go through
19  Camdenton and you go through Lebanon and then you get on I-44.
20  As soon as I got on Interstate 44, I emailed Mr. Oliver just to
21  have another way to communicate.  I knew he had a phone.  My
22  email has a phone.  I knew maybe he'd see it in between there.
23  I also flipped through my file and called ATF and left a
24  message because I knew they were involved, and what I wanted to
25  know is, you know, I wanted to know about him and what kind of

1   person he was and how scared I need to be.

2   Q       Before we get to the content of that email --

3               MR. PORTER:  Your Honor, we would offer, pursuant to

4   the stipulation of the parties, Government's Exhibit 6.

5               THE COURT:  Do you agree with that stipulation, the

6   foundation to Exhibit 6?

7               MR. BROWN:  Yes, Your Honor.  No problem.

8               THE COURT:   6 is admitted without objection.

9   Q      (By Mr. Porter)  And if all of us here in the courtroom

10  could together look along with you, Mr. Risley, at Exhibit 6,

11  you recognize that as the email Outlook receipt of the

12  voicemail that you left for Mr. Oliver?

13  A       Yes.  I was shown this and it indicates that he got

14  the voice -- or email saying the voicemail was sent on

15  September 29th at 1:55 and 3 seconds in the afternoon.

16  Q       So the voicemail that we just listened to a moment ago

17  was -- is the one that's referenced in Exhibit 6?

18  A       Yes, I believe it would have to be.  I specifically

19  recall looking at my phone later and I know I started that

20  phone call at 1:53, and I had to -- the phone had to ring and I

21  had to talk to his secretary and say, "Let it go to his

22  voicemail," so I guess that's the extra minute.

23  Q       And if we could just expand that view a little bit and

24  look only at the portion from "click attachment and above."  It

25  shows that it's a voicemail message and the number that is

1    associated with that call.  Is that your phone number?

2    A       Yeah.  My cell phone number, yes.

3    Q       The very cell phone number that we just heard you

4    repeat in the voicemail message itself that is Exhibit 4,

5    correct?

6    A       Yes, it is.

7            MR. PORTER:  And, Tracy, if we could pull up

8    Exhibit 17 side by side now with Exhibit 6 and expand both of

9    them as we did when we were looking at them individually.

10   Q       (By Mr. Porter)  We're talking now, Mr. Risley, about a

11   time frame of ten minutes or less that had elapsed from the

12   time you left this courtroom when the sentencing hearing of

13   your client ended and the time you sent the voicemail message,

14   right?

15   A       Yes.

16   Q       And the threatening words to you on the street about

17   killing you and your wife and kids happened before 1:55?

18   A       Yeah, right before.

19   Q       All right.  Let's look, if we can, together without the

20   jury being able to see it just yet what's been marked for

21   identification as Government's Exhibit 7.

22           Do you recognize that Mr. Risley?

23   A       Yes, I do.

24   Q       Tell us what it is.

25   A       It's a copy of an email that I sent to Mike Oliver

87

1  about an hour and a half after I left here.

2  Q     Is it a true and accurate reproduction of that email?

3  A     Yes, it is.

4           MR. PORTER:  Offer Exhibit 7, Your Honor.

5           THE COURT:  Any objection?

6           MR. BROWN:  If I may.  No objection.

7           THE COURT:  Admitted.

8  Q     (By Mr. Porter)  Now, if we could all look at it

9  together with the jury.

10          MR. PORTER:  And if you would, Tracy, give us a

11 little -- it's always easier when it's blown up just a wee bit.

12 Q     (By Mr. Porter)  Why did you send that email to Mr.

13 Oliver?

14 A     Again, I was -- I mean, I didn't know anything about

15 Mr. Stephens.  At that time I didn't even know his name.  You

16 will notice in the subject line I put "old man in court."  I

17 was certain it was Malcolm Redmon's dad.  I had been told that

18 at some point in between one and 1:30.  But I wanted to know

19 how serious I should take it.  I realized I was -- when I got

20 home, I would be two hours from Jefferson City, but I didn't

21 know anything about him, and I needed to know something to tell

22 my wife.  I didn't know if we were going to have to go to a

23 hotel or what.

24 Q     All right.  The subject line refers to, "Old man in

25 court."  You are referring to this defendant, correct?

1    A      Yes.

2    Q      And the person who stood on the street and threatened

3    to kill you, your wife, and your family is this defendant,

4    correct?

5    A      That's correct.

6            MR. PORTER:  Thank you, Your Honor.

7            THE COURT:  Mr. Brown, do you have any cross?

8            MR. BROWN:  Yes, ma'am.

9    CROSS-EXAMINATION BY MR. BROWN:

10   Q      Mr. Risley, you and I have met before; is that correct?

11   A      Yes, sir.

12   Q      And that was at the U.S. Attorney's Office in Kansas

13   City?

14   A      Yes, it was.

15   Q      Mr. Porter's office?

16   A      That's correct.

17   Q      And he and I and you talked about some of this, right?

18   A      Yes, we did.

19   Q      Now, anytime we represent codefendants in some sort of

20   a conspiracy charge or other case where there are multiple

21   defendants, cooperation's always a concern, right?

22   A      Mostly, yes.  I mean most of the time.

23   Q      And we don't like to let people know if our client is

24   cooperating?

25   A      Correct.

```
1    Q       And we take steps to either avoid mentioning that or

2    hide that some way?

3    A       We do the best we can, yes.

4    Q       Right.  Now, the first time you came into contact with

5    Mr. Stephens, as I understand it, you were out in the hallway

6    in front of this courtroom, double doors here?

7    A       Yeah, not more than 30, 40 feet.

8    Q       Isn't it true Wendy Houston asked who you were?

9    A       When who did?

10   Q       Wendy Houston.  Some woman asked who you were, who you

11   represent?

12   A       Yes.  I don't know her name but it was a female.

13   Q       Mr. Stephens didn't ask you anything?

14   A       He did not.

15   Q       And while you were out in the hall, you overheard some

16   stuff but he never directed that at you, did he?

17   A       I didn't take those statements to be directed at me,

18   but I thought they were directed at my client.

19   Q       Well, but he wasn't talking to you?

20   A       I thought he was.

21   Q       Who else was in the hall?

22   A       His -- I mean, there were three or four people there.

23   I assumed they were together but I didn't know.

24   Q       There was a young lady with two or three eight-,

25   ten-year-old kids?
```

90

```
1    A      I believe there was some children, yes.

2    Q      And Ms. Houston who had asked you who you represented?

3    A      I don't know her name but it was a female.

4           MR. PORTER:  Objection, Your Honor.  That misstates

5    the evidence.  He doesn't know the name of the person.

6           MR. BROWN:  Well, I apologize, Your Honor.

7    Q      (By Mr. Brown)  Some woman other than the woman with

8    the children?

9    A      I believe so.

10   Q      Was there a woman in a walker there or a wheelchair

11   type, maybe a sitting walker?

12   A      At one o'clock, no.  At 1:45, yes.

13   Q      And you've indicated that you assumed that these were

14   Mr. Redmon's family; is that right?

15   A      Yes, I did.

16   Q      Do you know how many relatives Mr. Stephens has that

17   were codefendants in this case?

18   A      I have no idea.

19   Q      Now, how long had you represented Vershawn Edwards?

20   A      It was about 20 months.  It was December of 2014 when I

21   got appointed, and then he pled guilty around July of 2015, and

22   then it was another -- over a year until he was sentenced in

23   September of 2016.

24   Q      And he was detained without bond that entire time?

25   A      Yes, he was.
```

1    Q      And as I understand your testimony, he may have been in

2    Maries County jail?

3    A      At that time, yes.  When we started, he was in either

4    Cole or Callaway County.  He had some other issues and went to

5    Boonville.  Then in May of 2015 is when he was released from

6    Boonville and then brought back and almost immediately was --

7    they figured out to put him in Maries County.  There were

8    numerous people involved in this case, and they were having to

9    figure out how to separate everyone.

10   Q      Now, prior to representing Mr. Edwards in this case,

11   14-04065-23, had you ever represented Mr. Edwards before?

12   A      No.

13   Q      Did you know him?

14   A      No, I didn't.

15   Q      So this whole period of time he was incarcerated; and

16   if you had to talk with him, you'd either have a telephone

17   conversation or meet him here in the courthouse when they were

18   bringing him in for some court appearance?

19   A      Yes.  Other than in January 2015 he was in, I think

20   it's Callaway County.  I know it was Fulton.  He was at the

21   county jail there.  I met with him because I had to review some

22   reports, and I had another reason to be in the area.  And then

23   at some point between January and May he was transferred to

24   Boonville and I had to see him face to face, so I drove all the

25   way to -- it's the state prison but it's in Boonville.  Other

1   than those two occasions, I either saw him here or on the

2   phone.

3   Q      Okay.  And prior to your representation in this case,

4   you didn't know Vershawn?

5   A      I did not.

6   Q      Fair to say you and he weren't close friends or buddies

7   or anything else?

8              MR. PORTER:  Your Honor, objection, relevance.

9              MR. BROWN:  Excuse me.

10  Q      (By Mr. Brown)  Before you represented him in this

11  case.

12  A      I did not know him at all until I was appointed to

13  represent him, and I didn't meet him until about three weeks

14  after I was appointed.

15  Q      Okay.  Now, you've testified that the sentencing

16  hearings in this conspiracy case were originally scheduled at

17  other times, right?

18  A      The sentencings of Mr. Edwards and Mr. Redmon, same day

19  but different times during the day.

20  Q      And if I recall your testimony correctly, originally

21  Mr. Edwards was going to be sentenced around nine o'clock?

22  A      Actually I know he was at 4:30 because I can just

23  recall the fact --

24  Q      Redmon was going to be sentenced at nine o'clock?

25  A      Nine or ten.  I know it was the morning.  I can't

1  remember which one but it was early in the morning.

2  Q     So you weren't concerned with any contact or anything

3  when you get the original schedule?

4  A     That's correct.

5  Q     And another reason that we sometimes are concerned

6  about scheduling is if codefendants are going to be sitting in

7  the marshal's lockup downstairs and it's just better that they

8  don't, right?

9  A     Right.  In fact, when they got scheduled back to back,

10 that was really my only concern.  I didn't have any expectation

11 of what happened that did.

12 Q     I believe you called AUSA Oliver when this sentencing

13 thing was changed and there might be a potential problem?

14 A     I either called him or emailed him.  I can't recall

15 which, but I know it was he that I addressed.

16 Q     Did you express your concern to the Court?

17 A     No, I didn't.

18 Q     Did you express your concern to the marshals?

19 A     No, because Mr. -- the response I got from Mr. Oliver

20 was that he had.  I sent him an email, I believe, and he

21 responded to me that he was going to let the marshals know.  So

22 that in my mind took care of it.

23 Q     All right.  Now, if I understand you correctly, when

24 you came into the courtroom for Mr. Edwards' sentencing, Mr.

25 Stephens was here?

1    A     Yeah.  He was sitting down and he had his arms like the
2    whole bench was his.
3    Q     Okay.  When you came in, you asked Mr. Edwards' family
4    members to sit over here?
5    A     Yes, in the back row because other members -- or other
6    people were in the front row.
7    Q     So they're in this area?
8    A     Yes.
9    Q     And where are the other individuals who you believed
10   were Redmon's family sitting?
11   A     Front row, right where you just walked by.
12   Q     Right here?
13   A     Yes.
14   Q     All right.  And you expressed some concern because you
15   believed he was looking at your client's family over in the
16   corner; is that right?
17   A     Yeah.  I saw him and that is where I believed he was
18   looking.
19   Q     And could he have been looking at his family or other
20   friends in this first pew?
21   A     I guess it's possible but it wouldn't have made any
22   sense to me.
23   Q     But in your mind he was looking at the Edwards' family
24   members?
25   A     Yes, because at that point he had stated several times,

95

```
 1    "Snitches belong in ditches."

 2    Q       And you overheard that?

 3    A       I did.

 4    Q       And that was out in the hallway?

 5    A       It was both, but yes.

 6    Q       Okay.  And so is it fair to say he was displaying a

 7    general garment and you claimed it as one to fit?

 8    A       I guess I don't know what that means.

 9    Q       Okay.  He was making a general statement about

10    snitches, right?

11    A       That's correct.

12    Q       And for whatever reason you believed he was talking

13    about your client?

14    A       I did believe he was talking about my client, because

15    he said it right after I said who I was representing.

16    Q       And you don't know what conversation was going on

17    before you showed up?

18    A       That's correct.

19    Q       And, as I understand it, after that, you left and you

20    don't know what conversation may have continued out in the

21    hallway after you left?

22    A       Outside, yeah.  Between one and 1:25 I was not around

23    them to hear what they were talking about.

24    Q       Okay.  Now, we finish up with Mr. Edwards' sentencing.

25    And according to the Plaintiff's Exhibit 17, that's at 1:45?
```

1   A        Yes.

2   Q        And did you have any stuff that you had to pack up and

3   take with you out of the courtroom?

4   A        For whatever reason I just had my client's file, which

5   was in a Redrope and it was -- I had pretty well collected it

6   after we had finished.

7   Q        And the marshals took Mr. Edwards out this way, out

8   that door, or did they take him out that way?

9   A        They took him out through the door next -- between the

10  judge and the -- I don't know if that's the other jury bench or

11  what that is over there.

12  Q        Right through this hallway?

13  A        That's correct.

14  Q        And you picked up your file and you head out the door?

15  A        Yes.  I start to the middle area because I have to

16  clear the railing; and as I'm walking there, I see -- I can see

17  them walking out and I'm looking right at him and I see him get

18  up and start to head towards the door also.

19  Q        All right.  When he got up, did you hear him say

20  anything?

21  A        No.

22  Q        And there, again, you believed he was going to heckle

23  Mr. Edwards' family?

24  A        Yes, I did.

25  Q        And so you got to this first set of doors, and you

```
1    wanted to send the family members on out to the elevator and
2    you blocked that door?
3     A      I did.
4     Q      And at least on this front one you're big enough that
5    pretty much standing in the doorway is enough to block it,
6    right?
7     A      Yes.  I was at the door and I had my hand on the
8    handle, and I was -- he would have had to wait for me to go
9    first.
10    Q      And did he say anything then?
11    A      Yes.  He said, "Get out of my way."
12    Q      Okay.  And your response?
13    A      I said something to the effect, "I'm all right for a
14   minute."  I don't know why I said that but that's what I said.
15    Q      So what does he do?
16    A      He's ready to go.  I mean --
17    Q      Is he pushing up against you at this point?
18    A      He was touching me.  I don't believe he was pushing me,
19   but he was close enough that he was right behind me and he was
20   ready to go out the door.
21    Q      It was obvious to you he wanted to get out of the
22   courtroom?
23    A      Yes, he did.
24    Q      There, again, you assumed that was so he could heckle
25   the family?
```

98

1    A       Yes.

2    Q       So eventually you look through the outer doors there

3    and you see that the family members are waiting for you right

4    outside there?

5    A       Yes.  I would say the time I waited at that door is

6    less than five seconds because I realized they weren't moving.

7    Q       So you went through the anteroom there, opened the door

8    and motioned them towards the elevator?

9    A       Yes, I did.

10   Q       And when you unblocked this first door and stepped

11   three or four paces to the outer door, what's Mr. Stephens

12   doing?

13   A       He's behind me, and I mean he's pretty close in

14   proximity.  When I opened the second door, I could feel him

15   towards this shoulder.

16   Q       He was right on your tail trying to get out, right?

17   A       Yep.

18   Q       And you blocked the second doorway?

19   A       I opened the door but he was -- I was making sure he

20   wasn't getting around me.  By then they had started walking.

21   Q       You were blocking the doorway from him coming out?

22   A       I was walking through the doorway but yes -- I was not

23   letting him around me to go confront them or at least what I

24   thought he was going to do.

25   Q       Did you have to put your arms out to block?

1    A       I extended my right arm slightly because I could feel

2    him here, and you mentioned the gal in the -- or the older lady

3    in the walker.  She was right up against the wall.  And so he

4    was trying to squeeze between us, and that's when he made

5    contact with my arm and said I pushed him.

6    Q       And he -- he brushed your shoulder and you bring up

7    your right arm so he can't get through?

8    A       I don't know.  I can't tell you which happened first.

9    I either had my arm up and he brushed me and then I put my arm

10   up, yes.

11   Q       And at that point is that when he said, "I'm going to

12   whip your ass"?

13   A       No.  He said, "Get the fuck out of my way."

14   Q       And you continued to block the doorway?

15   A       Yes, although it was right at that point that court

16   security came out, then I released.

17   Q       He wasn't quiet about saying, "Get the fuck out of my

18   way"?

19   A       No.

20   Q       And court security came over to see what the problem

21   might be?

22   A       They came out, yeah.  I presume that's what they were

23   doing.

24   Q       And you observed them talking with him?

25   A       Briefly, yes.

1    Q       And that's when you overheard him tell court security

2    he was just going to the bathroom?

3    A       I did hear him say that, yes.

4    Q       And as I understand your testimony, you then went on to

5    the elevator, got on the elevator, went down to two where the

6    marshal's office is and you had pretty much forgotten this?

7    A       Well, I hadn't forgotten it, but I was away from him

8    and I thought the incident, whatever happened was over.

9            THE COURT:  Mr. Brown, it's now 5:08 and you still

10   have some time.

11           MR. BROWN:  If we need to be done by 5:15, I think

12   we probably -- this is as good a place to quit.

13           THE COURT:  Then you'll resume with your

14   cross-examination in the morning is your preference?

15           MR. BROWN:  Yes, ma'am.

16           THE COURT:  That's what we'll do.

17           Ladies and gentlemen, since I told you we would have

18   our hours from approximately nine to five, I'd like to keep as

19   close to that as possible.

20           I need to read you the admonishment before you leave

21   one more time.

22           We are about to take a recess and I remind you of

23   the instruction I gave you earlier.  During this recess or any

24   other recess, you must not discuss this case with anyone,

25   including other jurors, members of your family, people involved

1  in the trial, or anyone else.  If anyone tries to talk to you

2  about the case, please let me know about it immediately.

3           Do not read, watch, or listen to any news reports of

4  the trial.  Finally, keep an open mind until all the evidence

5  has been received and you have heard the views of your fellow

6  jurors.

7           I'm not sure what the weather will be like tomorrow.

8  The roads may be difficult so you may want to take that into

9  consideration as you're preparing for your morning.

10          And, Ms. Wheeler, will you be taking them to the

11  jury room for any further housekeeping instructions?

12          THE COURTROOM DEPUTY:  Yes.

13          THE COURT:  Will you show the jury to the jury room?

14          We'll resume at nine o'clock in the morning, and I

15  have the jury here at 8:45.

16          Ms. Wheeler, you can see the jury back to the jury

17  room.

18          (The following proceedings were had in the courtroom

19  out of the presence of the jury:)

20          THE COURT:  Please be seated.  You can stand down.

21          MR. PORTER:  Your Honor, may I have just a moment

22  with Mr. Risley before he takes off?

23          THE COURT:  Absolutely.

24          And, Mr. Brown, I'm curious if we are able to take

25  up any more motions in limine or your objections tonight.

1     MR. BROWN:  I'm willing.  If the courtroom's

2   available or whatever.

3     MR. PORTER:  Thank you, Your Honor.

4     THE COURT:  Mr. Porter, do you have any issues that

5   have come up this afternoon that we should take up before we

6   leave tonight?  In particular, did you want to make any type of

7   proffer on your 404(b) proposed evidence, your summary charts?

8   I don't know if the summary charts are in the packet you gave

9   me.

10     MR. PORTER:  In the packet of exhibits you should

11  have, Your Honor, a copy of Exhibits 28, 29, 30, 31, and 32 are

12  the certified prior convictions for Mr. Stephens, and the

13  summary chart is Exhibit 33.  So 28 through 32 are the

14  certified priors and 33 is the summary chart.  I'm hoping those

15  are all in your packet.

16     THE COURT:  At this point when do you intend to get

17  this summary chart in?  Is this through Agent Abram?

18     MR. PORTER:  Your Honor, there are multiple

19  witnesses whose testimony is reflected in that chart.  So I

20  would not anticipate using it until perhaps closing argument.

21     THE COURT:  My inclination is to not -- if you

22  utilize this in closing argument and it summarizes your case,

23  you can use this summary chart if it's -- I don't see any

24  problem with using this in your closing argument, but it

25  wouldn't be independently marked as an exhibit for closing

1  arguments and it wouldn't go back to the jury.

2          MR. PORTER:  I understand, Your Honor.  But we

3  wanted to mark it for identification so we have a way of

4  referring to it so the record would be able to demonstrate what

5  we were talking about.  For purposes of using it, we can remove

6  the exhibit sticker.  That's no problem.

7          THE COURT:  Okay.  Let's remove the exhibit sticker

8  if you intend to present that in any fashion during closings.

9          MR. BROWN:  And you're not offering it, getting it

10  admitted, and wanting it to go back to the jury room?

11          MR. PORTER:  Correct.

12          MR. BROWN:  No objection then.

13          THE COURT:  And then I do not want to have a

14  separate instruction highlighting this summary chart of your

15  closing argument.  It's just as with any other type of closing

16  argument.  There doesn't need to be an instruction.  It would

17  be my inclination at this point if you have an argument

18  overnight and you want to argue against that, remind me to take

19  it up in the morning.  We can handle that.

20          The definition of "snitches belong in ditches," if

21  the defense intends to put in their own evidence of what that

22  means, I'm inclined to do that.

23          Mr. Porter, if you are opposed to that, you can

24  proceed with your argument now or take it up in the morning.

25          MR. PORTER:  I think our objection would pertain,

1    Your Honor, to the context, and we'll make an objection on

2    relevance grounds at the time it's offered, but I understand

3    the Court's ruling.

4            THE COURT:  On the 404(b), I will review your

5    certified copies of the convictions to see if it identifies

6    information that would make those acts similar in kind to the

7    allegation and if these bad acts are relevant to the material

8    issue of intent.  If that isn't contained, then I will sustain

9    the defense opposition to the 404(b) evidence.

10           MR. PORTER:  Understanding that, Your Honor, I

11   can -- I'm not trying to pull the rug out from underneath my

12   own feet but I don't think you're going to find a whole lot in

13   those certified priors that are going to bear on that issue.

14   So assuming for the sake of what I'm about to say next that the

15   404(b) offer is not permitted, understanding from the defense

16   opening statement that there's a high likelihood that Mr.

17   Stephens will testify as a defendant, it might be useful to

18   start thinking about those prior about impeachment material

19   should the defendant testify.

20           THE COURT:  That's fair game.  That's a different

21   ball game.

22           Go ahead, Mr. Brown.

23           MR. BROWN:  It's -- well, I'll talk with Gene about

24   it.

25           THE COURT:  I was just focusing on the 404(b) aspect

1   of it.

2            MR. PORTER:  And I appreciate that, Your Honor.

3   We've all been around a long time and we're all trying to help

4   each other by forecasting issues and trying to make sure that

5   we can deal with them sooner rather than later.

6            THE COURT:  Okay.  And if you want to make one

7   last-ditch effort of explaining on the record the connectivity

8   to the issue of intent and the similar-in-kind prong to the

9   standard admission --

10           MR. PORTER:  We'll rest on what we've submitted

11  today, Your Honor.  There's no point.

12           THE COURT:  So I will sustain, Mr. Brown, your

13  objection to 404(b) then.

14           MR. BROWN:  And that has implications with the

15  proposed instructions.

16           THE COURT:  Absolutely.

17           We do have the defense motion to exclude video.  At

18  this point I am going to deny that unless you have any further

19  argument, Mr. Brown, as to why that should not be admitted.

20           MR. BROWN:  No.

21           THE COURT:  Okay.  Is there any other issues that we

22  can take up tonight?

23           Mr. Porter?

24           MR. PORTER:  Give me just a moment to confer, but my

25  inclination is to say no, Judge.  Again, because we're trying

```
 1   to all predict what's going to happen, I think it's our hope, I
 2   know it's the Court's hope, and I'm pretty certain it's the
 3   defense hope as well we can finish tomorrow.  At what point do
 4   we need to have any further discussion about jury instructions?
 5              THE COURT:  I think tonight I'll be able to, with
 6   what you've given me, have a very close to final draft.  But if
 7   you repeat the testimony of the witnesses three times, twice on
 8   direct and once on cross, it may be longer than tomorrow.
 9              MR. PORTER:  We're going to try to pick the pace up
10   to the extent we can, Judge.
11              MR. BROWN:  And I get carried away sometimes.  Maybe
12   I'll try to make it shorter too.
13              THE COURT:  Okay.  Ms. Wheeler, any other issues we
14   can take up tonight?
15              THE COURTROOM DEPUTY:  No, Judge.
16              THE COURT:  Can we have our pretrial meeting in
17   chambers at 8:30 just to touch base?  If we need anything of
18   substance, I would like to go ahead and come out in the
19   courtroom so Mr. Stephens can be here as well; but if we could
20   at least touch base at 8:30 and hopefully we'll have an
21   instruction packet for you to start reviewing.
22              MR. PORTER:  Thanks, Judge.
23              THE COURT:  Have a good night.
24              (Court adjourned at 5:20 p.m. until 9 a.m. Tuesday,
25   December 6, 2016.)
```

Case 2:16-cr-04068-RK   Document 90   Filed 07/12/17   Page 107 of 107