UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | 16-04068-01-CR-C-RK |
| BRUCE WAYNE STEPHENS, | ) | |
| | ) | |
| Defendant. | ) | |


TRANSCRIPT OF PROCEEDINGS - VOLUME II
BEFORE THE HONORABLE ROSEANN KETCHMARK
UNITED STATES DISTRICT JUDGE
DECEMBER 6, 2016
JEFFERSON CITY, MISSOURI


FOR THE PLAINTIFF:
    MR. PHILLIP EUGENE PORTER
    MS. EMILY A. ORSINGER
    Assistant United States Attorneys
    Charles Evans Whittaker Courthouse
    400 East Ninth Street, Floor 5
    Kansas City, Missouri 64106

FOR THE DEFENDANT:
    MR. JAMES EDWARD BROWN
    1609 West 92nd Street
    Kansas City, Missouri 64114



    Proceedings recorded by mechanical stenography, transcript
produced by computer



KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
CHARLES EVANS WHITTAKER COURTHOUSE
400 EAST NINTH STREET
KANSAS CITY, MISSOURI 64106

108

I N D E X                                          Page

DECEMBER 5, 2016

VOLUME I

Pretrial conference. . . . . . . . . . . . . . . . . . . .   6

Government's opening statement . . . . . . . . . . . . .  30

Defendant's opening statement. . . . . . . . . . . . . .  39

GOVERNMENT'S EVIDENCE

BRIAN DAVID RISLEY
      Direct examination by Mr. Porter. . . . . . . . . .  45
      Cross-examination by Mr. Brown. . . . . . . . . . .  89

Case 2:16-cr-04068-RK   Document 91   Filed 07/12/17   Page 2 of 201

```
                        I N D E X                          Page
                        (continued)

                     DECEMBER 6, 2016

                        VOLUME II
```

BRIAN DAVID RISLEY (resumed)
     Cross-examination by Mr. Brown (continued). . . . . . 120
     Redirect examination by Mr. Porter. . . . . . . . . . 141
     Questions from the jury by Mr. Porter . . . . . . . . 148
     Recross-examination by Mr. Brown. . . . . . . . . . . 149
     Further redirect examination by Mr. Porter. . . . . . 150

G. PAUL TYREE
     Direct examination by Ms. Orsinger. . . . . . . . . . 151
     Cross-examination by Mr. Brown. . . . . . . . . . . . 169
     Redirect examination by Ms. Orsinger. . . . . . . . . 179
     Recross-examination by Mr. Brown. . . . . . . . . . . 185
     Questions from the jury by Ms. Orsinger . . . . . . . 202
     Further recross-examination by Mr. Brown. . . . . . . 202

RANDALL SINELE
     Direct examination by Mr. Porter. . . . . . . . . . . 204
     Cross-examination by Mr. Brown. . . . . . . . . . . . 206
     Redirect examination by Mr. Porter. . . . . . . . . . 207
     Recross-examination by Mr. Brown. . . . . . . . . . . 207
     Questions from the jury by Mr. Porter . . . . . . . . 209
     Further redirect examination by Mr. Porter. . . . . . 210

JAMES BLACK
     Direct examination by Ms. Orsinger. . . . . . . . . . 211
     Cross-examination by Mr. Brown. . . . . . . . . . . . 218
     Redirect examination by Ms. Orsinger. . . . . . . . . 221
     Questions from the jury by Ms. Orsinger . . . . . . . 222

WENDY HOUSTON
     Direct examination by Mr. Porter. . . . . . . . . . . 224
     Cross-examination by Mr. Brown. . . . . . . . . . . . 242
     Questions from the jury by Mr. Porter . . . . . . . . 276
     Recross-examination by Mr. Brown. . . . . . . . . . . 282
     Redirect examination by Mr. Porter. . . . . . . . . . 283

CODY ABRAM
     Direct examination by Mr. Porter. . . . . . . . . . . 285

Case 2:16-cr-04068-RK   Document 91   Filed 07/12/17   Page 3 of 201

                      I N D E X                           Page
                     (continued)

                   DECEMBER 7, 2016

                     VOLUME III

CODY ABRAM (resumed)
      Direct examination (continued) by Mr. Porter. . . . . 317
      Cross-examination by Mr. Brown. . . . . . . . . . . . 335
      Redirect examination by Mr. Porter. . . . . . . . . . 347
      Questions from the jury by Mr. Porter . . . . . . . . 359
      Redirect examination by Mr. Porter. . . . . . . . . . 362
      Recross-examination by Mr. Brown. . . . . . . . . . . 364

Instructions conference. . . . . . . . . . . . . . . . . . 374

DEFENDANT'S EVIDENCE

BRUCE WAYNE STEPHENS
      Direct examination by Mr. Brown . . . . . . . . . . . 396
      Cross-examination by Mr. Porter . . . . . . . . . . . 416
      Redirect examination by Mr. Brown . . . . . . . . . . 421
      Questions from the jury by Mr. Brown  . . . . . . . . 429

Government's closing argument. . . . . . . . . . . . . . . 435

Defendant's closing argument . . . . . . . . . . . . . . . 445

Government's rebuttal closing argument . . . . . . . . . . 453

Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . 464

Case 2:16-cr-04068-RK   Document 91   Filed 07/12/17   Page 4 of 201

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| **FOR THE GOVERNMENT:** | | | |
| 1 | Miranda rights waiver | 287 | 287 |
| 2 | Videotaped interview | 288 | 288 |
| 2(a) | Video clip | 292 | 292 |
| 2(b) | Video clip | 295 | 295 |
| 2(c) | Video clip | 297 | 297 |
| 2(d) | Video clip | 323 | 323 |
| 2(f) | Video clip | 328 | 328 |
| 2(g) | Video clip | 329 | 330 |
| 2(h) | Video clip | 330 | 330 |
| 4 | 9/29/16 voicemail | 81 | 81 |
| 5 | Voicemail transcript | 83 | 83 |
| 6 | Receipt | 86 | 86 |
| 7 | 9/29/16 email | 88 | 88 |
| 15 | Aerial photograph | 75 | 75 |
| 17 | Minute entry | 66 | 66 |
| 19 | Minute entry | 348 | 349 |
| 34 | Stipulation | 367 | 367 |

```
 1                         DECEMBER, 6, 2016

 2                         MORNING SESSION

 3               (The following proceedings were had in the courtroom

 4    out of the presence of the jury:)

 5               THE COURT:  Please be seated.

 6               Mr. Porter, do you have an issue?

 7               MR. PORTER:  Your Honor, I apologize.  These two

 8    issues came up after we finished our chambers conference this

 9    morning.

10               In anticipation of defense witness Linnel Beckner

11    testifying, we subpoenaed from the Burrell Treatment Center the

12    treatment records of Mr. Beckner.  We used a standard trial

13    subpoena, not a Rule 17 subpoena to require the protection of

14    those in advance.  The witness who has those records is here in

15    the courtroom, Mr. Houston, in the back, and he is

16    uncomfortable releasing those records to us without you

17    directly ordering him to do so.  So if you would entertain

18    ordering him to produce those records so we could start looking

19    at them, that would be useful.

20               THE COURT:  Can you come on up, please.  I'll have

21    you take the witness stand, please, and my clerk will swear you

22    in.

23    HUNTER HOUSTON, being sworn by the courtroom deputy, testified:

24               THE COURT:  Go ahead and be seated.  Do you want to

25    question him or do you want me to question him?
```

| 1 | MR. PORTER:  Your preference, Judge. |
| 2 | THE COURT:  I can just ask him a couple questions. |
| 3 | EXAMINATION BY THE COURT: |
| 4 | Q      Please state your name for the record. |
| 5 | A      My name is Hunter Houston. |
| 6 | Q      Would you spell your last name? |
| 7 | A      H-o-u-s-t-o-n. |
| 8 | Q      Where do you work? |
| 9 | A      I work for Burrell Behavioral Health in Columbia, |
| 10 | Missouri. |
| 11 | Q      What is your position there? |
| 12 | A      I am the lead health information management clerk. |
| 13 | Q      Are you considered records custodian? |
| 14 | A      Yes, I am. |
| 15 | Q      As part of your duties as records custodian, did you |
| 16 | receive a subpoena requesting records of a patient? |
| 17 | A      Yes, I did. |
| 18 | Q      And do you have that subpoena in front of you? |
| 19 | A      I do. |
| 20 | Q      Could I see that subpoena? |
| 21 | A      Yes. |
| 22 | Q      The subpoena was issued in the case of United States |
| 23 | vs. Bruce Stephens directing you to bring all records and |
| 24 | reports in the care, custody, and control of Burrell Behavioral |
| 25 | Health Crisis Service relating to Linnel Beckner, date of birth |

```
 1   and Social Security number listed; is that accurate?

 2   A       That is.

 3   Q       Pursuant to this subpoena, did you retrieve your

 4   records?

 5   A       Yes, I did.

 6   Q       Do you have them in court today?

 7   A       I do.

 8   Q       Are they accurate copies of the records that you were

 9   directed to bring?

10   A       Yes, they are.

11   Q       And I'm assuming it's pursuant to HIPAA that you're

12   reluctant to turn the records over?

13   A       That's correct.  Due to confidentiality, I can't

14   release the records without a court order.

15   Q       And I am directing you to release those records to the

16   Assistant United States Attorney at this time to be utilized in

17   this court proceedings but for no other purposes.

18   A       Okay.  Great.

19               MR. PORTER:  Thank you, Your Honor.

20               THE COURT:  Do you have any questions?

21               MR. PORTER:  No.

22               THE WITNESS:  Thank you very much.

23               MR. PORTER:  What we'll do at this point, Your

24   Honor, is review them, make some copies for defense counsel for

25   their use at the time of Mr. Beckner's examination.
```

| | |
|---|---|
| 1 | THE COURT: Okay. And do you want us to go ahead -- |
| 2 | when you're ready for us to make copies, if you could let my |
| 3 | staff know, they could make copies. |
| 4 | MR. PORTER: Then we'd also ask the witness to stay |
| 5 | so if we need to lay foundation for their admission in front of |
| 6 | the jury, we could do that, unless there's going to be a |
| 7 | stipulation to that effect. |
| 8 | THE COURT: Do you have any -- |
| 9 | MR. BROWN: I have no knowledge. I don't have any |
| 10 | idea what they say. I'm not prepared to do that. |
| 11 | THE COURT: Okay. Without an agreement as to the |
| 12 | foundation, I'll need you to stay. |
| 13 | THE WITNESS: Okay. |
| 14 | THE COURT: Is there any problem with that? |
| 15 | THE WITNESS: There shouldn't be. |
| 16 | THE COURT: And I would -- no one has invoked the |
| 17 | rule. Is there any problem with him staying in the courtroom |
| 18 | or do you want him to stay outside? |
| 19 | MR. BROWN: I don't have a problem. No one has |
| 20 | invoked the rule. I've asked my witnesses not to come in. |
| 21 | MR. PORTER: Even though no one's invoked, we've |
| 22 | observed it anyway, Your Honor. It doesn't matter to us either |
| 23 | way. |
| 24 | MR. BROWN: It doesn't matter to me. |
| 25 | THE COURT: If there's no objection to you being in |

1  the courtroom as records custodian, you are free to be in the
2  courtroom or outside, but you need to stay close by for the
3  government to be able to call you as a witness.

4         Thank you.

5         MR. PORTER:  I said there were two.  I've been
6  informed by the marshals that Mr. Redmon, who is here today
7  pursuant to the ASR, has stated that he will not testify unless
8  counsel is provided for him; and with that request in place, we
9  don't intend to call him.  So at this point, unless the defense
10 has an objection, it will be our intent to release Mr. Redmon
11 and let him be on his way and back in the care and custody of
12 the marshals and no further obligation to this court for this
13 proceeding.

14        THE COURT:  Mr. Brown, anything you want to say for
15 the record?

16        MR. BROWN:  I did not subpoena Mr. Redmon or writ
17 him here.  He is here under a writ.  I anticipated that the
18 government would call him because he was on the government's
19 witness list.  Just because they put him on the list, doesn't
20 create an obligation.  But I also included their parties on my
21 witness list, and I'd like to talk with him before -- A, if he
22 wants a lawyer, I think he certainly needs one.  I certainly
23 want to talk to him before I tell the Court that I'll be
24 calling him as a witness in my case.

25        THE COURT:  Let me ask you a couple of things.  Who

1  was his counsel?

2          MR. BROWN:  David Kelly.

3          THE COURT:  David Kelly.  Is he here in the area?

4          MR. PORTER:  He lives in Lee's Summit, Your Honor.

5          THE COURT:  And, Mr. Brown, I'll give you an
6  opportunity to visit with the public defender's office or I
7  could -- Ms. Russell, I may ask you to visit with Judge
8  Whitworth if he's here.  If he's not here to visit with the
9  public defender and see if we could get stand-in counsel for
10 Mr. Redmon, and then over a break or a lunch period we'll see
11 if we can accommodate him having counsel and you having an
12 opportunity to call him as a witness.  Of course, if you call
13 him as a witness, the AUSA can cross-examine.  So we'll try to
14 accommodate if that's what you end up wanting to do.  And we
15 may not be able to resolve this over our lunch hour.  If we
16 need to take an extra long lunch hour, we'll do that as well.

17         Any issues, Mr. Brown, before we call the jury in?

18         MR. BROWN:  Not that I'm aware of, no.

19         THE COURT:  And I thought I saw Mr. Risley come in.

20         MS. ORSINGER:  I had him wait in the vestibule since
21 you were talking.

22         THE COURT:  Then we'll need the defendant.

23         Good morning, Mr. Stephens.  I'll let you have a
24 seat before we call the jury back.

25         Mr. Risley, you can be seated.  We're going to have

1    the jurors submit questions if they have questions of

2    witnesses.  So after the attorneys have finished their

3    questioning, we're going to take a minute to collect note cards

4    from the jury.  So it might be something that you're not used

5    to but you'll just stay seated.

6              THE WITNESS:  Very good.  Thank you.

7              THE COURT:  Are we ready to call the jury back?

8              MR. BROWN:  No, Your Honor.  I may have left my

9    expando file in the chambers conference room.

10             THE COURT:  Ms. Russell.  We'll take just a second.

11             MR. PORTER:  Sorry for those two matters, Judge.  I

12   didn't see those coming.

13             THE COURT:  That's all right.

14             Mr. Brown, are you ready for the jury to come in?

15             MR. BROWN:  Yes, Your Honor.

16             (The following proceedings were had in the presence

17   of the jury:)

18   BRIAN DAVID RISLEY resumed the stand and testified:

19             THE COURT:  Please be seated.

20             Good morning, ladies and gentlemen.  I hope you had

21   a good evening and I'm glad you all made it safely back.

22             I had a chance to visit with the attorneys in our

23   conference this morning, and they are still hopeful that they

24   may be submitting the case to you for deliberations today.

25             I do have a question.  Since I warned you that we

1   would normally run from nine to five, is there anyone who would

2   need to leave at five?  Does anyone have an obligation?  Child

3   obligations?

4           (No response.)

5           THE COURT:  I'm saying that because if we turn the

6   case over to you, it's then out of our court and in yours and

7   you can deliberate as long as you want, go into the evening; or

8   if we don't get far enough today, we'll recess at five and

9   begin at nine.  So if you could just update Ms. Wheeler as to

10  your schedules.  I didn't warn you about that possibility last

11  night.  So it's fine if we need to leave at five today.

12          Second issue is, as I mentioned in one of the

13  earlier instructions, that you have note cards where you can

14  ask questions of the witnesses, and this is our first witness.

15  I'm just reminding you of that once the attorneys have finished

16  questioning the witness, then I'll have the intern collect 14

17  cards and place them up here.  So just to give you a heads up.

18          At this point, Mr. Risley, I need to inform you you

19  are still under oath.

20          And, Mr. Brown, are you ready to resume your

21  cross-examination?

22          MR. BROWN:  Yes, Your Honor.

23          THE COURT:  You may proceed.

24  CROSS-EXAMINATION (continued) BY MR. BROWN:

25  Q       Mr. Risley, when we left yesterday, we had been talking

                              120

1    about your email and voicemail that you sent to Mike Oliver.

2    A      Yes, sir.

3    Q      The email doesn't accurately describe what happened; is

4    that correct?

5    A      I guess I don't know what you mean about how --

6    Q      The email says something to the effect --

7           MR. BROWN:  Did we introduce that, Gene?

8           MR. PORTER:  Yes.  It is Government's Exhibit 7.  We

9    can put it on the screen if you like.

10          MR. BROWN:  Sure.  That would save me a lot of time.

11   Q      (By Mr. Brown)  Is that on your screen?  Your email

12   says, "He followed me outside and threatened me," is that

13   correct?

14   A      It does say that, yes.

15   Q      That is not what happened?

16   A      That would be correct.

17   Q      So that at least the events described in this email are

18   not correct?

19   A      The first part is not.

20   Q      Well, it makes a lot of difference between "he followed

21   me outside and threatened me" and "I had a chance encounter on

22   the street and he threatened me," doesn't it?

23   A      They're not the same thing.  I would agree with you.

24   Q      And so if this email was published to the court or law

25   enforcement or whatever in the sentencing hearing of Malcolm

1    Redmon, people would have a -- they wouldn't have an accurate

2    reflection of what occurred?

3    A      That would probably be fair, but I wasn't thinking of

4    that at the time I sent it.

5    Q      I understand.

6           MR. BROWN:  Could we turn off the screens to

7    everybody but --

8    Q      (By Mr. Brown)  What's been admitted as Government's

9    Exhibit 17 I'm going to put that on the Elmo.

10          MR. PORTER:  We can pull that one up for you also.

11          MR. BROWN:  Thank you.

12   Q      (By Mr. Brown)  There's a caption on that Plaintiff's

13   Exhibit 17; is that correct?

14   A      Yes.

15   Q      And it's United States of America v. Vershawn Edwards,

16   Case No. 14-04065-23-CR-C-SRB, correct?

17   A      Vershawn Dejuan Edwards, yes.

18   Q      The parties to that are United States of America and

19   Vershawn Edwards?

20   A      Yes.

21   Q      You're not a party.  Your name's on that but you're not

22   a party, correct?

23   A      I'm Mr. Edwards' counsel but I'm not a party.

24   Q      And since I don't intend to introduce these, just these

25   screens --

```
 1              MR. BROWN:  And can we go to the Elmo?

 2    Q      (By Mr. Brown)  Can you see that, Mr. Risley?

 3    A      Yes, I can.

 4    Q      And that's a pleading that was filed in this case?

 5    A      It certainly appears so.  I don't recall seeing it.

 6    Q      There's a caption on it.

 7              MR. PORTER:  Your Honor, could I interrupt?  Who's

 8    all viewing what the witness is seeing right now?

 9              MR. BROWN:  Mr. Risley and I.

10    Q      (By Mr. Brown)  And that caption reads United States of

11    America vs. Scott, et al. defendants, Criminal No. 14-4065-01?

12              MR. PORTER:  Judge, objection.  May we approach?

13              (Counsel approached the bench and the following

14    proceedings were had:)

15              MR. PORTER:  He can lay a foundation but he can't

16    read the exhibit.  So I object.

17              MR. BROWN:  I'll have him read the caption.

18              THE COURT:  If you want that as an exhibit.

19              MR. BROWN:  I can't.  I just want the caption.  I

20    don't want the pleading.

21              THE COURT:  I don't know if it's admissible or not

22    at this point.  I don't know the relevancy.

23              MR. BROWN:  I don't intend to -- I don't intend to

24    admit it.

25              THE COURT:  I don't understand what you're trying to
```

Case 2:16-cr-04068-RK   Document 91   Filed 07/12/17   Page 16 of 201

```
 1   do at this point.
 2             MR. BROWN:  Well, it's my position that the
 3   government has to prove the retaliation against a party in a
 4   specific proceeding.  I want to show the jury that he's not a
 5   party to the specific proceeding; and although his client, Mr.
 6   Edwards, may be a party in Scott, et al. and Edwards, U.S. v.
 7   Edwards, he's not a party in U.S. v. Redmon.
 8             MR. PORTER:  Can you keep your voice down so the
 9   jury can't hear you.
10             THE COURT:  I haven't seen this document.  At this
11   point you're testifying through your questions, and I would ask
12   that you use the proper rules of evidence to ask your questions
13   and generate your responses from this witness rather than just
14   reading a document.  And I guess you're asking him is that what
15   this document says?
16             MR. BROWN:  Okay.  I'm prepared to ask him to --
17             THE COURT:  You can utilize any document you want to
18   refresh his memory.  If this is the case he represented the
19   defendant -- I mean Edwards.  There's a lot of ways to skin a
20   cat, but I just don't want you to testify.  So your objection
21   is sustained, and I'll let you get into this area if it's
22   relevant.  Just utilize the rules of evidence.
23             (The proceedings returned to open court.)
24   Q      (By Mr. Brown)  Looking at the document that's on your
25   screen, what's the caption?
```

```
 1              MR. PORTER:  Objection, Your Honor.

 2    Q      (By Mr. Brown)  Do you recognize that document?

 3    A      I don't specifically recall seeing it, but I know what

 4    it is.

 5    Q      If you look at the bottom, it was filed in that case?

 6    A      I would agree with that, yes.

 7    Q      And the caption refers to what?

 8              MR. PORTER:  Objection, Your Honor.

 9              THE COURT:  Can you approach?

10              (Counsel approached the bench and the following

11    proceedings were had:)

12              THE COURT:  Go ahead.

13              MR. PORTER:  In addition, for the purposes of the

14    record, it's not marked for identification.  We have no way of

15    knowing for later proceedings what this is and how it was used.

16    It needs to be marked for identification if it's going to be

17    shown.  It needs to be -- the foundation needs to be laid.

18              MR. BROWN:  I intend to show -- and I can ask the

19    Court to take judicial notice of the filings and documents in

20    this case.

21              THE COURT:  What is your point of this?

22              MR. BROWN:  The point is the government has pled --

23              THE COURT:  I mean of this document.  Why are you --

24              MR. BROWN:  To show that Scott, et al. includes all

25    of the defendants and U.S. v. Redmon applies to a particular
```

1   defendant and U.S. v. Edwards with a specific case number

2   applies to a specific defendant.

3           THE COURT:  Can't you just ask him that?  Isn't that

4   the case he represented the case under?

5           MR. BROWN:  Yes.

6           MR. PORTER:  You can ask the question, but the

7   document and the way he's using it is totally improper.

8           THE COURT:  So your objection is sustained.

9           (The proceedings returned to open court.)

10  Q       (By Mr. Brown)  You represented Mr. Edwards in this

11  proceeding; is that correct?

12  A       Well, in the criminal case.

13  Q       Right.

14  A       Yes.

15  Q       And that's U.S. v. Scott, et al.?

16  A       That is correct.

17  Q       The case number to that is 14-04065-01/27-CR-C-SRB?

18  A       Yes, I believe so.

19  Q       And that refers to all of the 27 defendants when you

20  call that case, Scott, et al.?

21  A       That's how I take it, yes.

22  Q       And when you filed pleadings and paperwork in U.S. v.

23  Edwards, your client, who is part of the Scott, et al., you

24  would file under 14-04065-2-CR; is that correct?

25  A       Actually, no, he was No. 23.

1    Q      23.  I'm sorry.  And that refers to your specific

2    client, Mr. Edwards, who is part of Scott, et al.?

3    A      Yes.  My pleading would only say Vershawn Edwards but

4    drawing the case number to it would --

5    Q      And it only dealt with your client if you filed it

6    under that case number; is that right?

7    A      That's correct.  I didn't file any pleadings for any

8    other codefendants.

9    Q      And you had no participation in, you never filed

10   anything, you never represented anybody in U.S. v. Redmon?

11   A      I'll agree.  Yes, I did not.

12   Q      And that designation for that case is 14-065-02?

13   A      I'm thinking it's 04065, but yes.  It's 2 instead of

14   23.

15   Q      And you had absolutely no participation in that case?

16   A      Agree.

17   Q      You didn't represent any party in that case?

18   A      I would agree.

19   Q      And the parties in 04065-2 are the United States of

20   America?

21   A      Yes.

22   Q      And Malcolm Desean Redmon?

23   A      I'm pretty sure that's his name, yes.

24            THE COURT:  Can counsel approach, please?

25            (Counsel approached the bench and the following

1    proceedings were had:)

2            THE COURT:  I'm sua sponte going to interject in

3    what could be misleading nature of the questions.  The Court's

4    view is that the Scott case is the case and the designations of

5    the defendants in that case are set forth by the numerical

6    listing.  Your questions are posed as if there are multiple

7    cases.

8            MR. BROWN:  There are.  They're joined as Scott, et

9    al. but each case is an individual case.

10            MR. PORTER:  Judge, I agree with you.

11            THE COURT:  And I don't know if we need to let you

12    do a little research, Mr. Brown, to see if -- I think this

13    point -- I think what your defense possibly may be is that it's

14    a different case.  And if that's not accurate, then I want to

15    clear it up now.

16            MR. BROWN:  Well, Your Honor, the government

17    specifically pled in the indictment the official proceeding and

18    set it by number.

19            THE COURT:  Yes, which is the Scott case and they

20    designated --

21            MR. BROWN:  He just indicated he had no

22    participation in that case with that number.

23            THE COURT:  I think we're all on the same page and

24    you have different arguments.  I just don't want to mislead the

25    jury with a defense theory that might not be a legal theory in

1  splitting hairs for different defendants versus a case --

2  multiple cases. So I think we might be good to clear this

3  issue up now so that we can proceed all on the same page,

4  multiple cases or one case with multiple defendants.

5          MR. PORTER: I would absolutely agree with that

6  exactly the way you described.

7          THE COURT: Do you think at this point we could just

8  take a morning break and let us all have a chance to review

9  this issue, do some legal research, and just make sure we agree

10 coming forward, Mr. Brown? If I'm off base, I'm open-minded.

11 I just want to make sure we are accurate for the jury in our

12 questioning.

13         MR. PORTER: I'm happy to let counsel and the Court

14 have whatever time they want, but from our perspective if you

15 just have Ms. Calvert go back and find that portion of this

16 bench conference where you set out your concern at the very

17 beginning, I'm entirely comfortable that being the statement

18 you make to the jury.

19         THE COURT: And I want to take a break and I want to

20 actually do my own research and visit with the clerk's office

21 and get a sound understanding on how we move forward in the

22 most exact way. If you have -- if that is a valid defense, I

23 want you to have that, Jim, but I want to go in the right

24 direction because I think this small point might make a

25 difference in closing arguments.

1          MR. BROWN:  Well, here's my position.  The
2    government could have pled this as Scott, et al.  It chose not
3    to.  It pled it as U.S. v. Redmon with the specific case
4    number.
5          THE COURT:  See, I don't really see that as
6    critical.  He has the critical case number.  It does list one
7    of the defendants, which is relevant.  However, you can conform
8    your verdict director to conform to the evidence.  It may not
9    be exactly the indictment.  It's not one of the critical issues
10   in the indictment.  So there is some leeway there.  And if this
11   is just a red herring and it's not going to get you anywhere,
12   you need to know it now, because I don't want to get to a point
13   where I'm not going to let you argue that in closing and you
14   are counting on that.
15         MR. BROWN:  Well, I'm not counting on that, quite
16   frankly.  This is for the record because, as I've indicated all
17   along, I think they have to show the party that was retaliated
18   against in the official proceeding, and they put the specific
19   official proceeding -- you know, the indictment.
20         THE COURT:  Do you want to make any other comments
21   for the record?
22         MR. PORTER:  No.
23         THE COURT:  Let's take a morning break and let's
24   just be careful as we move forward.
25         MR. BROWN:  Okay.

1                    (The proceedings returned to open court.)

2                    THE COURT:  Ladies and gentlemen, we are going to

3     take an early recess this morning.  Normally we take one about

4     10 or 10:30, but I want to do a little legal research.  So

5     we're going to have a 45-minute morning recess.

6                    And let me go ahead, since it's the beginning of the

7     day, to read this instruction, the admonishment.  We are about

8     to take a recess and I'll remind you of the instruction I gave

9     you earlier.  During this recess or any other recess, you must

10    not discuss this case with anyone.  If anyone tries to talk to

11    you about the case, please let me know about it immediately.  I

12    may not repeat this before every recess but keep this in mind

13    throughout the trial.

14                   Ms. Wheeler, will you allow them to go outside the

15    jury room or do they --

16                   THE COURTROOM DEPUTY:  They can go outside, yes.

17                   THE COURT:  And did you allow them to bring in their

18    phones?

19                   THE COURTROOM DEPUTY:  Yes.

20                   THE COURT:  Will you -- they can utilize their

21    phones at break then.

22                   THE COURTROOM DEPUTY:  Yes, they can.

23                   THE COURT:  Were you all glad that you were able to

24    turn over your phones to the Court versus putting them

25    downstairs to use at the break?  I see a lot of heads nodding.

1    This is the direction I want to go in in the future.  I like

2    all the heads nodding.  So I can bring that back to my chief

3    judge.

4              Ms. Wheeler, if you can let them have their phones

5    and coordinate with the CSO since this is the first time this

6    courthouse has done this procedure.  Why don't we -- if they

7    want to utilize their phones, utilize their phones only in the

8    jury deliberation room if there's good cell coverage, and don't

9    bring the phones back downstairs in and out through the

10   security.  Let's just keep our business up here with the cell

11   phones.

12             They need to be back at 10:30.  We'll be in recess.

13             (Recess was taken at 9:50 a.m.)

14             (The following proceedings were had in the courtroom

15   out of the presence of the jury:)

16             THE COURT:  We do have some information.  The public

17   defender's office does not want to utilize their folks, which

18   they probably have one of the lead conflicts.

19             MR. BROWN:  Right.  They have Scott.

20             THE COURT:  So we're going to seek CJA appointment

21   who does not have a conflict with any of the 27 is what we're

22   doing.

23             I think the next question my clerk has is when does

24   that attorney need to be here to coordinate with you?  And I

25   don't know that we can make that call at this point.  I guess

```
 1    we could make it over our lunch hour, and we can take a long
 2    lunch hour if we need to.
 3              MR. BROWN:  Okay.
 4              THE COURT:  Unless you have another suggestion.  I'm
 5    open.
 6              MR. BROWN:  No, I don't.
 7              MR. PORTER:  The only input I would make, Judge, is
 8    I think that's the appropriate procedure that we should be
 9    following, but I don't think Mr. Redmon's going to have a
10    concern about Mr. Brown interviewing him without an attorney
11    being there.  I could be wrong about that.
12              MR. BROWN:  Well, I don't know, and I do -- Mr.
13    Redmon has counsel on appeal and I have permission from that
14    counsel to talk with him and I talked with him Saturday at the
15    Phelps County jail.  I don't mind talking with him, but I don't
16    want anybody sitting there saying that I'm giving him legal
17    advice or representing him or anything else.  I think he needs
18    counsel of his own.
19              THE COURT:  I'll leave that up to Mr. Porter and
20    you.  If he's willing to talk with you and there's no
21    objection, I'm fine.  I totally have no doubt that you'll be
22    appropriate.
23              MR. BROWN:  Okay.
24              THE COURT:  We'll be in recess.
25              (A recess was taken.)
```

1          (The following proceedings were had in the courtroom
2    out of the presence of the jury:)
3          THE COURT:  We're back on the record.  It's now
4    10:22.  The jury is out of the courtroom.
5          The Court's had a chance to have a conference call
6    with the court clerk, Mike Zadina, and case specialist
7    regarding case numbers and defendant designations.  In a case
8    with multiple defendants the court clerk advises that it is one
9    case, a base case with multiple defendants and that the
10   numerated defendants designate each defendant's docket sheet.
11   Each defendant's docket sheet is also part of the base case.
12         There are two examples that the specialist gave.  If
13   an individual defendant were to file a pleading under the base
14   case and designate the defendant number and that pleading was
15   applicable to another defendant in the base case, that pleading
16   would be listed under that individual defendant's docket sheet
17   as well as the other codefendant's docket sheet as well as
18   under the base case.
19         Another example was that if you had multiple
20   defendants and, for example, two defendants were severed off
21   and had a separate trial, the Court Clerk's Office views the
22   severed trial as remaining in the base case even if there were
23   multiple trials.
24         I say this because the questioning by the defense
25   left an impression in my mind, in the Court's mind that the

1    defense was arguing each codefendant is a separate case and

2    that the indictment in this case which set forth the base case

3    but designated Malcolm Redmon and his individual defendant

4    number, docket sheet number would be part of his defense of an

5    insufficient -- or defective indictment or some defense.  And

6    my concern is if the Court were to reject a proposed

7    instruction on his theory of defense, that it's most proper for

8    the Court to give a warning regarding this area which is more

9    the province of the Court regarding case number designations.

10              So that was my concern as I did not want the defense

11   to be negatively affected by an adverse ruling on a proposed

12   defense instruction.

13              I'll now give the defense and government a chance to

14   weigh in on the record.

15              Mr. Brown.

16              MR. BROWN:  I would just call the Court's attention

17   to Federal Rules of Criminal Procedure 8, joinder of offenses

18   and defendants, specifically 8(b), which deals with the

19   indictment of different defendants and joining different

20   defendants in a base case as indicated.

21              THE COURT:  But, Mr. Brown, I guess I don't

22   understand the relevancy of that rule to this case.  When

23   defendants are indicted jointly, they are -- joinder is

24   presumed proper and that rule wouldn't be applicable.  So what

25   is your point as to that rule?  I'm missing your point.

1          MR. BROWN:  Well, that they are charged as separate

2     defendants but their cases are joined under Rule 8(b) if it's

3     proper.

4          THE COURT:  I'll let Mr. Porter weigh in.

5          MR. PORTER:  Your Honor, I don't think that reliance

6     on Rule 8 is applicable to the issue the Court is addressing.

7     And in addition to what you've outlined, the only thing I would

8     add is that the issue that is trying to be developed in front

9     of the jury is, I think, as you described it, a legal issue,

10    not a question for the jury.  So this whole issue of base case

11    and all of that, I think the jury needs to hear that from the

12    Court as a matter of law, because any concern about the

13    defective indictment is preserved to whatever extent that

14    becomes an issue in further proceedings.  It's not a jury

15    question.  It's not a fact question.  It's a legal question and

16    it's not for the province of the jury.

17         THE COURT:  Mr. Brown, any follow-up?

18         MR. BROWN:  Well, Judge, our position as our motion

19    to dismiss, which has been overruled, raised this as a legal

20    issue.  The Court didn't rule that for whatever reason, but

21    it's made it an issue for the trier of fact.

22         THE COURT:  Mr. Brown, I think -- Court finds that

23    the designation of individual defendants does not designate

24    different cases, and it would be improper for you to argue that

25    they're not part of the same case.

1    Saying that, you do have -- you've made in your
2 motion a separate argument that under 1513 -- 18 U.S.C. 1513
3 that the retaliation or the threat needs to be directed at a
4 witness or a party, and that is a separate issue when the
5 threat was made towards the defense attorney.  So that in no
6 way affects that argument that you have.
7                MR. BROWN:  Right.
8                THE COURT:  Anything further, Mr. Porter?
9                MR. PORTER:  No, Your Honor.  I assume you're going
10 to give that instruction or that advice to the jury at some
11 point, and I think we'll be ready to continue on afterwards.
12                THE COURT:  I don't know that it rises to the level
13 of needing to instruct the jury as to that.  You can certainly
14 argue within the bounds of the law, both sides, and I wouldn't
15 allow a side to argue contrary to -- mislead the jury as to the
16 law.  If you have a proposed instruction for the Court's
17 review, I would entertain any instruction you submit.
18                MR. PORTER:  If you would give us a brief period of
19 time, not a recess, but we'll work on that and get that to the
20 Court as soon as practical.
21                THE COURT:  As long as it's before closing.
22                MR. BROWN:  I have just a minute, two or three more
23 questions of Mr. Risley and I'll be done.
24                THE COURT:  Okay.  Any other issues that we should
25 take up?  I do want to take up -- we do have CJA attorney

1    appointed now, Mr. Nick Brown, available to serve as counsel or
    2    standby counsel for Mr. Redmon who's now in our holding
    3    facility.  I would suggest that both Nick Brown and Jim Brown
    4    visit with Mr. Redmon together and work through that and just
    5    advise the Court as glitches occur.
    6            MR. BROWN:  That's fine.  And I've talked with Mr.
    7    Porter.  I'll go down and talk with Mr. Redmon at our lunch
    8    break.  If Mr. Brown is available then, I'll grab him and we'll
    9    go.
   10            THE COURT:  Very well.  For the record, Nick Brown
   11    is in the courtroom right now, and so if you could do that at
   12    our next break.
   13            Mr. Brown, I would also suggest Nick Brown going
   14    down right now and introducing himself.
   15            MR. NICK BROWN:  Yes, Judge.  When would the Court
   16    be taking the break for the conversation with the other Mr.
   17    Brown?
   18            THE COURT:  I anticipate during our lunch break.
   19            MR. NICK BROWN:  I will speak to him then.
   20            THE COURT:  Mr. Nick Brown, let me ask you, do you
   21    have any commitments throughout the day that we need to work
   22    around?
   23            MR. NICK BROWN:  I do have an appointment around two
   24    o'clock, but I don't know how long his testimony would be or
   25    whether you want me to stay through the conclusion of his

1    testimony.  I just don't know any of that.

2              MR. BROWN:  Well, we aren't going to get to him

3    until at least later today.

4              MR. NICK BROWN:  I mean I could come back.

5              THE COURT:  Are you far away?

6              MR. NICK BROWN:  No.

7              THE COURT:  You can work through that with Jim Brown

8    over the lunch hour.

9              Are we ready to call the jury back?

10             MR. PORTER:  Yes, Your Honor.

11             THE COURT:  And can we have Mr. Risley on the stand

12   again.

13             MR. PORTER:  Yes, ma'am.

14   BRIAN DAVID RISLEY resumed the stand and testified:

15             (The following proceedings were had in the presence

16   of the jury:)

17             THE COURT:  Please be seated.

18             Mr. Brown, sorry for that interruption.  You may

19   continue with your cross-examination.

20             MR. BROWN:  Thank you, Your Honor.

21   CROSS-EXAMINATION (continued) BY MR. BROWN:

22   Q     Mr. Risley, you were the court-appointed counsel for

23   Mr. Edwards?

24   A     That is correct.

25   Q     He didn't retain you.  He didn't spend any of his money

139

1    for your representation?

2    A        Correct.

3    Q        And then on the 29th of September in the evening you

4    met with agents with the FBI?

5    A        No, I did not.  I talked to them later.

6    Q        You had provided a statement, is that right, some

7    written statement?

8    A        I prepared a statement, yes, and I did email it to, I

9    believe only at that time, to Mr. Oliver.

10   Q        And that was written about 8:30 p.m. on September 29th?

11   A        Yes, it was.

12   Q        And you emailed that to whom?

13   A        Mike Oliver.  I may have emailed it the next morning.

14   I wrote the message out -- or I wrote the statement out for,

15   frankly, my own benefit at the time.

16   Q        And did any agent of the FBI, ATF, DEA ever interview

17   you regarding the events that occurred here at the courthouse

18   on the 29th?

19   A        Not on the 29th, no.  It was a few days later.  I think

20   it was the following Monday or Tuesday, I did a phone

21   interview.

22   Q        With?

23   A        With Mr. Abram with the FBI.  I did speak with the U.S.

24   Marshal the following day and he was aware of the statement,

25   but we didn't go -- there were other issues we were discussing.

```
1   Q      So the only agent that you've talked with regarding the
2   specifics of what occurred on the 29th would be Agent Abram?
3   A      Yes.  There was a local Springfield agent, but I didn't
4   talk the specifics of the case with him.
5   Q      And you've indicated your office is in Springfield?
6   A      Yes, it is.
7          MR. BROWN:  I don't have anything further, Your
8   Honor.
9          THE COURT:  Any redirect?
10         MR. PORTER:  Very briefly, Your Honor.
11  REDIRECT EXAMINATION BY MR. PORTER:
12  Q      Mr. Risley, the reason that you spoke with the FBI
13  agent that Mr. Brown just asked you about, what was the reason
14  for that?
15  A      He was following up after I -- I advised Mr. Oliver
16  what happened, spoke with him the next day, and spoke with the
17  U.S. Marshal, and he followed up with me, I think it was that
18  Monday, to determine what was going on.
19  Q      And the statement that you prepared was the one that
20  you created on your own?
21  A      That's correct.
22  Q      Before you talked to any law enforcement agent of any
23  kind?
24  A      Yes.  I talked to Mike Oliver briefly, but he's not a
25  law enforcement agent.
```

1   Q      And it was an attempt by you to record those events so

2   that -- while they were fresh in your mind?

3   A      That's correct.

4   Q      Did you record in that statement the words that the

5   defendant used when he confronted you on the street?

6   A      I did.

7   Q      Did you put that in quotes?

8   A      Yes, I did.

9   Q      And the quotes that you recorded while the events were

10  still fresh in your mind was what?

11  A      "Snitches, you're a motherfucking snitch.  Fuck you.  I

12  will kill you, kill your wife, kill your family."

13  Q      What was the tone and the tenor of Mr. Stephens' voice

14  when he spoke those words to you?

15  A      He was -- appeared pissed off, I mean mad at me.

16  Q      Had anything like that happened to you before?

17  A      No.

18  Q      Do you have any doubt in your mind that those were the

19  words that were spoken?

20  A      That's exactly what the words were.  I still remember

21  them today.

22          MR. PORTER:  Thank you, Your Honor.  Nothing

23  further.

24          THE COURT:  Any recross?

25          MR. BROWN:  No.

```
 1              THE COURT:  Ladies and gentlemen, if you have any
 2    questions now, if you could utilize the note card.  After you
 3    write a question or questions -- you don't have to write any
 4    questions -- I'll have my intern collect 14 cards.
 5              (Counsel approached the bench and the following
 6    proceedings were had:)
 7              THE COURT:  The first card is, "Brian Risley,
 8    attorney 16 years."  Then the next line is, "How does
 9    cooperation lighten Mr. Edwards' sentence?"
10              Mr. Porter, do you want to weigh in on that
11    question?
12              MR. PORTER:  I'm not sure that it's relevant, Judge,
13    but to the extent that it is, I think it's a factor the Court
14    considers in imposing sentence.
15              THE COURT:  Mr. Brown, what is your position as to
16    the question, "How does cooperation lighten Mr. Edwards'
17    sentence?"
18              MR. BROWN:  I have no objection.
19              THE COURT:  Do you have any objection to that being
20    asked?
21              MR. PORTER:  Not beyond what was stated.
22              THE COURT:  The second question on this card is,
23    "Who determined that this go to trial?  Mr. Risley or,"
24    question mark.
25              MR. PORTER:  I assume that's referring to Mr.
```

1   Edwards' case, not this case.

2          MR. BROWN:  No.  I'm assuming that it was this case,

3   not Mr. Edwards' case because he pled.

4          THE COURT:  I'm assuming it could mean this case.

5          MR. PORTER:  Who determined this go to trial?  If

6   the question is, is he going to trial because he's the

7   complaining witness and therefore he has a right to pursue

8   this, I think that answer is absolutely unequivocally no.  He's

9   only here because he's a witness and the government is pursuing

10  the case.  He doesn't have a vote in that.

11         MR. BROWN:  I don't think this is an appropriate

12  question of Mr. Risley.

13         THE COURT:  So you would object to this question

14  being asked?

15         MR. BROWN:  Yes.  Obviously Mr. Porter brought it

16  up.

17         THE COURT:  Do you agree that this second question

18  shouldn't be asked?

19         MR. PORTER:  We join in the objection.

20         THE COURT:  I would only ask the first question.

21         MR. PORTER:  Okay.

22         The second card says, "Any official evidence that

23  defendant had ready himself."

24         Is there any objection to that question?

25         MR. PORTER:  No.  There will be witness testimony

144

1   about that.

2           THE COURT:  So this will be handled later on?

3           MR. BROWN:  I mean, the CSOs who were throwing him

4   out of the courtroom could testify.  I don't know.  I don't

5   think it's an appropriate question for Mr. Risley.

6           MR. PORTER:  I don't know -- I don't know if Mr.

7   Risley has any knowledge of that.  We never asked him about it,

8   and we certainly didn't communicate with him about what was

9   said in the courtroom yesterday because that would have been

10  improper.  So the CSOs are going to testify about that.  So I

11  think that's one of those you can hold off on.

12          THE COURT:  We'll hold off on that question.

13          Next card, "Did he feel that the comment in the

14  hallway justified blocking him from the hallway?"

15          Mr. Porter, I'll let you weigh in first.

16          MR. PORTER:  It's a little difficult, Judge, because

17  there's more than just a comment in the hallway that

18  precipitated the blocking.

19          THE COURT:  So you object to this question?

20          MR. PORTER:  Yes.

21          THE COURT:  Do you object to this question?

22          MR. BROWN:  In its form, yes.

23          THE COURT:  Do you have any suggested change or do

24  you want to just not ask it?

25          MR. BROWN:  I don't think we ought to ask that

                                145

1    because there's too many variables.

2              THE COURT:  The next card is, "Who spoke first

3    outside when Risley was near his car and defendant was on the

4    sidewalk?"

5              MR. PORTER:  I have no problem with that.

6              MR. BROWN:  I have no problem with that.  I think

7    it's been asked and answered.

8              THE COURT:  The next card, "Why did Mr. Risley take

9    it upon himself to restrain Mr. Stephens and not notify court

10   security, slash, marshals?  If notified someone" -- "we may

11   have not had a confrontation."

12             Is there any objection to the first -- to the actual

13   question but not the comment?

14             MR. BROWN:  Not from me.

15             MR. PORTER:  The question is fine.

16             THE COURT:  I'll ask the question.  I won't say the

17   comment.

18             The last card is, "Was surveillance video available

19   of the occurrence in the courtroom or on courthouse grounds?"

20             Is there any objection to that question?

21             MR. BROWN:  I think that will be covered with the

22   CSOs, and Mr. Risley wouldn't have any knowledge of that, and

23   the CSOs are much more informed to answer this question.

24             MR. PORTER:  I agree.

25             THE COURT:  That question won't be asked.  The final

                                   146

1  question on this last card is, "Did the witness attempt to or
2  make any audio recordings of the event?"
3            MR. BROWN:  I don't care about that.
4            MR. PORTER:  That's a fair question, Judge.
5            THE COURT:  So I will circle the portions that I'll
6  ask questions, and you will be allowed to have any follow-up
7  questions.
8            MR. BROWN:  The conspiracy on Scott -- he's going to
9  ask, How does it lighten his sentence?  If it's -- they need to
10 know.
11           MR. PORTER:  He's given -- he knows the testimony,
12 not us.
13           MR. BROWN:  Well -- and he knows -- I don't know.
14 I'm asking for my edification.  He knows what Mr. Edwards was
15 facing?  I would like to know.  Was it a ten to life?
16           MR. PORTER:  The conspiracy was a mandatory minimum
17 ten and a maximum of life.
18           MR. BROWN:  Okay.
19           (The proceedings returned to open court.)
20           THE COURT:  Thank you, ladies and gentlemen.
21           As I mentioned in my initial instruction, some
22 questions may not be asked because of the rules of evidence or
23 because a witness at a later time may address an issue, but
24 there are some that we will ask at this point.  There are four
25 of them.

147

```
1          Mr. Porter, since this is your witness, I'm going to
2   have you ask these four questions that I've circled and I will
3   allow both attorneys to do any follow up.  You can either do it
4   after each question or do them as a group.  It's your
5   preference, Mr. Brown.
6          MR. BROWN:  Mr. Porter can choose.  I don't care.
7          MR. PORTER:  Thank you, Judge.
8   QUESTIONS FROM THE JURY BY MR. PORTER:
9   Q      Mr. Risley, the first question is, Did you attempt to
10  or make any audio recording of the events?
11  A      No, I did not.  I didn't have the time and I wasn't
12  there to do it.  So, no, I didn't.
13  Q      So the next question is, Who spoke first outside when
14  you were near your car and the defendant was on the sidewalk?
15  A      That would be Mr. Stephens.  He repeated something
16  several times.  I only said one word, which was "no."
17  Q      The third question is, How does cooperation lighten Mr.
18  Edwards' sentence?
19  A      He was facing a range of approximately five years at
20  the time he was sentenced.  He'd served 16 months.  Well, 16 to
21  20 months, depending on what counted.  By cooperating, the
22  government asked for 24 months.  I argued for probation because
23  of what he had served, and that's what the Court did.
24  Q      Finally, Why did you take it upon yourself to restrain
25  Mr. Stephens and not notify court security or the marshals?
```

1    A        The incident happened quickly.  I looked at him.  There

2    was a court security guard standing there.  To be honest, I

3    reacted.  My intention was not to restrain him but to create

4    separation.  The whole event from there to outside was 30

5    seconds or less.

6              THE COURT:  Do you have any follow-up questions, Mr.

7    Porter?

8              MR. PORTER:  None at this time, and subject to

9    follow-up following any inquiry from defense counsel.

10             THE COURT:  Mr. Brown, do you have any follow-up

11   questions?

12   RECROSS-EXAMINATION BY MR. BROWN:

13   Q        According to your statement that you prepared on

14   September 29th, the first thing Mr. Stephens said was, "You

15   want to push me again?  You want to push me again?"  Is that

16   correct?

17   A        Outside, yes, that is what he said.

18   Q        And how far away from you was Mr. Stephens when he said

19   that?

20   A        I would have to approximate 30 to 40 feet.  I knew I

21   could get to my car slightly before I thought he could reach

22   me, but it was pretty close.

23   Q        He had to yell at you, right?

24   A        I don't recall yelling.  He talked loud.  But I

25   wouldn't say he was yelling at me.

1    Q     And you've indicated Mr. Edwards was looking at about a

2    five-year sentence.  The conspiracy he was charged with carried

3    a minimum mandatory of ten to life; is that correct?

4    A     Yes, it did.

5    Q     Did he plead to a lesser-included offense or did he

6    plead to the conspiracy?

7    A     I'm almost certain he pled to the conspiracy.  You

8    raise a good question.  I don't know why -- the guidelines,

9    again, in my memory seemed to be 45 to 60 months.

10   Q     But the minimum -- ten-year minimum mandatory would

11   trump any --

12   A     You're correct.  Yes, sir.

13          MR. BROWN:  Nothing further.

14   FURTHER REDIRECT EXAMINATION BY MR. PORTER:

15   Q     And just on that subject of the sentencing exposure

16   that Mr. Edwards had and in light of that question and the

17   original question of how does cooperation lessen Mr. Edwards'

18   sentence, if there is cooperation, then the United States, the

19   prosecution, can ask the judge to sentence below that mandatory

20   minimum, correct?

21   A     Yes, that is correct.  That's the only way.

22   Q     And that's what happened in the case of Mr. Edwards?

23   A     Yes, it did.

24   Q     And so the cooperation is the triggering event that

25   allows the judge, upon request, to have the authority to

1    sentence less than that mandatory minimum?

2    A       That's correct.

3    Q       So that's how cooperation lessens a defendant's

4    sentence?

5    A       Yes.

6    Q       Thank you.

7              THE COURT:  Any other questions, Mr. Brown?

8              MR. BROWN:  No, Your Honor.

9              THE COURT:  You may stand down.  Thank you.

10             (Witness excused.)

11             THE COURT:  Mr. Porter, please call your next

12   witness.

13             MR. PORTER:  Your Honor, may Mr. Risley be excused?

14             THE COURT:  Mr. Brown, may he be finally excused?

15             MR. BROWN:  I can't think of any reason we need to

16   recall him.

17             THE COURT:  You're finally excused.

18             THE WITNESS:  Thank you, Your Honor.

19             MS. ORSINGER:  The government calls Paul Tyree.

20   G. PAUL TYREE, being sworn by the courtroom deputy, testified:

21   DIRECT EXAMINATION BY MS. ORSINGER:

22   Q       Good morning.

23   A       Good morning.

24   Q       Sir, for the record, please, state your full name

25   spelling your first and last name.

```
1    A       G. Paul Tyree, T-y-r-e-e.

2    Q       Mr. Tyree, where are you currently employed?

3    A       Here at the courthouse for Walton Security.

4    Q       And what is your official title here?

5    A       Court security officer.

6    Q       Short for that, would that be CSO?

7    A       Yes, ma'am.

8    Q       And how long have you worked here as a CSO?

9    A       About five and a half years here.  I worked two and a

10   half years for Kansas City.

11   Q       What do your duties entail?

12   A       To provide security for the building, either at entry

13   controlled points, bailiff-type duties here in the courtroom,

14   provide security for the personnel here at the courthouse.

15   Q       Do you have prior law enforcement experience?

16   A       Yes.  I was a law enforcement specialist for the United

17   States Air Force.  I'm a retired military member.  I was also a

18   deputy sheriff for Johnson County and Holden Police Department.

19   Q       How are your court security officer duties generally

20   divided each day?  Do you work the same post all day or does

21   that change?

22   A       It changes every hour.

23   Q       Were you working as a CSO here in Jefferson City on

24   September 29th, 2016?

25   A       Yes, I was.
```

152

```
 1    Q      And is Jefferson City located here within the Western

 2   District of Missouri?

 3    A      Yes.

 4    Q      Where were you assigned from 1 to 2 p.m. on that day?

 5    A      In this courtroom, 4B.

 6    Q      And do you recall where specifically you were located

 7   in this courtroom?

 8    A      Yes.  I was in the jurors' box sitting where the

 9   gentlemen is in the green shirt.

10    Q      For the record sake, are you designating the front row

11   of the jury box on the far end?

12    A      Yes.

13    Q      When I say "far end," the seat closest to the gallery?

14    A      Yes.

15    Q      Were there other CSOs in the courtroom on that day from

16   1 to 2 p.m.?

17    A      There was two others.

18    Q      And who were they?

19    A      James Black, Paul Milne.

20    Q      Were there any other parties located here in the

21   courtroom during that proceeding?

22    A      There was a defendant, judge, deputy marshals,

23   attorneys, several people in the gallery.

24    Q      And much like we're situated today, was the AUSA here

25   at this table?
```

153

1    A      Yes.

2    Q      The table closest to the jury box?

3    A      Yes.

4    Q      Was defense counsel and the defendant located at the

5    table there?

6    A      Yes.

7    Q      The further table away from the jury box?

8    A      Yes, ma'am.

9    Q      Judge on the bench?

10   A      Yes.

11   Q      Different judge, though, correct?

12   A      Judge Bough.

13   Q      And do you recall what type of hearing this was?

14   A      It was a sentencing hearing.

15   Q      And do you recall approximately what time the

16   sentencing hearing began?

17   A      1:30.

18   Q      Now, are you familiar with the defendant in this

19   particular case, Mr. Stephens?

20   A      I hadn't met him until that day or hadn't talked to him

21   or seen him until that day.

22   Q      When you say "that day," are you referring to

23   September 29th, 2016?

24   A      Yes, ma'am.

25   Q      Did you in fact observe Mr. Stephens on that day?

```
1    A       Yes.

2    Q       Where do you recall the defendant being located, so the

3    defendant, Mr. Stephens, being located in the courtroom on that

4    day?

5    A       In the gallery first row.  It would be the left side to

6    me, to myself here.

7    Q       So the first row closest to the jury box?

8    A       Yes.

9    Q       Where was the defendant, Vershawn Edwards, located?

10   A       He was at the end of the table, if I remember right.

11   At the end of that table there on the right.

12   Q       The defense table we referred to previously?

13   A       Yes.

14   Q       And you stated his attorney was located with him?

15   A       Yes.

16   Q       Were there other people in the gallery besides Mr.

17   Stephens?

18   A       There was several people in the gallery.

19   Q       And did they all appear to be together?

20   A       There looked to be three different groups.  There was

21   some law enforcement that I recognized.  There was three family

22   members of Mr. Edwards that were separate from the other people

23   that was in the gallery.  They were in the back row almost in

24   the middle on the right side.

25   Q       So back row on the right side.  So the benches closer
```

155

1    to the door?

2     A      Yes.

3     Q      Do you recall approximately what time the sentencing

4    hearing concluded?

5     A      About a quarter till, 1:45.

6     Q      And did there appear to be any reaction to the sentence

7    that was pronounced?

8     A      Yes.  I could tell that three people were happy besides

9    the defendant.  There was a little bit of noise.  You could

10   tell people weren't real happy with the way it went, the

11   sentencing.

12    Q      Was there any movement about the gallery once the

13   sentencing hearing concluded?

14    A      Yes.  Mr. Stephens had gotten up and started to walk

15   towards the door.  You want me to just tell you what happened,

16   what I remember happening?

17    Q      Yes.  Please.

18    A      As he walked towards the door, I had a premonition

19   something was going to happen, and that's part of our job to

20   recognize something happening.  So I got up from my seat and

21   proceeded towards the door; and as I did, I heard someone tell

22   him from the gallery to let it be, let it go, something to that

23   effect.  And he kept going towards the door.  At that time I

24   noticed that Mr. Risler [sic] was at the door and he was

25   blocking the door trying to prevent Mr. Stephens from going out

1    the door.

2    Q      Had you observed where those three women were located

3    at that time, the three you described earlier being in the back

4    on the right-hand side?

5    A      They had already left.

6    Q      And when you described -- is it Mr. Risley?  Does that

7    sound --

8    A      As the attorney?

9    Q      Yes.

10   A      Yes.

11   Q      Which door are you describing that you said Mr. Risley

12   was blocking?

13   A      The exit to my right, the far door to the right, over

14   here.

15   Q      So there is a set of doors.  There's a first door here

16   that's in the courtroom, then there is a second door.  Are you

17   talking about this first door?

18   A      Yes, the inner doors here.

19   Q      And did you observe whether Mr. Risley and the

20   defendant, Mr. Stephens, touched each other in any way?

21   A      It appeared that he was touching Mr. Mr. Risler because

22   he was trying to get past him.  He was trying to block the

23   doorway by his movements back and forth to keep him from going.

24   Q      And you said he appeared he was touching Mr. Risley.

25   Is it he, Mr. Stephens, touching Mr. Risley?

1   A       Yes, trying to get past him.

2   Q       Did you ever observe Mr. Risley push Mr. Stephens in

3   any way?

4   A       No.

5   Q       And when you say Mr. Risley appeared to be blocking the

6   doors -- or the door, what was he physically doing to block the

7   door?

8   A       He was moving his body from the left to the right,

9   matching Mr. Stephens' movements.

10  Q       Did Mr. Stephens respond verbally in any way?

11  A       I remember him telling him to get out of his way, and I

12  remember Mr. Risler telling him, You're not going to talk to

13  those three girls, those three women.

14  Q       Was the defendant, Mr. Stephens, cursing in any way at

15  that time?

16  A       I don't recall at the door, but the cursing started.

17  Q       The implication is was there cursing later?

18  A       Yes.

19  Q       So how did -- at some point did the parties make it

20  through this first door here in the courtroom?

21  A       Yes.  After I told Mr. Stephens we're leaving the

22  courthouse, Mr. Risler got out of the way, and we started to

23  walk through the door out into the hallway.

24  Q       And when you said that, did you identify yourself in

25  any way?

```
1    A        No.

2    Q        Were you wearing the same uniform you're wearing today?

3    A        Yes, ma'am.

4    Q        And you told Mr. Stephens that you guys were -- he was

5    leaving the courthouse.  So what happened once you get through

6    this first door?

7    A        That's when the cussing, calling us different names as

8    we were -- I want to use the word "push," and what I mean by

9    push is our pure body mass, trying to keep that person from

10   going behind us back into the courtroom.  In no way did I touch

11   him or did he touch me.  We kept pushing him to go out the door

12   towards the elevator.

13   Q        So when you say "push," you mean essentially you're in

14   his personal space?

15   A        Yes, ma'am.

16   Q        So you're walking and sort of leading him on his way

17   out without touching him?

18   A        Yes.

19   Q        When you say "we," who is we?

20   A        James Black, another CSO.

21   Q        Okay.  So Mr. Risley's not involved in this event?

22   A        No.

23   Q        In fact, once you appeared at the doorway and you were

24   there, Mr. Risley left; is that accurate?

25   A        Yes.  He got out of our way.  I don't know where he
```

1    went from there.

2    Q        And you said he was cursing.  Who is he?

3    A        Mr. Stephens.

4    Q        And do you recall specifically what he was saying?

5    A        Pardon my language, but he was calling us

6    motherfuckers.  At one point, "I wish you would die," he said

7    to me.

8    Q        At some point did you, CSO Black, and Mr. Stephens make

9    it through that second set of doors and you're in the hallway?

10   A        Yes.  We're working our way down the hallway almost to

11   the restroom that is on the right-hand side before you get to

12   the elevator.  He asked if he could use the restroom.  We

13   agreed to let him use the restroom.  There's no exit or entry

14   but the one, so we agreed to let him use the restroom.

15   Q        When was this request?  Where and when?  Where were you

16   located physically when this request to use the restroom was

17   made by the defendant?

18   A        Between halfway to the restroom or just before the

19   restroom doors.

20   Q        So within these doors here in the courtroom, the

21   defendant's not making any statements, "I need to use the

22   restroom," "let me go," anything like that?

23   A        I don't recall that, no.

24   Q        So you allowed him to use the restroom.  You mentioned

25   there being only one entrance and exit.  Did you go into the

1    restroom with him?

2    A       No.

3    Q       So you stayed in the hallway?

4    A       Yes.

5    Q       And who is present in the hallway at that time?

6    A       James Black and then a woman who identified herself as

7    his mother was in the hallway with us immediately, at the

8    immediate area.

9    Q       When you say "his mother," is that the defendant's

10   mother?

11   A       Yes, ma'am.

12   Q       And at some point did another CSO join you?

13   A       Paul Milne came out into the hallway.

14   Q       And Paul Milne, was he originally located in the

15   courtroom as well?

16   A       Yes, he was.

17   Q       Was anything decided while the defendant was in the

18   restroom?

19   A       I had it in my mind that immediately at the door that

20   he was leaving the courthouse.  So I had already decided.  Mr.

21   Black had told me that, "I think we need to take him outside."

22   And that's when I told him, "I have every intention of doing

23   that."

24   Q       So as a group, you collectively agreed that Mr.

25   Stephens at that point would be removed from the courthouse?

1    A       Yes.

2    Q       What happened once Mr. Stephens exited the restroom?

3    A       Well, just prior to that, his mother was tugging on my

4    arm asking me to please let him stay, and then she said she was

5    having some chest pain and having difficulty standing there.  I

6    guided her over towards where there's like little benches, and

7    I told her that he is going to leave, that he's being

8    disruptive, that he needs to leave.  I asked her if I needed to

9    call anybody for her.  She said she would be okay.

10           When he came back out, I tried to reason with him to

11   calm him down because he was just as fired up then as he was

12   before.  I tried to calm him down by telling him his mother was

13   having some problems with her chest and to please calm down for

14   her sake as we leave the courthouse.  And he didn't seem to

15   mind that at all.  He didn't react to it at all.

16   Q       Do you recall Mr. Stephens saying anything to you all,

17   you and Mr. Black, at that time?

18   A       Just cussing.

19   Q       And what did you do at that point?

20   A       Continued to escort him to the elevator.

21   Q       And were you able to get Mr. Stephens, the defendant,

22   into the elevator?

23   A       Yes.  Someone had brought the elevator up, a

24   maintenance worker was in the elevator.  He exited.  We got on

25   the elevator, just the three of us; James Black, myself, and

1    Mr. Stephens went downstairs.

2    Q        Did Mr. Stephens, the defendant, say anything during

3    the elevator ride to the first floor?

4    A        Again just cussing, cussing at us, cursing at us.

5    Q        What happened once you reached the first floor of the

6    courthouse?

7    A        Directed him to the front doors which the two CSOs

8    downstairs already had the glass doors open waiting for us to

9    take him through the door.  So I escorted him through the doors

10   to the main doors.  As we got to the first door -- there's two

11   double doors there -- he turned to me, told me, "I hope you die

12   and your whole family dies," and I just waited for him to get

13   to the second door.  Once I saw him leaving the front of the

14   door, I turned around and told my supervisor what had happened

15   in the courthouse because my supervisor was working the front

16   lobby area.

17   Q        When you described going out the double doors on the

18   first floor, those two entry/exit ways; is that correct?

19   A        Yes.

20   Q        One on the right and one on the left?

21   A        Yes.

22   Q        Which set of doors?

23   A        To the left.

24   Q        At any point in time did you ever physically touch the

25   defendant?

163

```
 1   A       No.

 2   Q       After the defendant was removed from the courthouse,

 3   what did you do?  Where did you go?

 4   A       After telling my supervisor what had happened up here

 5   in the courtroom, James Black and I reported back up here.  We

 6   knew there was another hearing going to be beginning so I

 7   needed to get back to my post.

 8   Q       Did you remain in this courtroom, 4B, after 2 p.m.?

 9   A       No.  I was relieved at 2 p.m.

10   Q       Where did you go to at 2 p.m.?

11   A       My post was the lobby.

12   Q       Down on the first floor?

13   A       Yes, ma'am.

14   Q       You mentioned earlier your duties, including entry

15   control points?

16   A       Yes.

17   Q       But for the first floor entryway, do defense attorneys

18   have any other entry points into the courthouse?

19   A       The ones that don't directly work for the U.S.

20   government has other entry control points.

21   Q       So I think what you're saying is AUSAs have different

22   entry points; is that accurate?

23   A       That they can get into the building, yes.

24   Q       But defense attorneys, so nongovernment employees?

25   A       One entry controlled point.
```

164

```
 1   Q       And is that the front door?

 2   A       Yes.

 3   Q       Did you ever observe -- I'm sorry.  You said you were

 4   at the front entry from 2 to 3 p.m.  Did you ever observe Mr.

 5   Risley leave the courthouse that day?

 6   A       No, I did not.

 7   Q       Did you ever observe the three women you had described

 8   having been present in the back of the courtroom for the 1:30

 9   sentencing hearing, did you ever observe them leave the

10   courthouse?

11   A       I did not.

12   Q       Did you make any observations of the defendant while

13   you were working the front lobby or front door from 2 to 3

14   p.m.?

15   A       I noticed that he stayed pretty much across the

16   courtyard.  There is a small wall and there is also like a

17   little pillar directly across.  He was sitting on those two

18   things at different times, but he generally stayed right there.

19               MS. ORSINGER:  If we could display what's already

20   been admitted as Government's Exhibit 15 and display it to the

21   jury as well.

22   Q       (By Ms. Orsinger)  Using Government's -- my screen is

23   not working so I will have to have you test it.  Can you tap in

24   the upper left-hand corner where it says color change, tap on

25   the screen.  Or change color.
```

```
 1    A       I don't have that screen that says change color.

 2    Q       On the edge of the screen itself.

 3    A       I can touch where the towers are at.

 4    Q       Perfect.  Using your finger, could you describe -- or

 5    show for the jury where you described that pillar area where

 6    the defendant appeared to be located?

 7    A       The left-hand side of that little, I guess it's a

 8    corner there where I made that little mark.

 9    Q       For the record sake, what's depicted -- the sort of

10    upside-down V, is that the federal courthouse?

11    A       Yes, straight ahead.

12    Q       And directly below that there appears to be a circle?

13    A       That is what I described as the courtyard.

14    Q       And what you marked on here would be the bottom or

15    about six o'clock of that circle; is that accurate?

16    A       Yes, ma'am.

17    Q       Do you recall when you -- approximately when you first

18    observed the defendant out in this courtyard area?

19    A       Probably about the time I got down, about five minutes

20    after two.

21    Q       So 2:05?

22    A       2:05.

23    Q       The individual you described exiting the courtroom

24    cursing at you and others and escorting out of the courthouse

25    on September 29th, 2016, do you recognize him present in the
```

1    courtroom today?

2    A        Yes.

3    Q        And for the record can you please describe where he's

4    currently located and what he's wearing?

5    A        From my vantage point I can see an orange T-shirt, a

6    gray and brown sweater.  He's standing up for us.

7    Q        Thank you.

8              MS. ORSINGER:  Please let the record reflect he's

9    identified the defendant.

10             THE COURT:  The record will so reflect.

11   Q        (By Ms. Orsinger)  Couple additional questions.  As you

12   were escorting the defendant out, at any point in time did you

13   observe whether he had urinated himself?

14   A        No.

15   Q        Is part of your duties -- at some point do you monitor

16   cameras in the building?

17   A        Yes, we do.

18   Q        And the cameras in the courtroom, do they -- are you

19   familiar whether or not they record?

20   A        I believe they do.  It's not in my duties to be able to

21   pull up that information.

22   Q        Are you in charge of maintaining videos for the

23   courthouse?

24   A        No.

25   Q        And when you described the defendant being removed from

1   the courthouse on the first floor, was Mr. Risley anywhere

2   within the area?

3   A      I did not see Mr. Risley from the moment we went

4   through the doors until the time I came back up I never saw him

5   again.

6   Q      Based upon your observations in the courtroom on that

7   day, was -- I think you described it -- I don't want to

8   misstate your words -- that something was about to happen; is

9   that accurate?

10  A      Yes, ma'am.

11  Q      And is that in relation to parties leaving the gallery

12  area?

13  A      That's at any time.  That could be on any post that

14  we're at.  To be able to recognize the way a person is walking,

15  trying to hide something, trying to start some type of trouble.

16  Q      And what specifically was it about the defendant that

17  gave you concern?

18  A      He was doing a lot of -- like I'm moving my head back

19  and forth, an exaggerated type movement in the gallery, not

20  agreeing with what was being said during the sentencing.  The

21  comments that one of the women made in the gallery as he was

22  walking by not to do something.  That's when I got up to ensure

23  that he was going to walk out and not possibly harass somebody.

24  I suspected that he was going to harass the three women.

25  Q      Based upon that, do you believe Mr. Risley blocking the

1    door was appropriate?

2    A       Yes.  I think he was going to say or do something to

3    those three women, yes.

4    Q       Thank you.

5            MS. ORSINGER:  The government passes this witness.

6            THE COURT:  Any cross?

7            MR. BROWN:  Yes, Your Honor.

8    CROSS-EXAMINATION BY MR. BROWN:

9    Q       Mr. Tyree, as I understand your testimony, you were on

10   the 29th at 1:30, for the 1:30 proceeding?

11   A       Yes, sir.

12   Q       You were sitting over here at the end of the jury box?

13   A       Yes, sir.

14   Q       And there were two other CSOs in the courtroom?

15   A       Yes.

16   Q       And there were marshals in the courtroom?

17   A       Yes, sir.

18   Q       Do you recall how many?

19   A       I remember one police officer that was hired as a

20   guard, and I remember a deputy marshal being in there.

21   Q       So at least two -- that's five law enforcement officers

22   kind of in the courtroom that we've identified at this point?

23   A       Yes, sir.

24   Q       And was there a case agent or any other federal agents

25   sitting at the prosecution's table or anywhere else in the

                              169

1  courtroom just to observe?

2  A      I believe there was possibly one at the table, but

3  there was other law enforcement that I recognized.

4  Q      Sitting out in the gallery?

5  A      Yes, to the left, though, to the left area over here.

6  Q      Over here?

7  A      Yes, sir.

8  Q      Behind Mr. Stephens?

9  A      Yes.

10  Q      Okay.  And you're not far from that -- if you're

11  sitting in the jury box, that first chair in the jury box,

12  you're not far from that first bench where Mr. Stephens was?

13  A      That's correct.

14  Q      Can you overhear -- if there was a conversation or

15  comments were being made from somebody sitting on that first

16  bench and you're sitting here, do you think you could hear

17  them?

18  A      Depending on how loud they were, yes.

19  Q      And you don't recall Mr. Stephens making any comments.

20  You say he was making body gestures, but he didn't make any

21  comments that you heard?

22  A      I didn't hear him make any comments, no.

23  Q      Now, you've indicated there was some sort of a

24  confrontation between Mr. Risley and Mr. Stephens at this first

25  door?

1    A      Yes, sir.

2    Q      And you got up and went over to that door where Mr.

3    Risley was blocking Mr. Stephens from leaving?

4    A      That's correct, sir.

5    Q      And did Mr. Risley at any time go to the second set of

6    doors at the alcove and motion these women away while still

7    blocking Mr. Stephens?

8    A      I don't recall him doing that, no.

9    Q      You didn't see that?

10   A      I did not.

11   Q      Now, you've talked about some video surveillance.

12   There are lots of cameras in this building; is that true?

13   A      That's true.  Yes, sir.

14   Q      And you have video surveillance available to you all

15   around the building, right?

16   A      There is two posts where I could look at video.

17   Q      I understand.  But there's surveillance cameras?

18   A      Are you asking, sir, if I'm able to go back and look at

19   video footage that has already happened?

20   Q      Well, I'm going to get there, so, yeah, sure, if that's

21   the answer.  Can you go back and look at video footage of what

22   various cameras around this courthouse have recorded?

23   A      I cannot.

24   Q      But your supervisor could or there's at least someone

25   in the marshal's office that could?

```
 1    A       That's correct.  There is somebody in the marshal's
 2  office that could.
 3    Q       And if you wanted to, you could ask whoever's
 4  responsible for that to let you review the recorded pictures
 5  that have been taken from any of these various cameras; and if
 6  there was an official reason or whatever, you don't think there
 7  would be any problem with that, do you?
 8    A       I've never heard of anybody asking to do that.
 9    Q       Well, didn't Mr. Abram ask to review some of the video
10  footage?
11    A       I'm not aware of that, no.
12    Q       But he probably asked your supervisor or somebody at
13  the marshal's office that's responsible for that?
14    A       My supervisor is also a contract guard just like me.
15    Q       And Amy Matous up at the marshal's office is actually
16  one that supervises the CSOs both here and Kansas City?
17    A       Yes, sir.
18    Q       And -- well --
19            MR. BROWN:  Could you pull up the courthouse
20  photograph?
21            MS. ORSINGER:  Are you referencing Government's
22  Exhibit 15?
23            MR. BROWN:  Yeah, the one you just used.
24    Q       (By Mr. Brown)  Can you see that?
25    A       Yes, sir.
```

172

1    Q      This parking lot down below, that's on my screen

2    anyway, it's to the left of the screen, it doesn't appear to be

3    any cars parked in there, but at least when this aerial was

4    taken.  Down there.  Do you see what I'm talking about?

5    A      Yes, sir, the one on State Street.

6    Q      There's a pole camera there where you drive in, I'd

7    guess about halfway between the entrance and the back of that

8    parking lot, right?

9    A      There's one on each end of that parking lot, a fixed

10   camera.

11   Q      Right.  So on both ends of the parking lot?

12   A      Yes, sir.

13   Q      So there's video surveillance going on down at the

14   parking lot all the time?

15   A      Yes.

16   Q      How about the sidewalk?  If I park down there and I

17   walk up to what you've called the courtyard, cut over and enter

18   the courthouse, am I under surveillance from video cameras that

19   whole way?

20   A      From the parking lot up State Street to the front?

21   Q      Yes.

22   A      Yes.  Pretty much, yes.

23   Q      Cameras would show what was going on on that sidewalk

24   on State Street?

25   A      Yes, sir.

1    Q       And when I enter the courtyard, am I still under
2    surveillance?
3    A       Yes.
4    Q       And I'm under surveillance all the way until I get to
5    the entry of the courthouse?
6    A       Yes.
7    Q       And as a defense attorney, the only way I can get in
8    the courthouse is going through the metal detector there at the
9    front entry?
10   A       Yes, sir, that's correct.
11   Q       Other lawyers, like AUSAs, they may be able to get in
12   someplace else, but that's the only way I get in?
13   A       Yes, sir.
14   Q       And once I go through the metal detector down there, am
15   I under surveillance in the lobby area of the first floor?
16   A       There is areas of the lobby that's covered, yes.
17   Q       Most of the lobby would be covered?
18   A       Yes.  I'd say most of the lobby is covered.
19   Q       Then when I get on the elevator to come up to the
20   fourth floor, am I on surveillance?
21   A       I'm not aware of any cameras in the elevator.
22   Q       When I exit the elevator into the hallway of the fourth
23   floor, am I on surveillance?
24   A       Yes.
25   Q       And as I turn left out of the elevator and walk down

```
 1    here to 4B, I'm on surveillance?

 2    A       Yes, sir.

 3    Q       When I enter the outer doorway to that vestibule, under

 4    surveillance?

 5    A       No.

 6    Q       And when I actually enter the courtroom, is the

 7    courtroom under surveillance?

 8    A       Most of it.

 9    Q       Okay.  So those are the areas that are under

10    surveillance and at least it's your understanding, although

11    it's not your responsibility, that those recordings -- or those

12    images are recorded in real time?

13    A       I've never looked at a recording.

14    Q       Okay.  What's your understanding?

15    A       That some cameras are capable and some, I believe, are

16    not.

17    Q       Well, we'll ask someone else probably.

18            Now, you approach Mr. Stephens.  You tell him we're

19    putting you out of the courthouse?

20    A       I told him he needed to leave the courthouse, yes.

21    Q       Okay.  That point he got angry and essentially he's

22    cussing you from the time you leave the hallway on the fourth

23    floor, down the elevator, out the front door where you all

24    leave him, right?

25    A       Except for the time he's in the restroom, yes.
```

```
 1    Q       Well, you all didn't follow him into the restroom?
 2    A       Did not.
 3    Q       And he asked to go into the restroom?
 4    A       He did ask, yes.
 5    Q       And you didn't have a problem with it because there's
 6    no place else for him to go?
 7    A       Yes, that's correct.
 8    Q       And did you check to make sure anyone else was in the
 9    restroom when you let him in?
10    A       I did not, no.
11    Q       Do you recall about how long he was in there?
12    A       Three to four minutes at the most.
13    Q       And he was still angry when he came out?
14    A       Yes, sir.
15    Q       Still cussing you?
16    A       Yes, sir.
17    Q       And I think, if I recall your testimony correctly,
18    there was an older woman in a walker who pleaded with you to
19    let him stay?
20    A       Yes.
21    Q       And you and Mr. Black leave him out on the courthouse
22    steps, right?
23    A       Yes.  I made sure he made it through the doors and the
24    door was closed, then he was outside.
25    Q       Okay.  And at some point -- you never had any -- you
```

```
 1   never had any physical confrontation with him?
 2   A       No.
 3   Q       He wasn't resisting you physically?
 4   A       He did not.
 5   Q       He was saying ugly things and he was cursing you?
 6   A       Yes.
 7   Q       But wasn't resisting you physically, didn't threaten
 8   you in any way?
 9   A       Not physically.
10   Q       Well, he said, "I hope you die and I hope your family
11   dies," but that's not a threat, is it?
12   A       I would never tell anybody I hope their family dies or
13   I die in doing their job.
14   Q       I understand.  That's an ugly statement.
15   A       Yes.
16   Q       But it's not a threat.  It's an expression of hope,
17   right, for a bad thing?
18   A       Did you say hope?
19   Q       That makes it an ugly statement but it's not a threat,
20   right?
21   A       I took it as a threat.
22   Q       Okay.  Now, you had this premonition that he might be a
23   problem because of his body movements, correct?
24   A       He got my attention with the body movement.
25   Q       And you've been doing this a long time.  You've been a
```

1    court security officer a long time, right?

2    A      A few years, yes, sir.

3    Q      So you developed this sixth sense or intuition or

4    whatever about --

5    A      It's what I call sizing somebody up.  As a police

6    officer, it's something that you need to do very quickly.  Your

7    life depends on it.

8    Q      Okay.  And you used that in your duties as a CSO?

9    A      Yes, sir.

10   Q      And as I understand your comments or your testimony,

11   Mr. Stephens never made any comments to anybody in the gallery

12   or anything like that before he got up to leave?

13   A      No.  I didn't say that he didn't make a comment.  I

14   didn't hear what the comment was.  After a woman made the

15   comment about him to leave it alone, he made a comment back.  I

16   didn't hear it.  I didn't hear what he said.

17   Q      Okay.  The next thing you hear him say is, "Get the

18   fuck out of my way," or something to that effect to Mr. Risley?

19   A      Yes.

20   Q      Is it my job as a defense lawyer to control what goes

21   on in the courtroom?

22   A      I don't know what a defense attorney's job is.

23   Q      I understand.  But, quite frankly, if there was a

24   ruckus or something going on in the courtroom, you would prefer

25   that I stay out of your way and not participate in that, right?

1   A      I don't know.  As a Good Samaritan I guess people get

2   involved with things all the time.  I can understand somebody

3   trying to protect somebody until somebody else can take care of

4   it.  I was a few steps behind.  I was there almost immediately

5   when this incident happened.

6   Q      And when you got to the first doorway there, you got it

7   under control, right?

8   A      I believe it was, yes, sir.

9   Q      And so Mr. Risley goes on and walks through the second

10  door and there's no confrontation with Mr. Risley?

11  A      I don't know where he went, sir.  My focus was on Mr.

12  Stephens to get him out of the courtroom, the courthouse.  I

13  don't know where he was at.

14               MR. BROWN:  That's all I have, Your Honor.

15               THE COURT:  Any redirect?

16               MS. ORSINGER:  Yes.  Just briefly.  Thank you.

17  REDIRECT EXAMINATION BY MS. ORSINGER:

18  Q      You were asked about law enforcement being present in

19  the courtroom.  I just wanted to be clear, as best you can

20  recall, where they were all located.  So CSOs were present in

21  the courtroom, and you had put yourself -- I'm going to call it

22  Juror No. 7's place; is that accurate?

23  A      Yes, ma'am.

24  Q      Do you recall where CSO Black was located?

25  A      The first time he was at the back of the courtroom.  He

179

```
 1   was either in a chair or at the very end of that pew at the
 2   very back.  When we came back, he sat with me up here.
 3   Q       And CSO Milne was present as well, correct?
 4   A       Yes.
 5   Q       Where was he?
 6   A       He's over where the CSO is today, in that area.
 7   Q       So to your right?
 8   A       To my right, yes.
 9   Q       He sat in a chair in that area?
10   A       I think he was standing pretty much at that time, yes.
11   Q       So you had described yourself and CSO Black responding
12   to the incident at the door; is that accurate?
13   A       Yes, ma'am.
14   Q       And as that transpired, you just happened to be the
15   first CSO to arrive; is that accurate?
16   A       Jimmy was on my -- James Black was on my heels.
17   Q       You call him Jimmy for short?
18   A       Yes, ma'am.
19   Q       And any U.S. Marshals, do they generally sit in the
20   gallery or are they generally in front of the bar?
21   A       On this side of the bar.  There's usually one somewhat
22   where the gentleman is there today, and there's usually one
23   sitting in this general area.
24   Q       Just so we're clear, the gentleman you're referring to
25   is the gentleman in the suit on this side of the bar --
```

1    A       Yes.

2    Q       -- closest to the Court?

3    A       Yes.

4    Q       There was a defendant that was in custody in that

5    sentencing hearing at 1:30, correct?

6    A       That's correct.

7    Q       Who is responsible for that defendant that's in

8    custody?

9    A       The marshals.

10   Q       So their duty is primarily for the defendant?

11   A       Yes.

12   Q       And as the name describes, courtroom security officer,

13   is your duty related to the security of this courtroom?

14   A       That's correct.

15   Q       So that may be up here, but it may be what's going on

16   in the gallery as well?

17   A       Yes.

18   Q       When you mentioned observing movements and reactions by

19   the defendant, Mr. Stephens, just for clarity sake, was that

20   during and after the sentencing hearing?

21   A       Yes, during and after.

22   Q       There was a long discussion about surveillance video,

23   cameras.  Earlier in your direct you had mentioned that that is

24   not one of your primary duties to maintain.  That's something

25   that your supervisor is maintaining and/or what's recorded --

1    it's above your pay grade?

2    A       I'm taking maintaining as someone who is able to go in

3    and take video off, record it.  Us, as CSOs, we have access to

4    the video cameras down in the lobby and in our control center,

5    but we do not have access to be able to play back anything.

6    Q       Or to personally record it?

7    A       Cannot.

8    Q       And the cameras themselves, do they have default

9    settings?  So directions they are by default pointed?

10   A       Yes.

11   Q       And you had mentioned the cameras in the courtroom.

12   Are you able to manipulate or move those cameras when you're in

13   the control center?

14   A       Not the one in the courtroom.

15   Q       And so does it depict the entire courtroom?

16   A       No, it does not.

17   Q       What's not depicted?

18   A       It will pick up maybe the first row, maybe the first or

19   second person on each side of that row.  It will pick up part

20   of the jury and also where everybody is sitting on this side of

21   it.  It's focused dead center on the judge is where it's

22   focused at.

23   Q       You said the parties on this side, your right side

24   again?

25   A       Yes.

1    Q       Does it depict the doorway?

2    A       No.

3    Q       And, again, this is a fixed camera, one that cannot be

4    moved?

5    A       Correct.

6    Q       You talked about observing the screens down in the

7    front lobby.  How many screens are there down there?

8    A       There's two.

9    Q       So you're only able to see two views at one time?

10   A       That's correct.

11   Q       And you mentioned that you were observing the defendant

12   outside near the pillar through one of those cameras; is that

13   accurate?

14   A       I could see him through there, but I could also see him

15   through the glass doors.

16   Q       The cameras outside as well, do they have a default

17   setting?

18   A       Yes.

19   Q       So when you're asked about whether someone's under

20   surveillance, the entire time they walk to the parking lot to

21   the front door of the courthouse, would that require the

22   cameras to be manipulated or moved?

23   A       There's a couple of the cameras that, if I recall, they

24   do not have a default setting that is outside of the building.

25   There is at least two that I know of that go to a default

1    setting.

2    Q      Okay.

3    A      So if it's pointed to say the sallyport area where

4    prisoners are transported in, that's where it will stay, that

5    specific camera.

6    Q      Are you aware of one camera that can be manipulated so

7    you can observe the entire area outside the courthouse?

8    A      Maybe one complete side of a building, but you cannot

9    see around the corner to see the other side of the building

10   with that camera.  You would have to bring up another camera to

11   do that.

12   Q      So it may require manipulating multiple cameras?

13   A      If you want to follow someone, you would have to be

14   clicking along different cameras.

15   Q      And is that something that would be done at the front

16   lobby?

17   A      It can be but our duties as the entry control point

18   sometimes you're too busy to do that.  The control center

19   monitors the cameras.

20   Q      Okay.  So that would require someone being present in

21   the control center manipulating the cameras?

22   A      Yes.

23   Q      Did Mr. Risley ever play any role in removing the

24   defendant from the courthouse?

25   A      No.

```
 1              MS. ORSINGER:  Nothing further.  Thank you.

 2              THE COURT:  Any recross?

 3   RECROSS-EXAMINATION BY MR. BROWN:

 4   Q      The only role Mr. Risley played in the exit was

 5   blocking the door, right?

 6   A      Yes.

 7   Q      Is the control center -- are the cameras manned all the

 8   time?

 9   A      Yes, it is.

10              THE COURT:  Excuse me.  I don't want to -- Mr.

11   Brown, I really want you to limit your questions as to

12   relevancy on courthouse security.  Any details please limit

13   your scale.

14   Q      (By Mr. Brown)  The control center's manned all the

15   time during the day anyway; is that true?

16   A      Yes.

17              MR. BROWN:  That's all I have.

18              THE COURT:  Ladies and gentlemen, if you have

19   questions, I want you to write your question or questions down

20   or turn in a blank card.

21              And, Mr. Brown and Ms. Orsinger, if you could

22   approach.

23              (Counsel approached the bench and the following

24   proceedings were had:)

25              THE COURT:  Mr. Brown, did you have additional
```

```
 1    questions that you wanted to ask this witness on security or

 2    were you through?

 3              MR. BROWN:  No.  No, I was done.  No.

 4              THE COURT:  Can you understand my point?

 5              MR. BROWN:  Yes, absolutely.

 6              THE COURT:  Okay.  I just wanted the record to be

 7    clear that I didn't limit you in some way.

 8              MR. BROWN:  No, I wasn't limited.

 9              THE COURT:  Thank you.

10              MR. BROWN:  Mr. Stephens needs to go to the

11    restroom.

12              THE COURT:  Would you like to take a recess?  What

13    time is it now?

14              MR. PORTER:  Almost noon.

15              THE COURT:  How long do you want a noon break?

16              MR. PORTER:  Shorter the better.

17              THE COURT:  What time do you suggest?  If it's now

18    noon, how long would you like?

19              MR. BROWN:  See Redmon or just take him to the

20    bathroom?

21              THE COURT:  Do you want a break for two hours?

22              MR. BROWN:  No, no, no.

23              MS. ORSINGER:  You're asking for a lunch break?

24              THE COURT:  If you want to break now, when do you

25    want to return?
```

186

1      MR. BROWN:  If we were back by 1:30, I think that
2   would be -- I'm not going to spend a lot of time with him.
3      THE COURT:  We'll discuss this.
4      (The proceedings returned to open court.)
5      THE COURT:  Ladies and gentlemen, we're now going to
6   take our noon recess, and we will recess until 1:30.  I would
7   ask you to be back in the jury deliberation room at 1:30.
8   That's an hour and a half.
9      (The following proceedings were had in the courtroom
10  out of the presence of the jury:)
11     THE COURT:  Please be seated.
12     The defendant can be excused.
13     For housekeeping, should we review the questions --
14  and you can stand down but be available at 1:30.
15     THE WITNESS:  Okay, ma'am.
16     MR. BROWN:  Sure.  We can review the questions.
17     THE COURT:  The first question is, "Has video
18  recording been viewed to see incident?"
19     Any objection to that question, Ms. Orsinger?
20     MS. ORSINGER:  This witness won't have personal
21  knowledge to that question.
22     MR. BROWN:  And he's already testified that he
23  didn't.
24     THE COURT:  Is that something that may be covered at
25  a later time?

```
 1                MS. ORSINGER:  Yes.

 2                THE COURT:  The next card is, "What about the

 3    cameras above judge?  Does not point to entryway, question

 4    mark?  Who's in charge of camera when trouble arises?"

 5                Is there any objection or will that be covered at a

 6    later time?

 7                MR. PORTER:  I can do it through Cody Abram and his

 8    testimony about his attempt to secure surveillance video

 9    footage, or some other member of the U.S. Marshal staff will be

10    able to cover that issue.

11                THE COURT:  Do you join in that objection?

12                MR. BROWN:  Yes.

13                THE COURT:  Next question, "Why was Stephens allowed

14    to stay on property?"

15                Any objection?

16                MR. BROWN:  I'm not sure he knows but I don't care

17    if they ask.

18                MR. PORTER:  I'm not sure if he knows either, but I

19    could tell you the answer to the question if you want to know

20    the answer.

21                THE COURT:  I don't want to know.

22                MS. ORSINGER:  The answer will come out through

23    another witness.

24                THE COURT:  Do you both object to this being asked

25    at this point?
```

188

1       MR. BROWN:  I don't object but I don't know that
2  it's something that he knows.
3       MR. PORTER:  I don't think we're going to get any
4  further along with him being asked that question.
5       MR. BROWN:  Right.
6       THE COURT:  Okay.  We won't ask that one.
7       The next card, "At any time after Mr. Stephens left
8  the restroom, did he complain about having urinated on himself
9  and how might it have been avoided if he had been able to get
10 to the restroom sooner?"
11      MS. ORSINGER:  The government has no objection.
12      MR. BROWN:  I don't care.
13      THE COURT:  Then we will allow Ms. Orsinger to ask
14 this question.  And it's actually a compound sentence.  Do you
15 want to split that into two questions?  Only ask the first.
16 Split it into two and ask both portions.  And let Mr. Brown
17 weigh in.
18      MS. ORSINGER:  It's a compound question.  I think it
19 needs to be clear that asking if at any time Mr. Stephens
20 stated how it might have been avoided if he had been able to
21 get to the restroom rather than coming out as a statement, if
22 that makes sense.
23      THE COURT:  What is your position, Mr. Brown?
24      MR. BROWN:  I don't care.
25      THE COURT:  Okay.  That makes sense to me, Ms.

```
 1   Orsinger.  So the first question will be, "At any time after

 2   Mr. Stephens left the restroom did he complain about having

 3   urinated on himself?"  The second question will be, "Did Mr.

 4   Stephens state how it" -- the second question will be, "If so,

 5   did Mr. Stephens state how it might have been avoided if he had

 6   been able to get to the restroom sooner?"

 7               Any objection?

 8               MS. ORSINGER:  Not from the government.

 9               MR. BROWN:  No.

10               THE COURT:  The next card, "Do you offer assistance

11   to people getting to their cars when situations could possibly

12   be volatile?"

13               MR. BROWN:  I don't have any objection.

14               MS. ORSINGER:  I don't have any objection.

15               THE COURT:  The next card.

16               MR. PORTER:  Judge, I assume it says, Do you -- do

17   the court security officers or do the -- I mean, it's not him

18   personally.

19               THE COURT:  Do the court security officers -- I can

20   amend it so that it's generally.

21               Thank you, Mr. Porter.

22               The next card, "Mr. Stephens had not told anyone in

23   the courtroom he had to urgently pee as he exited the room and

24   hadn't peed his pants with the need to exit the courtroom,

25   correct," question mark?
```

190

| 1 | What is your position, Ms. Orsinger and Mr. Brown?
| 2 | MS. ORSINGER:  I think this may have been covered by
| 3 | the earlier question.  It's more of a statement.
| 4 | MR. BROWN:  Right.  I do too.  He said he didn't
| 5 | hear anything and he didn't see any evidence.
| 6 | THE COURT:  We'll ask the question that addresses
| 7 | that previously.
| 8 | The next card is, "Procedurally in your day-to-day
| 9 | duties are you allowed to request reviews be made of
| 10 | surveillance coverage?"
| 11 | MS. ORSINGER:  No objection from the government.
| 12 | MR. BROWN:  No.
| 13 | THE COURT:  Second question on the card is, "Do you
| 14 | notify surveillance staff of incidents?"
| 15 | MR. PORTER:  It's a fair question.
| 16 | MR. BROWN:  Well, they file reports so they did
| 17 | notify them.  I don't know who they notify as far as
| 18 | surveillance but he filed a report.  It goes into the great
| 19 | bureaucracy.
| 20 | THE COURT:  Do you want me to modify this question?
| 21 | Instead of, "do you," "do CSOs notify surveillance staff of
| 22 | incidents?" or what is your preference?
| 23 | MS. ORSINGER:  The only concern I have with it is
| 24 | there's truly not a surveillance staff.  There are CSOs and
| 25 | there are U.S. Marshals or deputy marshals.

191

1       MR. BROWN:  Well, could we modify that, "Do you

2  notify whoever's in the control room of the incident?"  I think

3  that's really -- well, I don't know what they're asking.

4       MR. PORTER:  Another way to interpret is there's

5  some kind of standing operating procedure for what you do when

6  there is an incident.  I don't know if that's what they're

7  driving at.

8       MR. BROWN:  Since we can't tell, we probably

9  shouldn't ask that question.

10      MS. ORSINGER:  I agree.

11      THE COURT:  We won't ask that question.  We'll only

12  ask the first question.

13      The final card has three sections.  The first is,

14  "Conflicting story, slash, of location of people, slash,

15  courtroom doors as they were leaving, slash."

16      MR. BROWN:  That's what they're going to have to

17  resolve in deliberation.

18      THE COURT:  Three said, "He never touched Mr.

19  Stephens but yet used body to push Mr. Stephens through door,

20  slash, times Mr. Stephens was seen outside and time Mr. Risley

21  conflict where Mr. Stephens was at in courtroom, slash,

22  sidewalk."  I can't interpret a question from that.  What is

23  your position?

24      MS. ORSINGER:  The government objects to all of

25  those statements.

```
 1              THE COURT:  Mr. Brown, you would object to forming

 2    any question?

 3              MR. BROWN:  Yes.

 4              THE COURT:  Second portion, "Do we have video of any

 5    said events?"  And there's a little bit of some language, which

 6    I don't know if that belongs to the first portion or the second

 7    portion.

 8              MS. ORSINGER:  I can't tell which one it belongs to.

 9              THE COURT:  Regardless, what about the second

10    question about the additional writing?

11              MR. PORTER:  "Do we have video of said events?"  Is

12    that what your --

13              THE COURT:  Yes.

14              MR. BROWN:  I take it those others apply to the set

15    in the hallway, courtroom, courtyard, but I don't know.  And

16    since I don't know, I'm not going to --

17              MS. ORSINGER:  I believe he's already stated that --

18    I believe he's already stated that's not part of his duties.

19    That would be his supervisor.  He does not have personal

20    knowledge, so I don't believe that question can be asked.

21              THE COURT:  What is your position, Mr. Brown?

22              MR. BROWN:  I don't think we should ask that

23    question.

24              THE COURT:  It won't be asked.

25              Then, finally, "Have three cameras looks that entire
```

1    courtroom covered?"  I'm sorry.  "Have the three cameras, looks

2    like entire courtroom covered."

3              MR. BROWN:  That's a statement.

4              THE COURT:  Oh, the cameras in the back.

5              MR. BROWN:  Well, I don't know which cameras.

6              THE COURT:  What is your position, Ms. Orsinger?

7              MS. ORSINGER:  It's not a question.  It's a

8    statement.  So as written, I don't believe it could be asked.

9              THE COURT:  Is there any modification to this

10   question that would not be objected to?

11             MR. PORTER:  I'm not sure there can be, Judge.  This

12   witness may not have -- that right there is not the camera

13   that's being used in the control center.  The two in the back

14   are not the cameras being used in the control center.  The only

15   one in the control center --

16             THE COURT:  Is there a witness that will address

17   this?

18             MR. PORTER:  We have a witness from the marshal

19   service.  He's not currently on our witness list so we ask for

20   the opportunity.

21             THE COURT:  Mr. Brown.

22             MR. BROWN:  Who's the witness you want to endorse?

23             MR. PORTER:  It's going to probably be Brett Stevens

24   or Amy Matous or somebody who's with the marshal service who

25   has authority over those cameras.

1          MR. BROWN:  That's fine.

2          MS. ORSINGER:  The other person would be Randy

3     Sinele.

4          MR. PORTER:  Yes, Randy Sinele is another option.

5          THE COURT:  What is your position, Mr. Brown?

6          MR. BROWN:  Well, if they feel like they need to, I

7     don't care, but I think we're getting far afield, and bottom

8     line is they don't have any video surveillance because they've

9     forgotten the password.  When they came back out to fix that,

10    the data was destroyed.

11         MR. PORTER:  Are you familiar with what we're

12    talking about, Judge?

13         THE COURT:  Not at all but that's okay.

14         MR. PORTER:  If you want to know the short story,

15    Readers Digest version, I can give it to you.  That's not far

16    off.

17         MR. BROWN:  There's no video.

18         MR. PORTER:  Not only is there no video but not all

19    the cameras have video attached to them.  Some of them are only

20    monitoring and have no ability to record.

21         MS. ORSINGER:  The one in the courtroom is actually

22    only monitoring.  His statement that he believes it records is

23    inaccurate.  It doesn't.  But he doesn't have that personal

24    knowledge.

25         MR. PORTER:  The court en banc decided a long time

```
 1    ago they don't want activities in the courtroom recorded.  They
 2    don't want the marshals, for example, to be able to sit in that
 3    control center and look on defense counsel's table to see
 4    what's going on at the defense counsel.  The only thing that
 5    can happen in the courtroom is monitoring, and not all the
 6    other cameras that are monitoring are set up to record.  So
 7    we'll clarify all of that through the marshal service witness,
 8    but that also raises your issue perhaps about the disclosure of
 9    courthouse security measures, and we don't want that.  I'm
10    sensitive to that.  That's why I wanted to bring it up to you.
11            MR. BROWN:  Right.  And I'm sensitive to that.
12    Maybe not as sensitive as Gene, but I don't know that I want to
13    get into -- bottom line is they don't have it.  They can't
14    produce it and --
15            MR. PORTER:  And when the effort was made to go back
16    and try to recover what was available on a recorded video, it
17    had never been accessed before.  The password to get to it had
18    been lost, and the only way they could then get back into it
19    was to create a new password and that process destroyed the
20    existing video.
21            THE COURT:  You will have a witness that explains
22    that generic --
23            MR. PORTER:  Generically in that context without --
24    we can do that without disclosing that not all of the cameras
25    are recording.
```

```
 1            THE COURT:  Okay.  If you could -- my suggestion
 2    would be when you question the witness, that you don't identify
 3    various cameras as ones that can record and ones that can't and
 4    just generically an effort was made of all potential vantage
 5    points.
 6            MR. BROWN:  I don't care.  I don't care if they
 7    explain that.
 8            MR. PORTER:  The bottom line is we don't have any
 9    but not for lack of trying.
10            THE COURT:  Explain in generic terms.
11            MR. BROWN:  Right.
12            THE COURT:  That will be fine.  I will not ask --
13            MS. ORSINGER:  Judge, are you granting us leave to
14    call one of those U.S. Marshal witnesses?
15            THE COURT:  For generic explanation?
16            MS. ORSINGER:  Yes.
17            THE COURT:  Mr. Brown, do you have any objection?
18            MR. BROWN:  No.
19            THE COURT:  You are allowed to do that and in your
20    case in chief.
21            MS. ORSINGER:  Yes.
22            THE COURT:  Very well.  We will go that direction.
23    So at this point we only have the four circled questions.
24            We'll take a recess now until 1:30.
25            (Recess was taken at 12:17 p.m. until 1:30 p.m.)
```

```
 1                       AFTERNOON SESSION

 2              THE COURT:  Please be seated.

 3              We've now finished our lunch break and Juror

 4   No. 11 -- I believe it was No. 11, Ms. Wheeler; is that

 5   correct?

 6              THE COURTROOM DEPUTY:  Yes.

 7              THE COURT:  Mentioned to Ms. Wheeler that she left a

 8   second question card on her chair.

 9              And, Ms. Wheeler, will you go check her chair and

10   see if there is a card.

11              Ms. Wheeler, will you hand the card to me.  The card

12   reads, "At any time while you were walking Mrs. Stephens out of

13   the courthouse" -- I'm sorry -- "Mr. Stephens out of the

14   courthouse and he was speaking to you, did you attempt to say

15   anything to try to calm him down?"  I'll read that again.  "At

16   any time while you were walking Mr. Stephens out of the

17   courthouse and he was speaking to you, did you attempt to say

18   anything to try to calm him down?"

19              Ms. Orsinger, what is your --

20              MS. ORSINGER:  The witness is on the stand.  Are you

21   okay with him being in here?

22              THE COURT:  While we discuss, why don't you stand

23   outside the courtroom.

24              MS. ORSINGER:  Sorry about that.

25              THE COURT:  What is your position?
```

198

1      MS. ORSINGER:  The government has no objection to
2  that question.
3      THE COURT:  Mr. Brown, what's your position?
4      MR. BROWN:  I think it's been answered.  If I recall
5  the testimony correctly, he indicated that after Mr. Stephens
6  came out of the bathroom, Mrs. Jordan, Mr. Stephens' mother,
7  was having heart palpitations and he tried to quiet him down
8  for her sake.  So I'd say it's asked and answered.  The jury
9  collectively will remember that even if that particular juror
10  doesn't.
11      THE COURT:  The question specifically references out
12  of courthouse.  Was that asked and answered, in your opinion,
13  Mr. Brown?
14      MR. BROWN:  Yes.
15      THE COURT:  What was the answer?
16      MR. BROWN:  I tried to.  Because of his mom, he kept
17  cussing me and everything and we took him out and the whole
18  time he was cussing, making ugly statements to me.
19      THE COURT:  So you would object to this question
20  being asked?
21      MR. BROWN:  Yes, ma'am.  And I think collectively
22  the jurors will remember that.
23      MS. ORSINGER:  Your Honor, from the government's
24  perspective, the question that was asked was with regard to
25  when the defendant came out of the bathroom.  That's when Mr.

```
 1   Tyree testified that he attempted to calm Mr. Stephens down in
 2   this hallway here on the fourth floor.  The question is related
 3   to from the fourth floor down out of the courthouse.  So that's
 4   different than what the witness has testified to.
 5              MR. BROWN:  That's not my recollection, and I would
 6   object.
 7              THE COURT:  With the defense objection, I will not
 8   ask that question, but that can come up at another time.
 9              Is there anything besides asked and answered that
10   you object to?
11              MR. BROWN:  No, not really.  If they call Black and
12   want to cover that in their direct of Black, that's okay.
13              THE COURT:  Okay.  And then before we call Mr. Tyree
14   back in, Mr. Brown, do you want to make a record regarding
15   calling Mr. Redmon?
16              MR. BROWN:  Yes, ma'am.  After consultation with
17   Nick Brown, who was appointed to represent him in Mr. Brown's
18   presence and in my presence he said if he were called to
19   testify, he would state his name and assert his Fifth Amendment
20   rights and that's all he would do.  I believe that makes him
21   unavailable.
22              If the Court wants to make a record or indicate that
23   that's the case, that's up to the Court; but I'm satisfied if I
24   called him, he would assert his Fifth Amendment rights.  As far
25   as I'm concerned, that makes him unavailable.
```

```
1          THE COURT:  I'm not requesting a record.  Is the
2   government requesting a further record?
3          MR. PORTER:  No, Your Honor.
4          THE COURT:  Okay.  Let's call in Mr. Tyree and the
5   jury.
6          And we do have our latest version of the verdict
7   director, just to keep this flowing to you what our thoughts
8   are.
9          MR. BROWN:  As far as the Court's concerned, the
10  marshals can take Mr. Redmon wherever they need to take him; is
11  that correct?
12         THE COURT:  Yes.  He can be discharged from his
13  subpoena.  Is that okay, Mr. Porter?
14         MR. PORTER:  Absolutely, Your Honor.  He's here
15  pursuant to that ASR and we've communicated to the marshals
16  they can transport him and the ASR is no longer in effect.
17         THE COURT:  Very well.
18         And can Mr. Tyree come back in and take the stand.
19  G. PAUL TYREE resumed the stand and testified:
20         (The following proceedings were had in the presence
21  of the jury:)
22         THE COURT:  Please be seated.
23         Ladies and gentlemen, there are some questions that
24  you submitted that we are able to ask, and so I'd ask Ms.
25  Orsinger to ask those questions.
```

201

```
 1              And I would remind Mr. Tyree that you are still
 2    under oath.
 3    QUESTIONS FROM THE JURY BY MS. ORSINGER:
 4    Q       At any time after Mr. Stephens left the restroom, did
 5    he complain about having urinated on himself?
 6    A       No.
 7    Q       If so, did Mr. Stephens state how it might have been
 8    avoided if he had been able to go to the restroom sooner?
 9    A       No, never brought up.
10    Q       Do CSOs offer assistance to people getting to their
11    cars when a situation could possibly be volatile?
12    A       We have been asked by other judges to escort members of
13    the jury to their cars.
14    Q       Procedurally in your day-to-day duties are you allowed
15    to request review be made of surveillance coverage?
16    A       No.
17              MS. ORSINGER:  The government has no follow-up
18    questions.
19              THE COURT:  That's all of the questions?
20              MS. ORSINGER:  Yes.
21              THE COURT:  Mr. Brown, do you have any follow-up?
22              MR. BROWN:  I do have one.
23    FURTHER RECROSS-EXAMINATION BY MR. BROWN:
24    Q       You were the CSO in this courtroom at 1:30 on the 29th
25    of September; is that correct?
```

A        I was one of them, yes, sir.

Q        Did Mr. Risley ever communicate to you that there might

be --

              MS. ORSINGER:  Objection.  May we approach?

              (Counsel approached the bench and the following

proceedings were had:)

              MS. ORSINGER:  This is starting to go outside the

scope of the juror questions, so before we go there --

              THE COURT:  What is this regarding?  The questions?

              MR. BROWN:  Well, I'm going to ask him if he had --

if it had been brought to the attention of Judge Bough and

Judge Bough had asked that he take him to the car, they would

have done that.

              MS. ORSINGER:  If Mr. Risley had done --

              MR. BROWN:  No.  If Judge Bough had asked the CSOs

to escort any of these people to the car, the CSOs would have

done that.  If you want me to --

              MS. ORSINGER:  The question started back there was

related to Mr. Risley which was why I initially objected.  It

wasn't --

              MR. BROWN:  I will ask him if Judge Bough had asked

the CSOs to escort anyone, would they do that?

              MS. ORSINGER:  I have no problem with that question

as stated.

              (The proceedings returned to open court.)

```
1   Q       (By Mr. Brown)  Mr. Tyree, if Judge Bough had requested
2   you or any of the other CSOs to escort any visitors or whatever
3   to their car, would you have done that?
4   A       Yes.
5               THE COURT:  Any other questions, Ms. Orsinger?
6               MS. ORSINGER:  No thank you, Your Honor.
7               THE COURT:  You may stand down.  Thank you.
8               (Witness excused.)
9               THE COURT:  You may call your next witness.
10              MR. PORTER:  Your Honor, if the Court please, we
11  would call Randy Sinele.
12  RANDALL SINELE, being sworn by the courtroom deputy, testified:
13  DIRECT EXAMINATION BY MR. PORTER:
14  Q       Good afternoon, sir.
15  A       Hi.
16  Q       If you would try to speak into that microphone as much
17  as you can, that would be much appreciated by all of us here so
18  we don't miss any of your testimony.
19  A       Okay.
20  Q       If you would, sir, please state your name and for the
21  benefit of our court reporter, spell both your first and your
22  last names.
23  A       Randall, R-a-n-d-a-l-l, Sinele.  That's S-i-n-e-l-e.
24  Q       Sir, you are employed by the United States Marshal
25  Service; is that correct?
```

```
1    A      Yes.

2    Q      And your place of duty is here in this Jefferson City

3    courthouse?

4    A      Yes, sir.

5    Q      Give us a brief description of your duties with the

6    marshal service here in the courthouse.

7    A      We are responsible for producing prisoners, court

8    security, fugitive investigations.

9    Q      Okay.  Now, I want to direct your attention to

10   September the 29th of 2016.  Do you recall that date?

11   A      Yes.

12   Q      And this jury has heard previous testimony about the

13   events that occurred that afternoon, but I want to focus your

14   attention on events that occurred after September the 29th.

15   A      Okay.

16   Q      In particular, you as a member of the U.S. Marshal

17   Service here in this courthouse were the recipient of a law

18   enforcement request to view or recover the video from any

19   cameras that had been used for either courthouse, meaning

20   exterior, or courtroom, referring to interior cameras,

21   associated with the events that occurred on September the 29th

22   of 2016, correct?

23   A      Yes.

24   Q      In response to that request, the computer that stored

25   that archived video locked up?
```

1    A      Yes.

2    Q      And you learned at that point that the only way to

3    restart that computer was to re-image the computer?

4    A      That's what I was told.

5    Q      And once that computer was re-imaged, the stored or

6    archived video would be lost?

7    A      Yes.

8    Q      And because of that, no video of the events that

9    occurred on September the 29th has been recovered?

10   A      Correct.

11   Q      Either from the interior of the courthouse or the

12   exterior of the courthouse?

13   A      Yes.

14   Q      Both of them -- none of it can be recovered?

15   A      Right.

16   Q      Due to that mechanical failure?

17   A      Yes.

18          MR. PORTER:  Nothing further, Your Honor.

19   CROSS-EXAMINATION BY MR. BROWN:

20   Q      Sir, we don't have any video from the outside or the

21   inside of this courthouse for October 29th, right?

22   A      Correct.

23   Q      And that's because somebody lost the password and they

24   couldn't access it so when it was reset, that data was

25   destroyed; is that correct?

```
 1   A       I'm not sure we ever knew the password for that system.

 2   Q       But it was a password problem, not an equipment

 3   problem?

 4   A       I guess so.

 5   Q       And you don't have any backup for that, for the video

 6   that's recorded here in the courthouse or anything?

 7   A       No.

 8           MR. BROWN:  I don't have anything further.

 9   REDIRECT EXAMINATION BY MR. PORTER:

10   Q       Mr. Sinele, to make sure there's not confusion, and I

11   may have misheard, and if I did, I apologize, but I think

12   perhaps Mr. Brown said October instead of September when he was

13   asking you his questions.  The events we're talking about are

14   on September the 29th of 2016?

15   A       Yes.

16           MR. PORTER:  That's all, Your Honor.

17   RECROSS-EXAMINATION BY MR. BROWN:

18   Q       And if I misstated it, I apologize.  If the data from

19   September 29th is not available, then we don't have any

20   surveillance for those same reasons; is that correct?

21   A       Correct.

22           THE COURT:  If you can remain seated and we'll see

23   if the jurors have any questions.

24           MR. PORTER:  May we approach, Your Honor?

25           THE COURT:  Yes.
```

```
1              (Counsel approached the bench and the following
2      proceedings were had:)
3              THE COURT:  This makes a trial pretty transparent.
4              Mr. Brown, do you have any objections to any of
5      those?
6              MR. BROWN:  I don't.
7              MR. PORTER:  That question, Your Honor, is long-term
8      security of the facility and thus -- I get it.
9              MR. BROWN:  That one might border on security.  It
10     said "before" and I think that's something that's relevant.
11             THE COURT:  If it ever happened before that they've
12     captured it.
13             MR. BROWN:  Yes.
14             MR. PORTER:  This is maybe helpful to make it clear
15     that they're not Keystone Cops.  They are going to fix the
16     problem.  And I think maybe that's okay.
17             THE COURT:  I'll instruct him not to disclose any
18     security.
19             So for the record I will be circling four questions
20     that can be asked, and I'll give a cautionary warning to this
21     witness to not disclose any specifics about security for
22     security reasons.
23             (The proceedings returned to open court.)
24             THE COURT:  Mr. Sinele, we have approximately four
25     questions.  They're fairly general questions.  And because this
```

```
 1    is regarding courthouse security, I would ask that you not

 2    disclose any details of the security system beyond general

 3    answers.

 4              THE WITNESS:  Okay.

 5              MR. PORTER:  Your Honor, if we might approach very

 6    quickly, I want to bring up one more matter.  You said four.  I

 7    think we have five.

 8              THE COURT:  Five.  Okay.

 9              MR. PORTER:  I just didn't want to ask more than you

10    said.

11              May I inquire, Your Honor?

12              THE COURT:  Yes.

13    QUESTIONS FROM THE JURY BY MR. PORTER:

14    Q     Mr. Sinele, the first question from the jury is, has

15    the problem with lost video ever happened before?

16    A     No, not in this building and I wouldn't be aware of any

17    other.

18    Q     Is there a backup protocol for video?

19    A     Not that I'm aware of.

20    Q     And how long is video typically retained?

21    A     That I don't know.

22    Q     The next question is, there are absolutely no data

23    retrieval systems in place for video?

24    A     Not that I'm aware of.  I'm not --

25    Q     The next question is, how is retrieval not possible?
```

```
 1   Who's in charge of the upkeep and password to the computers?
 2   Let me rephrase that as one question.  I think I just asked you
 3   two.  How is retrieval not possible?
 4   A      I don't know.  I'm not --
 5   Q      And who's in charge of the upkeep and the passwords to
 6   the computers?
 7   A      I don't know that answer either.
 8   Q      Finally, are there plans to correct this for the
 9   future?
10   A      Once we can get the machine running, the situation --
11   I'm sure they'll put procedures in place.
12              MR. PORTER:  Those are all the questions, Your
13   Honor.
14              THE COURT:  Any follow-up?
15              MR. BROWN:  No, Your Honor.
16   FURTHER REDIRECT EXAMINATION BY MR. PORTER:
17   Q      The computer that locked up --
18   A      Yes, sir.
19   Q      -- is maintained by ADT?
20   A      If there was a problem, they would be the ones to come
21   in and fix it.
22              MR. PORTER:  Thank you.
23              THE COURT:  You may stand down.
24              (Witness excused.)
25              THE COURT:  Please call your next witness.
```

| 1 | MS. ORSINGER: United States calls James Black. |
| 2 | JAMES BLACK, being sworn by the courtroom deputy, testified: |
| 3 | DIRECT EXAMINATION BY MS. ORSINGER: |
| 4 | Q    Mr. Black, can you please state your full name for the |
| 5 | record. |
| 6 | A    James Black. |
| 7 | Q    Are both of those names common spelling? |
| 8 | A    Yes. |
| 9 | Q    Where are you currently employed? |
| 10 | A    AD Lafayette U.S. Marshals court -- federal courthouse. |
| 11 | Q    Here in Jefferson City? |
| 12 | A    Yes. |
| 13 | Q    How long have you worked here in Jefferson City? |
| 14 | A    Ten and a half years. |
| 15 | Q    What is your title? |
| 16 | A    Court security officer. |
| 17 | Q    What do your duties generally entail? |
| 18 | A    To monitor the coming and going of people to the |
| 19 | courthouse, checking for any kind of threats. |
| 20 | Q    Do you have prior law enforcement experience? |
| 21 | A    Yes. |
| 22 | Q    What does that entail? |
| 23 | A    Started in '99 with the Morgan County sheriff's |
| 24 | department.  Was there about a year, then went to the Stover |
| 25 | Police Department for four years, and then back to Morgan |

1    County for two years and then started here in '06.

 2    Q      CSO duties, are they generally divided by hour posts?

 3    A      Yes.

 4    Q      Were you working here as a CSO on September 29th, 2016?

 5    A      Yes.

 6    Q      More specifically, from the times 1 to 2 p.m. were you

 7    assigned to this courtroom, courtroom 4B?

 8    A      Yes.

 9    Q      Is that the same courtroom we're located in here today?

10    A      Yes, it is.

11    Q      Do you recall where you were located in the courtroom?

12    A      Yes, I do.

13    Q      Where was that?

14    A      I was sitting on this side of the courtroom monitoring

15    the people in the gallery and the rest of the courtroom.

16    Q      And you motioned to your left?

17    A      To my left, yes.

18    Q      Are you referring to the jury box area?

19    A      Yes.

20    Q      And do you recall which row you were in?

21    A      I believe I was in the back row.

22    Q      Do you recall what type of hearing you were present

23    for?

24    A      Criminal hearing.

25    Q      Was it a sentencing hearing?

```
 1    A       Sentencing, yes.

 2    Q       Do you recall approximately what time that began?

 3    A       I believe it started around one, between one and 1:30,

 4    I think.

 5    Q       Are you familiar with the defendant, Mr. Stephens, the

 6    defendant in this particular case?

 7    A       Just what happened that day.

 8    Q       Okay.  Prior to September 29th you were not familiar

 9    with him?

10    A       No.  Never met him, no.

11    Q       Did you see him on September 29th, 2016?

12    A       Yes.

13    Q       That being Mr. Stephens?

14    A       Yes.

15    Q       And where did you first observe Mr. Stephens?

16    A       He was sitting in the gallery.  It would be the left

17    side of the courtroom, my left.

18    Q       Do you recall what row he was located in?

19    A       I believe he was sitting in the front row.

20    Q       And the defendant, Vershawn Edwards, and his attorney,

21    do you recall where they were located?

22    A       They were sitting at the defense table, which would

23    have been to my right where Mr. Stephens is sitting now.

24    Q       Okay.  And you've just identified Mr. Stephens.  Could

25    you please describe also what he's wearing?
```

```
 1    A        Right now?

 2    Q        Yes, for the record.

 3    A        He's wearing a polo shirt, black and brown.

 4              MS. ORSINGER:  Please let the record reflect the

 5    witness has identified the defendant.

 6              THE COURT:  The record will so reflect.

 7    Q        (By Ms. Orsinger)  Okay.  So this sentencing hearing of

 8    Vershawn Edwards once it concludes, what do you recall

 9    happening?

10    A        When it was over the -- Mr. Edwards' attorney, Mr.

11    Risler [sic], started to leave the courtroom with two females.

12    I don't know who they were.  And Mr. Stephens followed them

13    out.  When I noticed there was commotion between the door --

14    this door and the outer door at that time, I proceeded towards

15    the door and Paul Tyree, another CSO, followed me out.

16    Q        You said when you noticed.  Is there a possibility that

17    events were happening before your attention was drawn to it?

18    A        There could have been, yes.

19    Q        So if I understand you correctly, you're referring to

20    some commotion between the sets of door.  So this first door in

21    the courtroom and the second door that exits into the hallway?

22    A        Yes.  What got my attention was loud voices and other

23    commotion going on.

24    Q        Okay.  So did you proceed to that area?

25    A        Yes.
```

1   Q      And continue describing what you observed.

2   A      By the time I got over there, Mr. Stephens and Mr.

3   Risler were already out in the hallway.  I could see Mr.

4   Stephens saying -- telling Mr. Risler he was going to whip his

5   ass if he touched him again.  That's when we proceeded to

6   separate the two.  We asked Mr. Stephens to step away, to step

7   down the hallway with us.  He kept -- he kept mouthing stuff

8   all the way down the hallway.

9   Q      And I want to ask a follow-up question to make sure I

10  understood you correctly.  The statement you heard Mr. Stephens

11  say was that, I'm going to whoop or whip?

12  A      Whip.

13  Q      W-h-i-p?

14  A      Yes.

15  Q      And you mentioned separating the two.  Did anyone stay

16  with Mr. Risley, the defense attorney?

17  A      No.

18  Q      So the CSOs went with Mr. Stephens?

19  A      Yes.  Because at that time myself and Paul Tyree was

20  the only two CSOs in the hallway.

21  Q      And continue what was being said and where were you

22  going?  What was happening?

23  A      Mr. Stephens was upset with, I assume, with the

24  attorney, Mr. Risler.

25  Q      What was he saying?

```
1    A       He kept saying he was going to whip his ass if he
2    touched him.  He said that two or three times.
3    Q       Did you personally ever observe Mr. Risley ever touch
4    Mr. Stephens?
5    A       No, I did not.
6    Q       So where did you go from there?
7    A       We went ahead and escorted him down the hallway a
8    little bit further.  We were close to the bathrooms.  Mr.
9    Stephens' mother was there with us.  She was complaining of
10   chest pains and stuff, and we was trying to -- Paul Tyree was
11   trying to get him calmed down.
12   Q       Him being Mr. Stephens?
13   A       Mr. Stephens, yes.  And at one point Mr. Stephens asked
14   if he could go to the bathroom.  We told him, yes, that would
15   be fine.  Come back out when he's done.
16   Q       And when did Mr. Stephens first request to use the
17   bathroom?
18   A       Whenever we were down by the bathrooms.
19   Q       So prior to that within the doorway and immediately
20   outside the courtroom did Mr. Stephens ever ask to use the
21   bathroom?
22   A       No.  The only time he asked is when we escorted him
23   down towards the bathroom in the hallway.
24   Q       And once there, you and CSO Tyree allowed Mr. Stephens
25   to use the bathroom?
```

```
1    A       Yes.

2    Q       And did you ever observe that Mr. Stephens had urinated

3    himself?

4    A       No.

5    Q       At some point did Mr. Stephens exit the bathroom?

6    A       Yes.

7    Q       What happened at that point?

8    A       At that time another CSO, Paul Milne, was down with us,

9    and at that point we decided that Mr. Stephens needed to leave

10   the building.

11   Q       And where did CSO Milne come from?

12   A       He came from out of the courtroom.  He came out of the

13   same doors we did.

14   Q       But after you and -- I'm sorry, CSO Tyree?

15   A       Yes, after us.

16   Q       And so did CSO Milne stay with you and CSO Tyree?

17   A       It was myself and CSO Tyree that escorted Mr. Stephens

18   down the elevator out to the outer doors.

19   Q       Was Mr. Stephens saying anything from the bathroom to

20   the elevator?

21   A       At one point he said this is bullshit that he had to

22   leave, but we advised him that he was making too much of a

23   commotion and that he needed to leave.

24   Q       What about in the elevator?  What happened then?

25   A       In the elevator he mentioned one other time that he was
```

1  going to whip Mr. Risley's ass if he would have touched him.

2  Q     What happened once you got down to the first floor?

3  A     We exited the elevator and escorted him across the

4  elevator -- or excuse me -- across the lobby and out the glass

5  doors.

6  Q     And was Mr. Stephens saying anything during that time?

7  A     Whenever he got out to the glass doors, he looked back

8  at myself and CSO Tyree and said he hoped we would die and our

9  family would die and then he walked out the doors.

10 Q     What did you do once Mr. Stephens was removed from the

11 courthouse?

12 A     Went back up to this courtroom.

13 Q     Until what time?  Approximately is fine.

14 A     About four o'clock, I believe.

15 Q     Did you ever observe the defendant return to the

16 courthouse on September 29th, 2016?

17 A     No, I did not.

18 Q     Thank you.

19        MS. ORSINGER:  The government passes this witness.

20 CROSS-EXAMINATION BY MR. BROWN:

21 Q     Mr. Black, you've indicated that at about 1:30 on

22 September 29th you were in this courtroom as CSO or security

23 officer, correct?

24 A     Correct.

25 Q     And you believe you were sitting in the back row of the

218

1  jury box?

2  A       Yes, I believe I was sitting there.

3  Q       And how many other CSOs were in the courtroom?

4  A       Paul Tyree was one of them and Paul Milne was the other

5  one.

6  Q       Where were they located?

7  A       I believe Tyree was in the jury box with me, and Paul

8  Milne would have been standing on the other side of the

9  courtroom.

10 Q       All right.  And after the sentencing took place, you

11 observed Mr. Stephens leaving the courtroom?

12 A       Yes.

13 Q       And he got through this first door?

14 A       Yes.

15 Q       And at that point while he was out in that anteroom

16 area, you heard loud voices or something?

17 A       Yes, loud -- yes.

18 Q       That's when you went to see what's going on?

19 A       Yes.

20 Q       And where were the other CSOs?  Did you all converge

21 or --

22 A       Me and CSO Tyree went about the same time.  We both

23 noticed the commotion and we headed that way at the same time.

24 Q       Okay.  And when you got into the anteroom, they had

25 already -- this had spilled out in the hall?

```
1    A       Yes.

2    Q       And you went out into the hall and they were having

3    words and Mr. Stephens was loud?

4    A       Yes.

5    Q       And you -- and your recollection is he was telling Mr.

6    Risley, "If you touch me again, I'm going to whip your ass"?

7    A       Yes, sir.

8    Q       That's when you and Officer Tyree approached him and

9    kind of separated them?

10   A       Yes.

11   Q       And did you tell him he was going to leave the

12   courthouse or did Officer Tyree?

13   A       Officer Tyree did.

14   Q       And he's cussing you; is that fair?

15   A       That's fair, yes.

16   Q       And you kind of head him down the hallway and he says,

17   "I have to go to the bathroom"?

18   A       Yes.

19   Q       You let him go in?

20   A       Yes.

21   Q       Did you check if anybody was in the bathroom?

22   A       No, we did not.

23   Q       Where was Mr. Risley?  Did you see him leave?

24   A       He was still up by the courtroom doors.

25   Q       Back here?
```

```
 1    A       Back here in the hallway, yes.

 2    Q       He hadn't proceeded to the elevators?

 3    A       No.

 4    Q       How long do you think Mr. Stephens was in the restroom?

 5    A       No more than three minutes or so.

 6    Q       All right.  He came out voluntarily?  You didn't have

 7    to go in and get him or anything?

 8    A       That's correct.

 9    Q       He's still cussing you?

10    A       Yes.

11    Q       You take him down the elevator, take him across the

12    lobby, and put him out the door?

13    A       Yes.

14    Q       And he's pretty much cussing you and saying ugly things

15    the whole time?

16    A       Pretty much, yes.

17            MR. BROWN:  That's all I have of this witness, Your

18    Honor.

19            MS. ORSINGER:  Just briefly.

20    REDIRECT EXAMINATION BY MS. ORSINGER:

21    Q       You were asked by defense counsel if they were having

22    words.  You mentioned earlier you heard the defendant say, "I'm

23    going to whip your ass."  Did you hear Mr. Risley say anything?

24    A       Not that I can recall, no.

25    Q       Thank you.
```

Case 2:16-cr-04068-RK   Document 91   Filed 07/12/17   Page 114 of 201

```
 1            MS. ORSINGER:  No other questions.

 2            THE COURT:  Any recross?

 3            MR. BROWN:  No, Your Honor.

 4            THE COURT:  If the jury has any questions, they can

 5   write on their cards.

 6            (Counsel approached the bench and the following

 7   proceedings were had:)

 8            MS. ORSINGER:  No objections.

 9            THE COURT:  Any objections?

10            MR. BROWN:  No.

11            MS. ORSINGER:  This should be -- I think the second

12   part is asking, "Where was the third officer?"  Do you agree

13   with that?

14            MR. BROWN:  I guess, yeah, sure.

15            MS. ORSINGER:  We can ask follow-up questions if we

16   need to clear it up.

17            Three needs to be third; is that right?

18            MR. BROWN:  I think he testified to that.

19            MS. ORSINGER:  He did.

20            MR. BROWN:  I think I asked him questions.

21            THE COURT:  Do you object to that?

22            MR. BROWN:  No.

23            (The proceedings returned to open court.)

24   QUESTIONS FROM THE JURY BY MS. ORSINGER:

25   Q     Mr. Black, I'm going to read you some questions from
```

222

```
 1   the jury.  You said where you and Tyree were when you heard

 2   them.  Where was the third officer for court?

 3    A      The third officer would have been standing where the

 4   female CSO is right now.

 5    Q      Just for the record, you're pointing to your right?

 6    A      The far right, yes.

 7    Q      The wall closest to the exit?

 8    A      Yes.

 9    Q      Do you feel you did everything you could to diffuse the

10   problem concerning Mr. Stephens' anger?

11    A      Yes.

12    Q      At any time did you observe Risley attempt to obstruct

13   defendant's exit?

14    A      No, I never did.

15    Q      Did you observe Risley go to elevator?

16    A      No, I did not.

17    Q      Could -- it reads could he -- could you see or smell

18   any signs of urination?

19    A      No, I could not.

20    Q      Was -- it says was he.  Were you in front of Tyree in

21   the vestibule?

22    A      I can't remember.

23           MS. ORSINGER:  I have no follow-up questions to

24   those, Your Honor.

25           MR. BROWN:  I have no questions.
```

223

```
1              THE COURT:  Very well you may stand down.

2              (Witness excused.)

3              THE COURT:  Ms. Orsinger, will you call your next

4    witness?

5              MS. ORSINGER:  Yes, Your Honor.

6              MR. PORTER:  Your Honor, if the Court please, Wendy

7    Houston.

8    WENDY HOUSTON, being sworn by the courtroom deputy, testified:

9              MR. PORTER:  Before you take the witness, would you

10   like to leave your coat back there?

11             THE WITNESS:  Yes.

12   DIRECT EXAMINATION BY MR. PORTER:

13   Q      And if you want to leave your gloves on or off?

14   A      I do.  It's cold.

15   Q      Ma'am, if you would, please, state your name, your full

16   name and for the benefit of the court reporter, spell both your

17   first and your last names.

18   A      My name is Wendy, W-e-n-d-y, Houston, H-o-u-s-t-o-n.

19   Q      Are you employed, ma'am?

20   A      Yes.

21   Q      Where are you employed?

22   A      Nestle Waters North America.

23   Q      Where do you live?

24   A      Dallas, Texas.

25   Q      Are you a former resident in the Columbia, Missouri,
```

224

```
1    area?

2    A       Yes, sir.

3    Q       And do you have a past and current relationship to

4    Malcolm Redmon?

5    A       Yes.

6    Q       You love him?

7    A       Yes.

8    Q       You believe he loves you?

9    A       He does.

10   Q       Do you have any children by him?

11   A       No.

12   Q       Does he have children by other women?

13   A       Yes.

14   Q       Ma'am, I want to direct your attention to September the

15   29th of this year, 2016.  Do you recall that date?

16   A       Yes.

17   Q       There were a number of sentencing hearings being held

18   that date here in this courthouse and in this courtroom; is

19   that right?

20   A       Yes.

21   Q       You came to attend those sentencing hearings that day?

22   A       Yes.

23   Q       Who did you come with?

24   A       With Bruce.

25   Q       And you're referring to Bruce Wayne Stephens?
```

```
 1   A        Yes.

 2   Q        The defendant in this case?

 3   A        Uh-huh.

 4   Q        Is he present in the courtroom today?

 5   A        Yeah.  But I can't see him, though.  There he is.

 6   That's him.

 7   Q        And to help make sure the jury and everyone else is

 8   able to hear you, if you could try to speak into that

 9   microphone as much as possible.  It's got a flexible thing

10   there that can bend down.

11            Can you identify Mr. Stephens by describing where

12   he's seated in the courtroom and what he's wearing?

13   A        Yeah.  He's sitting -- I don't know -- right directly

14   in front of me now.  And he's wearing I think a brownish jacket

15   and an orange shirt underneath of it.

16            MR. PORTER:  May the record reflect the

17   identification of the defendant, Your Honor?

18            THE COURT:  The record will so reflect.

19   Q        (By Mr. Porter)  Now, there were a number of sentencing

20   hearings scheduled that day for a number of the codefendants in

21   a multiple defendant narcotics prosecution, correct?

22   A        Correct.

23   Q        One of those was the sentencing hearing for Malcolm

24   Redmon, yes?

25   A        Yes.
```

1   Q      One of them was for the sentencing hearing of Vershawn
2   Edwards, correct?
3   A      Yes.
4   Q      You attended both of those sentencing hearings that day
5   on September the 29th?
6   A      Among others.
7   Q      Among others.  So those were just two of the sentencing
8   hearings that day, right?
9   A      Yes.
10  Q      Referring specifically to Vershawn Edwards, prior to
11  coming to court that day, you knew that he was what's referred
12  to as a cooperator against Malcolm Redmon, yes?
13  A      I knew that some of them were.  I didn't know who
14  specifically but, yes, I figured that out.
15  Q      Well, when we talked last night, which was the first
16  time you and I ever spoke, correct?
17  A      Uh-huh.
18  Q      Yes?
19  A      Yes.
20  Q      Last night was the first time we ever spoke?
21  A      Yes.  Yes.
22  Q      You told us you knew Vershawn Edwards was a cooperator
23  before you ever got to the courthouse that day, yes?
24  A      I don't think we went into that kind of detail, but I
25  knew that there were a lot of people that cooperated from

227

1    reading the articles of the Tribune and everything else.  So,
2    yeah, I knew that there were people that were going to be
3    cooperators that were going to be on trial that day.
4    Q    There were no trials that day, were there, Ms. Houston?
5    A    I'm sorry.  What did you say?
6    Q    There were no trials that day.  There were only
7    sentencing hearings.
8    A    Okay.  Well, I mean -- I called it a trial.  Sentencing
9    hearing.  Excuse me.
10   Q    Trial is when someone's guilt or innocence or not
11   guilty or guilt is being established; is that your
12   understanding?
13   A    Okay.
14   Q    And a sentencing hearing is after somebody has already
15   pled guilty and the judge is deciding what the outcome of the
16   case is going to be in terms of a sentence.
17   A    You're the attorney.  I'll take your word for it.
18   Q    Did you attend sentencing hearings that day or did you
19   attend trials that day?
20   A    There was a lot of testimony going on, so I
21   assumed there was -- I'll just let you have that.  It's a
22   sentencing hearing.  You got it.
23   Q    And you knew that of the defendants that were being
24   sentenced some --
25   A    Yes.

```
 1    Q        -- had cooperated?

 2    A        Yes.

 3    Q        And provided testimony about Malcolm Redmon's

 4    involvement in that narcotics conspiracy that he pled guilty

 5    to, correct?

 6    A        True.

 7    Q        Pled guilty to, Malcolm Redmon pled guilty saying he

 8    did it?

 9    A        He pled guilty with stipulations that he disputed.

10    There were plenty of things he objected to.  Don't go to that

11    level if you don't want me to answer truthfully.

12    Q        I'm asking you if he pled guilty to being involved in

13    a --

14    A        He pled guilty with the understanding that he could

15    dispute many things at his trial -- his sentencing hearing.

16    Q        And he had the opportunity to dispute those, did he

17    not?

18    A        My opinion is something different than what yours will

19    be but, yes, his attorney had --

20    Q        Let's just stop.  We don't need to make --

21    A        Why are we talking about Malcolm?

22    Q        There was a sentencing hearing for Malcolm Redmon, was

23    there not?

24    A        Yes.

25    Q        He had a lawyer representing him?
```

1    A       Yes.

2    Q       And that lawyer presented whatever evidence that lawyer

3    thought was necessary for the judge to hear for the purpose of

4    sentencing Malcolm Redmon, correct?

5    A       Okay.  Say it again.  That the judge did what?

6    Q       The lawyer representing Malcolm Redmon put on whatever

7    that lawyer thought was necessary to represent Malcolm at that

8    sentencing hearing?

9    A       Yes.  Yes, I would say that he did.

10   Q       And you sat through that sentencing hearing?

11   A       Yes, I did.

12   Q       And the judge made decisions after hearing both sides,

13   right?

14   A       Yeah, he made a decision.

15   Q       So part of that involved the judge hearing those very

16   issues that you said Malcolm reserved the right to dispute,

17   correct?

18   A       Yes.

19   Q       And after putting on his evidence, the judge decided

20   how to resolve that dispute.  The judge resolved the dispute

21   that Malcolm asked him to resolve, correct?

22   A       Correct.

23   Q       Okay.  There was nothing like that that took place at

24   the Vershawn Edwards' sentencing hearing, was there?

25   A       What do you mean nothing that took place?

1    Q       The dispute about everything.  Let me say it this way.

2    How long did the Vershawn Edwards' sentencing hearing take?

3    A       Maybe an hour.  I don't recall.  I don't know.

4    Q       May we see Exhibit 17, please.  If you'll look at the

5    monitor in front of you, Ms. Houston.  That's been admitted as

6    an exhibit in this trial and it tells us exactly --

7    A       Okay.

8    Q       -- how long it took.  How long did it take?

9    A       It says 1:30 to 1:45.  I don't have a good time

10   reference in my mind.  So -- I mean, excuse me.

11   Q       Do you have any reason to dispute this?

12   A       No, I don't dispute that at all.  If it says 15

13   minutes.  It felt like a lifetime.

14   Q       How long did the sentencing hearing with Malcolm Redmon

15   take?

16   A       A lifetime in my opinion.  It took forever.  It felt

17   like forever.

18           MR. PORTER:  If we could have the witness and only

19   the witness look at Exhibit 19.

20   A       I didn't have a phone that day.  I couldn't look at the

21   clock.  I don't know what time it was.

22   Q       (By Mr. Porter)  There's not a question before you,

23   ma'am.

24           MR. PORTER:  If we could zoom in on the same part

25   of 19.

231

1    Q      (By Mr. Porter)  Do you recognize the caption at the

2    top of that as being the caption for Malcolm's case?

3    A      Yes.

4    Q      Do you see the time that is indicated there from

5    beginning and end?

6    A      Yes.

7    Q      Three hours for that sentencing hearing, right,

8    according to the official court record, correct?

9    A      Yes.  Yes.

10   Q      And you sat through that whole sentencing hearing,

11   didn't you?

12   A      Yes.

13   Q      That's when all the things got resolved that Malcolm

14   wanted to dispute, right?

15   A      That's when he got sentenced, yes.

16   Q      All right.  I want to go back now to the start of Mr.

17   Edwards' sentencing hearing, and if we can look back again at

18   Exhibit 17.  Since it tells us that that hearing started at

19   1:30, I want you to sit there for a moment and try to recall

20   for the benefit of this jury the 30 minutes that preceded 1:30.

21   I want you to go back in time to about one o'clock that

22   afternoon.

23   A      Okay.

24   Q      You were seated outside this courtroom waiting for that

25   hearing or the rest of the court to begin; is that right?

1    A    I was waiting to see Malcolm's attorney. That's what I

2    was waiting for. But, yes, I was in the hallway.

3    Q    So you were outside this very room that we're in right

4    now in the hallway of the courthouse that's on the outside of

5    this room; is that right?

6    A    Yeah. I didn't realize this was the same room but,

7    yeah, I was on a bench.

8    Q    And a man came down the hallway and you were trying to

9    identify who that was?

10   A    Yes.

11   Q    And you asked him a question?

12   A    Yes.

13   Q    What did you ask him?

14   A    I said, "Who do you represent?"

15   Q    Did you know who that man was before you asked that

16   question?

17   A    No.

18   Q    What did he give you by way of an answer?

19   A    He said -- if I recall correctly, I think he just said

20   he was the attorney for Mr. Edwards.

21   Q    At that time who else was in the hallway outside this

22   courtroom with you?

23   A    I think it was just me and Bruce, and then I think

24   Malcolm's kids were there and maybe Courtney and her friend.

25   Q    So you heard that man identify himself as the attorney

```
1    for Vershawn Edwards?

2    A      Uh-huh.

3    Q      Right?

4    A      Yes.

5    Q      And you also heard Mr. Stephens say something

6    immediately after that, correct?

7    A      Yes.

8    Q      What did Mr. Stephens say after that?

9    A      He was just joking with him and he said, "How much do

10   they pay snitches nowadays?"  And he kind of chuckled about it.

11   Q      Anyone else able to hear that?

12   A      I don't know.

13   Q      Were you able to hear it?

14   A      Yes.  I just told you I heard it.

15   Q      How far away was Mr. Edwards' attorney when those words

16   were spoken?

17   A      Maybe 3 or 4 feet.  I don't know.

18   Q      In close enough time range to be able to hear that

19   statement -- excuse me -- in a close enough physical range.  I

20   said time.  He was close enough in space to be able to hear

21   what was said?

22   A      I mean, relative -- I don't know.  I mean, I guess.

23   There were four or five other people in the hallway talking.

24   Q      Prior to the time that Mr. Risley came and was present

25   in the hallway and identified himself as Mr. Edwards' attorney,
```

1   had you heard Mr. Stephens say anything about snitches?

2   A       Prior to that?  No.

3   Q       That was the first time that day that you heard Mr.

4   Stephens say anything about snitches?

5   A       That's all -- yeah.  I don't believe I heard anything

6   else prior to that.

7   Q       At the end of that Edwards' sentencing hearing, that 15

8   minutes that we saw on Exhibit 17, you saw Mr. Stephens start

9   heading towards the door, correct?

10  A       Yes.

11  Q       And you said something to him at that time, correct?

12  A       Yes.

13  Q       What did you say?

14  A       I said, "Hopper, calm down," or "Hopper, chill out," or

15  something.

16  Q       And by Hopper, who are you referring to?

17  A       Bruce.

18  Q       That's his nickname?

19  A       That's what I call him.

20  Q       And you told him to calm down?

21  A       Yes.

22  Q       You saw trouble coming?

23  A       He was just getting loud a little bit and I said calm

24  down.

25  Q       Did he heed your advice?

```
1   A       He reacted to me.  He just said, "It's my opinion."  He
2   said, "There's nothing wrong with my opinion."  And I said,
3   "Okay."
4   Q       And you heard him say some vulgarities as well; is that
5   correct?
6   A       I think he said maybe, "This is bullshit," or something
7   like that.
8   Q       And you told him to stop, correct?
9   A       I just told him to calm down.  I didn't say stop.  I
10  said calm down.  You can play it back on the video.
11  Q       Well, ma'am, there is no video of what took place in
12  this courtroom.  I don't know what you're referring to, but
13  there's no video of what took place in this courtroom.
14  A       Okay.  Well, I was under the impression there was.
15  There's cameras everywhere.  I assume there was.
16  Q       So you would be wrong about that impression, right?
17  A       Obviously.
18  Q       So you sat through Mr. Redmon's sentencing hearing?
19  A       Yes.
20  Q       When that commotion started occurring with Mr.
21  Stephens, what did you do?
22  A       Nothing.
23  Q       Did you distance yourself from him?
24  A       Malcolm --
25  Q       No.  I'm talking about Mr. Edwards' sentencing hearing.
```

1    When the commotion started with Mr. Stephens, you saw that

2    happening at the front door, the only door of this courtroom,

3    you distanced yourself from those events, correct?

4    A    I just stayed in my own spot where I would have been

5    the whole time.  I didn't go anywhere.

6    Q    You didn't want to get entangled in that, correct?

7    A    I didn't want to leave out of the courtroom.  I didn't

8    know if they were going to ban people from coming back.  I

9    wanted to stay put.

10   Q    And you were sitting in the courtroom at the end of

11   Malcolm Redmon's sentencing hearing, correct?

12   A    Yes.

13   Q    That was around five o'clock because we saw earlier

14   that that's the time that it took to complete Malcolm's

15   sentencing hearing, correct?

16   A    Yes.

17   Q    And you heard a statement that was read about the event

18   that had occurred on the street that you weren't present for

19   and you didn't know anything about, but there was a statement

20   read about what occurred on the street involving Mr. Stephens

21   making a threat.  You heard that in this courtroom, yes?

22   A    Yes.

23   Q    Okay.  You didn't know what that was about because you

24   weren't present?  You had no idea what that was referring to

25   because you hadn't seen anything that occurred on the street,

```
 1   correct?
 2   A       Correct.
 3           MR. PORTER:  May I have just a moment, Your Honor.
 4           THE COURT:  Yes.
 5           MR. PORTER:  Briefly, Your Honor.
 6   Q       (By Mr. Porter)  After five o'clock when Malcolm
 7   Redmon's sentencing hearing was over, you did leave, not just
 8   this courtroom but the courthouse, correct?
 9   A       Yes, I did.
10   Q       You found Mr. Stephens?
11   A       Yes.
12   Q       The two of you drove home?
13   A       Yes.
14   Q       You asked him what had happened because you had just
15   heard in the courtroom that there had been something happen on
16   the street?
17   A       Yes.
18   Q       He said nothing happened?
19   A       Correct.
20   Q       Ms. Houston, I want to take you finally back to the
21   topic of what was happening in the hallway outside of this
22   courtroom prior to the time that Vershawn Edwards was
23   sentenced.
24   A       Okay.
25   Q       I asked you if Mr. Stephens had said anything about
```

```
1    snitches, right?

2    A       Yes.

3    Q       And you said that he jokingly said something about

4    snitches getting stitches.  Is that all that you recall?

5    A       Of him saying to Mr. Edwards --

6            THE COURT:  There's an objection.  May you approach?

7            (Counsel approached the bench and the following

8    proceedings were had:)

9            MR. BROWN:  As I remember the testimony, she said he

10   asked how much --

11           MR. PORTER:  You're correct.  I'll rephrase.

12           (The proceedings returned to open court.)

13   Q       (By Mr. Porter)  Again, back to that same time period

14   we were talking about, your testimony here today was that you

15   heard Mr. Stephens say something about, "How much are they

16   paying snitches these days?"  That's what you told this jury,

17   correct?

18   A       Yes.

19   Q       All right.  Is that all that you recall him saying

20   about snitches, him being Mr. Stephens?

21   A       To Mr. Risley?

22   Q       At that point in time in that hallway is that all you

23   recall hearing him say?

24   A       He talked to the children.  He was talking to his

25   grandkids, but he wasn't talking to Mr. Edwards' attorney.
```

```
 1    Q      Okay.  Do you recall listening to a tape recording with

 2    you and I last night when we were visiting?

 3    A      Yes.

 4    Q      A tape recording with you on the telephone?

 5    A      Yes.

 6    Q      If you had a chance to review a transcript of that tape

 7    recording, would that perhaps refresh your recollection as to

 8    things that were said?

 9    A      No.  I know what you're talking about.  I thought you

10    meant did he say anything to an adult person and, no, he

11    didn't.  I know what you're talking about now.  I thought you

12    were talking about Mr. Risley.  I got confused.

13                MR. PORTER:  Your Honor, may I approach the witness

14    for just a moment?

15                THE COURT:  To show her an exhibit?

16                MR. PORTER:  To have her look at a transcript of a

17    recording.

18                THE COURT:  You may.

19                MR. PORTER:  And I can mark it for identification if

20    the Court would like.  We would mark it for identification --

21    well, actually --

22                THE COURT:  If it's used to refresh her memory, you

23    don't have to mark it.

24    Q      (By Mr. Porter)  Have you had a chance to review the

25    document I've just shown you?
```

1    A       Yes.

2    Q       And you recall hearing that on the tape recording?

3            THE COURT:  Will you stand back, Mr. Porter?

4            MR. PORTER:  Sorry.  Excuse me.

5    A       Yes, it was on the recorder.

6    Q       (By Mr. Porter)  And what did you say at that time that

7    Mr. Stephens said about snitches and stitches?

8    A       To the kids.  To the kids he said, "Snitches get

9    stitches."

10   Q       It wasn't just the kids, though, was it?

11   A       Yes, it was.  He didn't -- he wasn't --

12           MR. PORTER:  May I approach again, Your Honor?

13           THE COURT:  You may.  And bring the document up

14   there.

15   A       He was talking to his grandkids.

16   Q       (By Mr. Porter)  Who else was present according to your

17   statement besides Little Malcolm when those statements were

18   made?

19   A       Okay.  But you're asking me did he speak these words to

20   any other person.  He spoke them to his grandchildren.  But my

21   problem was that I was afraid that he was in the earshot of the

22   prosecutor, and so I said, "Your dad out in the hallway in

23   front of the prosecutor is telling Little Malcolm snitches get

24   stitches," and that -- I mean, that's what --

25   Q       What else did you say that he said that happens to

1  snitches?

2  A      And that they'll get a new butthole.

3  Q      You heard this defendant speak those words that you

4  said on that recording, correct?

5  A      Not to the person that he's accused of threatening.

6  That's why I'm lost as to what you want me to do about this.

7  Q      I'm not asking you anything other than did he say those

8  words?

9  A      Yes.

10  Q      Yes.

11  A      Okay.

12          MR. PORTER:  That's all, Your Honor, for now.

13          THE COURT:  Any cross?

14          MR. BROWN:  Yes, Your Honor.

15          MR. PORTER:  May I recover the exhibit, Your Honor?

16          THE COURT:  We'll just leave it up there for now.

17  CROSS-EXAMINATION BY MR. BROWN:

18  Q      Ms. Houston, I'm Jim Brown.  We've never met; is that

19  correct?

20  A      True.

21  Q      We've talked on the telephone?

22  A      True.

23  Q      You're the person that asked Mr. Risley who he

24  represented -- who he represented when he came up the hallway;

25  is that correct?

242

```
 1    A      Yes, I did.

 2    Q      Why did you ask him who he represented?  You were

 3   looking for Mr. Kelly, Malcolm Redmon's attorney; is that

 4   correct?

 5    A      Yes, sir.

 6    Q      And you had never seen Mr. Kelly before?

 7    A      I didn't know who he was.  I tried to Google a picture

 8   of him to get an idea of him.

 9    Q      And Mr. Risley comes up in a suit and tie.  You think

10   he might be an attorney.  So you asked him, "Who do you

11   represent?"

12    A      Yeah, because his attorney had told me he was going to

13   be attending some of the prior hearings as well, so I was just

14   trying to catch him because it's hard to catch up with the man.

15    Q      How long have you known Mr. Stephens?

16    A      Probably about four or five years now.

17    Q      Do you talk with him regularly?

18    A      Every day pretty much, except this last week.

19    Q      On the 29th of September 2016 were you anxious when you

20   came from Columbia to Jefferson City?

21    A      Was I anxious?

22    Q      Were you anxious?

23    A      Yeah.  Yes.

24    Q      Because Malcolm Redmon was getting sentenced that day?

25    A      Yes.
```

```
 1   Q      Was Mr. Stephens anxious?

 2   A      Yes.

 3              MR. PORTER:  Objection, Your Honor.

 4              THE COURT:  Overruled.

 5   Q      (By Mr. Brown)  Was Mr. Stephens anxious?

 6   A      Yes.  Even probably more so than I.  It's his son.

 7   Q      Was Mr. -- were you concerned about Mr. Stephens'

 8   health?

 9   A      Yes.

10   Q      Why?

11   A      Because he was sick leading up to me flying home, and I

12   was really worried about him.  I kept telling him he needed to

13   go to the doctor.

14   Q      Would he go to the doctor?

15   A      No.

16   Q      Why not?

17   A      Because he was afraid they were going to put him in the

18   hospital and that he would miss Malcolm's trial.

19   Q      How was it that --

20   A      Or hearing, his sentencing hearing, whatever.

21   Q      Okay.  How was it that you came to see Mr. Stephens on

22   the morning of the 29th?

23   A      I called him.  Well, at first we knew the sentencing

24   was supposed to happen at 9 a.m.  They switched it up until

25   two.  Then I got a little worried we needed to go early because
```

```
 1    I didn't know if they would just do it in succession, like if
 2    somebody finished early and the next person just starts.  So I
 3    asked him to please be ready probably no later than ten so that
 4    we could get down here just in case.  So I picked him up right
 5    around 10 a.m., I think, and told him to be ready and I'll come
 6    and get him and bring him down here.
 7    Q     You were his ride down to Jeff City?
 8    A     Yes.  We wanted to come together.
 9    Q     Was any other relative of Mr. Stephens being sentenced
10    that day?
11    A     Yes.
12    Q     Who?
13    A     Marlon Jordan.
14    Q     And what time was his sentencing?
15    A     His was due to start at 11.  I wanted to try to get
16    here at least for his.
17    Q     And were you successful?
18    A     Yeah.  We saw him first.
19    Q     You and Mr. Stephens attended Mr. Jordan's sentencing?
20    A     Yes.
21    Q     Same courtroom?
22    A     Yes.
23    Q     Do you recall approximately what time that got done?
24    A     I thought it was an hour, but I'm probably wrong.
25    Q     What did you all do after Mr. Jordan's sentencing?
```

```
 1   A      Well, I wanted to get him something to eat and make
 2  sure he was eating and drinking.  I took him up to McDonald's
 3  just real quick, and I waited in the parking lot.  He won't go
 4  in the drive-through.  We always go in the parking lot and
 5  he'll go in and use the bathroom.
 6   Q      Does he have bathroom issues, do you know?
 7   A      Yes.
 8   Q      So you left the courthouse in the late morning of
 9  September 29th?
10   A      Yes, sir.
11   Q      And did you return to the courthouse?
12   A      Yes.
13   Q      About what time was that?
14   A      I thought we were gone about an hour, 40 minutes maybe.
15  It wasn't long.  Like we just went up on the Missouri Boulevard
16  to the McDonald's there, and then he just got something to eat
17  and drink and I drove right back, and so just there and back
18  like 30 -- I don't know, 30 minutes, 40 minutes probably.  It
19  was over the lunch hour so it was a little bit busy.
20   Q      Because you were anxious and you wanted to be here for
21  Malcolm Redmon's sentencing?
22   A      Yes.
23   Q      And when you came back in, you and Mr. Stephens come on
24  up to the fourth floor?
25   A      Yes.
```

1    Q       Could you get into the courtroom?

2    A       No.  The door was locked still.

3    Q       Did you know whose sentencing was going to happen next?

4    A       Not necessarily.  I tried to keep up with it on the

5    video thing but it would scroll.  I couldn't catch it every

6    single time.  So I just waited out there.  But I knew -- I kind

7    of had an idea who all was going to be going today -- or that

8    day.

9    Q       But there was nothing particular about seeing Mr.

10   Edwards' sentencing that you were aware of?

11   A       No.  I don't know who that guy is.  He doesn't know

12   him.  He didn't ever know him.

13   Q       So at some point Mr. Risley shows up, right?

14   A       Yes.

15   Q       And you asked who he is?

16   A       Yeah.

17   Q       Doors are still locked?

18   A       Yes, sir.

19   Q       He stands out in the hall a minute?

20   A       Mr. Risley?

21   Q       Yes, ma'am.

22   A       I think he might have tried the door same as we did

23   kind of like -- at that time we were kind of laughing because

24   we all tried the door, whatever.

25   Q       Then he wanders off?

```
 1    A      Uh-huh.

 2    Q      And eventually they open the courtroom door?

 3    A      Yes.

 4    Q      What happens when they open the courtroom door?

 5    A      I think everybody just started filing in.

 6    Q      And when you say "everybody started filing in," who is

 7    that?

 8    A      Well, by that time there was -- Mr. Edwards' family was

 9    out there too.  Like, he had a mother and a girlfriend and I

10    think the girlfriend's mom too.  So his family -- I'll say his

11    family.  I don't know him.  But his family, our family.  The

12    prosecutor might have came through the back -- he was in the

13    hallway for a minute.  I want to say he came through that door

14    over there.  Then Mr. Kelly eventually showed up, then we had

15    more family.

16    Q      So --

17    A      It was a lot of people.

18    Q      And they came into the courtroom?

19    A      Yeah.

20    Q      Bruce take a seat right there in the front?

21    A      Yep.

22    Q      You and other family members take a seat over here kind

23    of --

24    A      We sat with the Edwards family over there.

25    Q      Edwards family was in the back?
```

```
 1   A        Yeah.

 2   Q        Now --

 3            MR. BROWN:  Do you know what exhibit the email is?

 4   I'm sorry.

 5            MR. PORTER:  No. 7.

 6   Q        (By Mr. Brown)  Mr. Porter asked you about some

 7   announcement that was made in Malcolm Redmon's sentencing.  Is

 8   that what was read out?

 9   A        Not word for word.

10   Q        Okay.

11   A        If I recall correctly, he just stated that he was

12   followed outside and threatened.  I don't recall these words

13   being read, not directly word for word, but he just -- the gist

14   of it all was that he felt like he was threatened outside.  He

15   was followed outside and threatened, and he thought that it

16   might have been Malcolm Redmon's father.

17   Q        So your impression based on the announcement was that

18   Mr. Stephens followed Mr. Risley out and there was some sort of

19   a confrontation on the street?

20   A        That's what I thought.  I mean, I think it was even in

21   Malcolm's transcripts if I read it correctly.

22   Q        Now, Mr. Porter asked you about not doing anything when

23   Mr. Stephens left the courtroom and you saw a scuffle coming

24   on.  Do you remember his questions about that?

25   A        Oh, about me not doing anything?
```

1    Q      Uh-huh.

2    A      Yes, I remember that.

3    Q      What did you see?  Did you see a scuffle?

4    A      The scuffle was at the doorway.

5    Q      Okay.  Was it in the doorway right there?

6    A      Yes.

7    Q      Going out into that little vestibule?

8    A      Yeah.

9    Q      What did you see happen at that door right there?

10   A      The attorney was taking up the walkway for the exit

11   right there, and Hopper just kept saying he needed to get

12   through.  And the guy is wide.  He was a wide man.  And there

13   was some more security people over there, maybe two or three.

14   I don't remember all of them exactly, but there were a couple,

15   few of them over there, and Hopper just kept saying he needed

16   to get through.  Let me out.  And the man put up his arms on

17   both sides of the door frame because the door was open, and

18   then he said, "No, I'm good.  I'll be here for a minute."  Then

19   he didn't let Hopper go and then he yelled and told him to get

20   the F out of my way.

21   Q      Was there any pushing or shoving or physical contact?

22   A      The only shoving was when the man -- so they were

23   really close to each other and Hopper was telling the attorney

24   to get out of the way, let him go, and then he put his arms up

25   there and like stabilized himself, then he kind of bumped back

1   on him.

2   Q       Bumped back onto Mr. Stephens?

3   A       Yes.

4   Q       Eventually did you see Mr. Stephens get through that

5   doorway?

6   A       Yeah.  And I don't -- I've been trying to replay it in

7   my brain.  I don't remember exactly how everybody got loose

8   from there.  I don't remember if the guys in the blue jackets

9   said everybody out or how it all happened, but somehow --

10  sorry -- somehow it ended up into the middle doors there and I

11  didn't go out there.

12  Q       Were you able to hear anything?

13  A       I just heard, I mean, voices.

14  Q       You couldn't understand what was being said?

15  A       No, I don't know who was saying anything.  I didn't

16  ever go out there to check.

17  Q       And you didn't see Mr. Stephens again on the 29th until

18  after five o'clock in the evening; is that correct?

19  A       Yes.  I went and found him after I left out of

20  Malcolm's hearing.

21  Q       And where was he?

22  A       He was just waiting on the pillar out there for me.

23  Q       Mr. Porter indicates that Malcolm's sentencing hearing

24  took about three hours; is that right?

25  A       Yeah.

```
 1   Q      And so you were -- you were in the courtroom.  You

 2   didn't leave after you came in about 1:30 until after five?

 3   A      No, I never left.

 4   Q      You don't know where Mr. Stephens is?

 5   A      No.

 6   Q      You don't know what's happened to him, but at this

 7   point it's more important to you that you see Malcolm's hearing

 8   than what happened to Mr. Stephens; is that true?

 9   A      Yes.  I was worried about Malcolm.

10   Q      Now, I believe Mr. Porter asked you about what Mr.

11   Stephens said on the ride home?

12   A      Yes.

13   Q      And you indicated he denied anything happening, right?

14   A      Yes.

15   Q      He didn't tell you, I threatened that SOB or whatever?

16   A      No, he's never told me that.  Every time I tell him to

17   plead guilty or do anything he said, "No, I'm not going to.  I

18   didn't do it."

19   Q      And he's always denied any threats were made to Mr.

20   Risley; is that correct?

21   A      Yes.

22   Q      Now, the prosecutor also asked about snitches get

23   stitches and the comments Mr. Stephens was making out in the

24   hallway?

25   A      Yes.
```

1   Q      And you had a telephone conversation that they recorded

2   with Mr. Redmon later that day?

3   A      Yes.

4   Q      And in that you expressed that it wasn't very

5   appropriate for Mr. Stephens to be saying that to the kids; is

6   that right?

7   A      Yeah.  I know Malcolm's protective over the children.

8   He doesn't want them to hear or see certain things.  So I knew

9   he would be mad at his dad, but I had to tell him.

10  Q      But it bothered you he was saying that in front of his

11  grandchildren?

12  A      Yes.

13  Q      Quite honestly, it bothered you he was saying it in

14  front of the prosecutor?

15  A      Yeah.  All of that bothered me because I didn't want

16  Malcolm to be -- I just wanted this day to go differently than

17  it did.

18            MR. BROWN:  I don't think I have anything further,

19  Your Honor -- well, may we approach?

20            THE COURT:  Sure.

21            (Counsel approached the bench and the following

22  proceedings were had:)

23            MR. BROWN:  I'm not sure.  A lot of this other stuff

24  wasn't beyond the scope of direct, but I would like to ask her

25  about the I am tha Town song and that's not been mentioned at

1  this point. I'm going to ask that you release her from her
2  subpoena and tell her that I'll recall her.
3          MR. PORTER: The witness is here pursuant to a
4  government-issued subpoena. We're responsible for her travel.
5  And she's scheduled to leave tomorrow to go back to Dallas. I
6  don't have any concern about how he wants to do it, but there
7  needs to be some other arrangements for taking care of her
8  expenses if we're done with her, and we are.
9          MR. BROWN: Okay. I'm going to -- I can ask her
10  questions about that right now.
11          MR. PORTER: But it's outside the scope --
12          MR. BROWN: And if they object, then I'm entitled to
13  ask the Court to not release her from her subpoena; and if that
14  costs them some money, so be it. It's coming out of the same
15  pocket whether it's me or her.
16          MR. PORTER: Not exactly. It's coming out of the
17  same government treasury but not the same budget. Be that as
18  it may, Judge, I don't want that area explored at this point.
19  I think it's inappropriate and so -- if that means we have to
20  reschedule her flight, to me that means he needs to help
21  mitigate this by getting her on as early as possible in his
22  case. That's what I'm thinking.
23          MR. BROWN: That's fine. I'll put her on as my
24  first witness.
25          THE COURT: I won't release her from the subpoena

```
 1   then.  We'll take a break now.

 2              (The proceedings returned to open court.)

 3              THE COURT:  We're going to take our afternoon break

 4   at this point, and I would ask if you have any questions, to

 5   write down your questions before we take a break, and we'll

 6   review those questions, and you can take a break while we're

 7   reviewing those questions.

 8              Ms. Wheeler, if you would take the jury back to the

 9   jury room, please.

10              (The following proceedings were had in the courtroom

11   out of the presence of the jury:)

12              THE COURT:  Please be seated.  If counsel will come

13   up and we'll look through the questions.

14              MR. PORTER:  Can the witness be excused for the

15   moment, Your Honor?

16              THE COURT:  Yes.  You may step down.

17              THE WITNESS:  Where do you want me to go?

18              THE COURT:  In the hallway.  And we'll call you

19   back, and there's probably going to be a 20-minute break.

20              THE WITNESS:  Okay.  I'll just go use the restroom

21   or something.

22              THE COURT:  On the record.  Mr. Brown, will you look

23   at these and hand me which ones you have objections to.

24              That one he has an objection to.

25              MR. BROWN:  This is kind of a three-parter.  I might
```

1    have an objection to one.

2              THE COURT:  Do you have an objection to this one?

3              MR. PORTER:  Here's my only concern about that

4    question, and I don't have any concern about the factual nature

5    of the question, but she has a personal risk of perjury

6    depending on how she answers that question.  Just being totally

7    candid.

8              MR. BROWN:  I think you ought to let the Court know

9    that.

10             MR. PORTER:  I don't mind her answering it.  But

11   there is -- if she says no, she will have exposed herself to a

12   personal charge based on other evidence accumulated

13   underlying --

14             THE COURT:  Do you think this would be an improper

15   question if either the government or defense were to ask it of

16   this witness?

17             MR. BROWN:  Yes.

18             THE COURT:  What's your basis?

19             MR. BROWN:  Well, we are talking about Mr.

20   Stephens -- I'm too loud when I shouldn't be and not loud

21   enough when I can.  This case is about Mr. Stephens, not about

22   Malcolm Redmon, and I object to any details of Malcolm Redmon's

23   case coming in on this jury.  I think it exposes my client to

24   the potential of being convicted over some extraneous matter

25   that his son's responsible for.

1            MR. PORTER:  You want a response, Judge?  The fact
            2    that Mr. Redmon's criminal activity and the fact of his
            3    conviction and the nature of that conviction, selling crack
            4    cocaine, is already before this jury.  So that risk of
            5    spillover, we've passed that bridge a long time ago.  To your
            6    question, it could potentially be relevant for bias and that's
            7    its only --
            8            THE COURT:  Let's move, then, to the next question.
            9    "She stated he has health problems.  What kind and what are the
           10    side effects?"
           11            Ms. Orsinger, what's your position?  Mr. Porter?
           12            MR. PORTER:  Your Honor, that is objectionable on
           13    hearsay.  She doesn't have -- she can't have any personal
           14    knowledge.  Whatever she's going to know is through somebody
           15    else.
           16            THE COURT:  And what is your position?
           17            MR. BROWN:  I don't care if you ask that question.
           18    I don't have an objection.  He's probably right that she's not
           19    a healthcare provider.
           20            THE COURT:  I won't ask it then.
           21            "Mr. Stephens never told you what -- where he had
           22    been all the time you were in Malcolm's hearing."
           23            What is your position, Mr. Brown?
           24            MR. BROWN:  That's objectionable.  This is now
           25    getting into matters if it occurred after the alleged incident

                                        257

| | |
|---|---|
| 1 | with Mr. Risley out on the street.  We've got a three-hour |
| 2 | window here and they're basically asking, Did he tell you |
| 3 | anything that happened in the three or four hours that he was |
| 4 | missing?  And what he did at four o'clock is not relevant to |
| 5 | what occurred at 1:30 or 1:55 when he got kicked out. |
| 6 | THE COURT:  What is your position? |
| 7 | MR. PORTER:  The question is, Did he tell you? |
| 8 | THE COURT:  Did Mr. Stephens tell you where he had |
| 9 | been?  What are -- where he had been all the time during |
| 10 | Malcolm's hearing? |
| 11 | MR. PORTER:  That was discussed at length post |
| 12 | statement.  Cody will testify to that at length. |
| 13 | THE COURT:  You both feel that this question |
| 14 | shouldn't be asked? |
| 15 | MR. PORTER:  At this time. |
| 16 | THE COURT:  "Did Mr. Stephens tell you of his |
| 17 | whereabouts after he was forced to leave the building?" |
| 18 | MR. BROWN:  I mean, in some ways it's the same |
| 19 | question that we just talked about. |
| 20 | MR. PORTER:  We're going to have Cody Abram testify |
| 21 | in Mr. Stephens' own words what he said he did. |
| 22 | THE COURT:  So both your preference is not to ask |
| 23 | this question of this witness? |
| 24 | MR. PORTER:  Yes. |
| 25 | MR. BROWN:  Yes. |

```
 1              THE COURT:  He needs clarification between
 2    relationship between parties in this hearing.  What is your
 3    position?
 4              MR. PORTER:  That's not a question and it doesn't
 5    make any sense and I don't think we can decipher it.
 6              MR. BROWN:  And I object to it.
 7              THE COURT:  "When did the witness move to Texas?
 8    Did she always live there?"
 9              MR. BROWN:  I know the answer to that question
10    but -- and I don't have any objection to it.
11              MR. PORTER:  That's fine.
12              THE COURT:  "Did she know all the people being
13    sentenced and how many?"
14              MR. PORTER:  That's fine.
15              MR. BROWN:  That's fine with me.
16              THE COURT:  "Who read the email to the Court and
17    during whose sentencing?"
18              MR. PORTER:  Your Honor, we've marked for
19    identification as Government's Exhibit 17 -- excuse me -- 18
20    the transcript of that sentencing hearing, and I'm going to ask
21    the Court to take judicial notice of the last two pages of that
22    transcript.  That will answer that question.
23              MR. BROWN:  Well, I don't mind if the Court limits
24    the portion of the transcript -- the reading of the email and
25    the identity of the person who does it, but I don't remember
```

259

1  right off the top of my head what occurs after in the last two

2  pages.  So my position is I don't care if the Court reads the

3  statement and who made it; but beyond that, I would object to

4  the introduction of any transcript of Malcolm Redmon's

5  sentencing hearing.

6          MR. PORTER:  Judge, the last two pages -- Judge, it

7  starts at the top of this page where Mr. Oliver is speaking,

8  asking the Court to make an additional record.  I'll be quiet.

9          THE COURT:  "Judge, I would move to dismiss the

10  original indictment and the other counts of the superseding

11  indictment to which Mr. Redmon did not enter a plea of guilty

12  to.

13          "Also, Judge, there's a matter that I want to place

14  on the record after we have completed the sentencing hearing.

15          "COURT:  Very good.  Anything additional from the

16  defendant?

17          "DEFENDANT:  Yes, Your Honor.  On the various" --

18  "variance in my criminal history, was that taken into

19  consideration when asked for a variance in my criminal history

20  points?

21          "COURT:  I considered all of that in coming up with

22  my sentence, yes, sir.

23          "DEFENDANT:  So I'm at a 35 was my final offense

24  level you said?

25          "COURT:  Your final offense level was a 35, and your

```
 1    criminal history category was a VI.
 2                "KELLY:  Mike, do we need to clear the courtroom for
 3    this?
 4                "OLIVER:  Yes.
 5                "KELLY:  Judge, we'd ask the courtroom be cleared
 6    for the next part.
 7                "OLIVER:  Judge, I can't ask the courtroom be
 8    cleared.  What I want is to make a record outside the hearing
 9    of the gallery.  Let me explain.  I think I'm just going to put
10    this on the record out in the open, Judge.
11                "At 3:37 this afternoon I received an email from
12    counsel for Vershawn Edwards.  Counsel advised in an email that
13    he was followed outside and threatened, both he and his family,
14    after an altercation outside the courtroom, and that he
15    believes that the individual was Mr. Redmon's father.  And I
16    responded to his email instructing him to make a report about
17    what had transpired.
18                "COURT:  Very good.  You have something else you'd
19    like to say, Mr. Kelly?  You look like it.
20                "KELLY:  I was standing up for you, Judge.
21                "COURT:  Okay.  If there's additional record you
22    need to make.
23                "KELLY:  I think you talked about the appeal and the
24    14 days.
25                "COURT:  I talked about the appeal.  We'll be in
```

recess."

What is important to you in that?  That the sentence was completed?

MR. PORTER:  It's not the first part, Judge.  I just wanted you to have the context.  I think the important part is that Mr. Oliver did what he did on the record in open court, and the verbiage that's in the transcript is what the witness heard who's on the stand right now.

THE COURT:  My concern is that this verbiage didn't affect his sentence clearly because he had been rendered his sentence prior to that.

MR. PORTER:  Correct.  Correct, Your Honor.

THE COURT:  So I don't want to mislead the jury if there's an implication that Oliver's comment of --

MR. BROWN:  Right.

THE COURT:  -- "he followed me outside" increased Malcolm's sentence.

MR. PORTER:  I think you can make it clear that this was read after the sentencing hearing was over.  It was all done.

MR. BROWN:  And the portion that starts at "3:37 this afternoon" and down.  So lines 3 through 10 I don't have a problem with.

THE COURT:  Would counsel be agreeable to leading the witness in this series of questions regarding after the

```
 1    sentencing hearing Assistant U.S. Attorney Mike Oliver placed
 2    on the record the email -- is this the correct reading of what
 3    transpired in court?
 4              MR. PORTER:  I would be comfortable trying, Judge.
 5    I'm not confident of success even in leading, because I had a
 6    different witness on the stand than the one that talked to me
 7    last night.
 8              MR. BROWN:  Me too.  I've had a different
 9    personality in telephone calls.
10              THE COURT:  And where I'm concerned is the question
11    reads, "Who read the email to the Court," question mark?  And
12    during whose sentencing?  And why was that done during a
13    sentencing hearing?"
14              MR. BROWN:  She's not going to know the answers to
15    those.
16              MR. PORTER:  She will not know why it is read.
17              THE COURT:  Right.
18              MR. BROWN:  And she's not going to know Mr. Oliver.
19              THE COURT:  I think she attended the hearing.
20              MR. BROWN:  Yeah.  She might be able to say the
21    prosecutor.
22              MS. ORSINGER:  She knows Oliver.  She said his name
23    before.
24              MR. BROWN:  Okay.  Well, fine.  I don't care.  And
25    if -- Oliver after the sentence was imposed, something like
```

```
 1    that.

 2              THE COURT:  Or the prosecutor --

 3              MR. BROWN:  Right.

 4              THE COURT:  -- Mr. Oliver.  Okay.  And if we would

 5    then lead -- what's her name?  Houston.

 6              MR. PORTER:  I think maybe I'm going to try -- the

 7    best way to try to lead her through is to have her read the

 8    transcript of what Oliver said out loud to the jury.

 9              MR. BROWN:  Lines 3 through 10.

10              MR. PORTER:  Yes, the lines we're talking about.

11    She's seen that transcript.  She read it last night.

12              THE COURT:  Okay.  So we could have her refresh her

13    memory on these two pages.

14              MR. BROWN:  Yes.  I just don't want more than the

15    statement.

16              MR. PORTER:  We don't need to do more.  We don't

17    need to answer more than the question that's been asked.

18              THE COURT:  Right.  Okay.  The next, "What pillar

19    did you see him at when you found him at 5 p.m. outside the

20    courthouse?"  Any objection?

21              MR. BROWN:  No.

22              MR. PORTER:  No.

23              THE COURT:  "You stated you do not -- you did not

24    know Edwards.  So why did you and defendant attend his hearing

25    for sentencing on September 29th?"
```

```
1              Any objection?

2              MR. PORTER:  No.

3              MR. BROWN:  No.

4              THE COURT:  "How did you figure out Edwards was a

5    cooperative -- cooperating witness?"

6              Any objection?

7              MR. BROWN:  Yes.

8              THE COURT:  What is your objection?

9              MR. BROWN:  Well, I think she -- she stated in

10   response to Gene's question about that she didn't know.  She

11   kind of figured it out.  I think she didn't know.

12             THE COURT:  The question is, "How did you figure out

13   Edwards was a cooperating witness?"  She said she figured it

14   out.

15             MR. BROWN:  Well, I would like to talk with her

16   before she answered that.

17             MR. PORTER:  Wouldn't we all?

18             MR. BROWN:  I mean, she's not my witness.

19             MR. PORTER:  I don't have any problem with the

20   question.

21             MR. BROWN:  It asks something that we have no idea

22   what she's going to say, and she could say something really

23   objectionable that we couldn't unring.

24             THE COURT:  For example, give us a worse case

25   scenario.  I'm trying to think of what she could say.
```

```
 1              MR. BROWN:  I got a list of people who cooperated
 2    from Mr. Stephens.
 3              MR. PORTER:  She's not going to say that.
 4              MR. BROWN:  She asked, for an example --
 5              THE COURT:  And that would be pretty relevant.
 6              MR. PORTER:  That would be really relevant.
 7              MR. BROWN:  Except -- okay.
 8              THE COURT:  Give us another example.
 9              MR. BROWN:  I wouldn't want that.  I don't know.  It
10    scares me and that's all I can say.
11              THE COURT:  Do you have any objection to it, Mr.
12    Porter?
13              MR. PORTER:  No.
14              THE COURT:  I would have allowed you to ask her
15    that.  I would have allowed both defense and government.
16              MR. BROWN:  Well, if I knew the answer to that
17    question, I might have asked it.
18              THE COURT:  "Were you aware of your call via phone
19    with Malcolm being recorded?"
20              MR. PORTER:  No objection.
21              MR. BROWN:  I don't have any objection.  It's one of
22    those jail calls.
23              MR. PORTER:  Judge, I want to come back to this one.
24    It's Oliver instead of Olive.  And we're not going to ask the
25    why question at the end.
```

1     THE COURT:  Exactly.  That's what my markings were.

2  Thank you for clarifying that.

3     "Did Stephens make any comments while in the gallery

4  during or immediately after Edwards' hearing?"  I don't know

5  that was cleanly asked.

6     MR. BROWN:  I don't have an objection.  We've asked

7  other people.  Let's see what she remembers.

8     THE COURT:  "Were you upset with Edwards for

9  cooperating?"

10     Any objection?

11     MR. BROWN:  Not relevant what her feelings about

12  Edwards are.  Whether she was upset that Edwards was a

13  cooperator is not an issue.  It might be relevant if Mr.

14  Stephens was upset.  But whether she was upset because --

15     MR. PORTER:  It's not relevant, Judge.

16     THE COURT:  "Did you blame Edwards for Redmon's

17  sentence?"

18     MR. PORTER:  Not relevant.

19     MR. BROWN:  No, it really isn't.

20     THE COURT:  "How did you know all of Edwards family

21  members if she didn't know who he was?"  Any objection?

22     MR. PORTER:  No.

23     MR. BROWN:  No, not really.  I would like to hear

24  that too.

25     THE COURT:  "Are you concerned about your safety if

```
1    you speak negatively of Stephens?"

2              Any objection?  Do you have any objection?

3              MR. BROWN:  No.

4              MR. PORTER:  No.

5              THE COURT:  And you have no objection?

6              MR. BROWN:  No.  There's a question on the back of

7    that.

8              THE COURT:  "How do you know he had health problems?

9    Did he go to the doctor after?"

10             MR. PORTER:  That's the same kind of hearsay problem

11   we had before, I think, Judge.

12             THE COURT:  What is your position?  I guess if she

13   drove him to the doctor or she went with him to the doctor.

14             MR. PORTER:  The open-ended invites the hearsay

15   response.  It didn't ask for what did you do.

16             MR. BROWN:  I will object to that.

17             THE COURT:  Okay.  We won't ask that.

18             And "Were you aware Malcolm was selling crack

19   cocaine?"

20             Jim, you object to this?

21             MR. BROWN:  Yes.

22             THE COURT:  Mr. Porter, what is your position?

23             MR. PORTER:  That fact is already in front of the

24   jury in the form of the nature of the charge, the fact of

25   conviction, and it goes to her bias as to her being here today.
```

268

| 1 | If she says, "I didn't know," then I think there's a bias |

1  If she says, "I didn't know," then I think there's a bias

2  implication there.

3              THE COURT:  So do you object or are you okay with

4  this question being asked?

5              MR. PORTER:  I would like to have the question

6  asked.  This is also the one that has the perjury connotation.

7              THE COURT:  I understand.  But that's a fair

8  question regarding the nature of this offense and her

9  relationship to Malcolm and this defendant.

10             MR. BROWN:  If it's going to have potential criminal

11 consequences, don't you think she ought to have some sort of

12 advice before we invite her to answer a question that may

13 incriminate her in the future?

14             THE COURT:  She's under oath.  I don't know.  Is she

15 charged?

16             MR. BROWN:  No.  But what I'm hearing anyway is that

17 based on her answer, Gene may charge her with --

18             MR. PORTER:  Wait a minute.  That's not what I'm

19 saying.

20             MR. BROWN:  Okay.  Tell me what you're saying.

21             MR. PORTER:  It's no different than any other

22 witness who is on the stand and exposes themselves to perjury

23 by either telling the truth or not telling the truth.  All I'm

24 saying based on what I know her answer to that should be yes.

25 But if she says --

```
 1              THE COURT:  I'll have her testify outside the
 2    hearing of the jury as a proffer to see what happens.
 3              MR. PORTER:  On just that one question?
 4              THE COURT:  Yes, advising her of any statement she
 5    previously made.  I want to be careful.
 6              MR. PORTER:  Okay.
 7              THE COURT:  Outside the hearing of the jury.
 8              MR. BROWN:  On this one I'm clueless, you know.  I
 9    don't know what the government knows, anything like that.  So I
10    don't know what a good answer or bad answer would be.
11              THE COURT:  Let's call her in.  We have a few
12    minutes.  Let's call her in and find out without the jury in
13    the courtroom.
14              MR. PORTER:  Your Honor, before you inquire, do we
15    need to have the defendant present?
16              THE COURT:  Yes.  Mr. Stephens is now back in the
17    courtroom.  We have not brought the jury in yet.
18              But we have Ms. Houston back on the stand.
19              Ms. Houston, I remind you, you are still under oath.
20    After questioning by the attorneys, the jurors have an
21    opportunity to write questions on cards, and we have a few
22    questions that they will ask you when the jury comes back in,
23    but one question I wanted to ask outside the hearing of the
24    jury, just in case there are implications regarding any perjury
25    potential charges or, in other words, it's imperative that you
```

270

tell the truth.

The question is, "Were you aware Malcolm was selling crack cocaine?" And I don't know if you've given a statement one way or the other that's recorded in any way; but if you were to give a different statement, could have some implications.

THE WITNESS: Yeah, I'm not comfortable answering that.

THE COURT: Well, my point is that you have to answer truthfully and --

THE WITNESS: At any point in his life you mean? Ever?

THE COURT: This is directed at the underlying offense in this case of his drug conspiracy.

THE WITNESS: Well, that's why I'm not comfortable answering that because his drug conspiracy, in my opinion, the judge goes way back to his -- all of his prior offenses when they convicted him. So for me to say that I never knew that he ever sold any crack cocaine, I can't -- I don't feel comfortable answering that, and I don't know why the jury would want to know that from me, quite frankly. Like, I'm not --

THE COURT: Were you aware of him selling crack cocaine at the time charged in the indictment?

THE WITNESS: You realize the time frame was like years.

1          THE COURT:  And were you aware of Malcolm selling

2     crack cocaine during those time years?

3          THE WITNESS:  Do I have to answer that?  I mean, I'm

4     asking somebody.

5          MR. BROWN:  Judge, it appears to me that the witness

6     is uncomfortable with this question and in fairness, she ought

7     to have an opportunity to consult with an attorney if she's

8     uncomfortable answering that.

9          MR. PORTER:  Your Honor, the answer to that question

10    does not implicate any Fifth Amendment right she might have

11    regarding that conduct.  She's not being asked did she sell any

12    crack cocaine.  And I've made it clear to her as of last night

13    that she has no reason to fear a prosecution of her based on

14    drug distribution during the time period charged in that

15    conspiracy, and I'm saying that now for the benefit of the

16    Court as an officer of the court, which is same thing I told

17    her last night.  That's not that question.  That question is

18    did she know or was she aware that Malcolm was selling crack

19    cocaine.  That doesn't implicate her Fifth Amendment right.

20         MR. BROWN:  Well, may I make -- perhaps make -- did

21    she know that Malcolm pled guilty to selling crack cocaine?

22         MR. PORTER:  That's not the same question.

23         MR. BROWN:  Okay.

24         THE COURT:  I think that isn't the same question.  I

25    think the juror wants to know, "Were you aware of Malcolm

1  selling the crack cocaine in the indictment period of the

2  underlying offense?"

3          THE WITNESS:  I honestly don't want to answer that

4  question.  I mean, am I obligated to answer that question or go

5  to jail?  I mean, what are the consequences if I say that I do

6  not feel comfortable answering that question.  I have nobody

7  here to consult with.

8          MR. PORTER:  Your Honor, I think you can direct the

9  witness to answer.  That's why we're doing this outside the

10  presence of the jury so we don't have this problem in front of

11  the jury.

12          MR. BROWN:  Well, here's the other problem I have

13  with this.  This is a result of a jury question.  Neither Mr.

14  Porter or I during direct or cross asked her about her

15  knowledge of his selling crack cocaine.  So if nothing else,

16  it's beyond the scope of both direct and cross-examination.

17          THE COURT:  The Court finds that it is relevant to

18  her interest, bias, prejudice, her credibility.  So I think it

19  is probative, and I am -- want to limit this question to is she

20  aware that he was selling crack cocaine, not her involvement in

21  any way, and I would not allow any questions beyond that, but

22  that point obviously is probative to this jury, and I find that

23  it is a probative question specifically to her interest, bias,

24  prejudice, her credibility as a witness.

25          What is your answer?  Were you aware Malcolm was

1    selling crack cocaine during the time period charged in the

2    indictment in the underlying case?

3            THE WITNESS:  So my answer to that will be that

4    Malcolm always asserts that he was selling powder cocaine; that

5    he was not selling crack cocaine.

6            THE COURT:  Are you attorneys satisfied with that

7    response, that Malcolm asserts that he was selling powder

8    cocaine, not crack cocaine?

9            MR. PORTER:  May I have a moment, Your Honor?  The

10   problem with that answer, Your Honor, is that she's not

11   responding based on her personal knowledge.  She's providing a

12   hearsay answer based on the statements of Mr. Redmon.  Malcolm

13   always asserted that.  It doesn't say anything about her

14   knowledge.  She's trying to be his mouthpiece when she makes

15   the statement about what Malcolm claims.  So it's nonresponsive

16   and also has a hearsay component.

17           THE COURT:  Outside of Malcolm's claim that he was

18   not selling crack cocaine and that he was only selling powder

19   cocaine, were you aware of Malcolm selling cocaine during that

20   time period?

21           THE WITNESS:  I never personally witnessed him with

22   cocaine, nor did I ever personally witness him sell cocaine.

23           THE COURT:  Does that clarify, Mr. Porter?

24           MR. PORTER:  Again, it's an argumentative answer

25   that's not responsive.  Were you aware?  It doesn't say, Did

1  you see it?  It says, Were you aware?  And it's a simple, yes,
2  I was aware or, no, I was not aware.  I know the witness
3  doesn't want to answer the question.
4          MR. BROWN:  Then that's the problem with the
5  question.  Was she aware?  He pled guilty.  Of course, she was
6  aware.  But did she have any personal knowledge?  That's a
7  different question.
8          THE COURT:  What is the time period of the
9  underlying indictment?  Do you have that at your fingerprints
10  or no?
11          THE WITNESS:  2011 to 2014.  Over a three-year span.
12          THE COURT:  And, Ms. Houston, if I limit the
13  question to, Were you aware Malcolm Redmon was selling cocaine
14  during the period of 2011 to 2014 charged in the underlying
15  indictment, what would your answer be?
16          THE WITNESS:  Well, I can't -- it's hard because I
17  know now.  He's told me.
18          THE COURT:  At the time.
19          THE WITNESS:  At the time, no.  I tried every day to
20  get him to go to job interviews.  I enrolled him in college.  I
21  did everything under the sun to keep him out of trouble.  Did I
22  hear things?  Of course.  Do I believe everything I hear?  No.
23          THE COURT:  Mr. Porter, do you have any follow-up
24  questions while the jury is still out?
25          MR. PORTER:  No, Your Honor.

275

```
1           THE COURT:  Mr. Brown, do you have any follow-up
2    questions?
3           MR. BROWN:  No.
4           THE COURT:  Thank you.
5           If you will call the jury back.  And I think it's
6    best if we don't ask this question.  Mr. Brown, I think it's
7    best if we don't ask this question.
8           MR. BROWN:  I agree.
9           THE COURT:  We'll leave it at that.
10          MR. PORTER:  I know you haven't had a chance to get
11   off the bench.
12          THE COURT:  I'm fine.  How are you?
13          MR. PORTER:  Just one minute.
14          (The following proceedings were had in the presence
15   of the jury:)
16          THE COURT:  Please be seated.
17   WENDY HOUSTON resumed the stand and testified:
18          THE COURT:  Ms. Houston, you are still under oath
19   and we have a few questions from the jury, please.
20          THE WITNESS:  Thank you.
21   QUESTIONS FROM THE JURY BY MR. PORTER:
22   Q     Ma'am, as the judge indicated, these are questions that
23   have been requested to be asked by the jury and I'm just going
24   to read them.
25   A     Okay.
```

1   Q      You stated that you did not know defendant Edwards so

2   why did you and this defendant attend the hearing for

3   sentencing on September 29th?

4   A      I personally wanted to take notes.  I was trying -- in

5   my mind I was trying to gauge what may happen at Malcolm's

6   trial based on what had happened at the trials -- or the

7   sentencing hearings that were leading up to Malcolm's

8   sentencing hearing.  So in my mind I thought, well, I went to

9   Marlon's and I knew he had gotten a lot of time, and I was just

10  trying to gauge, to prep myself mentally, emotionally, whatever

11  you want to call it for what may happen at the end of the day

12  with Malcolm honestly.

13  Q      The next question from the jury is, how did you figure

14  out Edwards was a cooperator?

15  A      I knew that there were several people that had

16  cooperated against him.  Whether it was really true or not I

17  didn't really know until obviously the court hearing.  I had

18  heard through hearsay.  And then there was an article in the

19  Tribune that I think talked about who was going to be sentenced

20  and perhaps who was going to cooperate against him.  Just

21  through word of mouth and stuff like that.  I didn't know Mr.

22  Edwards, but I knew there were several defendants that were

23  going to cooperate with the government, which is their choice,

24  whatever.

25  Q      The next question from the jury is, were you aware of

1   your call via phone with Malcolm being recorded?

2    A       Absolutely.  Every single time he calls, it tells you

3   at the beginning before you even accept to pay for the call, it

4   tells you that this call is subject to recording and

5   monitoring, and I think it even tells me that it could monitor

6   my location of my cellular device.  So, yeah, I knew.  I didn't

7   care.  I knew he was going to be mad at his dad and I was going

8   to tell him.

9    Q       What pillar did you see Mr. Stephens at when you found

10  him at 5 p.m. outside the courthouse?

11   A       Okay.  So if you walk out the very front of the court

12  and you go through the little glass doors and they'll give you

13  back your phone at the end of the day and you exit; and then if

14  you don't go over here to the pedestrian walk that's kind of

15  like facing the prison, if you don't go to that one and you

16  just kind of cut right directly straight through the courtyard

17  right there and then go -- he was at the very last pillar

18  closest to the street sitting.  It was like at the -- like if

19  that clock up there is the circle of the courtyard out front of

20  the courthouse, he was at the pillar -- at the very edge of the

21  steps that go to the street.  That's all I can tell you.

22   Q       The next question is, did Mr. Stephens make any

23  comments while in the gallery during and immediately after the

24  Edwards hearing?

25   A       The only thing that I remember him saying was like

this -- he was just frustrated with the judgment, and so he was

saying like, "This is bullshit," or something like that and

that's when I think I said, "Calm down," because he had to walk

by me because I was sitting right there, like where the

gentleman in the back coat is.  I was sitting in that

particular location.  So he had to walk by me to exit the

courtroom, and I just said, "Hopper, calm down."  And he was

like, "No, I'm entitled to my opinion."

Q    Next question is, how did you know all of Edwards'

family members if you didn't know who he was?

A    Because there were other -- oh, the judge told us that

he had support of his mother, his sister, and his girlfriend

was here and she may have had a baby with her.  I don't recall.

The judge told us that because they were talking about who was

here to support each defendant in the hearings.

Q    The next question, are you concerned about your safety

if you speak negatively of Mr. Stephens?

A    Nope.  No.  I told on him already to his son.  He knows

I'm going to tell on him if he did something wrong.

Q    The next question is, when did you move to Texas?  Have

you always lived there?

A    No.  I lived in Columbia.  I moved to Texas for a new

job in August.  Actually, I moved -- I left my job here on

August 18th, moved on August 19th, and started my job down

there on August 31st of 2015.  I've been there just over a

```
 1    year.
 2    Q       The next question is, did you know all the people being
 3    sentenced and, if so, how many?
 4    A       No.  I don't know any -- well, any of them on that day
 5    other than Marlon, which I said that was the only one I was
 6    really worried about trying to attend, which was the eleven
 7    o'clock hearing and that was Malcolm's family.  But on that
 8    day, no.  The other ones I didn't know.  I didn't know Vershawn
 9    or any of the other ones.  We saw their families in the
10    hallway, but I didn't know them.  Malcolm's family just spoke
11    to them but we just kept it moving.
12                MR. PORTER:  Your Honor, the next question is the
13    one that you wanted us -- the last question that you wanted us
14    to lead through.  Permission to approach the witness with the
15    transcript?
16                THE COURT:  Yes.
17    Q       (By Mr. Porter)  Ms. Houston, I've handed you what's
18    been marked for identification as Government's Exhibit 19.  Do
19    you see that number on the first page?
20    A       Okay.  18.
21    Q       Does it say 18?  I'm sorry if I misspoke.
22    A       Yeah, 18.
23    Q       Government's Exhibit 18 marked for identification?
24    A       Yep.
25    Q       And the face sheet of that identifies it as the
```

```
 1   transcript of the sentencing hearing for Malcolm Redmon,

 2   correct?

 3   A      Yes.  I recognize it.

 4   Q      We actually talked about this last night, correct?

 5   A      Did we?  I don't remember.  Yeah, maybe.

 6   Q      Turn to the last page.

 7   A      (Witness complied.)

 8   Q      And I want to direct your attention to lines 3 through

 9   10 on the last page, which should be noted at the bottom as

10   page 108.  Do you have that in front of you?

11   A      Yes, I do.

12   Q      Before we refer to that specifically, flip back to the

13   previous page.

14   A      (Witness complied.)

15   Q      And does it indicate at the bottom of page 107 the

16   identity of the person that's speaking?

17   A      Do you mean Mr. Oliver?  Is that what you are talking

18   about, line 24?

19   Q      Does it say Mr. Oliver?

20   A      Yeah.

21   Q      Who did you know Mr. Oliver to be?

22   A      The prosecutor.

23   Q      So flip back over to the next page starting at line 3.

24   A      Yes.

25   Q      Tell us what is on the transcript on pages -- or excuse
```

1  me -- lines 3 through 10.  Just read it for us.

 2  A      It says, "At 3:37 this afternoon I received an email

 3  from counsel for Vershawn Edwards.  Counsel advised in an email

 4  that he was followed outside and threatened, both he and his

 5  family, after an altercation outside the courtroom and that he

 6  believes the individual was Mr. Redmon's father, and I

 7  responded to his email instructing him to make a report about

 8  what had transpired."  Yeah, I think that's what I told you

 9  last night.

10  Q      And that is what you heard in the courtroom?

11  A      Yeah.

12  Q      At the very end of Malcolm's sentencing hearing?

13  A      Right.

14  Q      Malcolm's sentence had already been pronounced?

15  A      Yep.

16  Q      That statement had nothing to do or had no impact of

17  Malcolm's sentence because Malcolm's sentence was already done

18  and over with?

19  A      That's correct.  Yeah.

20             THE COURT:  Any further questions, Mr. Porter?

21             MR. PORTER:  Not subject to redirect, no, Your

22  Honor.

23             THE COURT:  Mr. Brown, do you have any follow-up?

24             MR. BROWN:  Yes, Your Honor.

25  RECROSS-EXAMINATION BY MR. BROWN:

```
 1   Q      I think in one of your answers about being afraid of
 2   Mr. Redmon, you said I told on him already?
 3   A      On Hopper?
 4   Q      Yeah.  Excuse me.
 5   A      Yeah.
 6   Q      When you say that, do you mean you told Malcolm about
 7   what had occurred?  It isn't like you --
 8   A      Yeah.  Yeah.  I mean, if he's going to get mad at me
 9   for telling on his son -- telling to his son.
10   Q      Right.  And is it fair to say when you told Malcolm,
11   you said, "Don't tell your dad but?"
12   A      Yeah.
13   Q      And you're not afraid of Mr. Stephens at all, are you?
14   A      No.  He got his butt chewed out.
15          THE COURT:  Any questions?
16          MR. PORTER:  Just one, Your Honor.
17   REDIRECT EXAMINATION BY MR. PORTER:
18   Q      The reason you're not afraid is because you're not
19   snitching on Mr. Stephens, are you?
20   A      No.  I'm telling you what happened.  That was a trick.
21   I gotcha.
22          MR. PORTER:  That's all, Your Honor.
23          THE COURT:  Any other questions, Mr. Brown?
24          MR. BROWN:  No, Your Honor.
25          THE COURT:  Thank you.  You can stand down.
```

```
1                    (Witness excused.)

2              THE COURT:  Mr. Porter, will you call your next

3    witness?

4              MR. BROWN:  Judge, the subpoena, the government's

5    subpoena.

6              THE COURT:  Yes.  You will need to -- you're still

7    under subpoena in case the defense wants to call you in their

8    case in chief if they elect to, but you can leave the courtroom

9    for now.

10             THE WITNESS:  You mean go home, like go back to my

11   hotel?

12             MR. PORTER:  We'll get an explanation for the

13   witness outside the presence of the jury, Your Honor.

14             Your Honor, if the Court please, Cody Abram is our

15   next witness.

16   CODY ABRAM, being sworn by the courtroom deputy, testified:

17             MR. PORTER:  Your Honor, before we begin, may Mr.

18   Brown and I have a moment at the bench?

19             THE COURT:  Absolutely.

20             (Counsel approached the bench and the following

21   proceedings were had:)

22             MR. PORTER:  Your Honor, I don't know the

23   significance of this, but just in the interest of putting

24   everybody on notice of the same facts, Linnel Beckner is on the

25   defense witness list.  He's informed Mr. Abram that he does not
```

```
 1    plan to be here tomorrow because it's his birthday and if he's

 2    not under subpoena, he's not planning on coming back tomorrow.

 3                Is Mr. Beckner under subpoena?

 4                MR. BROWN:  Yes.  I served him this morning.

 5                MR. PORTER:  He's stating he's not planning on

 6    coming back tomorrow because it's his birthday.  You can

 7    confirm with him he does need to be here even though it's his

 8    birthday.

 9                THE WITNESS:  I will tell him.

10                MR. PORTER:  Thank you, Judge.

11                (The proceedings returned to open court.)

12                MR. PORTER:  May I inquire, Your Honor?

13                THE COURT:  You may.

14    DIRECT EXAMINATION BY MR. PORTER:

15    Q       Good afternoon, sir.

16    A       Good afternoon, sir.

17    Q       Would you please begin by stating your full name and

18    for the benefit of our court reporter spell both your first and

19    last names.

20    A       Sure.  My name is Cody Abram, C-o-d-y, last name is

21    A-b-r-a-m.

22    Q       What's your occupation, sir?

23    A       I'm a special agent with the FBI.

24    Q       Are you one of the law enforcement agents who

25    investigated the alleged criminal activity of this defendant,
```

1    Bruce Wayne Stephens?

2    A       Yes, sir.

3    Q       Mr. Abram, I want to direct your attention to October

4    the 12th of 2016.  Did your investigation include an interview

5    of the defendant on that date, October the 12th?

6    A       Yes, sir.

7    Q       Tell us where the interview took place.

8    A       The interview took place subsequent to the arrest of

9    Mr. Stephens at the Columbia Police Department in Columbia,

10   Missouri.

11   Q       Was Mr. Stephens read his Miranda rights prior to being

12   interviewed?

13   A       Yes, sir.

14   Q       Did he waive those rights and agree to speak with you?

15   A       Yes, he did.

16   Q       Is the same Bruce Wayne Stephens that you interviewed

17   on October the 12th, 2016, present in the courtroom today?

18   A       Yes, sir.

19   Q       And can you identify him by stating where he's located

20   and what he's wearing?

21   A       Mr. Stephens is located next to his counsel, Mr. Jim

22   Brown.  He's wearing a brown shirt and orange T-shirt

23   underneath it.

24           MR. PORTER:  Your Honor, may the record reflect the

25   identification of the defendant?

1          THE COURT:  The record will so reflect.

2     Q      (By Mr. Porter)  Special Agent Abram, I want to now

3    direct your attention to what's been marked for identification

4    as Government's Exhibit 1, and if we can have that displayed to

5    you and counsel but not the jury just yet, and ask you after

6    you're able to see it whether you recognize Exhibit 1 marked

7    for identification?

8     A      Exhibit 1 is the FBI's advice of right form.  It's a

9    federal document 395.

10    Q      Does it have writing on it, handwriting?

11    A      Yes, sir.

12    Q      Is it the rights advice form that you used when you

13   spoke with Mr. Stephens?

14    A      It is.

15          MR. PORTER:  Offer Exhibit 1, Your Honor.

16          MR. BROWN:  No objection.

17    Q      (By Mr. Porter)  If we can now all look at Exhibit 1

18   together.

19          THE COURT:  Exhibit 1 is admitted.

20    Q      (By Mr. Porter)  Was anyone else present during that

21   interview besides you and the defendant on October the 12th?

22    A      Special Agent Charlie Tomlin with the ATF was present.

23    Q      Was that October 12th, 2016, interview of the defendant

24   recorded on video at the time of the interview?

25    A      Yes, sir.

1   Q      And if I could, sir, I would like to direct your

2   attention now to what's been marked for identification as

3   Government's Exhibit 2.  I can't put that in front of you

4   because it's not a paper document, but are you familiar with

5   what I'm referring to about Government's Exhibit 2?

6   A      No, not off the top of my head.

7   Q      Did we make -- the video recording was marked for

8   identification as Exhibit 2?

9   A      Okay.  Yes.

10  Q      You had an opportunity to review Exhibit 2 marked for

11  identification prior to your testimony here today?

12  A      Yes, I have.

13  Q      And is it a true and accurate video recording of the

14  interview between you and the defendant on October 12th?

15  A      Yes, it is.

16          MR. PORTER:  Offer Exhibit 2, Your Honor.

17          MR. BROWN:  No objection.

18          THE COURT:  Exhibit No. 2 is admitted.

19  Q      (By Mr. Porter)  Special Agent Abram, you've had an

20  opportunity to review that videotaped recording of that

21  interview on October the 12th.  From recollection,

22  approximately how long did the entire interview last?

23  A      The interview lasted approximately 30 to 35 minutes of

24  actual contact with Mr. Stephens.

25  Q      And the video itself is slightly longer than that?

1    A       I believe it's roughly 40 to 45 minutes.

2    Q       And why is it slightly longer than the actual interview

3    itself?

4    A       The video captured Mr. Stephens going into the

5    interview room by himself until I entered the room.  So there

6    was some time on the front end of that interview.  And then

7    when I was done with the interview, there was some time when

8    Mr. Stephens was still in the interview room.  So that's maybe

9    the difference in that time.

10   Q       So during those times, there was no questioning or

11   conversation taking place.  Mr. Stephens was simply sitting in

12   the room by himself?

13   A       That's correct.

14   Q       And that footage is recorded because that's how the

15   camera operates?

16   A       That's right.

17   Q       As long as someone's in the room, the video is running?

18   A       The video is running as soon as anybody enters the

19   room.

20   Q       Prior to trial, did we use Government's Exhibit 2, the

21   entire 37 minutes or 35 minutes of the actual interview, to

22   prepare separate video clips with certain relevant portions of

23   that interview?

24   A       That's correct.

25   Q       Let me direct your attention first then to what's been

1    marked for identification as Government's Exhibit 2(a).

2    A      Okay.

3    Q      Again, since it's a video and we're not actually

4    looking at it, can you recall from memory the portion of the

5    video that's on Exhibit 2(a)?

6    A      No, not from memory.

7                 MR. BROWN:  May we approach, Your Honor?

8                 (Counsel approached the bench and the following

9    proceedings were had:)

10                MR. BROWN:  Judge, I think as Mr. Porter is going to

11   try to play clips, the rule of completeness requires that we

12   show the whole thing first.  I don't think we can show clips

13   out of context on that, and I think the jury -- we should

14   probably show Exhibit 2 at this point.

15                MR. PORTER:  Judge, I'm trying to move through this

16   in an efficient way and if in the interest of the rule of

17   completeness during cross-examination they want to play the

18   whole thing, they certainly are free to do that, but the rule

19   of completeness doesn't require that it be all played at the

20   front end.

21                MR. BROWN:  That's going to be my first question on

22   cross-examination is to publish the whole thing.

23                MR. PORTER:  If it's your preference for whatever

24   reason that we do it all right now, I'm not going to make a big

25   fuss about it.  I'm just trying to move this along, Judge.

1          THE COURT:  You can try your case how you want to.

2    You're not required to play the whole thing, but he is entitled

3    to request the whole portion be -- it's your choice.  Either

4    way.

5          MR. PORTER:  Can we confer, then we'll make a

6    decision.

7          (The proceedings returned to open court.)

8          MR. PORTER:  Your Honor, before we start going into

9    separate clips, I think in the interest of time, it may be

10   effective to just play the entire 37 minutes.  It will take us

11   just a moment to get it cued up unless we want to look at the

12   time he's sitting in the room by himself.

13         MR. BROWN:  There's nothing about that that we need

14   to waste their time looking at.

15         MR. PORTER:  That's going to take a few moments.  I

16   don't know if you want to give us a brief recess or you want

17   everyone sitting here while we're doing that, but we'll get it

18   cued up right at the point the questioning starts.

19         THE COURT:  We're now at 25 till five.  There are a

20   couple of options.  You can proceed if you want to play your

21   select portions and play the full video tomorrow morning and

22   get through as much of the direct as you want, or you can play

23   the video for the next 30 minutes and we will end at that point

24   of the day, or we could play your clips and let --

25         MR. PORTER:  Let's do this, then, Your Honor, to

291

```
 1    make the maximum use of our time.  Let's start with 2(a) and

 2    the first thing tomorrow morning we'll be ready right out of

 3    the gate to start at the very beginning and go all the way

 4    through.

 5              THE COURT:  And I'm not requiring that you play the

 6    whole clip.  You are able to.  It's admitted into evidence.

 7              MR. PORTER:  Thank you, Your Honor.

 8    Q    (By Mr. Porter)  All right.  Exhibit -- the clip that's

 9    marked for identification as 2(a) depicts the reading of Mr.

10    Stephens' Miranda rights to him and the signing of that rights

11    waiver form that's already admitted as Government's Exhibit 1?

12    A    Yes, sir.

13    Q    Is that clip marked for identification as Exhibit 2(a)

14    a true and accurate recording of just that portion of the

15    interview?

16    A    Yes, sir.

17              MR. PORTER:  Your Honor, we would offer 2(a).

18              THE COURT:  Any objection?

19              MR. BROWN:  No objection.

20              THE COURT:  Admitted.

21              MR. PORTER:  And if we could pull 2(a) up.

22              And, Your Honor, permission to publish 2(a) by

23    playing it for the jury at this time?

24              THE COURT:  Yes.

25              (Government's Exhibit No. 2(a) was played.)
```

```
 1              MR. PORTER:  Can we stop for a moment.

 2              Your Honor, I just want to have the Court inquire to

 3   make sure the jury can hear.  If there's a volume issue, if we

 4   need to make it louder.

 5              If we can rewind and start at the beginning so we

 6   don't miss anything.  We'll start again.

 7              (Government's Exhibit No. 2(a) was played.)

 8   Q     (By Mr. Porter)  All right.  We've just watched the

 9   entirety of that clip, Exhibit 2(a).  Let's -- while it's still

10   there visible on the screen, identify the persons who are

11   depicted in that image.

12   A     Sure.  Mr. Stephens is wearing a white T-shirt and blue

13   jeans, it looks to be a pair of Crocs sitting in the corner.

14   To his left is Charlie Tomlin who is a special agent with the

15   ATF, and I am the one in the gray T-shirt that is gracefully

16   balding.  So that would be me.

17   Q     While you were going through the process of advising

18   the defendant of his rights, were you evaluating him and

19   forming your own assessment of whether he understood those

20   rights?

21   A     Yes, sir.

22   Q     Were you also evaluating him and forming your own

23   assessment whether he understood what it meant to waive those

24   rights?

25   A     Yes, sir.
```

1    Q      What was your assessment of whether he understood those

2    rights?

3    A      Mr. Stephens absolutely understood his rights.

4    Q      What was your assessment of whether he understood the

5    meaning of waiving his rights?

6    A      It was my assessment that he understood that he could

7    waive his rights.

8    Q      Now, during the course of the entire interview that

9    lasted roughly 35 or 37 minutes, did the defendant ever say to

10   you that he wanted to stop talking to you?

11   A      No, sir.

12   Q      During the entire course of that interview, did he ever

13   say that he wanted to have a lawyer present?

14   A      No, sir.

15   Q      And now if I could, Special Agent Abram, I want to

16   direct your attention to what's been marked for identification

17   as Government's Exhibit 2(b).  Have you had an opportunity to

18   review that prior to your testimony here today?

19   A      I have but I don't remember which clip is what, but I

20   did.

21   Q      And that clip is a portion of the defendant's statement

22   during the interview when he described being escorted out of

23   the courthouse?

24   A      Okay.

25   Q      Is that a true and accurate recording of that portion

1    of the interview between you and the defendant on October 12th

2    referring to Exhibit 2(b)?

3    A       Yes, sir.

4              MR. PORTER:  Offer 2(b), Your Honor.

5              MR. BROWN:  No objection.

6              THE COURT:  Admitted.

7              MR. PORTER:  And, Your Honor, permission to publish

8    2(b) by playing it for the jury at this time?

9              THE COURT:  You may.

10             (Government's Exhibit No. 2(b) was played.)

11   Q       (By Mr. Porter)  Special Agent Abram, during this video

12   clip, Exhibit 2(b), defendant is stating that Brian Risley was

13   knocking him down and pushing him in the courtroom?

14   A       Yes, sir.

15   Q       During the course of your investigation, did you find

16   any evidence to support that statement that Brian Risley

17   knocked him down and pushed him?

18   A       No, sir.

19   Q       There was also a portion of the video clip where the

20   defendant states where he said a lot of vulgar things while

21   being escorted out of the courthouse.  Do you recall hearing

22   that?

23   A       Yes, sir.

24   Q       Did you find evidence to support that statement that he

25   did in fact say a lot of vulgar things while being escorted out

                                  295

1   of the courthouse?

2    A      Yes, sir.

3    Q      What types of evidence did you find to support that?

4    A      Just witness statements of him being escorted out of

5   the courthouse, calling the CSOs motherfuckers and referring to

6   Mr. Risley that he's going to whip his ass, a lot of F words.

7    Q      And at the end of that video clip, Exhibit 2(b), do you

8   recall Mr. Stephens describing what he did after he was

9   escorted out of the courthouse?

10   A      He went outside and sat near a column or a pillar of

11  some sort.

12   Q      Now, I want to look very briefly at Exhibit 2(b).  You

13  should still have it there in front of you.  Is there a

14  notation in the upper left-hand corner with some numbers?

15   A      Yes, sir.

16   Q      Can you see that?

17   A      Yes, sir.

18   Q      What are those numbers representing?

19   A      You got 2016 for the year, October 12th.  It looks like

20  10:35:57.

21   Q      Is that an indication of the time that that -- ten

22  o'clock, 35 minutes after the hour, 37 seconds?

23   A      Fifty-seven seconds.

24   Q      Fifty-seven.  I'm sorry.

25   A      That's correct.

1    Q      And that timer or that keeping of time is running

2    continuously throughout the video as it's recording?

3    A      That's correct.

4    Q      Okay.  Let me direct your attention now to Exhibit 2(c)

5    marked for identification.  You had an opportunity to review

6    that prior to coming to court today?

7    A      Yes, sir.

8    Q      Is it a true and accurate recording of that portion of

9    the interview on October the 12th?

10   A      Yes, sir.

11          MR. PORTER:  Offer 2(c).

12          MR. BROWN:  No objection.

13          THE COURT:  Admitted.

14   Q      (By Mr. Porter)  And in this clip the defendant is

15   continuing to describe to you what he did after being escorted

16   out of the courthouse?

17   A      Correct.

18   Q      All right.

19          MR. PORTER:  Permission to publish 2(c), Your Honor?

20          THE COURT:  You may.

21          MR. PORTER:  And as soon as you pull that up, if you

22   would just stop it immediately because we want to look at that

23   timer.

24   Q      (By Mr. Porter)  Again, directing your attention to the

25   upper left-hand corner, what time is depicted there?

```
 1   A       The time is 10:35:57.

 2   Q       So that is immediately after --

 3   A       Yes, sir.

 4   Q       -- the previous clip?

 5   A       Yes, sir.

 6   Q       There's been no lapse?

 7   A       No lapse.

 8   Q       We've just stopped it because it's a different subject

 9   matter?

10   A       Yes, sir.

11   Q       And so now we're picking up immediately where

12   Exhibit 2(b) left off?

13   A       Yes.

14   Q       There's been no conversation that's not recorded?

15   A       No conversation.

16           MR. PORTER:  Let's continue.

17           (Government's Exhibit No. 2(c) was played.)

18   Q       (By Mr. Porter)  The big guy in the suit he's referring

19   there to at the end of clip is whom?

20   A       It's Mr. Risley, Vershawn Edwards' defense attorney.

21   Q       So let's go back and review what's just been played for

22   the jury.  The first thing Mr. Stephens says he did after he

23   was out there was sitting by the pillar?

24   A       Yes, sir.

25   Q       And his granddaughter comes out, right?
```

```
 1    A       Among others, granddaughter and others showed up.

 2    Q       He and -- then he and his granddaughter sat there for a

 3    few minutes outside the courthouse?

 4    A       Yes.

 5    Q       They went for a walk?

 6    A       She had actually tried to get into the courthouse and

 7    couldn't because she needed to use the restroom and they

 8    wouldn't let her in because she didn't have an I.D.  So after

 9    that encounter, she comes back out with Mr. Stephens sitting

10    there.  Then they decide to take a walk, which I assume was to

11    find a bathroom for her.

12    Q       And he said that he and his granddaughter went for a

13    walk.  Did he say where they went for the walk?

14    A       He referred to it as an old folks home, like the Tower

15    Apartments, which is a block from the courthouse.

16    Q       Let's look at Exhibit 15 together.  Exhibit 15 is

17    before you, Special Agent Abram.  Can you identify for the jury

18    the place that Mr. Stephens was referring to when he said where

19    he and his granddaughter went for a walk to, a place for older

20    folks?

21    A       Yeah.  Just as you come out of the courthouse down to

22    the parking lot there, you go up the hill just a little bit and

23    there's two Tower Apartments that are up there.  That's where

24    the granddaughter used the restroom and Mr. Stephens sat on the

25    bench.
```

```
 1    Q      Are you referring to the area that's in the upper

 2    left-hand corner of the photograph?

 3    A      Just right where it says 80 Lafayette Street there's a

 4    complex there.  Seven, eight stories, apartments.

 5    Q      All right.  I think, if technology is going to be our

 6    friend, that you can with your finger circle the area you are

 7    describing as the old folks home.

 8    A      It's not actually an old folks home but that's what he

 9    referred to it as.

10    Q      Okay.  And that is on what's marked as State Street?

11    A      Yes, sir.

12    Q      And we can look at the photograph and the street

13    intersections and conclude from that that it's roughly two

14    blocks away?

15    A      Yes, sir.

16    Q      And that's where he said he and his granddaughter went

17    and she went inside and he sat outside on the benches?

18    A      That's correct.

19    Q      Did he say how long he sat there?

20    A      I don't think he did.  No specifics.

21    Q      Ultimately his granddaughter came back out?

22    A      Yes.

23    Q      They reunited?

24    A      Yes.

25    Q      Then they went up the street to find the white Chrysler
```

```
 1    that she had keys to?

 2    A       Yes.

 3    Q       And they both got in the white Chrysler?

 4    A       Yes.

 5    Q       And according to him fell asleep?

 6    A       That's correct.

 7    Q       Did he say how long he was asleep?

 8    A       No, he did not.

 9    Q       Did he say what he did after he woke up?

10    A       I believe he said that Malcolm's mother and others came

11    back outside, I believe to smoke a cigarette at the car, and

12    woke him up, he and his granddaughter.

13    Q       And after Malcolm's mother, sister, other family

14    members came and found him, they spoke?

15    A       Yes.

16    Q       What happened to those other family members?

17    A       I believe after the smoke break, they returned to the

18    courthouse.

19    Q       That's what he told you?

20    A       Yes.

21    Q       Did he say what he did after those family members left

22    and went back to the courthouse?

23    A       He said somebody rolled up.  I couldn't quite make out

24    the name on the interview.  Looking back I put that he had to

25    go get his girlfriend so they rolled with him.
```

```
1    Q     Did they make a reference going back to sleep at that
2    point?
3    A     Yes.
4    Q     The girlfriend that needed to be picked up, was that
5    someone that he identified that you were able to understand who
6    that person was?
7    A     No.
8    Q     Whoever it is they needed to go get their girlfriend?
9    A     That's correct.
10   Q     And about that time or after that is when the
11   defendant's cousin Dobby --
12   A     Yes.
13   Q     -- came down the street?
14   A     That's correct.
15   Q     And the defendant then met up with Dobby and the two of
16   them started walking?
17   A     Yes.
18   Q     And as the defendant is walking with Dobby, that's when
19   the defendant tells you he encountered the big guy, Brian
20   Risley?
21   A     Mr. Risley, that's correct.
22             MR. PORTER:  If we could go back to where we were at
23   on Exhibit 2(c).
24             (Government's Exhibit No. 2(c) was played.)
25   Q     (By Mr. Porter)  All right.  At the clip in the upper
```

```
 1   left-hand corner what's the time?

 2   A       It looks like 10:38:26.

 3   Q       So he's just now given you roughly a -- from 10:35:57

 4   at the start to 10:38:26 at the end, two and a half minutes?

 5   A       Yes, sir.

 6   Q       Give or take?

 7   A       Right.

 8   Q       It's hard not to notice that during that time period

 9   you're not interrupting Mr. Stephens very much?

10   A       No, sir.

11   Q       He's giving you his own narrative account of what he

12   did?

13   A       Yes, sir.

14   Q       Prior to the time that there was the encounter with Mr.

15   Risley?

16   A       That's correct.

17   Q       Why didn't you interrupt him?

18   A       I wanted to hear what he had to say.

19   Q       As you were listening to what he had to say, was it

20   apparent to you that that had some inconsistency problems?

21   A       He was lying to me.

22   Q       So let's look just a moment briefly at Government's

23   Exhibit 17.

24   A       Yes, sir.

25   Q       And we know from that Vershawn Edwards' sentencing
```

1   hearing ended at 1:45, correct?

2    A       Yes, sir.

3    Q       And let's just look for another moment quickly at

4   Exhibit 6 at the same time.  Separately is fine.  That's fine.

5   And we know that the voicemail message that Mr. Risley left for

6   Mike Oliver was at 1:55?

7    A       That's correct.

8    Q       So we know the time period between the end of the

9   sentencing hearing and after the encounter had already happened

10  is less than ten minutes?

11   A       Less than ten minutes, yes.

12   Q       All the things that Mr. Edwards -- excuse me.  All the

13  things that Mr. Stephens described to you sitting with his

14  granddaughter outside the courthouse for a few minutes, taking

15  a walk, going up to that place two blocks away, coming back,

16  getting in a car, falling asleep, waking up, having a

17  conversation with other family members, walking down the

18  street, going back to sleep, meeting somebody else about a

19  girlfriend, meeting up with Dobby, and then encountering Mr.

20  Risley, is it possible for that to have even happened in that

21  less than ten-minute time period?

22   A       No, sir.

23            MR. PORTER:  Your Honor, we can break whenever you

24  wish.

25            THE COURT:  This is your witness.  If this is a good

1   time to break, let's break for tonight.

2           MR. PORTER:  Thank you.

3           THE COURT:  Ladies and gentlemen of the jury, we

4   will take our evening break, and obviously you will be

5   returning again tomorrow.  Let's have you back at 8:45.

6           I'll read you the admonishment for the evening.  We

7   are about to take a recess and I remind you of the instruction

8   I gave you earlier.  During this recess or any other recess,

9   you must not discuss this case with anyone, including the other

10  jurors, members of your family, people involved in the trial,

11  or anyone else.  If anyone tries to talk to you about the case,

12  please let me know immediately about it.

13          Do not read, watch, or listen to any news reports of

14  the trial.  Finally, keep an open mind until all the evidence

15  has been received and you have heard the views of your fellow

16  jurors.  I may not repeat these things to you before every

17  recess but keep them in mind throughout the trial.

18          I would also ask that -- we should be able to finish

19  the evidence and turn the case over to you tomorrow.  I would

20  ask that you clear your calendars in case we need to go later

21  than five.  If you have an obligation or a problem, will you

22  let Ms. Wheeler know either tonight or tomorrow morning; and if

23  there's a time period that you must be back at home or leave

24  the courthouse, please let us know so we can plan accordingly.

25          Have a good evening and drive safely.  We'll be in

1    recess.

2              (The following proceedings were had in the courtroom

3    out of the presence of the jury:)

4              THE COURT:  Please be seated.  Let's go back on the

5    record.

6              And, Mr. Abram, you can stand down from the stand.

7              Mr. Brown, do you have any issues to take up tonight

8    or anything we can accomplish this evening?

9              MR. BROWN:  I don't have anything to bring up, but I

10   would be certainly happy if anybody else does.

11             THE COURT:  Mr. Porter and Ms. Orsinger, do you have

12   any issues to take up or anything we can accomplish tonight?

13             MR. PORTER:  Your Honor, we don't have any issues,

14   but I can report to the Court that Wendy Houston has been

15   advised to be back here at the courthouse at 8:45 tomorrow, and

16   I think arrangements are underway or will be underway to make

17   whatever accommodations or arrangements that need to be made

18   for her relative to a place to stay and travel for tomorrow.

19             THE COURT:  Very good.  Let me ask my staff if there

20   are any issues that came up that we can handle tonight, or are

21   we ready to recess for the evening?

22             I think that will wrap up today's work and if you

23   guys can be back -- does 8:15 sound doable?

24             MR. BROWN:  For me.

25             THE COURT:  Since we will probably go over

```
 1   instructions in the morning, it would be nice if we can flush

 2   those out.  I don't know that we can do much more.

 3              MR. BROWN:  Right.  And for what it's worth, Judge,

 4   I'll talk with Mr. Porter after we've recessed here and maybe

 5   we can speed up, if they have the technology, because I don't,

 6   listening to the whole video.

 7              THE COURT:  Okay.  I'll let you both work that out.

 8   You both have the ability to play that during your different

 9   cases in chief.

10              I did give to you -- I believe one of my clerks gave

11   you Instruction No. 21 where the Court sees the evidence

12   flowing at this point to conform with the evidence.  But,

13   again, that's my -- the Court's interpretation subject to the

14   various arguments.

15              MR. PORTER:  We'll be ready, Your Honor, on behalf

16   of the government to have a robust instruction conference with

17   you at 8:15 tomorrow morning.

18              THE COURT:  Very good.  Have a good evening.

19              DEPUTY MARSHAL:  Your Honor, two things.  What time

20   do you want the defendant here?  You want him here for jury

21   instructions?

22              THE COURT:  The defendant?  Yes.  I'm assuming --

23   Mr. Brown, do you know if your client wants to be here while we

24   hash through instructions?  Sometimes we can do that in

25   chambers and then come back out and put them on the record.
```

```
 1            MR. BROWN:  I can't imagine he would want to sit
 2    through --
 3            THE COURT:  Okay.  That's your call.  So if you can
 4    coordinate with the marshals when you want your client brought
 5    in before nine o'clock.
 6            MR. BROWN:  I plan to go see -- he's over here in
 7    Cole County.  They don't want anyone there until after six,
 8    6:30 this evening.  I can let them know.  I won't say anything
 9    unless he insists on being here when we hash it out, and the
10    regular time would be, I'm sure, sufficient.
11            THE COURT:  Let's have him here at 8:30 and he'll
12    need to be ready for court at nine.
13            DEPUTY MARSHAL:  I informed Mr. Beckner that he is
14    under subpoena and required to be here.
15            THE COURT:  And did he acknowledge that?
16            DEPUTY MARSHAL:  He acknowledged it.  He said he
17    doesn't have a ride and he has a -- he missed an appointment
18    with the psychiatrist today and he has one at two o'clock
19    tomorrow afternoon and he has to speak with Mr. Brown.
20            THE COURT:  Okay.  Very good.
21            MR. PORTER:  Is Mr. Beckner still here?
22            DEPUTY MARSHAL:  As far as I know he is, yes.
23            THE COURT:  I'll speak to him before I leave.
24            (Court adjourned at 5:05 p.m. until 8:15 a.m.
25    Wednesday, December 7, 2016.)
```