UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF MISSOURI


UNITED STATES OF AMERICA,           )
                                    )
                  Plaintiff,        )
                                    )
        vs.                         )    Case No.
                                    )    16-04068-01-CR-C-RK
BRUCE WAYNE STEPHENS,               )
                                    )
                  Defendant.        )



            TRANSCRIPT OF PROCEEDINGS - VOLUME III
            BEFORE THE HONORABLE ROSEANN KETCHMARK
                 UNITED STATES DISTRICT JUDGE
                      DECEMBER 7, 2016
                   JEFFERSON CITY, MISSOURI


FOR THE PLAINTIFF:
     MR. PHILLIP EUGENE PORTER
     MS. EMILY A. ORSINGER
     Assistant United States Attorneys
     Charles Evans Whittaker Courthouse
     400 East Ninth Street, Floor 5
     Kansas City, Missouri 64106

FOR THE DEFENDANT:
     MR. JAMES EDWARD BROWN
     1609 West 92nd Street
     Kansas City, Missouri 64114



     Proceedings recorded by mechanical stenography, transcript
produced by computer



               KATHERINE A. CALVERT, RMR, CRR
               FEDERAL OFFICIAL COURT REPORTER
             CHARLES EVANS WHITTAKER COURTHOUSE
                  400 EAST NINTH STREET
                KANSAS CITY, MISSOURI 64106

Case 2:16-cr-04068-RK   Document 92   Filed 07/12/17   Page 1 of 159

I N D E X                                    Page

DECEMBER 5, 2016

VOLUME I

Pretrial conference. . . . . . . . . . . . . . . . . . . .  6

Government's opening statement . . . . . . . . . . . . .  30

Defendant's opening statement. . . . . . . . . . . . . .  39

GOVERNMENT'S EVIDENCE

BRIAN DAVID RISLEY
        Direct examination by Mr. Porter. . . . . . . . . .  45
        Cross-examination by Mr. Brown. . . . . . . . . . .  89

Case 2:16-cr-04068-RK   Document 92   Filed 07/12/17   Page 2 of 159

I N D E X                                  Page
(continued)


DECEMBER 6, 2016


VOLUME II


BRIAN DAVID RISLEY (resumed)
     Cross-examination by Mr. Brown (continued). . . . . . 120
     Redirect examination by Mr. Porter. . . . . . . . . . 141
     Questions from the jury by Mr. Porter . . . . . . . . 148
     Recross-examination by Mr. Brown. . . . . . . . . . . 149
     Further redirect examination by Mr. Porter. . . . . . 150


G. PAUL TYREE
     Direct examination by Ms. Orsinger. . . . . . . . . . 151
     Cross-examination by Mr. Brown. . . . . . . . . . . . 169
     Redirect examination by Ms. Orsinger. . . . . . . . . 179
     Recross-examination by Mr. Brown. . . . . . . . . . . 185
     Questions from the jury by Ms. Orsinger . . . . . . . 202
     Further recross-examination by Mr. Brown. . . . . . . 202


RANDALL SINELE
     Direct examination by Mr. Porter. . . . . . . . . . . 204
     Cross-examination by Mr. Brown. . . . . . . . . . . . 206
     Redirect examination by Mr. Porter. . . . . . . . . . 207
     Recross-examination by Mr. Brown. . . . . . . . . . . 207
     Questions from the jury by Mr. Porter . . . . . . . . 209
     Further redirect examination by Mr. Porter. . . . . . 210


JAMES BLACK
     Direct examination by Ms. Orsinger. . . . . . . . . . 211
     Cross-examination by Mr. Brown. . . . . . . . . . . . 218
     Redirect examination by Ms. Orsinger. . . . . . . . . 221
     Questions from the jury by Ms. Orsinger . . . . . . . 222


WENDY HOUSTON
     Direct examination by Mr. Porter. . . . . . . . . . . 224
     Cross-examination by Mr. Brown. . . . . . . . . . . . 242
     Questions from the jury by Mr. Porter . . . . . . . . 276
     Recross-examination by Mr. Brown. . . . . . . . . . . 282
     Redirect examination by Mr. Porter. . . . . . . . . . 283


CODY ABRAM
     Direct examination by Mr. Porter. . . . . . . . . . . 285

Case 2:16-cr-04068-RK   Document 92   Filed 07/12/17   Page 3 of 159

I N D E X                                    Page
(continued)

DECEMBER 7, 2016

VOLUME III

CODY ABRAM (resumed)
     Direct examination (continued) by Mr. Porter. . . . . 317
     Cross-examination by Mr. Brown. . . . . . . . . . . 335
     Redirect examination by Mr. Porter. . . . . . . . . 347
     Questions from the jury by Mr. Porter . . . . . . . 359
     Redirect examination by Mr. Porter. . . . . . . . . 362
     Recross-examination by Mr. Brown. . . . . . . . . . 364

Instructions conference. . . . . . . . . . . . . . . . . 374

DEFENDANT'S EVIDENCE

BRUCE WAYNE STEPHENS
     Direct examination by Mr. Brown . . . . . . . . . . 396
     Cross-examination by Mr. Porter . . . . . . . . . . 416
     Redirect examination by Mr. Brown . . . . . . . . . 421
     Questions from the jury by Mr. Brown  . . . . . . . 429

Government's closing argument. . . . . . . . . . . . . . 435

Defendant's closing argument . . . . . . . . . . . . . . 445

Government's rebuttal closing argument . . . . . . . . . 453

Verdict. . . . . . . . . . . . . . . . . . . . . . . . . 464

Case 2:16-cr-04068-RK   Document 92   Filed 07/12/17   Page 4 of 159

## INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | OFFERED | RECEIVED |
|---|---|---|---|
| **FOR THE GOVERNMENT:** | | | |
| 1 | Miranda rights waiver | 287 | 287 |
| 2 | Videotaped interview | 288 | 288 |
| 2(a) | Video clip | 292 | 292 |
| 2(b) | Video clip | 295 | 295 |
| 2(c) | Video clip | 297 | 297 |
| 2(d) | Video clip | 323 | 323 |
| 2(f) | Video clip | 328 | 328 |
| 2(g) | Video clip | 329 | 330 |
| 2(h) | Video clip | 330 | 330 |
| 4 | 9/29/16 voicemail | 81 | 81 |
| 5 | Voicemail transcript | 83 | 83 |
| 6 | Receipt | 86 | 86 |
| 7 | 9/29/16 email | 88 | 88 |
| 15 | Aerial photograph | 75 | 75 |
| 17 | Minute entry | 66 | 66 |
| 19 | Minute entry | 348 | 349 |
| 34 | Stipulation | 367 | 367 |

313

```
1                          DECEMBER 7, 2016

2                          MORNING SESSION

3                    (The following proceedings were had in the courtroom

4       out of the presence of the jury:)

5                    THE COURT:  Please be seated.

6                    Good morning.  This is the third day of trial.  It

7       is December 7th.  And all the parties are in the courtroom.

8                    Good morning.

9                    Good morning, Mr. Stephens.  And, please, you can

10      finish your snack there at the table.

11                   Mr. Brown, do you have any issues you want to put on

12      the record this morning before we bring the jury back?

13                   MR. BROWN:  Yes, there are two or three.  Based on

14      the representation of the government that they're not going to

15      play the I am tha Town video, as far as I'm concerned, Ms.

16      Houston may be released from her subpoena.  I'm not going to

17      call her for anything else if they don't use that.  And as far

18      as I'm concerned, she's a citizen at that point.  If she wants

19      to stay, fine.  If she wants to go, fine.

20                   THE COURT:  Mr. Porter, what's your position or Ms.

21      Orsinger?

22                   MS. ORSINGER:  Thank you, Your Honor.

23                   That's correct.  We are not intending to play the

24      rap video I am tha Town.  We would note Ms. Houston does have

25      travel arrangements.  She does have a flight to catch.  She is
```

1  released from her subpoena but she does have travel

    2  arrangements that have been made by the government so she will

    3  need, if she's going to go back, to make her flight.

    4          MR. BROWN:  I don't care.  I'm just not going to

    5  call her if they're not playing the video.

    6          THE COURT:  Okay.  Very well.

    7          MR. BROWN:  The second thing, we still have the

    8  records custodian for Mr. Beckner's records.  I've agreed with

    9  the government that he can be released; and if Mr. Beckner

   10  testifies, they can use those records and that I won't be

   11  making any foundational objections.

   12          THE COURT:  Very well.  Thank you.

   13          MR. BROWN:  And then I think we have the stipulation

   14  as to the video -- or the courtroom video and would tender --

   15          THE COURT:  That would be marked as an exhibit, and

   16  I'll have the government present that or jointly present that.

   17  And I will not read, then, the stipulation instruction,

   18  proposed government stipulation instruction.

   19          MR. BROWN:  I think that's all I had.

   20          MS. ORSINGER:  I believe there's one more issue.  In

   21  chambers we had discussed an issue with regard to defense

   22  witness Linnel Beckner making a statement to some of the jurors

   23  yesterday.

   24          MR. BROWN:  Right.

   25          MS. ORSINGER:  And do you mind if I state what the

1  statement was?  Our understanding of the statement was to the

2  effect, "Tomorrow is Pearl Harbor day.  At two o'clock the

3  world will be on fire."  Apparently multiple jurors had heard

4  such.  Defense counsel has indicated that he does not want to

5  inquire further of the jury how they perceived that threat.  Is

6  that a correct statement?

7           THE COURT:  Then I'll let -- Mr. Brown, you go ahead

8  and make your record regarding what your request is on how the

9  Court handle that and why.

10           MR. BROWN:  If the Court wants to make any inquiry

11  of the jurors about what they heard or what their perception

12  was, I would prefer that it be after the defense has rested.  I

13  think it highlights -- if it were perceived as a threat, it's

14  detrimental to the jury -- or to the defendant and highlights

15  that conduct, and strategically I would much prefer if the

16  Court makes an inquiry, they wait.

17           THE COURT:  And I will defer significantly to how

18  you strategically want to handle the situation.  The Court can

19  inquire now.  The Court can leave it alone and not highlight it

20  at all.  If Mr. Beckles [sic] testifies, we can make an inquiry

21  ahead or after.  There's a lot of ways we can handle this.  So

22  I would like to proceed as you think best for your defense.

23           MR. BROWN:  Well, at this point I would prefer we

24  not do anything --

25           THE COURT:  Okay.

```
 1              MR. BROWN:  -- and go from there.

 2              THE COURT:  Did you have any issues, Ms. Orsinger,

 3   to put on the record?

 4              MS. ORSINGER:  Nothing further, Your Honor.

 5              THE COURT:  All right.  Are we ready to call the

 6   jury back?

 7              MS. ORSINGER:  Yes.

 8              THE COURT:  Agent Abram, you can go ahead and have a

 9   seat on the jury stand; and when the jury comes in, I'll remind

10   you that you are still under oath.

11              THE WITNESS:  Yes, Your Honor.

12    CODY ABRAM resumes the stand and testifies:

13              (The following proceedings were had in the presence

14   of the jury:)

15              THE COURT:  Please be seated.

16              Good morning, ladies and gentlemen.  We are all

17   accounted for.  Thank you for your attentiveness in the

18   proceedings so far.

19              We are going to resume where we left off yesterday

20   with Mr. Abram.

21              You may proceed.

22              MR. PORTER:  Thank you, Your Honor.

23   DIRECT EXAMINATION (continued) BY MR. PORTER:

24   Q     Special Agent Abram, when we were concluding yesterday,

25   we mentioned to the jury that for sake of going forward we were
```

1    going to play the clips; that when we started off first thing
2    this morning we would play Exhibit 2 in its entirety.
3    A        Yes, sir.
4             MR. PORTER:  Your Honor, with the Court's
5    permission, publish Exhibit 2 to the jury?
6             THE COURT:  Yes.
7    Q        (By Mr. Porter)  We've cued it up to start at the point
8    where the wait is over, correct?
9    A        Correct.
10   Q        So -- let's just note at the top again the time
11   counter.  We're at what time, sir?
12   A        It's October 12th, 2016, at 10:21:30.
13   Q        Thank you.
14            (Government's Exhibit No. 2 was played.)
15            MR. PORTER:  Anyone having trouble hearing?  Little
16   more volume.  Thank you.  Let's go on.
17            (Government's Exhibit No. 2 continued being played.)
18   Q        (By Mr. Porter)  Special Agent Abram, is that the
19   entirety of the interview that took place on October the 12th?
20   A        Yes, sir.
21   Q        Between yourself and the defendant?
22   A        Yes, sir.
23   Q        The remaining portion of the video is just Mr. Stephens
24   sitting there by himself?
25   A        He's sitting there by himself until I come in to

1    transport him down to the United States Marshal Service.

2              MR. PORTER:  Your Honor, I don't know what the

3    Court's preference is.  I'm more than happy to continue to

4    inquire; but if there is any reason to take a break for any

5    reason, we can do that at this time as well.

6              THE COURT:  Let me ask the jurors.  Is there anyone

7    that needs to take a break at this point?

8              I see no hands.

9              We'll continue on for a bit.

10             MR. PORTER:  Thank you, Your Honor.

11   Q      (By Mr. Porter)  Special Agent Abram, I want to resume

12   now going -- and looking at some of the clips that we made and

13   prepared in advance of trial, and I want to direct your

14   attention -- well, hang on a second.  Before we do that.

15             There was a portion of the interview where you're

16   telling the defendant that Mr. Risley was wearing a body

17   recorder?

18   A      Yes, sir.

19   Q      Is that a true statement?

20   A      No, sir.

21   Q      Explain to the jury the rationale and the law

22   enforcement techniques and methods that's associated with that

23   form of questioning.

24   A      There was an attempt by me to get Mr. Stephens at a

25   level of comfort that we had more evidence on him than what we

1    actually had at the time of the interview.  So that's when I

2    told him there was a body recorder on Mr. Risley when he exited

3    based on his behavior inside the court and the time frame he

4    believed there was time to be able to do that so he would

5    confess to what he had said to Mr. Risley on the street after

6    he left the courthouse.  It's within my purview to do that as a

7    law enforcement officer during an interrogation.

8    Q      So as an interview or an interrogation technique, it's

9    permissible to make that kind of representation to someone

10   that's being interviewed?

11   A      Yes, sir.

12   Q      Courts have never said that's wrong or can't be done?

13   A      That's correct.

14   Q      And its purpose is to do what?  When you engage in that

15   kind of process, what's the intended effect on the person being

16   questioned?

17   A      The intended effect is for the person to believe that

18   there is more evidence than what we had at that particular time

19   so that they can get over the hump or the hurdle so that they

20   can feel comfortable saying, Yeah, this is what I said and I

21   said it.  You caught me.  You got me.

22   Q      There's also a portion of the interview where you're

23   having conversation with him about future harm, correct?

24   A      Yes.

25   Q      At that point on October the 12th it was a known fact

1    that no harm had actually come to Mr. Risley?

2    A      That's correct.

3    Q      Were there still processes in place that had been taken

4    by law enforcement to maintain an assessment of that risk of

5    future harm?

6    A      Investigation was still continuing even after this

7    interview on this particular instant.  Early on when I caught

8    wind of what I needed to do or Mr. Oliver called me to get

9    involved in the case, I immediately reached out to the United

10   States Marshal Service and to an FBI agent in Springfield and

11   spoke with the marshal service who said they had already

12   started the threat assessments on Mr. Risley's employment in

13   his area where he works and threat assessment on his residence

14   and family's patterns as well.  So we knew that was in place

15   for Mr. Risley's protection.

16          Then I reached out to a SWAT operator in

17   Springfield, Missouri, as a point of contact for Mr. Risley

18   since I wasn't in Springfield or be there, and then obviously

19   those assessments were carrying through the entire

20   investigation process so that we can ensure Mr. Risley and his

21   children and his wife's safety through this process, not

22   knowing if anybody else in these circles would cause harm to

23   him in retaliation for Mr. Edwards' cooperation with the

24   government.

25   Q      That concern about possible future harm was based on

1    factual information about prior conduct of these individuals?

2     A     Absolutely.  Through the whole process individuals were

3    trying to uncover who was cooperating with the government

4    through the investigation and prosecution phase of the drug

5    conspiracy.  Any cases like this there's always that concern.

6    We're always aware of it, trying to address it continuously.

7    However, in this particular case there was evidence of that.

8     Q     And evidence that identities of cooperators had been

9    disclosed and circulated amongst the defendants in the

10   underlying criminal prosecution of Mr. Redmon?

11    A     That's exactly correct.

12    Q     So this wasn't just a hypothetical.  It was based on

13   factual information?

14    A     That's correct.

15    Q     And so the questions were in that area of the interview

16   were designed to assist you in assessing the risk of future

17   harm?

18    A     That's correct.  I was not sure if Mr. Stephens would

19   be detained by the United States magistrate during the

20   detention hearing so I was trying to put him on notice that we

21   were aware of the threats and that nothing should happen or we

22   would be obviously coming back for him and others, and I wanted

23   him to ultimately relay that message as well to others that the

24   FBI is engaged at this point and we're going to do what we can

25   to protect Mr. Risley and his family.

```
 1           MR. PORTER:  May I have just a moment, Your Honor?

 2           Your Honor, I'm going to direct the attention of the

 3   witness now to Government's Exhibit 2(d) marked for

 4   identification.

 5   Q    (By Mr. Porter)  Special Agent Abram, Exhibit 2(d)

 6   marked for identification is a portion of the defendant's

 7   statement when he describes the encounter with Mr. Risley

 8   outside the courthouse.  Do you remember those events?

 9   A    Yes.

10   Q    And was 2(d) a true and accurate clip of that portion

11   of the interview?

12   A    Yes, sir.

13           MR. PORTER:  Your Honor, we would offer 2(d).

14           THE COURT:  Any objection?

15           MR. BROWN:  No, Your Honor.

16           THE COURT:  Admitted.

17           MR. PORTER:  I'm trying to evaluate right now, to be

18   real honest with you, Judge, whether I want to replay any of

19   those clips or just inquire of the witness about them in the

20   interest of trying to pick up the pace.

21           I think maybe we're going to look at 2(d) if I have

22   permission to publish it to the jury at this time.

23           THE COURT:  You may.

24           (Government's Exhibit No. 2(d) was played.)

25   Q    (By Mr. Porter)  At that point in the interview,
```

```
 1   Special Agent Abram, there is a statement -- excuse me -- get

 2   back to my page -- where the defendant admits having a

 3   conversation with Mr. Risley in the hallway outside this

 4   courtroom?

 5   A       Correct.

 6   Q       And you confront him with the statements, "Snitches

 7   belong in ditches"?

 8   A       Yes.

 9   Q       Then he said -- after that, he also made a statement

10   that, "How much are you paying the snitches?"

11   A       Yes.

12   Q       Does it make any sense for that statement --

13           MR. BROWN:  Your Honor, may we approach?

14           (Counsel approached the bench and the following

15   proceedings were had:)

16           MR. BROWN:  I'm not sure whether something makes

17   sense or not is this witness' -- I haven't heard the question

18   but I'm concerned we're getting into some -- I would ask that

19   he reword the question.

20           THE COURT:  What was your question?

21           MR. PORTER:  I was going to ask the witness, Does it

22   make sense to associate Edwards with the term "snitches" if you

23   don't know Edwards is a snitch?  I can rephrase.  I'm happy to

24   rephrase it.

25           THE COURT:  Do you care how he phrases it?
```

1          MR. BROWN:  That's up to him.

2          MR. PORTER:  I understand where he's coming from.

3   I'll be happy to make a different statement.

4          THE COURT:  Very well.

5          (The proceedings returned to open court.)

6   Q      (By Mr. Porter)  Special Agent Abram, at that point in

7   time Mr. Stephens has heard Mr. Risley identify himself as the

8   attorney who represents Vershawn Edwards?

9   A      That's correct.

10  Q      And immediately after that, Mr. Stephens starts saying

11  statements to Mr. Risley about snitches?

12  A      Yes.

13  Q      The snitch reference, is it to Mr. Risley being a

14  snitch or Mr. Vershawn Edwards being a snitch?

15  A      It's directed for Mr. Edwards being a cooperator with

16  the government, a snitch.

17  Q      And does that context indicate to you the defendant's

18  knowledge of Vershawn Edwards being a cooperator and, quote, in

19  his own words, the defendant's own words, a snitch?

20  A      That's correct.

21  Q      You asked Mr. Stephens why he was even in the courtroom

22  during the sentencing hearing of Vershawn Edwards?

23  A      Yes, sir.

24  Q      And he told you what?

25  A      He told me that Malcolm wanted them there early.  He

1  said Malcolm wanted them early and I just reiterated so that

2  they could hear what was being said so they could report back

3  to him.

4  Q     As you're hearing that and evaluating the significance

5  of the meaning of that, what process and conclusions were you

6  forming as to why would Malcolm need to know what the snitch

7  witness had happened to them in the courtroom?

8  A     It was very concerning to me because that was what I

9  thought the retaliation was.  They wanted to know exactly who

10 said what and when.  In several of those sentences, as you may

11 not know, they discuss the cooperation that the defendant

12 provided the government so that the judge can --

13            MR. BROWN:  Judge, may we approach?

14            (Counsel approached the bench and the following

15 proceedings were had:)

16            MR. BROWN:  The response of this witness as to what

17 happens in several sentencings is not relevant.  What happened

18 in Mr. Edwards' sentencing may be relevant, but what happens in

19 several sentencings is not relevant and is misleading.

20            THE COURT:  Do you have a response?

21            MR. PORTER:  I can redirect the witness and rephrase

22 the question, Your Honor, and cure that easily to whatever

23 concerns are on the part of the Court.

24            MR. BROWN:  Edwards' sentence is relevant.

25            MR. PORTER:  We'll talk about Edwards' sentencing

1    hearing right now.

2              (The proceedings returned to open court.)

3    Q      (By Mr. Porter)  During the interview of Mr. Stephens

4    when you were having this portion of the conversation with Mr.

5    Stephens, he told you he already knew what Mr. Edwards was

6    going to say as a cooperator, correct?

7    A      Yes.

8    Q      And to, again, make sure there's almost no doubt about

9    the fact that everyone knew Mr. Edwards was a cooperator, let's

10   look at Exhibit 17 for a moment.  And zoom in on the part below

11   the dotted line this time.  Exhibit 17 reflects the Court's

12   determination of the guideline sentencing range of 46 to 57

13   months; does it not?

14   A      Yes, sir, it does.

15   Q      And we heard testimony earlier that the mandatory

16   minimum sentence that Mr. Edwards was facing was not less than

17   ten years and up to life?

18   A      Yes, sir.

19   Q      And the actual sentence he received was probation?

20   A      That's correct.

21   Q      And the only way someone can get probation when you

22   have a mandatory minimum sentence is with a

23   government-sponsored motion to ask the Court to reduce the

24   sentence below that mandatory minimum?

25   A      Correct.

```
 1   Q      So once someone who's facing this sentencing range

 2   receives probation, once that's announced in open court when

 3   the witnesses who are there hear it, what does everyone who's

 4   in that courtroom know?

 5   A      He cooperated with the government.

 6   Q      And Mr. Stephens was in Vershawn Edwards' sentencing

 7   hearing on September the 29th?

 8   A      Yes, sir.

 9   Q      And Mr. Stephens, as he said during the interview, has

10   been on the street a long time?

11   A      Yes, sir.

12   Q      Knows how the criminal process works?

13   A      Yes, sir.

14   Q      Let's look, then, at Exhibit 2(f).  You had occasion to

15   look at clip 2(f) before coming today?

16   A      Yes, sir.

17   Q      True and accurate segment of that interview?

18   A      Yes, sir.

19              MR. PORTER:  Offer 2(f), Your Honor.

20              THE COURT:  Any objection?

21              MR. BROWN:  No, Your Honor.

22              THE COURT:  Admitted.

23              MR. PORTER:  Permission to publish 2(f), Your Honor?

24              THE COURT:  You may.

25              (Government's Exhibit No. 2(f) was played.)
```

1    Q      (By Mr. Porter)  So he's describing to you at this

2    point what?

3    A      He's describing the fact that some get a pat on the

4    back referring to probation or cooperation level from the

5    sentencing and that they put a rope around Malcolm's neck

6    because he did not cooperate.

7    Q      And you then explained to Mr. Stephens that that same

8    opportunity to cooperate had been extended to Malcolm?

9    A      Several times.

10   Q      Including times by you personally?

11   A      Twice by me before he was even charged.

12   Q      And that that offer was rejected by Malcolm?

13   A      Yes, sir.

14   Q      Because Malcolm wasn't going to be a snitch?

15   A      Yes, sir.

16   Q      Let me direct your attention now to Exhibit 2(g), to

17   the clip for the portion of that video.  You had a chance to

18   review that prior to coming to court today?

19   A      Yes, sir.

20   Q      True and accurate segment -- or that segment is true

21   and accurate of what was on the entire video?

22   A      Yes.

23           MR. PORTER:  Offer 2(g), Your Honor.

24           THE COURT:  Any objection?

25           MR. BROWN:  No, Your Honor.

329

```
1              THE COURT:  Admitted.

2              MR. PORTER:  Permission to publish, Your Honor?

3              THE COURT:  Yes.

4              (Government's Exhibit No. 2(g) was played.)

5    Q     (By Mr. Porter)  So what is Mr. Stephens telling you

6    even at that point in time, some 13 days after he was in this

7    courtroom on September the 29th, what is he even telling you

8    then what he thinks should happen to all snitches?

9    A     He thinks that all snitches should die.

10   Q     Then let's look at Exhibit 2(h), last clip that we've

11   prepared.  True and accurate recording of -- or that segment is

12   true and accurate for that portion of the entire interview?

13   A     Yes, sir.

14             MR. PORTER:  Offer 2(h), Your Honor.

15             MR. BROWN:  No objection.

16             THE COURT:  Admitted.

17             MR. PORTER:  Permission to publish, Your Honor?

18             THE COURT:  Yes.

19             MR. PORTER:  And before we do, Your Honor, we've

20   prepared a transcript of that clip, which we've marked for

21   identification as Government's Exhibit 3.

22             THE COURT:  Before you publish that transcript, I

23   want to read Instruction No. 13 at this point.

24             Ladies and gentlemen, Instruction No. 13.

25             (Instruction No. 13 was read to the jury.)
```

330

1                    THE COURT:  You may publish.

2                    MR. PORTER:  Thank you, Your Honor.

3                    For the purpose of the record, if I might lay a

4    brief foundation for the admissibility of Exhibit 3, the

5    transcript?

6                    MR. BROWN:  Judge, may we approach?

7                    (Counsel approached the bench and the following

8    proceedings were had:)

9                    MR. BROWN:  The transcript is not admissible and he

10   doesn't need to lay a foundation for admissibility, and it may

11   be marked as an exhibit but we would certainly object to the

12   introduction of this as an exhibit.

13                   THE COURT:  I think we're all on the same page.  Mr.

14   Porter, go ahead and explain to Mr. Brown the difference.

15                   MR. PORTER:  I'm going to have him authenticate this

16   as being accurate from his perspective so he can look at this,

17   then I'm going to ask if Ms. Wheeler can hand these out to the

18   jury; and then as soon as they have them, we'll play the clip.

19                   THE COURT:  And it's just to aid in listening to the

20   clip, and it won't be admitted into evidence as an exhibit to

21   go back to the jury room.

22                   (The proceedings returned to open court.)

23                   MR. PORTER:  May I approach the witness, Your Honor?

24                   THE COURT:  You may.

25   Q      (By Mr. Porter)  Special Agent, Abram, you have before

```
1    you what's been marked for identification as Government's

2    Exhibit 3?

3    A      Yes, sir.

4    Q      Can you tell us what that is?

5    A      It's a transcript from the recorded interview.

6    Q      And it's this particular clip that we're about to play

7    that has been admitted as Exhibit 2(g)?

8    A      Yes.

9    Q      Is it a true and accurate written reflection of what is

10   spoken on the clip?

11   A      Yes.

12          MR. PORTER:  Your Honor, I can hand them to the jury

13   or perhaps the --

14          THE COURT:  Ms. Russell, will you assist Mr. Porter,

15   please.

16          MR. PORTER:  While they're doing that, I think I

17   perhaps -- in fact, I'm certain I misspoke.  We're about to

18   play 2(g) -- excuse me.  We're about to play 2(h).  I said

19   2(g).

20          THE COURT:  Thank you for that clarification.

21          MR. PORTER:  Your Honor, I believe all the members

22   of the jury now have a copy of Exhibit 3 in front of them, and

23   with the Court's permission we'll publish 2(h) to the jury at

24   this time.

25          THE COURT:  Proceed.
```

```
1                    (Government's Exhibit No. 2(h) was played.)

2                    MR. PORTER:  May I have a moment, Your Honor?

3                    Your Honor, we have no further questions at this

4    time on direct examination.

5                    THE COURT:  Thank you.

6                    Ladies and gentlemen, it's now 10:25.  We'll take

7    our morning recess, and let's take a 20-minute recess.  I show

8    it's 10:25 so we will be back at 10:45.

9                    I would remind the jurors to not talk amongst

10   yourselves about the case during recess.

11                   (The following proceedings were had in the courtroom

12   out of the presence of the jury:)

13                   THE COURT:  Please be seated.  Are there any other

14   issues we need to take up or we'll just take a recess?

15                   MR. PORTER:  Nothing from the United States, Your

16   Honor.

17                   MR. BROWN:  Nothing for defense, Your Honor.

18                   (Recess was taken at 10:25 a.m.)

19                   (The following proceedings were had in the courtroom

20   out of the presence of the jury:)

21                   THE COURT:  Let's go back on the record before the

22   jury comes back.

23                   My plan is after the government rests to have the

24   jury go back out, let Mr. Brown make any motions, and then have

25   Mr. Stephens put on the record whether he wishes to testify or
```

1    not.  At that point it might be lunch.

2              MR. PORTER:  Just to assist the Court and counsel

3    further, we will be resting at the conclusion of Special Agent

4    Abram's testimony from direct and cross.

5              There's a housekeeping matter that we'll take up --

6    or ask the Court to take up.  We identified Exhibit 19 but we

7    never offered it so I'm going to offer 19.

8              MR. BROWN:  What's that?

9              MR. PORTER:  The minute entry from Malcolm's

10   hearing.  Then we'll read the stipulation, then we plan to

11   formally rest our case.

12             THE COURT:  The stipulation is exhibit?

13             MR. PORTER:  We've marked it as Exhibit 34, Your

14   Honor.

15             THE COURT:  Very good.  Okay.

16             Ms. Wheeler, are you ready to bring the jury back

17   in?

18             THE COURTROOM DEPUTY:  Yes.

19             (The following proceedings were had in the presence

20   of the jury:)

21             THE COURT:  Please be seated.

22             Mr. Brown, do you have any cross-examination?

23             MR. BROWN:  Yes, Your Honor.

24             THE COURT:  And, Mr. Abram, I remind you you are

25   still under oath.

```
 1                    THE WITNESS:  Yes, Your Honor.

 2    CODY ABRAM resumed the stand and testified:

 3    CROSS-EXAMINATION BY MR. BROWN:

 4    Q       Agent Abram, you're the case agent in this case?

 5    A       Yes, sir.

 6    Q       And could you explain to the jury what a case agent is?

 7    A       Case agent is the individual at the end of the day

 8    that's responsible for the investigation.  We assign

 9    investigations out to the squad members and different agents

10    and this particular case was assigned to me which makes me the

11    case agent.

12    Q       And so as the case agent, you were charged with the

13    responsibility of investigating and at least reporting to the

14    U.S. Attorney the results of your investigation?

15    A       Yes, sir.

16    Q       And did you in fact have an investigation?

17    A       Yes, sir.

18    Q       As part of that investigation, did you talk to any

19    other of the 27-plus lawyers that were associated with Malcolm

20    Redmon's case about whether they had received any threats?

21    A       No, sir.

22    Q       So you can't tell this jury whether or not they had any

23    confrontation with Mr. Stephens?

24    A       No.  There's no contact as far as I know.  Nothing's

25    been reported.
```

1  Q      So is it fair to say none of the other 27-plus lawyers

2  got into a confrontation with Mr. Stephens?

3  A      Yes, sir, that's fair.

4  Q      Just Mr. Risley?

5  A      Yes, sir.

6  Q      Now, let's talk a little bit about the interview that's

7  been admitted as Government's Exhibit 2.  Before that

8  interview, Mr. Stephens had already been charged in this case;

9  is that correct?

10  A      He was indicted, yes.

11  Q      And you -- the reason you met with him on the 12th of

12  October was to arrest him on the warrant that was the result of

13  that indictment?

14  A      Yes, sir.

15  Q      You had completed your investigation at that point?

16  A      No, sir.

17  Q      Okay.  And this interview was not to gather

18  information, was it?

19  A      Yes, it was.

20  Q      So this interview was a search for the truth?

21  A      Yes, sir.

22  Q      It wasn't a search for a confession?

23  A      It was -- I believe the truth led to the confession

24  but, yes, it's both.

25  Q      The real reason you interviewed him was to see if he

1    would give you a confession; is that right?

2    A        Yes.

3    Q        Now, I think in response to Mr. Porter's question about

4    one of the clips, I want to say 2(b), you concluded that -- or

5    your response was you concluded that Mr. Stephens was lying to

6    you?

7    A        Yes, sir.

8    Q        And I think that's the result of his saying he met his

9    granddaughter, they walked down to the apartment complex, took

10   a nap in a white Chrysler, and then the confrontation on the

11   street with Mr. Risley happened?

12   A        Yes.

13   Q        Is that fair?

14   A        I mean, there was a couple of times in the interview

15   that he had lied to me, but that particular instant, yes.

16   Q        And the other -- well, as I recall -- and the jurors

17   are going to have a much better recollection than I am -- you

18   said at some point in that interview that Malcolm's sentencing

19   was scheduled at 3 p.m.?

20   A        Yes.

21   Q        And was that part of the -- of your investigative

22   technique to misstate facts or were you just confused about

23   when he was sentenced?

24   A        I believe I misspoke.

25   Q        Okay.  Did your investigation indicate to, other than

1    the fact that Mr. Stephens was in the courtroom for Mr.

2    Edwards' sentencing, any knowledge on the part of Mr. Stephens

3    about Vershawn Edwards?

4     A       You'll have to repeat the question, sir.

5     Q       Okay.  Did you learn anything in your investigation

6    that made you believe that Mr. Stephens knew Vershawn Edwards?

7     A       Yeah.  I believe Mr. Stephens knew who Vershawn Edwards

8    was, among others, involved in the investigation.

9     Q       What was the basis for your belief that he knew who

10   Vershawn Edwards was?

11    A       It would be based on the common knowledge through other

12   witnesses that the -- that it was known to the family and

13   others who had cooperated through news articles and stuff like

14   that.

15    Q       We'll get to who and common knowledge about who

16   cooperated in a minute.

17    A       Sure.

18    Q       But is -- anything else your investigation reveal that

19   Mr. Stephens knew Vershawn Edwards?

20    A       No.

21    Q       Okay.  So he happened to be in the courtroom when

22   Vershawn Edwards was sentenced and common knowledge?

23    A       Yes, he was in the courtroom when he was sentenced.

24    Q       Okay.  And you sat through -- as the case agent, you

25   get to sit in the courtroom when other witnesses testify?

1   A      Correct.

2   Q      And you've paid attention?

3   A      Yes, sir.

4   Q      And you heard Mr. Risley's testimony?

5   A      Yes, sir.

6   Q      Based on your investigation, the comments that were

7   made out in the hallway before the Edwards' sentencing hearing

8   started, did Mr. Stephens ever identify Mr. Edwards as a snitch

9   or a cooperator?

10  A      I think his response of who Mr. Risley was representing

11  and going into snitches in ditches puts those two together.

12  Q      That's the only -- you reached that conclusion because

13  of the timing of Mr. Risley's statement of who he represented

14  and Mr. Stephens' comments about snitches?

15  A      Yeah.  As soon as he said, "I represent Vershawn

16  Edwards," Mr. Stephens made reference to snitches in ditches

17  and things like that.  That's to me a direct -- as a response

18  to me saying one thing he said something else.

19  Q      So it's your understanding from your investigation that

20  Mr. Stephens was talking to Mr. Risley?

21  A      Yes, sir, it is.

22  Q      Anything else that he may have said, anybody overheard,

23  a result of your investigation that ties any of these comments

24  directly to Vershawn Edwards?

25  A      I believe when he says, "How much do the snitches get

339

1  paid these days" -- I may be misspeaking on that but something

2  to that effect, as a result of Mr. Risley identifying himself

3  as Mr. Edwards' attorney, then that along -- that too.

4  Q    So what you're saying is these general comments you

5  attribute to knowledge of Vershawn Edwards?

6  A    I absolutely agree with that.

7  Q    Okay.  Now, if I recall Mr. Risley's testimony

8  correctly, there was something about in USA v. Scott, et al.,

9  the conspiracy that Malcolm was charged in, the defendants are

10 listed by number, more or less by culpability?

11 A    Yes, sir.

12 Q    And so you would consider the No. 1 defendant, Mr.

13 Scott, more culpable than Edwards who is designated as No. 23?

14 A    Yes, sir.

15 Q    Big difference in the culpability between Mr. Scott and

16 Mr. Edwards?

17 A    Yes, sir.

18 Q    And there were a number of cooperators in this case; is

19 that right?

20 A    To my understanding, yes.  I was not the case agent on

21 that investigation so --

22 Q    I understand.  But as part of your investigation, you

23 checked into that?

24 A    I'm familiar with the investigation.

25 Q    Okay.  And there were a number of these codefendants

```
 1  that are also related to Mr. Stephens; is that right?
 2  A       I know of two for sure.
 3  Q       Well, we have Mr. Redmon who's his son?
 4  A       Yes.
 5  Q       We have Marlon Jordan who is his nephew?
 6  A       That's the second one, yes.
 7  Q       And that's the one he attended the sentencing hearing
 8  earlier that morning for, right?
 9  A       Yes, sir.
10  Q       Then we have Ronnie Brown or Ronald Brown who is the
11  stepson.  I think that was on information in that interview?
12  A       Yes, sir.
13  Q       And we have Marcus Jordan who's a nephew?
14  A       Yes, sir.
15  Q       Did any of those family members cooperate?
16  A       I don't know.
17  Q       How about Marcus Jordan?
18  A       I don't know.
19  Q       And that wasn't important to your investigation?
20  A       I didn't believe so.
21  Q       Fair to say out of the first ten named defendants in
22  the Scott conspiracy, four, probably five, were cooperators?
23  A       I'm not familiar, sir.
24  Q       That wasn't important?
25  A       No, sir.
```

```
 1   Q      So if they were, they'd probably know a lot more about

 2   this case and everybody's involvement than No. 23, Vershawn

 3   Edwards, right?

 4   A      I would speculate on that.  I don't know the facts in

 5   regards to the cooperation level, of what was said or not said,

 6   again, not being the case agent.  Special Agent Charlie Tomlin

 7   with the ATF was the particular case agent on that

 8   investigation.

 9   Q      Now, you said or at least alluded to in the interview

10   that Malcolm wanted people to come in and hear what went on at

11   other codefendants' sentencings so he could figure out who was

12   cooperating?

13   A      Yes.

14   Q      And how many family members of Mr. Stephens were in the

15   courtroom for Vershawn Edwards' sentencing, do you know?

16   A      I don't know the exact number.

17   Q      That wasn't important to your investigation?

18   A      No.

19   Q      And Ms. Houston, who the government subpoenaed and

20   testified, she was in the courtroom?

21   A      Yes.

22   Q      As part of your investigation, you're aware that she

23   takes telephone calls from Malcolm and does three-ways and that

24   type thing with his family members?

25   A      Three-way calls from the jail.
```

1    Q        So they can talk?

2    A        Yes.

3    Q        She was in the courtroom?

4    A        Yes.  For Vershawn Edwards' sentencing?

5    Q        Yes.

6    A        Yes, sir.

7    Q        So if you wanted to run somebody in to find out what

8    was going on in the sentencing, would you send Mr. Edwards to

9    report back to you or would you send somebody maybe a little

10   younger and a little more intelligent?

11   A        I missed all of that.  I'm sorry.

12   Q        Okay.  If you were -- if you were a defendant who has

13   pled guilty and you want to find out what other cooperators

14   have said or whether they cooperated, would you send a

15   70-year-old man to report or would you send somebody younger

16   and perhaps more intelligent to find that out?

17   A        I would probably send anybody that could tell me

18   anything.

19   Q        Now, on 2(g), the clip we've heard, and I think you've

20   characterized it as 12 days later he still wants to see

21   cooperators dead?

22   A        Yes, sir.

23   Q        That's how you characterized 2(g)?

24   A        I can't say exactly.  I didn't memorize the 2(g) part;

25   but, yes, the fact it's been that many days caused me great

1    concern that he's still --

2    Q      What he actually said was before Risley I'd rather see

3    the snitches dead, right?

4    A      I don't know verbatim what he said, but I think it

5    sends the same point.

6    Q      The 12 jurors are going to be able to remember.

7    A      My concern was what is said the day of the sentencing

8    when he was very emotional and having 12 nights of sleep and 13

9    days afterwards he still wished death upon somebody else

10   regardless of who they were.

11   Q      Well, that's your characterization.  And that's what

12   you understood from that comment; is that right?

13   A      Yes, sir, it is.

14   Q      Now, 2(h), the last one that we heard before I started

15   questioning you, pretty brief snippet that they've included

16   into 2(h), right?

17   A      Transcript that we just saw?

18   Q      Uh-huh.

19   A      Okay.  Yes.

20   Q      It's the video that's the evidence.  The transcript's

21   not evidence, right?  We did see the video and the transcript

22   was provided as an aid to the jury, but it's the video.

23   A      I don't know, sir.  It was an exhibit.  I assume the

24   jury has that.

25   Q      When you listened to 2 (h) on that stand, were you

344

1    relying on the transcript or were you listening to the video?

2    A      I was actually following along with the transcript and

3    listening to the video.

4    Q      Okay.  But it's a pretty brief snippet, right?

5    A      I agree, yes, sir.

6    Q      And for some probably five minutes before that snippet

7    you were -- you and Charlie were talking about how the

8    community oughtn't believe -- that at least the community's

9    attitude toward snitches oughtn't be what it is?

10   A      Yes, sir.

11   Q      And your purpose was to get a confession from Mr.

12   Stephens?

13   A      I think the purpose was releasing our frustration

14   working these investigations.

15   Q      And you hadn't gotten a confession up to this point,

16   right?

17   A      No.

18   Q      He's denying that he ever threatened Mr. Risley,

19   denying that he ever threatened Mr. Risley's family?

20   A      He was lying to me two previous times in regard to his

21   encounter with Mr. Risley.

22   Q      So at the end of this five-minute discussion about

23   community attitudes towards snitches, you make another run at

24   him?

25   A      Yes.

345

```
 1   Q      And the response to that run is, "It was said"?

 2   A      Yes.

 3   Q      And you were happy.  You didn't follow up and ask what

 4   do you mean by "It was said," did you?

 5   A      No.

 6   Q      And it's your interpretation that "it" means the

 7   threats, right?

 8   A      Yes, sir.

 9   Q      But you didn't follow up with Mr. Stephens about he

10   might have a different view of what "it" meant?

11   A      No.

12   Q      "It" could mean the ugly statements that he had claimed

13   he had made, right?

14   A      No.

15   Q      Okay.  Did -- well, after that interview, you took him

16   to the marshals and turned him over and he was processed --

17   A      Yes, sir.

18   Q      -- on the warrant for the indictment?

19   A      Yes, sir.

20   Q      Did you ever interview him again?

21   A      No, sir.

22   Q      He was cooperative in this interview.  He wasn't

23   reluctant to talk with you, true?

24   A      True.

25   Q      You read him his rights and he understood his rights.
```

346

1   He kind of wanted to explain what went on, right?

2   A       Yes.

3           MR. BROWN:  I don't think I have anything further

4   for this witness.

5           THE COURT:  Any redirect?

6           MR. PORTER:  Your Honor, before I inquire, could the

7   Court determine if the members of the jury still have

8   Government's Exhibit 3 in front of them or available to them?

9   REDIRECT EXAMINATION BY MR. PORTER:

10  Q       And do you still have a copy of that in front of you?

11  A       I do not.

12  Q       Understanding, Special Agent Abram, that Exhibit 3, the

13  transcript that you have in front of you, according to the

14  Court's instructions, is not the evidence but is only an aid to

15  understanding and to try to speed this up and not to just

16  replay the clip, let me direct your attention to Exhibit 3 you

17  have in front of you.

18  A       Yes, sir.

19  Q       The statement by you is, "Nobody in Mr. Risley's entire

20  life ever said that to him that they were going to kill him,

21  his wife, and kids."  That's what you were focusing on and

22  wanting to talk to Mr. Stephens about at that time?

23  A       Yes.

24  Q       And in the context of the remaining portions of your

25  statement is there any doubt in your mind that what you're

1  referring to is that event?

2  A      No.  That's specifically what we were talking about.

3  Q      And Mr. Stephens' response was, "It was said"?

4  A      He actually finished my thought when I paused, but,

5  yes, he said, "It was said."

6  Q      That wasn't interrogation at that point.  That was him

7  finishing his statement for you?

8  A      It was conversation.

9          MR. PORTER:  Nothing further, Your Honor.

10          THE COURT:  Any recross?

11          MR. BROWN:  No, Your Honor.

12          THE COURT:  You may stand down.

13          (Witness excused.)

14          THE COURT:  Mr. Porter, do you have a couple of

15  exhibits?

16          MR. PORTER:  Your Honor, as a housekeeping matter,

17  as we're coming to the close here, we noticed we made reference

18  during the course of the trial to Government's Exhibit 19

19  identified for identification but never offered it.  So we

20  would offer Exhibit 19 at this time.

21          THE COURT:  Can you remind me what 19 is?

22          MR. PORTER:  It is the minute entry from the

23  sentencing hearing of Malcolm Redmon.

24          THE COURT:  Any objection?

25          MR. BROWN:  No objection, Your Honor.

```
 1              THE COURT:  Admitted.  Admitted at 11:15.
 2              Mr. Abram, I forgot to allow the jurors to submit
 3    note cards.  I'm going to ask you to come back up and take the
 4    stand and you'll still be under oath if you are asked any
 5    further questions.
 6    CODY ABRAM resumed the stand and testified:
 7              THE COURT:  And I apologize, ladies and gentlemen.
 8    Thank you, Ms. Wheeler, for keeping everything on track.
 9              And, ladies and gentlemen, I will tell you that I've
10    asked Ms. Russell to order you pizza and salad to have lunch
11    here in the jury deliberation.  So we'll just all stay close
12    together since we are winding it down.
13              MR. PORTER:  May we approach, Your Honor?
14              THE COURT:  Yes.
15              (Counsel approached the bench and the following
16    proceedings were had:)
17              THE COURT:  First photo card says, "You made
18    reference to a recording of the defendant accepting names for
19    his son.  Is there any other proof of this?"
20              What is your position, Mr. Brown?
21              MR. BROWN:  Do not -- I would object to that.
22              THE COURT:  You would object?
23              MR. BROWN:  Yes.
24              MR. PORTER:  We agree.
25              MR. BROWN:  And he's already said he wasn't the case
```

1  agent on the other case and obviously doesn't know much about

2  it.

3         THE COURT:  The Court will not read that.

4         "Do you feel certain Mr. Stephens was admitting to a

5  threat of death to Mr. Risley?"

6         What is your position, Mr. Brown?

7         MR. BROWN:  I think -- I think his answer to -- at

8  least to my questions makes it clear he was pretty certain, so

9  I'd say it's kind of cumulative.

10        MR. PORTER:  I don't have a problem with it being

11 asked, Judge.  I'll leave it at that.

12        THE COURT:  I'm inclined to not allow that under the

13 rules of evidence because it's giving an opinion as to if he's

14 confessing.

15        MR. PORTER:  Okay.

16        THE COURT:  So I won't ask that.

17        Is there any objection to not giving that?

18        MR. BROWN:  I object to giving it but not to not

19 giving it.

20        THE COURT:  I just want to make clear that

21 everyone's in agreement.

22        The next card, "At any point did Mr. Stephens admit

23 to guilt and what was said?"

24        MR. BROWN:  I don't have a problem with that.

25        MR. PORTER:  I don't either.

1          THE COURT:  The next card has four questions.  The

2     first one is, "Why is Mr. Abram allowed in the courtroom while

3     others testify and other witnesses were called in one at a

4     time?"

5          And what is your position, Mr. Brown?

6          MR. BROWN:  Well, I think I may have brought that

7     up, just because he's the case agent and he's allowed to be in

8     here to assist the U.S. Attorneys.  My problem with that

9     question is I have no idea of what he might say.

10          THE COURT:  So you basically object to that?

11          MR. BROWN:  Yeah.

12          THE COURT:  What is your position?

13          MR. PORTER:  Your Honor, I think there's a way to

14     answer that question to satisfy that issue in the jurors' mind

15     without asking it of the witness.  For example, you can simply

16     tell them that it's okay, it's permissible, it's allowed for

17     the reasons Mr. Brown indicated.  That way, because it's a

18     legal question, not a factual or evidentiary question, the

19     witness would reply and you can explain to them as a matter of

20     law it is perfectly permissible.

21          MR. BROWN:  I don't have a problem with the Court

22     doing that.  I'm just concerned about what the answer might be

23     solicited from Agent Abram.

24          THE COURT:  Under the Rules of Evidence 615 is where

25     the assistance of the case agent is allowed to be at counsel

351

1    table to assist the parties.  I would reference that.

2           The second question is, "How was the information of

3    cooperators revealed?  Is that public knowledge?"

4           What is your position, Mr. Brown?

5           MR. BROWN:  Well, I think at least there is -- has

6    been testimony that there were reports and the news reports in

7    the Columbia Tribune that indicated people were cooperating.

8           THE COURT:  So do you object to that question being

9    asked?

10          MR. BROWN:  Of this witness, yes.

11          THE COURT:  Do you agree, Mr. Porter?

12          MR. PORTER:  I think it's -- I don't have any

13   problem with that question being asked, Judge.  I don't think

14   it's improper, and I think he's talked about it in some fashion

15   along with other witnesses.  I don't think he's going to say

16   anything other than what's already out there in terms of the

17   proceedings that happened publicly, the reporting that happened

18   in the newspaper.

19          THE COURT:  All right.  I'll ask that one.

20          The third question is, "Were there issues with other

21   cooperators?"

22          Do you object to that question, Mr. Brown?

23          MR. BROWN:  Well, I don't know what they mean by

24   "issues."  I really don't.  But one of my follow-ups is going

25   to be, "The afternoon of the 29th were Scott, who cooperated,

the No. 1 defendant, and Edwards, the No. 2 defendant, transported from the courthouse to the Phelps County jail together in the same van?"

        MS. ORSINGER:  Edwards and Redmon.

        MR. BROWN:  Excuse me.  Redmon and Scott.

        MR. PORTER:  It is vague.

        THE COURT:  Is there any objection to asking this question, Mr. Brown?

        MR. BROWN:  Yes.

        THE COURT:  I'll leave it up to you.

        MR. BROWN:  Yes.

        THE COURT:  The fourth question, "How many sentencing hearings did Malcolm's family attend besides the other family members?"

        Any objection?

        MR. BROWN:  No.

        THE COURT:  Any objection?

        MR. BROWN:  I don't think he knows, but, yeah, let's ask him.

        MR. PORTER:  If he knows.

        THE COURT:  The next card, "While interviewing an individual, what do you look for to determine the truthfulness of his statement?"

        Any objection?

        MR. BROWN:  Not really.

```
 1              MR. PORTER:  No.

 2              THE COURT:  I'm hesitant to turn him into a lie

 3  detector test for this jury.

 4              MR. BROWN:  Also I would have a lot of follow-ups so

 5  maybe -- I'm not objecting to it, but it is one of those deals

 6  where it is -- I don't know what his answer is going to be.

 7              MR. PORTER:  The same reason, Your Honor, that we've

 8  had conversations and made decisions about a need to protect

 9  security and not putting that in the proper domain.  I think

10  law enforcement probably are not particularly anxious to

11  disclose some of what they're looking for to protect that

12  investigative technique, but --

13              THE COURT:  The second part of the question, "Did

14  you see these indications of not speaking the truth in Mr.

15  Stephens?"  I'm inclined not to ask this series of questions of

16  this witness.

17              MR. BROWN:  I would object to No. 2 or the second

18  part.

19              THE COURT:  I'm inclined to not allow either of

20  these two questions.  Does anyone have a problem with that?

21              MR. PORTER:  No.

22              MR. BROWN:  No.

23              THE COURT:  The next card, "Who wrote the

24  transcript?"

25              Any objection, Mr. Brown?
```

```
 1            MR. BROWN:  No.

 2            THE COURT:  Any objection, Mr. Porter?

 3            MR. PORTER:  No.

 4            THE COURT:  The second part of that, "Is there any

 5   other reason to conduct that type of interview other than to

 6   seek confession?"

 7            Any objection?

 8            MR. BROWN:  No.

 9            THE COURT:  Any objection?

10            MR. PORTER:  He's already answered that.

11            THE COURT:  I'll allow that.

12            The next card, "Is it possible to see Mr. Stephens

13   walk?"

14            Any objection to that?  This is totally your --

15            MR. BROWN:  Yes, I object to that.  If he

16   testifies --

17            THE COURT:  They'll see him walk.

18            MR. BROWN:  -- they'll see him walk.

19            THE COURT:  I'm not going to force the defendant to

20   do anything at this point.

21            The next card, "Has Dobby been in this courtroom at

22   any time during these proceedings?"

23            Any objection?

24            MR. BROWN:  No objection to courtroom.  If we go

25   beyond the courtroom -- he's never been in this courtroom to my
```

1    knowledge.

2            MR. PORTER:  He has been in this courtroom.

3            MS. ORSINGER:  He was yesterday at the end of the

4    day.  He was asking for you.

5            MR. BROWN:  He's never been in this courtroom while

6    the jury was here.

7            MR. PORTER:  I believe part of that time yesterday

8    he was in the courtroom.

9            MR. BROWN:  Well, I don't know.

10           THE COURT:  Do you object?

11           MR. BROWN:  Yes, I object, and part of the reason

12   for that is that we suspect there may have been some statements

13   out there.

14           THE COURT:  Okay.  I won't allow that question.  The

15   second question is, "Did anyone ever wear a wiretap during this

16   investigation?"

17           MR. BROWN:  I have no objection.

18           THE COURT:  Any objection?

19           MR. PORTER:  No objection.

20           THE COURT:  Last card, "Why were you so quick to

21   call him on the perceived lie initially when his timeline did

22   not add up when discussing the events with Risley outside?  Why

23   not call him on that?"

24           Any objection, Mr. Brown?

25           MR. BROWN:  I have no objection.

```
 1                    THE COURT:  Any objection?

 2                    MR. PORTER:  No.

 3                    THE COURT:  So I will address the first ones.

 4                    MR. PORTER:  If you want to do that first before we

 5     start these.

 6                    THE COURT:  Yes.

 7                    (The proceedings returned to open court.)

 8                    THE COURT:  Thank you for your patience, ladies and

 9     gentlemen.

10                    As we go through these questions --

11                    MR. PORTER:  Your Honor, excuse me.  May I have just

12     one more moment?

13                    THE COURT:  Sure.

14                    (Counsel approached the bench and the following

15     proceedings were had:)

16                    MR. PORTER:  Dobby is in the courtroom right now.

17                    MS. ORSINGER:  In the back.

18                    MR. PORTER:  In the back with his arms across the

19     pew.  In the back to the Court's right closest to the door.

20                    THE COURT:  Are we asking that question?

21                    MR. BROWN:  No, we are not asking that question.

22                    THE COURT:  Do you have any objection to that

23     question?

24                    MR. BROWN:  Yes, I object to that question.

25                    MS. ORSINGER:  I think the greater concern is the
```

357

1    issue that was raised, the issue if there was any intimidation

    2    to the jury.

    3              MR. BROWN:  And I don't necessarily want to

    4    associate myself with him.  If that was a problem, I would go

    5    ask him to go out in the anteroom.  I don't want to call

    6    anybody's particular attention but --

    7              THE COURT:  Let's not ask that just out of an

    8    abundance of --

    9              MR. PORTER:  I'm just alerting the Court.

   10              MS. ORSINGER:  It wasn't for the question.  It was

   11    the concern of the intimidation.

   12              MR. PORTER:  I just want the Court --

   13              THE COURT:  Thank you.

   14              (The proceedings returned to open court.)

   15              THE COURT:  As I mentioned in the earlier

   16    instructions about jurors asking questions, some of the

   17    questions aren't permissible under the rules of evidence.  Some

   18    we didn't ask because they were answered later by another

   19    witness.

   20              One question is, "Why is Mr. Abram allowed in the

   21    courtroom while others testify and not other witnesses?"  And

   22    instead of asking this witness a legal question, the Court

   23    would like to be the one to instruct the jurors on the law and

   24    that under the Federal Rules of Evidence 615 that is

   25    permissible as a case agent assisting the United States.  There

1    are some questions that are permissible.

2              And, Mr. Porter, will you ask your witness those

3    questions?

4              MR. PORTER:  Thank you, Your Honor.  Yes.

5    QUESTIONS FROM THE JURY BY MR. PORTER:

6    Q    Special Agent Abram, the first question from the jury

7    is, Who wrote the transcript?  Referring to Government's

8    Exhibit 3.

9    A    I believe that was the United States Attorney's Office.

10   Q    The next question is, Is there any other person to --

11   hang on a second.  Is there any other reason to conduct that

12   type of interview other than to seek a confession?

13   A    Yes.  Any of these interviews or interrogations, it's

14   simply to find the truth at the end of the day.  The way I

15   approach all the cases is we're putting a puzzle together and

16   we're getting pieces from the investigation.  As we put those

17   pieces together, there is a picture that is shown.  Sometimes

18   those pieces are missing and different interviews can fill

19   those pieces in for us so we have a total picture of the

20   situation.  It's nothing more than to seek the truth at the end

21   of the day, and that's the way we approach it.  If a confession

22   is provided, then that was just part of the investigation.

23   Q    The next question is, Did anyone ever wear a wiretap

24   during this investigation of this case that's on trial?

25   A    No wiretaps in this investigation.

359

1    Q       The next question is, How was the information of the
2    cooperators revealed and is that public knowledge?
3    A       Read the question one more time, please.
4    Q       How was the information of cooperators revealed and is
5    that public knowledge?
6    A       Some of it is public knowledge; some of it isn't for
7    the security of the cooperators in certain situations.  But
8    when it comes to sentencing, the defense attorney trying to do
9    his or her job will try to articulate to the judge a degree of
10   cooperation and what that was so that the judge can make an
11   assessment of where they may sentence the individual at some
12   point.  So there is a discussion at some point.  The details of
13   the cooperation are typically tried to minimize those for the
14   safety of the defendant that's cooperating and family members
15   or what have you.
16   Q       The next question is, How many sentencing hearings did
17   Malcolm's family attend besides the other family member?
18   A       I don't know this.  I was not here at the sentencing of
19   that particular drug conspiracy of Malcolm.  So I -- only ones
20   I know of were what was --
21             MR. BROWN:  He's answered that question.  He doesn't
22   know.
23             THE COURT:  We'll leave it at that.
24             THE WITNESS:  Yes, sir.
25   Q       (By Mr. Porter)  The next question is, from the jury,

1    Why were you so quick to call him, referring to the defendant,

2    on the perceived lie initially but when his timeline did not

3    add up when discussing events with Risley outside, why not call

4    him on that?  You want me to read it again?

5    A       Yeah, please.

6    Q       Why were you so quick to call him, referring to Mr.

7    Stephens, on the perceived lie initially but when his timeline

8    did not add up when discussing the events with Risley outside,

9    why not call him on that?

10   A       That's a good question.  It was a technique or tactic

11   in the sense that once -- the reason we were there was for the

12   threat against Mr. Risley.  Once an individual lies to you

13   about, I guess, the big reason why you're there, it is very

14   difficult for that individual to come back through an interview

15   later and say, I lied to you.  So what I try to do is not even

16   allow that lie to happen on the front end in an attempt that we

17   can just get through the conversation so there is a degree of

18   comfort that's established between myself and who I'm

19   interviewing, in this particular case Mr. Stephens.  So I did

20   not want him to lie to me because I felt like I knew the truth

21   and if he initially tried to lie, it would be hard for him to

22   overcome that emotionally with me.  Once you lie to somebody to

23   their face, it's hard to undo that.  Sometimes you just dig

24   your heels in and you stay with it, and I didn't want that to

25   be what we were trying to accomplish at that point.

```
 1   Q      The last question is, At any point did Mr. Stephens
 2   admit to guilt and what was said?
 3   A      One more time, please.
 4   Q      At any point did Mr. Stephens admit to guilt and what
 5   was said?
 6   A      That was -- when he says, "It was said," that is an
 7   admission of what I had just said to him.
 8          MR. PORTER:  Those are all of the questions, Your
 9   Honor.
10          THE COURT:  Mr. Porter, do you have any follow-up
11   after reading those questions?
12   REDIRECT EXAMINATION BY MR. PORTER:
13   Q      Special Agent Abram, referring to the transcript and
14   its preparation, you had an opportunity to review that for
15   accuracy?
16   A      Yes.
17   Q      Before we brought it before the jury?
18   A      Yes.
19   Q      And you compared what was on the transcript to what you
20   were hearing on the videotape?
21   A      Yes.
22   Q      And you were confident, comfortable with the transcript
23   being accurate?
24   A      Yes, sir.
25   Q      There's been discussion during the trial about
```

362

1    listening to recorded jail calls?

2    A       Yes.

3    Q       Are jail calls allowed to be reviewed by law

4    enforcement without the need of a wiretap?

5    A       Yes.

6              MR. BROWN:  Judge, may we approach?

7              (Counsel approached the bench and the following

8    proceedings were had:)

9              MR. BROWN:  This isn't a follow-up to the jurors'

10   questions.

11             MR. PORTER:  It was a question about wiretaps.

12             MR. BROWN:  About wiretaps.  Jail calls are jail

13   calls.

14             MR. PORTER:  They don't know that.  We know that.

15             MR. BROWN:  They didn't ask about any recordings.

16   They asked about wiretaps.  There weren't any.  It's not

17   responsive to any of these questions.

18             THE COURT:  Can you rephrase your question to

19   reflect --

20             MR. PORTER:  It is an attempt to be responsive.

21   Were there wiretaps in this investigation?  And I want to

22   confirm to the jury's comfort that the jail calls they heard

23   about, the recorded jail calls were okayed and didn't require

24   wiretap.

25             THE COURT:  Can you connect that to that question as

```
 1   a follow-up to clarify what the wiretap is and what a jail call

 2   is?

 3              MR. PORTER:  Such as.  My question was, it was

 4   rephrased such as, Is a wiretap required for a jail phone call?

 5   Would that be appropriate in the Court's eyes?

 6              MR. BROWN:  I don't care about that.

 7              MR. PORTER:  Thank you.

 8              (The proceedings returned to open court.)

 9   Q      (By Mr. Porter)  Does law enforcement -- does the law

10   require law enforcement to obtain a wiretap before listening to

11   and recording a phone call from someone in a jail?

12   A      No, sir.

13              MR. PORTER:  That's all the follow-up I would have,

14   Your Honor.

15   RECROSS-EXAMINATION BY MR. BROWN:

16   Q      Agent Abram, I think you said this -- it was your

17   understanding the transcript was prepared by the U.S.

18   Attorney's Office.  So the answer to that question is you don't

19   know who prepared that transcript?

20   A      I did not prepare it.

21   Q      Or anybody that you know prepare it?

22   A      No.

23   Q      Just don't know who prepared that?

24   A      Correct.  Yes, sir.

25   Q      Now, you've testified about public knowledge in the
```

| | |
|---|---|
| 1 | community about cooperators in USA v. Scott. There were |
| 2 | reports in the Columbia Tribune that indicated cooperation, |
| 3 | that type thing. It just isn't word of mouth. There were |
| 4 | published newspaper reports about it too, right? |
| 5 | A     Yes, sir. |
| 6 | Q     Okay. And I -- if I remember your response to one of |
| 7 | the questions about this interview, you said I knew the truth, |
| 8 | and I just wanted to flush out missing pieces and get a |
| 9 | confession, if I could? |
| 10 | A     No. |
| 11 | Q     Okay. But that's the attitude you had walking into |
| 12 | that interview is that you knew the truth? |
| 13 |           MR. PORTER: Objection. |
| 14 |           THE COURT: Can we approach? |
| 15 |           (Counsel approached the bench and the following |
| 16 | proceedings were had:) |
| 17 |           MR. PORTER: Judge, that's not responsive to any of |
| 18 | those jurors' questions. |
| 19 |           MR. BROWN: He testified -- |
| 20 |           MR. PORTER: We're talking about the juror |
| 21 | questions. |
| 22 |           MR. BROWN: Yes, I understand that. He testified in |
| 23 | response to, I knew the truth, and I just want to call him on |
| 24 | that. |
| 25 |           THE COURT: Is this the question you are referring |

1    to?

2              MR. PORTER:  I don't think he said that, Judge.

3    It's just not there.

4              MR. BROWN:  Okay.  I won't ask that question.

5              (The proceedings returned to open court.)

6              THE COURT:  Mr. Brown, do you have any other

7    follow-up questions of this witness?

8              MR. BROWN:  No, Your Honor.

9              THE COURT:  Very well.  You can stand down.

10             THE WITNESS:  Yes, Your Honor.

11             (Witness excused.)

12             THE COURT:  Mr. Porter, any other witnesses,

13   exhibits, or stipulations?

14             MR. PORTER:  We do, Your Honor.  With the Court's

15   permission the parties have entered into a factual stipulation.

16   We've marked it for identification as Government's Exhibit 34.

17   With the Court's permission, we would read it to the jury at

18   this time.

19             THE COURT:  You may proceed.

20             MR. PORTER:  "Stipulation of fact.

21             "The parties stipulate and agree that the following

22   facts are true and correct:

23             "On September 29th, 2016, the surveillance camera

24   that monitors activity occurring inside courtroom 4B in the

25   Jefferson City, Missouri Federal Courthouse was set to view a

1  fixed area inside the courtroom.  The portion of courtroom 4B

2  that was within the view of the surveillance camera did not

3  include the area where the public and spectators are allowed to

4  sit and also did not include the doors and the doorway area

5  through which the public enters and exits the courtroom.

6          "This stipulation shall be marked as an exhibit,

7  admitted into evidence, and read to the jury.

8          "Executed the 7th day of December, 2016."  And it's

9  signed by myself, Mr. Brown, and Mr. Stephens.

10          MR. BROWN:  No objection.

11          THE COURT:  That stipulation is admitted as

12  Exhibit 34.

13          Anything further, Mr. Porter?

14          MR. PORTER:  Your Honor, with that, the government

15  would rest its case in chief.

16          THE COURT:  Thank you.

17          At this time it is 11:51.  We will take our noon

18  recess.  And since we are ordering in food -- it should be here

19  at 12:15 -- let's give 30 minutes for lunch.  Let's resume at

20  one o'clock.

21          Is that doable, Ms. Wheeler?

22          THE COURTROOM DEPUTY:  Yes, Judge.

23          THE COURT:  Very good.

24          (The following proceedings were had in the courtroom

25  out of the presence of the jury:)

```
 1              THE COURT:  Please be seated.

 2              Mr. Brown, do you have a motion?

 3              MR. BROWN:  I do, Your Honor.  At this time I hand

 4    your clerk or courtroom deputy defendant's motion for judgment

 5    of acquittal at the close of plaintiff's case.  I have a copy

 6    for the Court.  I've provided one to counsel already.  I would

 7    ask you all file that on ECF for me.

 8              THE COURT:  We will do that.

 9              MR. BROWN:  Thank you.

10              THE COURT:  You don't have any objection to the

11    Court personnel filing this on behalf of Mr. Brown?

12              MR. PORTER:  Of course not, Your Honor.  No

13    objection.

14              THE COURT:  Thank you.

15              And the defendant's motion for judgment of acquittal

16    at the close of plaintiff's evidence is denied.

17              Mr. Brown, I'd like to make a record of your client,

18    Mr. Stephens, what his decision is whether he wants to testify

19    or not testify.  Can he come to the stand now and make that

20    record or do you need to visit with him?

21              MR. BROWN:  No.  I think we can make that now.  Mr.

22    Beckner, Dobby, is in the courtroom.  I'm releasing -- under my

23    subpoena I'm releasing him.  If maybe you can give me a minute

24    to tell him he can go and that type thing.

25              THE COURT:  So you want a bit?
```

| 1 | MR. BROWN: Just a couple of minutes. |
| 2 | THE COURT: Of course. |
| 3 | MR. BROWN: Sorry about that, Your Honor. |
| 4 | THE COURT: That's okay. |
| 5 | Is this a good time to make a record, Mr. Brown? |
| 6 | MR. BROWN: Yes, Your Honor. |
| 7 | Could you go on up to the stand. |

BRUCE WAYNE STEPHENS, being sworn by the courtroom deputy,
testified:

EXAMINATION BY MR. BROWN:

Q    Mr. Stephens, you and I have talked about your right to
testify and your right not to testify; is that correct?

A    Yes.

Q    And you've told me on a number of occasions you want to
testify?

A    Yes.

Q    And I've explained to you that Mr. Porter's going to
ask you questions or the prosecutors are going to ask you
questions and you're going to have to answer those truthfully?

A    Anything I say is going to be the truth.

Q    And I have expressed some reluctance about calling you
as a witness; is that true?

A    Yes.

Q    And you still want to testify?

A    Yes.

1  Q        Now, further, as you've seen with other witnesses,

2  Judge Ketchmark has been letting the jurors submit questions

3  after questioning by the government and the defense are done?

4  A        Yes.

5  Q        Because you're a defendant -- and we've talked about

6  this.  Because you're a defendant, if you don't want to allow

7  jurors to ask you questions, Judge Ketchmark won't require

8  that.  What's your feeling about that?

9  A        They could ask me personal questions.  I will answer

10 each question they ask me.

11 Q        As a matter of fact, you told me at one point you'd

12 like to sit down with them all and answer every question?

13 A        Every question they ask me.

14         MR. BROWN:  Is that a sufficient record, Your Honor?

15         THE COURT:  Mr. Stephens, do you understand that if

16 you want me to tell the jury that I don't allow them to ask

17 questions of the defendants in criminal cases, that I'll do

18 that and there will be no implication whether it's your choice

19 or not?  Do you understand that I will instruct the jury to

20 that effect if you would like me to?

21         THE DEFENDANT:  I don't have nothing to hide.  I'll

22 just answer the question but truthfully.

23         THE COURT:  Is your preference that they submit

24 cards, or would you like for me to tell the jury I don't allow

25 questions of a party -- of a defendant in a criminal case?

1      THE DEFENDANT:  I agree with that if you don't want

2   to do that.

3      MR. BROWN:  She wants to know what you want her to

4   do.

5      THE DEFENDANT:  Let's get the record straight why I

6   am in here from the beginning.  That's all I want them to know.

7   This is not -- with Malcolm Redmon I'm standing charged with

8   obstructing justice and retaliation.  I want them to know this

9   is not why I'm in here.  This is what the government wants to

10  do.  I'm in here because Mr. Risley did what he did over in

11  that corner.  That's the only reason why I'm in here.  If they

12  would have did the job from the beginning, we would never have

13  had this problem.  Mr. Risley put his hands on me.  He hurt me

14  and he hurt my feelings.

15     THE COURT:  Mr. Stephens, do you want to allow jury

16  questions?

17     THE DEFENDANT:  Sure.  I will take their questions.

18     THE COURT:  And is that your preference?  Would you

19  rather them ask questions on cards or would you rather me tell

20  them I don't ever allow questions of defendants?  What is your

21  choice of those two?

22     THE DEFENDANT:  I would answer their cards.

23     THE COURT:  And what is your choice?  I mean, what

24  is your preference?  What would you rather happen?  Them write

25  questions on cards or me tell them I don't allow that?

1        THE DEFENDANT:  If you have to tell them you don't

2   allow it so they have to write cards.

3        MR. BROWN:  Would you rather the judge tell the

4   jurors, We never let juror questions for a defendant or would

5   you rather that they submit cards with their questions?

6        THE DEFENDANT:  They can submit cards.

7        MR. BROWN:  And that's what you would prefer that we

8   do?  Since every other witness has had cards submitted, you

9   want to be treated just like everyone else?

10       THE DEFENDANT:  Yes, I want to answer their

11  questions.

12       THE COURT:  Do you have any concerns or complaints

13  about jurors submitting questions for you to be asked?

14       THE DEFENDANT:  Well, they need to be asked.

15       THE COURT:  Mr. Porter, do you have any record that

16  you would like to make?

17       MR. PORTER:  No, Your Honor.

18       THE COURT:  Very well.  I have nothing else for the

19  record.

20       You may stand down.

21       (Witness excused.)

22       THE COURT:  Mr. Brown, I think the record's clear

23  that your client has no objection to the jurors submitting

24  questions for our review.  The next level is if you have any

25  objections to that review, I can have them not even submit

1    cards.  We could also allow them to submit cards and just if
2    you object to all of them, we can handle that however you want.
3    I just want the record to be clear that the defense and you are
4    getting your choice in this matter.
5           MR. BROWN:  I'm going to defer to my client, and I'm
6    not going to object to their submitting questions.  Once the
7    questions are submitted, I may have objections to specific
8    questions.
9           THE COURT:  And I can tell you this, that if there
10   are any questions of the defendant, if you object to any of
11   them, I will follow your desire on those questions of your
12   client.  You can have that assurance.
13          Two final things.  Mr. Brown, I think you -- did you
14   release your only witness besides your client?
15          MR. BROWN:  Right.  Yes.
16          THE COURT:  Is there any record you want to make on
17   releasing -- I'm not even sure what his name is.  Remind me.
18          MR. BROWN:  Linnel Beckner.
19          THE COURT:  Mr. Beckner.  Is there any record you
20   want to make regarding Mr. Beckner?
21          MR. BROWN:  No, not at this time.  I can certainly
22   justify that if a 2255 were filed.  I don't have a problem with
23   that one.
24          THE COURT:  Strategically you are electing not to
25   call him.

```
1              MR. BROWN:  You bet.

2              THE COURT:  Secondly, can we take a 40-minute lunch

3    break until 12:45 and have the instruction conference on the

4    record at 12:45?  Any problem with that, Mr. Brown?

5              MR. BROWN:  I don't think so.

6              THE COURT:  Mr. Porter?

7              MR. PORTER:  No problem, Judge.

8              THE COURT:  And Wendy Houston is all taken care of;

9    is that correct, Mr. Porter?

10             MR. PORTER:  I believe she's left the courtroom and

11   the courthouse and is in travel status at the moment.

12             THE COURT:  So we have no more issues with Wendy

13   Houston that you are aware of, Mr. Brown?

14             MR. BROWN:  Not that I'm aware of, no.

15             THE COURT:  Very well.  We'll be in recess then

16   until 12:45.

17             (The noon recess was taken at 12:06 p.m. until 12:45

18   p.m.)

19                       AFTERNOON SESSION

20             (The following proceedings were had in the courtroom

21   out of the presence of the jury:)

22             THE COURT:  Please be seated.

23             It's 12:50 and we're back on the record to try to

24   have a final instruction conference on the record.

25             We are now at Instruction No. 13, which has already
```

1  been read to the jury.

2          MR. BROWN:  Do we have a new packet of the finals?

3          THE COURT:  We can.

4          MR. BROWN:  That's okay.  We can work off the

5  working copy.

6          THE COURT:  Can you print off a new packet?

7          MS. RUSSELL:  I can.

8          THE COURT:  In that new packet can you add the

9  consistent language of U.S. v. Scott?

10          So we'll take a little bit.  It will take a minute.

11          THE COURT:  Ms. Orsinger, do you think you will have

12  any rebuttal evidence if the defendant elects to testify or do

13  you know yet?

14          MS. ORSINGER:  We don't know yet but if we did, it

15  would be Special Agent Abram.

16          I want to ask you while we're waiting, Mr. Brown,

17  I'm thinking that closing should be about 15 minutes.  What are

18  you wanting to request?

19          MR. BROWN:  I tend to run long.  Twenty?  If I don't

20  use it, I don't use it.

21          THE COURT:  Ms. Orsinger or Mr. Porter, what is your

22  preference for time?

23          MR. PORTER:  I know this will be no surprise to you,

24  Judge, but like Jim I would always want more.  Twenty or 25 if

25  the Court would permit.

```
 1                    THE COURT:  Sure.

 2                    MS. ORSINGER:  Twenty-five.

 3                    MR. BROWN:  How are you splitting?

 4                    THE COURT:  We could go 30 if that's your

 5   preference.

 6                    MR. BROWN:  I don't think it's worth 30.

 7                    MR. PORTER:  If you tell me 30, I won't speed up.  I

 8   don't want to speed up.  Twenty-five.  And I want to split it

 9   up 15 and 10.  And if there is some way I can get a warning at

10   15, they'll let me know, if I'm not already there, I need to

11   get there.

12                    THE COURT:  Who will go first for the government?

13                    MR. PORTER:  I will.

14                    THE COURT:  And you're going to have 15.  And what

15   type of warning do you want?  Do you want one or two warnings?

16                    MR. PORTER:  Anything.  Just some kind of, Mr.

17   Porter, you're at the 15-minute mark or 14 or 13.  However you

18   want to do it.

19                    THE COURT:  It's your call, your preference.

20                    MR. PORTER:  It won't affect me or bother me.

21   However you want to do it.

22                    THE COURT:  Do you want that orally then?

23                    MR. PORTER:  Please.

24                    THE COURT:  One oral notice warning at 15; when you

25   reach 15?
```

1                    MR. PORTER:  Uh-huh.

         2                    THE COURT:  Okay.  Ms. Orsinger, you'll do the

         3    second half with the remaining portion?

         4                    MS. ORSINGER:  I believe Mr. Porter --

         5                    MR. PORTER:  Actually I'm going to do both halves,

         6    Judge.

         7                    THE COURT:  What type of warning do you want on the

         8    second half?

         9                    MR. PORTER:  If I'm not done by eight minutes, tell

        10    me eight minutes.

        11                    THE COURT:  Eight minutes is left?

        12                    MR. PORTER:  No.  If I've used eight minutes and I'm

        13    not finished.

        14                    THE COURT:  Oh, two minutes before the 25 is up?

        15                    MR. PORTER:  Please.

        16                    THE COURT:  Do you want any more than that, just the

        17    one at two minutes until your time is up?

        18                    Any questions, Ms. Wheeler?

        19                    THE COURTROOM DEPUTY:  So, Gene, do you just want me

        20    to say two minutes remaining?

        21                    MR. PORTER:  Either two minutes remaining or you've

        22    used eight minutes.  I'll know what it means however you say

        23    it.

        24                    THE COURTROOM DEPUTY:  Thank you.

        25                    THE COURT:  Mr. Brown, what type of warnings do you

                                                        377

```
 1   want?
 2              MR. BROWN:  Five-minute warning.
 3              THE COURT:  Do you want a second warning?
 4              MR. BROWN:  No, just cut me off.  Do you have
 5   lights?  I don't see any either but you know with stuff built
 6   in.
 7              THE COURT:  What's behind the jury's heads?
 8              MR. PORTER:  That looks like a thermostat.
 9              MR. BROWN:  That's fine.  Just tell me five minutes.
10   If you just tell me I've got five minutes left, that's cool.
11   Maybe I'll speed up too.
12              THE COURT:  Regarding -- let's go ahead and talk a
13   little bit about the defense proposed Instructions 9(a) and 9,
14   theory of defense.  My inclination is to not give either.  On
15   defendant's Instruction 9(a), "Unless you are convinced beyond
16   a reasonable doubt that Vershawn Edwards is a party to Malcolm
17   Desean Redmon" --
18              MR. BROWN:  That's 9(a).
19              THE COURT:  9(a), yes.  The Court finds that is
20   confusing and in some ways inaccurate because they were both
21   charged in the same case as codefendants.  Do you want to make
22   any further record on 9(a) as to why that should be submitted
23   or anything about my ruling?
24              MR. BROWN:  Yes.  Your Honor, as to 9(a), and we'll
25   talk about it with other instructions too, the Court has
```

378

1   essentially amended the indictment because the indictment sets
2   out a specific case as the official proceeding.  I understand
3   the Court's reasoning but this is for the record.  I believe
4   that that amendment is impermissible and following the
5   indictment, this instruction would be proper because the
6   indictment does not identify people.  The indictment talks
7   about persons generally and any person -- the statute requires
8   the retaliation is sought against a party.  They have
9   designated in the indictment a specific case, and so I believe
10  that 9(a) is an accurate statement of the law; and as a theory
11  of defense instruction, should be given.
12          THE COURT:  Mr. Porter or Ms. Orsinger, do you have
13  any response that you want to make on the record?
14          MS. ORSINGER:  There's nothing to add to this
15  instruction, Your Honor.  We believe the Court's covered it.
16  Thank you.
17          THE COURT:  And while we're on the subject of
18  defense theory, defendant submitted Instruction No. 9, which is
19  similar to the verdict director but simply sets -- I think the
20  point of this instruction is that they have to find proof
21  beyond a reasonable doubt as to both element 1 and element 2
22  and if either one of those is missing, they must find not
23  guilty; is that correct?
24          MR. BROWN:  That's correct, Your Honor.
25          THE COURT:  And I find that the instruction proposed

1    verdict director covers that proposition.  I could make this

2    suggested change to our current draft.  Our current draft that

3    last sentence says, If both -- it says, "If all of these

4    elements have been proved beyond a reasonable doubt."  The

5    Court can change that to, "If both of these elements have been

6    proved beyond a reasonable doubt."  If that satisfies your

7    point, and I would look at notes on use of defense theory --

8    theory of defense under the model jury instructions 9.05 and

9    the notes on use in a similar case, United States v.

10   S-h-i-g-e-m-u-r-a, 682 F.2d 699, sets forth that same

11   proposition that if the instructions set forth the point of law

12   as it relates to the facts sufficiently, that it does not need

13   to be repeated.

14           Is there any further argument that you want to make

15   regarding your proposed Instruction No. 9?  And if you have a

16   preference as to the wording of the verdict director, if you

17   want to emphasize the words "both elements."

18           MR. BROWN:  As to proposed Instruction No. 9, I

19   would ask the Court for the record to indicate whether the

20   Court believes that accurately states the law.  If it does, I

21   believe the theory of defense instruction is there so that the

22   defendant can highlight a particular portion of the

23   instructions or the law that the defense is relying on; and if

24   it's a correct statement of the law, I believe that it must be

25   given.  And whether or not the other instructions adequately

1  address that point, my position is, no, even a modification of

2  the language in the verdict director would not adequately

3  satisfy my theory of defense.

4           Obviously I'm going to be arguing it, so I would

5  object to the Court not giving 9 and don't think a change in

6  the language of the verdict director would cure that.  So

7  that's my position, Your Honor.

8           THE COURT:  Some years ago I think there was some

9  State law, Missouri case law that had the proposition that you

10 could emphasize an element or that it was an error to emphasize

11 an element.  You're saying that's federal law.  Can you direct

12 me to --

13          MR. BROWN:  Well, the only thing I would say --

14 would call the Court's attention to is the notes on use on the

15 model instructions.  I think I had the 2013 version.  It may

16 have been updated more recently, but I think there were federal

17 and Eighth Circuit citations regarding the theory of defense.

18          THE COURT:  Do you think a portion of your proposed

19 Instruction No. 9, that any portion of it is not covered in the

20 instructions already given, the instruction of law?

21          MR. BROWN:  Not adequately.

22          THE COURT:  In what aspect?

23          MR. BROWN:  Well, part of the theory of defense

24 instruction is to highlight the theory of defense, and this

25 highlights the fact that even if they find element 1, if they

1    don't find element 2, they have to acquit him.  I think we're
         2    entitled to have that theory included in the instruction packet
         3    to the jury.
         4              THE COURT:  And I just don't want to confuse the
         5    jury with any more instructions than are required, and I'm just
         6    not --
         7              MR. BROWN:  Well, obviously, obviously I can argue
         8    that with the verdict director that's being given.  But I think
         9    I'm entitled to highlight it as a theory of defense, and I'm
        10    asking the Court to do that.
        11              THE COURT:  Ms. Orsinger, what is your position as
        12    to defendant's proposed Instruction No. 9, or Mr. Porter?
        13              MS. ORSINGER:  Your Honor, in the committee comments
        14    under 9.05, the 2014 version, page 730 there is a case that
        15    stands for the principle, "It's also been held that certain
        16    obvious concepts cannot be elevated to a theory of defense."
        17              The government's position is the defendant's theory
        18    of defense is simply that we have not met our burden, and the
        19    Court's right that the verdict director covers the defendant's
        20    theory of defense.  In his statement that it's reversible error
        21    not to properly -- or not to give a defendant's theory request
        22    as instructed, there's also a case under the committee
        23    comments, page 728, and I'll give the case citation.  I'm
        24    sorry.  I missed the last one, the last citation, was United
        25    States v. Peltier, 585 F.2d at 328.  Let me see if I can find

1  the previous citation.  I don't see it offhand.

2          The other holding is reversible error not to give a

3  properly requested instruction which is supported by the

4  evidence contains a correct statement of the law and is not

5  otherwise covered by the instructions.  Our position is his

6  theory of defense is otherwise covered by the verdict director,

7  and that's United States v. Manning, 618 F.2d 45.

8          THE COURT:  I find that the proposition that the --

9  even if they don't -- even if they find element 1, that they

10  find guilt because all elements must be proved beyond a

11  reasonable doubt is sufficiently covered in the verdict

12  director.

13          With that ruling, Mr. Brown, do you have a

14  preference as to the verdict director highlighting all elements

15  or specifically both elements?

16          MR. BROWN:  The way it's written is fine.

17          THE COURT:  Well, it's written both ways.  My most

18  current says both because I changed it at our last recess.  So

19  we can make it either way.

20          MR. BROWN:  No.  That's fine.  That adequately

21  covers the elements absent the theory of defense.

22          THE COURT:  I'm just wanting to be sure I let you

23  know.  At this point our latest draft says, "If both elements

24  have been proved beyond a reasonable doubt, then you must find

25  the defendant guilty of the crime charged.  Otherwise, you must

```
 1    find the defendant not guilty of this crime."
 2                Is that our most recent draft?
 3                MS. RUSSELL:  Yes.
 4                THE COURT:  Any objection to that language, Mr.
 5    Brown?
 6                MR. BROWN:  No.
 7                THE COURT:  Let's go through the instructions now.
 8    Do the attorneys have a packet now?
 9                So if we can --
10                MS. PERRY:  You have the only copy.
11                THE COURT:  So yesterday's draft of Instruction 14
12    that was intended to be played if the song was played, we are
13    now deleting that instruction and Instruction 14 will start
14    with, "Members of the jury, the instructions I gave you at the
15    beginning," which previously was marked as Instruction No. 15.
16    Does that make sense?
17                MR. BROWN:  Yes.
18                THE COURT:  So at this point most of our
19    instructions will shift one number.  I think we can still go
20    forward until you get the packet.
21                MR. BROWN:  That's fine.
22                THE COURT:  Our Instruction 15 will begin with, "It
23    is your duty to find."
24                Any objection, Mr. Brown?
25                MR. BROWN:  No.
```

| | |
|---|---|
| 1 | THE COURT: Any objection by the government? |
| 2 | MS. ORSINGER: No, Your Honor. |
| 3 | THE COURT: The newly numbered Instruction 16 will |
| 4 | begin with, "I have mentioned the word evidence," patterned |
| 5 | after 3.03. |
| 6 | Any objection, Mr. Brown? |
| 7 | MR. BROWN: No. |
| 8 | THE COURT: Any objection by the government? |
| 9 | MS. ORSINGER: No. |
| 10 | THE COURT: The newly numbered Instruction 17, |
| 11 | patterned after 3.04 and submitted as plaintiff's proposed |
| 12 | Instruction 21(a) begins with, "In deciding what the facts |
| 13 | are." |
| 14 | Any objection, Mr. Brown? |
| 15 | MR. BROWN: No. |
| 16 | THE COURT: Any objection, Ms. Orsinger? |
| 17 | MS. ORSINGER: No. |
| 18 | THE COURT: The newly numbered Instruction 18, |
| 19 | patterned after Model 1.06B, which has been modified, is |
| 20 | regarding the written questions by the jury, and we have |
| 21 | substituted from this morning's draft language, "There are |
| 22 | several reasons why the question that was submitted by a juror |
| 23 | was not asked." We put that in place of, "If you submitted a |
| 24 | question that was not asked." Does that make sense? |
| 25 | MS. ORSINGER: Yes. |

385

```
 1                THE COURT:  Does that make sense, Mr. Brown?

 2                MR. BROWN:  Yes, Your Honor.

 3                THE COURT:  With that change, any objection, Mr.

 4   Brown?

 5                MR. BROWN:  No, Your Honor.

 6                THE COURT:  Ms. Orsinger?

 7                MS. ORSINGER:  No, Your Honor.

 8                THE COURT:  The new Instruction 19, patterned after

 9   3.05 is, "The indictment in this case charges," is the

10   beginning language.  We also from this morning deleted the word

11   "investigation," and the instruction now just says, "Who is a

12   cooperating codefendant in the prosecution of the defendant's

13   son, Malcolm Desean Redmon."

14                I believe, Mr. Brown, you still may have an

15   objection.  Do you want to speak to that for the record?

16                MR. BROWN:  Yes.  We took out the last paragraph

17   there, right?  Am I correct?  There's no burden upon the

18   defendant?

19                MS. PERRY:  That's gone.

20                MR. BROWN:  That's gone.  Okay.  I have an objection

21   as to cooperating codefendants.  There, again, I understand the

22   Court's ruling on the modification and, yes, he was a

23   cooperating codefendant in Scott, et al., but there, again, the

24   indictment charges U.S. v. Redmon.  And I kind of -- I'm

25   concerned somewhat, and maybe we could word it better, "Because
```

1    of Brian Risley's participation in representing."  I don't like

        2    the word "participation."  I understand -- I understand and I

        3    don't like it and I think we could say that more accurately.

        4            THE COURT:  What is your suggested change?

        5            MR. BROWN:  Well, perhaps, "Because Brian Risley

        6    represented Vershawn Edwards."  The real deal, as I understand

        7    it with the modification, is Brian Risley was threatened.  It

        8    was in retaliation against Edwards who was a party to Scott, et

        9    al. and when we say, "With the intent to retaliate because of

       10    Brian Risley's participation," I think it's confusing or

       11    perhaps a juror could read it, Well, retaliation wasn't against

       12    Vershawn Edwards, the party, it was against Brian Risley, the

       13    participant.  That's my concern with Instruction 20.

       14            THE COURT:  Ms. Orsinger, do you want to weigh in on

       15    the record?

       16            MS. ORSINGER:  Yes, Your Honor.  The government

       17    would note that our indictment included participation language.

       18    The only slight difference is it says, "Participation in an

       19    official proceeding," which is the representation of Vershawn

       20    Edwards.  The government's position is both our indictment and

       21    this instruction language is essentially the same thing, and

       22    would note that at this point defense has argued against

       23    modifying from the indictment and both using language in the

       24    indictment itself.  We believe this stands for the same

       25    principle.

                                            387

```
 1              THE COURT:  After listening to the evidence to this
 2    point, if the retaliation was directed at the cooperator,
 3    Vershawn Edwards, by threatening the attorney, if it got back
 4    to Vershawn Edwards and that affected his cooperation, then it
 5    seems more accurate to utilize the wording that the threat was
 6    to retaliate against Vershawn Edwards by threatening the
 7    attorney who was participating in representing Vershawn
 8    Edwards.
 9              MR. BROWN:  If we could do that a little more
10    succinctly, yeah.
11              THE COURT:  And I guess my concern is that if we
12    limit it to your suggested changes, "Retaliate because Brian
13    Risley represented Vershawn Edwards," that they may do just the
14    opposite and find that the retaliation may be because he
15    represented him versus trying to retaliate about Vershawn's
16    cooperating.  I mean, I'm just trying to make this as
17    straightforward and unconfusing.
18              Can I ask the government to speak to why they would
19    object, if they would, to the changed language, "With intent to
20    retaliate because Brian Risley represented Vershawn Edwards"?
21    Do you have any objections to that; and if so, why?
22              MR. PORTER:  We think the way the Court has drafted
23    it as is is the best way to approach this issue.  Making the
24    change that you've described presents the risk that would be
25    exploited on appeal upon conviction of saying that the Court
```

1    instructed in a language materially varying from the indictment

2    which uses the word "participation." He's trying to hoist us

3    on our petards here, Judge, and he's trying to say at one point

4    you can't define this in the way the Court has done because

5    it's not an official proceeding, then when we use the language

6    of the indictment, which he says we have to use, then he wants

7    to strike that too.

8            This is not the verdict director. This is just the

9    portion of the Court's instructions that gives them a summary,

10   and the way it's currently drafted is an adequate, sufficient,

11   and legally correct summary of the charge that the Court then

12   elaborates on and gives the jury its detail on for their

13   deliberations on the elements in the following instruction.

14           The only instruction that Mr. Brown or I are going

15   to talk about in closing is the verdict director. That's the

16   only one that really matters. To that extent, leaving it the

17   way you have it and overruling the objection to the

18   participation language is the right way to go.

19           THE COURT: At this point my ruling is to leave the

20   language as proposed this morning with the only exception that

21   we will -- and we have deleted the two words "investigation"

22   and before prosecution of the defendant's son.

23           Let's move to the verdict director which is now

24   No. 20.

25           Did we have packets for defense attorney and

1    government attorney?  That's okay if we don't.

2              Let's move on to the verdict director.  The only

3    change from this morning as mentioned would be "all" is

4    substituted for "both" in the last sentence.

5              Any objections, Mr. Brown, to the verdict director?

6    Oh, and there is another change.  I did want -- I added U.S. v.

7    Scott in element 1.  And we're going to place on the Elmo the

8    instruction.

9              Thank you, Madison.

10             MR. BROWN:  Here are my objections to the verdict

11   director.  Everything after Brian Risley should be eliminated

12   in element 1, and so I believe it should read, "Defendant

13   knowingly threatened to cause bodily injury to another person,

14   specifically Brian Risley and did so with intent to retaliate

15   against Vershawn Edwards."  I would object to the, "who was

16   being sentenced on September 29th, 2016."

17             THE COURT:  And your basis for the record?

18             MR. BROWN:  The basis for the record is that the

19   Court has impermissibly modified the indictment.  The language

20   that I just described is additional and not required to be

21   proved, potentially confusing; and when we -- and I understand

22   why the Court's done it but when we describe Scott as also

23   including the prosecution of Malcolm Redmon, I would

24   specifically object to that.

25             THE COURT:  Any other record you want to make

1    regarding that?

2              MR. BROWN:  No.

3              THE COURT:  Ms. Orsinger, is there any record you

4    want to make?

5              MR. PORTER:  Your Honor, we would just ask that the

6    Court overrule those objections and adopt the instruction as

7    currently drafted.  We have no objection to it.

8              THE COURT:  Mr. Brown, your objection is overruled.

9              The next instruction following the verdict director,

10   the newly numbered Instruction No. 21 would be the knowingly

11   instruction.

12             Any objection, Mr. Brown?

13             MR. BROWN:  No.

14             THE COURT:  That's plaintiff's submitted Instruction

15   No. 25.

16             The next Instruction 22 is plaintiff's

17   instruction -- proffered Instruction 26, intent.

18             Any objection, Mr. Brown?

19             MR. BROWN:  No.

20             THE COURT:  The next Instruction No. 23 is the

21   reasonable doubt.  The Court sustained the defense objection

22   and is using the 2014 model.

23             Any objection, Mr. Brown?

24             MR. BROWN:  No, Your Honor.

25             THE COURT:  The next instruction is Instruction 24,

```
 1    "In conducting your deliberations," pattern 3.12.
 2              Any objection?
 3              MR. BROWN:  Not from the defense.
 4              THE COURT:  The final Instruction 25.
 5              MR. BROWN:  That just follows the patterned
 6    instruction?
 7              THE COURT:  It would follow the last instruction
 8    unless do you want --
 9              MR. BROWN:  No, no, no.
10              THE COURT:  It follows the patterned instruction.
11              MR. BROWN:  Right.  There's no modification other
12    than maybe they talk about the case, whatever.
13              THE COURT:  Let me confirm with the government.  Did
14    your proposed Allen instruction pattern the Brooks language?
15              MR. PORTER:  It did, Your Honor.
16              THE COURT:  Were you able to confirm that or did you
17    just rely on the representation?
18              MS. RUSSELL:  I relied on the representation.
19              MS. PERRY:  I confirmed it.
20              MR. BROWN:  I have no reason to believe it doesn't.
21    I was just trying to confirm that.
22              THE COURT:  Was there any other objections to the
23    instructions by the government or any additional objections,
24    Mr. Brown, that you would like to cover?
25              MR. BROWN:  Yes.  We have an objection to the
```

Case 2:16-cr-04068-RK   Document 92   Filed 07/12/17   Page 84 of 159

1  verdict director where the crime is referenced as, "obstructing

2  justice by threatening to retaliate."  And if that language

3  appears in any of the other instructions that are being given,

4  I would specifically object to the final instruction conference

5  for that characterization.  I understand it's been overruled by

6  the Court, but just for the record I make that objection.

7            THE COURT:  Any comments for the record by the

8  government?

9            MS. ORSINGER:  No, Your Honor.  No objection from

10  us.

11            THE COURT:  As the Court earlier ruled, 18 U.S.C.

12  1513 is a crime in the genre of the obstructing section and

13  that is the spirit and the genre of that statute and it is an

14  accurate statement of the offense.

15            One final --

16            MR. PORTER:  I was going to say the same thing, one

17  final thing.  In the verdict director --

18            THE COURT:  The verdict form needs to have the

19  corrected number.

20            MR. PORTER:  Well, the crime of "obstructing justice

21  by threatening to retaliate" is not listed in the beginning of

22  the verdict director.  It simply says, "The crime of

23  threatening to retaliate."  My only concern is if we don't say

24  it exactly the same, there is a possibility of confusion on the

25  part of the jury.  So if by leaving it in the verdict form, we

```
 1   also need to leave it in the verdict director, "The crime of

 2   obstructing justice by threatening to retaliate."

 3             THE COURT:  We'll make that change.

 4             And then does the verdict form -- yes, she made that

 5   change to the verdict director.

 6             So I believe there's only one change now.

 7             Then my final question is I have not given the Allen

 8   instruction in the packet before closing arguments.  Do you

 9   want me to give the Allen instruction after we show them the

10   verdict form or before the verdict form and end with showing

11   the verdict form?

12             What is your preference, Mr. Brown?

13             MR. BROWN:  I don't care.

14             THE COURT:  Mr. Porter, do you have a preference?

15             MR. PORTER:  I think it reads better if we just

16   continue reading that at the end -- I mean make that the last

17   instruction you read to the jury before you get to the verdict

18   form.

19             THE COURT:  Okay.  I will do that.

20             When we have the jury come in, now that it's 1:30,

21   will you be ready to proceed with your case in chief, Mr.

22   Brown?

23             MR. BROWN:  He needs to go to the bathroom.

24             THE COURT:  Absolutely.  Then after testimony, if

25   you want to approach and make any motion, can we then go right
```

394

1    on to instructions and closing argument?

2              MR. BROWN:  As far as I'm concerned.

3              THE COURT:  And let me know if you need a break.

4              We'll be in recess for five minutes.

5              (Recess was taken at 1:30 p.m.)

6              (The following proceedings were had in the courtroom

7    out of the presence of the jury:)

8              THE COURT:  Please be seated.  Are you ready to

9    bring the jury back?

10             MR. BROWN:  I believe so.

11             MR. PORTER:  Yes, Your Honor.

12             (The following proceedings were had in the presence

13   of the jury:)

14             THE COURT:  Please be seated.

15             Welcome back, ladies and gentlemen, and thank you

16   again for your patience.

17             The attorneys, the Court, and court staff have been

18   working diligently through most of the lunch break and

19   completely over the last hour.  The good news is the Court's

20   instruction packet is ready to give to you after hearing legal

21   presentations and arguments.  There should be less interruption

22   this afternoon.

23             So with that, Mr. Brown, do you have any witnesses

24   that you wish to call?

25             MR. BROWN:  Yes, Your Honor.  We call Bruce

1   Stephens.

2                    DEFENDANT'S EVIDENCE

3   BRUCE WAYNE STEPHENS, being sworn by the courtroom deputy,

4   testified:

5   DIRECT EXAMINATION BY MR. BROWN:

6    Q      Mr. Stephens, would you state your name and spell your

7   name for the court reporter, please.

8    A      Bruce Stephens, Bruce Wayne Stephens, B-r-u-c-e,

9   S-t-e-p-h-e-n-s.

10   Q      All right.  And where do you live, Mr. Stephens?

11   A      Columbia, Missouri.

12   Q      How long have you lived there?

13   A      Seventy-one years.

14   Q      And do you have any -- well, first off, do you remember

15   the events of the 29th of September, 2016, this year?

16   A      Yes, I do.

17   Q      Do you have any chronic health problems?

18   A      Well, I have irregular heartbeat, cirrhosis of the

19   liver, diabetes, arthritis, and prostate problem.

20   Q      Do you take any medication for those?

21   A      I take 11 pills a day.

22   Q      Do you know what that medication is, or do you just

23   take what the doctor prescribes?

24   A      I just take them, yes.

25   Q      Were you taking those medications and have you had

```
 1   those conditions since before September of 2016?

 2    A       Before.

 3    Q       Now, how were you feeling the few days -- physically

 4   the few days before the 29th of September?

 5    A       Terrible.

 6    Q       Tell the jury why.

 7    A       I had a long trip to Rolla, Missouri, to visit my son;

 8   and if it is a long trip, it hurts my back.  My hands and feet

 9   swell up.  And my breathing problem is kind of bad, COPD.

10    Q       Did you have any sort of infection?

11    A       Yes.  I had a bad infection.  I still got it.

12    Q       What kind of symptoms were you exhibiting here on the

13   27th, 28th, 29th?

14    A       A lot of burning.  Sometimes it's hard to urinate.

15   When you do, you can't hardly stop it.

16    Q       Did you have a fever or was there any other symptoms

17   that you might have had?

18    A       Just aching in the back.

19    Q       Now, emotionally how were you feeling on the 28th and

20   29th?

21    A       Terrible.

22    Q       Why?

23    A       Because my son was getting sentenced.

24    Q       And you knew he was facing a pretty long prison

25   sentence, right?
```

```
1    A        Yes.  Yes, he was.

2    Q        At least ten years?

3    A        Or more.

4    Q        That made you anxious about that?

5    A        Yes.  Plus, I had a doctor's appointment the week

6   before to go in and get a checkup and have some polyps removed.

7   I knew if I go, I wouldn't be able to go to the sentencing.

8    Q        So you didn't go to the doctor?

9    A        No.

10   Q        Now, on the morning of the 29th did you meet somebody

11  to come down to Jefferson City?

12   A        Well, Wendy Houston had called me earlier in the

13  morning and asked if I was feeling all right.  I told her I

14  would make it.  So she picked me up.

15   Q        So she picked you up and gave you a ride?

16   A        To the courthouse.

17   Q        Okay.  That's Ms. Houston that testified here --

18   A        Yesterday.

19   Q        -- here in the courtroom yesterday.  And what's your

20  relationship with Ms. Houston?

21   A        She's a friend -- her ex-husband's got three children

22  by my niece and she's been a stepmother to them ever since they

23  were born.

24   Q        Okay.  Has she ever been to your home?

25   A        Several times.
```

```
 1    Q        Have you been to her home?

 2    A        Not in Dallas.

 3    Q        Well, I mean when she lived up in Columbia.

 4    A        No, I haven't been by there.

 5    Q        All right.  Do you know her children?

 6    A        I know a couple of them.

 7    Q        Do you visit with them on the telephone?

 8    A        Several times.

 9    Q        So she brought you to Jefferson City the morning of the

10    29th?

11    A        Yes.

12    Q        Why did you come in the morning?

13    A        Because she told me that Malcolm had said that Marlon

14    needed somebody to be there when he goes to sentencing.  So

15    he's ready to go to sentencing about ten o'clock or 10:30.  So

16    we got here.  She took me to get something to eat because I

17    hadn't eaten.  By the time we got here it was about almost over

18    with.

19    Q        Well, were any of your family members or kin being

20    sentenced that day?

21    A        Malcolm Redmon, my son, was going to be sentenced that

22    day.

23    Q        I didn't understand you.  Who?

24    A        Malcolm Redmon.

25    Q        All right.  Mals?
```

399

1   A       Mals had already been sentenced.  That's who we were

2   here for.

3   Q       You wanted to see his sentencing because he's kin?

4   A       Yes, he's my nephew.

5   Q       And his was in the morning?

6   A       Yes.

7   Q       So you first came to this courthouse and this courtroom

8   on the morning of the 29th to see your nephew being sentenced?

9   A       Yes.

10  Q       Is that correct?

11  A       That's correct.

12  Q       After his sentencing, did you stay in the courthouse or

13  did you go somewhere?

14  A       After his sentence, we left.  We left, went to

15  McDonald's.

16  Q       Okay.  Then you came back?

17  A       Yes.

18  Q       Didn't take long at McDonald's?

19  A       No.

20  Q       Why didn't you take long at McDonald's?

21  A       Because she was in a hurry to get back to see Mals, to

22  see what happened to Mals.

23  Q       Okay.  So when you came back to the courthouse on the

24  29th, where did you come?

25  A       Come here.

```
1    Q       Was the door open or closed?

2    A       It was closed.

3    Q       What did you do when you knew you couldn't get to the

4    courtroom?

5    A       We sat out there on the benches.

6    Q       Okay.  Now, did you know who was going to be sentenced

7    when you came into the courtroom?

8    A       No.

9    Q       Do you know Vershawn Edwards?

10   A       No.

11   Q       If he were to walk in this courtroom today, would you

12   recognize him?

13   A       No.

14   Q       But you sat through his sentencing and you saw him?

15   A       Well, when we got in here, his sentence was about over

16   with.  It only took about five or ten minutes.

17   Q       Now, you've heard the testimony of various individuals

18   that you were talking snitches get stitches; is that right?

19   A       Yeah.

20   Q       Whether or not it's politically correct or not, what's

21   your attitude towards snitches?

22   A       Well, from history mostly snitches get hurt.  You see

23   it on television, read it in the newspapers, and we didn't -- I

24   didn't know who all -- except the one on television and in the

25   newspaper.
```

```
1    Q      This is not a new concept?

2    A      No.

3    Q      And you made -- you made some comments about snitches

4    out in the hall, right?

5    A      Yeah, to my grandson.

6    Q      You were talking to your grandson?

7    A      Right.

8    Q      As a matter of fact, Ms. Houston didn't like you

9    talking to your grandson that way, did she?

10   A      No, because one of them said something.

11   Q      I beg your pardon?

12   A      One of them said something about the snitches.

13   Q      Okay.  Now, I think there's been testimony from Mr.

14   Risley that when you came into the courtroom and you were

15   sitting up there, you made other comments about snitches.  Do

16   you recall making those comments?

17   A      No.  I didn't say anything.

18   Q      And I think he testified you looked over at Vershawn's

19   family and made some comments about snitches?

20   A      I didn't say anything to them people.

21   Q      You can kind of be an ornery guy, right?

22   A      At times.

23   Q      And your language might not be appropriate for all

24   situations, right?

25   A      Sometimes.
```

1   Q       Tell the jury what happened right after Mr. Edwards was

2   sentenced on the 29th.

3   A       Well, I was sitting over there where that gentleman is

4   sitting, and I was -- I kept moving my legs because I had to go

5   to the bathroom but I had to wait until everybody to leave.  So

6   when they got up, there was security sitting by the doorway and

7   Mr. Risley -- I ran up and said, "I got to go to the bathroom.

8   I got a prostate problem."  I kept saying that to him.  So in

9   the process of me trying to get out to the bathroom, he kept

10  moving his body and his arms where I couldn't get out.  So we

11  had -- I cussed him out.

12  Q       Did you say anything about snitches when you were

13  trying to leave the courtroom?

14  A       I didn't say anything about snitches.  I was trying to

15  get out to go to the bathroom.

16  Q       Now, you say he blocked the doorway.  Are you talking

17  about this doorway here?

18  A       Both of them.

19  Q       All right.  So there was some confrontation where he

20  wouldn't let you go through?

21  A       Yes.

22  Q       In the first doorway?

23  A       Right.

24  Q       And there was an additional confrontation --

25  A       In the second door.

```
 1    Q       -- going through the second set of doors?

 2    A       Right.

 3    Q       And you say you cussed him?

 4    A       I cussed him, yes.

 5    Q       Fairly bad language?

 6    A       Yes.

 7    Q       Why were you cussing at him?

 8    A       Because he did what he did to me, wouldn't let me out.

 9    Q       Now, at some point you got out into the hallway?

10    A       Yes.

11    Q       Was court security there at that time?

12    A       There was two guys.

13    Q       All right.  What happened then?

14    A       Well, I told -- they told me I could go to the bathroom

15  because Mr. Risley was gone down the hallway.

16    Q       Were they -- had court security said anything to you at

17  this point?

18    A       Well, I said something to them.  I asked them, "Why are

19  you letting this man do me like he did me?"  They said, "You

20  want to use the damn bathroom or not?"  So I had done urinated

21  a bit on myself.  So I went on inside, I guess about three or

22  four minutes.  I cleaned myself up the best I could.  I came

23  back out and I asked them again.  He said my mom was having a

24  bad time.

25    Q       If you'll stop just a minute.  Now, you indicated that
```

1    you were incontinent.  You peed yourself?

2    A        Yes.

3    Q        And part of your prostate problem do you have to go to

4    the bathroom a lot?

5    A        Lots of times, sometimes all night long.

6    Q        And when you're incontinent or pee yourself, it isn't

7    like a five-year-old where they eliminate all of the urine in

8    your bladder.  Tell the Court or tell the jury what it's like

9    when you're incontinent or you pee yourself.

10   A        I had an infection in my prostate and it goes down --

11   sometimes it comes full flow and other times it drips; and once

12   the drips is over with, the flow comes out but it's painful.

13   Q        And you take medication for your prostate problem?

14   A        Prostate.

15   Q        And part of the medication helps increase the flow from

16   your bladder; is that correct?

17   A        Yes.

18   Q        Now, was anybody else in the bathroom with you when you

19   went in?

20   A        No one.

21   Q        And you cleaned yourself up?

22   A        Yes.

23   Q        You came out of the bathroom?

24   A        Yeah.

25   Q        Tell the jury what happened then.

```
 1   A      We got out and I asked them again, I said, "Why do
 2   you allow this man to do me like he did?"  They said, "You
 3   got to go."  So I start cussing him.  And on the way down the
 4   hallway -- I cussed them all the way out to the doorway because
 5   I was pissed off.  I'm pissy and I was pissed off at him of
 6   what just happened to me.
 7   Q      Now, you've heard the testimony of Court Security
 8   Officer Tyree, Court Security Officer Black.  You were in here
 9   when they testified?
10   A      Yes.
11   Q      And they said you were cussing them basically from the
12   time you left the bathroom --
13   A      Until I got out the door.
14   Q      -- until you got out the outer door; is that true?
15   A      Yes.
16   Q      You were saying ugly things to them?
17   A      Yes.
18   Q      Tell the jury what happened when you left the
19   courthouse, when they put you out the front door.
20   A      I went out there and sat on one of the pillars outside.
21   I don't know how long.  I sat there until -- until some more
22   family members came.  So my granddaughter was with them.  She
23   told us she has to use the bathroom.  I said, "You have to have
24   your I.D. with you.  Unless you have your I.D. you're not going
25   to get in."  She said, "Maybe they'll let me use it."  I said,
```

1  "No, they won't." So she went in anyway. Wasn't in there five

2  minutes and she come back out. So we sat there and talked for

3  a few minutes.

4        She says, "I got to find a bathroom, restroom

5  somewhere." So I said, "Okay. Come walk with me." So we

6  walked all the way down the street. We went up to like this

7  old folks -- I thought it was an old folks place. It was a

8  place where people live. So she went in there. I sat on the

9  bench outside. They wouldn't let her use it. They said they

10 had no public restroom. She went to the next building. They

11 told her the same thing. So we walked on out.

12       She said, "Let me stop in here at this health

13 department." So the health department was right there on the

14 right side when you're heading back east. So she went in there

15 and I sat outside and waited for her. Then we went back. She

16 come out. We went up the street.

17       She said, "I got my cousin's car." I said, "So

18 let's go sit down in it." I rolled down the windows. I sat in

19 the front seat and she sat in the back. We sat in there. I

20 went to sleep and so did she. I couldn't tell you how long we

21 slept.

22       In the process of that, there was a knock on the

23 window. It was Malcolm's mother's sister and auntie. They

24 said, "We come out for a cigarette break." She smokes a

25 cigarette. She said, "We have to hurry and get back there

```
 1  because I think the court's going to start back again."  So
 2  they left us.

 3          I guess about ten or 15 minutes later the owner of
 4  the car came out and he said, "I'm late.  I got to go pick my
 5  girlfriend up."  So I said, "I'll ride with you."  We'll go
 6  with him.  So we rode with him to some building.  I don't know
 7  where the place was at, off East McCarthy.  You go around a
 8  roundabout.  So we went and picked her up.  She was kind of
 9  pissed at him as far as him being late.  So I got up from the
10  front seat and got in the back.  So he drove us right back down
11  to the courthouse.

12          So I sat there for five, ten minutes until I seen
13  Dobby come up the street.  When he come up the street, I come
14  out.  I said, "I can't go in."  I said, "You go on in and check
15  it out."  So we walked up the street.  About this time Mr.
16  Risley came out.

17  Q      Okay.  May I stop you right there a minute?
18  A      Yes.
19  Q      Now, it was no surprise to you or to me about the time
20  stamp on showing the time Mr. Risley called and left this
21  voicemail with AUSA Oliver, was it?
22  A      No.
23  Q      We knew about that --
24  A      Yes.
25  Q      -- all along.  You remember the events differently.
```

```
 1    You think it happened more than ten minutes after you got

 2    thrown out of the courthouse?

 3    A       It had to have happened because I sat outside longer

 4    than that.

 5    Q       On the other hand, the time stamp indicates --

 6    A       Differently.

 7    Q       -- that it happened within ten or 15 minutes after?

 8    A       Yes.

 9    Q       You can't explain that?

10    A       I can't explain it.

11    Q       That's what you remember, though, happening?

12    A       I thought it was later than that.

13    Q       Okay.  And that's the way -- that's the way you

14    remember it today?

15    A       Yes, I do.

16    Q       That's the way you remembered it on October 12th?

17    A       Yes.

18    Q       When Cody Abram interviewed you?

19    A       Yes.

20    Q       And you recognize the time stamp doesn't jive with what

21    you're saying?

22    A       No.

23    Q       So were you lying to Cody Abram on the 12th when you

24    told him that?

25    A       No.
```

1    Q        That's the way you remember it?

2    A        That's exactly what happened.

3    Q        Okay.  Now, at some point, whether it was ten or 15

4    minutes after you got put out of the courthouse or sometime

5    later than that, did you have an occasion to see Mr. Risley

6    again?

7    A        Yes.

8    Q        How did that occur?

9    A        When we were coming up the sidewalk, I seen him.

10   Q        When you say, "We were coming up the sidewalk," who's

11   we?

12   A        Dobby and I.

13   Q        Okay.  When did you first see Mr. Risley there out on

14   the sidewalk?

15   A        He was by his car opening his door up.

16   Q        I beg your pardon?

17   A        He was opening his car door up.

18   Q        Okay.  Did you say anything to him?

19   A        Yes, I said something to him.

20   Q        How far away were you?

21   A        Well, he was parked over on the side.  I guess it was

22   about 20, 25 feet maybe, or less.

23   Q        You were on the sidewalk.  He was --

24   A        Over where they parked the car.

25   Q        -- over across the street where they park the cars on

1    the street?

2    A      Yeah.

3    Q      Did you have to yell at him or use a loud voice so he

4    could hear you?

5    A      I don't know if he heard me or not because I don't

6    speak too loud.

7    Q      Well, would you have to use a louder voice to talk with

8    him than you are talking to the jury?

9    A      Maybe, maybe.

10   Q      What did you say to him?

11   A      I asked him why he do me like he did, why he pushed me

12   around like he did, and he didn't say anything.

13   Q      Okay.

14   A      So I told him -- I called him a motherfucker.

15   Q      Okay.

16   A      I said, "You're a motherfucker.  Now, you know why you

17   did that."  He got in his car.  When he got to his car, I told

18   him, "I hope when you get home, your family and kids are dead,"

19   something to that effect, but he didn't say anything.  He got

20   in his car and drove on off.

21          When I left him, the Edwards family was coming past

22   us.  So we acknowledged each other.  They spoke to me and I

23   nodded my head.  So we went on.  I sat back on the bench again

24   where I was sitting at first on the pillar.

25   Q      Now, let's go back to what you told me.  Did you ever

```
 1   tell him, "I'm going to kill you"?

 2   A      I never told anybody that in my life.

 3   Q      Did you ever make any statements to him about snitches?

 4   A      No.

 5   Q      Did you ever say, "I'm going to kill your wife"?

 6   A      No.

 7   Q      Did you ever say, "I'm going to kill your children"?

 8   A      No.

 9   Q      You did say, "I hope when you get home, you find your

10   family dead"?

11   A      Yes, I did say that.

12   Q      Ugly?

13   A      Yes, very ugly.  It hurt me after I said it.

14   Q      Why did you say those ugly things to Mr. Risley out

15   there on the sidewalk?

16   A      Because there's nothing I could do with him physically.

17   That's the only way I figured I could get back at him for

18   saying that.  And that's what I said to him.

19   Q      Did it have anything to do with Vershawn Edwards?

20   A      No.

21   Q      Did it have anything to do with Mr. Risley's

22   participation in Vershawn Edwards' case?

23   A      No.

24   Q      What did it have to do with?

25   A      The altercation at the doorway.
```

```
 1   Q       That resulted in your being thrown out of the
 2   courthouse?
 3   A       Yes.
 4   Q       Were you able to attend your son's sentencing?
 5   A       No.
 6   Q       How did that make you feel?
 7   A       Terrible.
 8   Q       I think that there's been testimony that his sentencing
 9   started -- his sentencing hearing started about two and ended
10   about five o'clock on that day.  What did you do during that
11   time?
12   A       Sat outside.
13   Q       Okay.  Did you ride home with Ms. Houston?
14   A       Yes.
15   Q       You heard some -- or she asked you because of something
16   that was read out in Malcolm's sentencing hearing what had
17   occurred; is that right?
18   A       Yeah.
19   Q       What did you tell her?
20   A       What did I tell Malcolm?
21   Q       No.  What did you tell Ms. Houston?
22   A       I told her I didn't threaten to kill him.  I do nothing
23   like that.  I told her what I did say to him, I said I wished
24   he would go home and find his kids dead.
25   Q       Now, had you ever met Mr. Risley before the 29th?
```

```
 1    A       No.

 2    Q       Had you ever been to any other court proceedings where

 3    Mr. Edwards or your son, Malcolm, appeared in court here in

 4    federal court?

 5    A       No.

 6    Q       After you left out Jefferson City to go home to

 7    Columbia, did you ever think about the incident that occurred

 8    out on the sidewalk here?

 9    A       I never thought no more about it.

10    Q       And when's the next time you thought about it?

11    A       When they came to my house.

12    Q       That would have been October 12th?

13    A       October the 12th.

14    Q       Now, you seen the video of your interview with Agent

15    Abram; is that correct?

16    A       Right.

17    Q       And there is some discussion about the attitude in the

18    community about snitches and you and Charlie mostly but

19    sometimes Agent Abram chimed in.  That went on for how long?

20    A       I don't know.  Maybe three, four, five minutes.

21    Q       Okay.  And then you'd also explained to him during this

22    interview the ugly things you had said?

23    A       Yes.

24    Q       And then Agent Abram asked you about the specifics of

25    "I'm going to kill you.  I'm going to kill your wife.  I'm
```

```
 1    going to kill your children."  Do you remember that?

 2    A       That's what he said.

 3    Q       Do you remember seeing that this morning?

 4    A       Yes.

 5    Q       And you said something to the effect, "It was said"?

 6    A       Yes.

 7    Q       What were you talking about when you said "it"?

 8    A       "It was said."  What I told him that when he gets home,

 9    I hope he finds his family dead, his kids and wife.  I didn't

10    know if he was married or not.

11    Q       Do you know anything about Mr. Risley?

12    A       No.

13    Q       Other than the fact that he was here on the 29th and

14    you all had a run-in?

15    A       Right.

16    Q       Anything else about him?

17    A       No.  You said -- I asked you -- I thought he was from

18    Kansas City.  You said he was from Springfield.  I told you, I

19    never been to Springfield in my life.

20    Q       At any rate, you said those ugly things to him.  Why?

21    A       Because the way -- the altercation at the doorway.

22              MR. BROWN:  I don't think I have anything further.

23              MR. PORTER:  May counsel and I have a moment?

24              MR. BROWN:  Oh, I do have another question.

25    Q       (By Mr. Brown)  Mr. Stephens, in the past ten years, so
```

```
 1   going back to 2006, have you had any felony convictions?

 2   A        I had one.

 3   Q        What's that for?

 4   A        Driving.

 5   Q        Driving while suspended?

 6   A        Yes.

 7   Q        It's a felony conviction?

 8   A        After you get two or three of them, I think it's a

 9   felony.

10   Q        And you were charged with a felony?

11   A        Yes.

12   Q        Pled guilty?

13   A        Yes.

14   Q        You're on probation for that?

15   A        Yes.

16   Q        Right now?

17   A        Right.

18            MR. BROWN:  That's all.

19            MR. PORTER:  May I inquire, Your Honor?

20            THE COURT:  You may.

21   CROSS-EXAMINATION BY MR. PORTER:

22   Q        Mr. Stephens, if you would be kind enough, because you

23   are soft spoken today, to help the jury make sure they're able

24   to hear you, try to speak into that microphone as much as you

25   can, sir.  Would that be all right?
```

416

A        Yes.

Q        Mr. Stephens, in addition to the felony conviction that you just described, when we were listening to the recorded interview this morning --

MR. BROWN:  Your Honor, may we approach?

(Counsel approached the bench and the following proceedings were had:)

MR. BROWN:  Judge, my position on impeachment is even though he's the defendant, it's limited under 609 unless the Court finds that anything else would be more probative than prejudicial, and I would suggest any other impeachment convictions, unless they deal with truthfulness and veracity, shouldn't be allowed because they are more prejudicial than probative.

MR. PORTER:  The way to handle this is at the defense insistence under the rule of completeness objection, they allowed this jury to hear this morning that entire interview where multiple prior convictions, the fact he's been in prison was all put before this jury without objection.  In fact, not without objection but at the insistence.  So they can't now use as a shield that which they wanted to use as a sword before.  It's out there.  I'm not going to dwell on it.  I'm only going to talk about the facts and move through as quickly as this witness will allow.  We're not plowing new ground.  We're going to cover the areas that they insisted the

417

1    jury hear this morning.

2         MR. BROWN:  Wait a minute.  I don't remember it that

3    way.  We're not going to argue that.  The question is, is it

4    more probative than prejudicial, and I suggest that it's more

5    prejudicial than probative.  What does it go to?

6         THE COURT:  I don't think the rule of completeness

7    is applicable.  If the information on the interview was

8    accurate and not misleading, I don't know that we need to

9    highlight those facts by replowing this again.

10        MR. PORTER:  I at least would like to ask him to

11   confirm he has spent time in prison as a result of prior felony

12   convictions, because that's going to establish his knowledge of

13   what it's like to be a snitch and what happens to snitches in a

14   custody context, because that explains the basis of his

15   knowledge for why he's talking about snitches; and if you don't

16   want me to do the particular convictions, I'll stay away from

17   them.  I at least should be allowed to say to him, "You spent

18   time in prison.  You know from your prison experience what it's

19   like to be a snitch in prison."

20        MR. BROWN:  I have less of an objection to that than

21   going through his convictions.

22        THE COURT:  Say the first part again.

23        MR. BROWN:  I have less of an objection to him

24   spending time in prison than what's the attitude toward

25   snitches or whatever.  I don't care.  But I don't want a

1    50-year-old robbery conviction --

2              MR. PORTER:  Your Honor, again, if you don't want

3    the specifics of the convictions or the dates, if I just go

4    through the fact he's been in prison, that will work.

5              THE COURT:  I will sustain your objection as to

6    going through the convictions.  I do think it's relevant as

7    to --

8              MR. BROWN:  Whether he's been in prison.

9              THE COURT:  And his perception and his intent

10   regarding his perception of snitches and surrounding the

11   snitches aspect.

12             MR. PORTER:  Thank you.

13             (The proceedings returned to open court.)

14   Q     (By Mr. Porter)  Mr. Stephens, on the recording of your

15   statement on October 12th that we listened to this morning, you

16   discussed the fact that you had been in prison before as a

17   result of prior felony convictions, correct?

18   A     I went to prison.

19   Q     And while you were in prison, you learned how snitches

20   are treated in the prison environment, didn't you?

21   A     Terrible.

22   Q     And that's where you saw, while you were in prison,

23   what happens to snitches in that prison environment, right?

24   A     Yes.

25   Q     That's where you learned that snitches belong in

1    ditches or that snitches get stitches or whatever other phrase

2    you want to use to describe it that we've heard throughout this

3    testimony, but that's how you learned that snitches get hurt,

4    harmed, and threatened, right?

5    A      Yes.

6    Q      And you even told this jury today during your

7    questioning or the answers you gave to Mr. Brown's questions

8    that snitches get hurt.  That's what you understand that

9    meaning to be when you start talking about those phrases in

10   that way, right?

11   A      Yeah.  I seen it before.

12   Q      And 13 days after September the 29th, on October

13   the 12th when you were talking to Cody Abram, you even told him

14   then that your words "snitches should be dead," right?

15   A      That's how I felt at the time, yes.

16   Q      And you still feel that today?

17   A      I don't know if I do or not.

18   Q      And in your view, the only person who did anything

19   wrong on September the 29th was Brian Risley?

20   A      He's part of the reason.

21   Q      He's the only person who did anything wrong on

22   September 29th.  He's the one in your view that should have

23   been charged with a crime?

24   A      Me?

25   Q      No.  No.  In your view, the only person who should

| 1 | Have been charged with a crime for what happened on September |
| 2 | the 29th in this courtroom was Brian Risley. |
| 3 | A    He was part of the reason. |
| 4 | Q    You think he did something wrong to you? |
| 5 | A    Yes, by taking over someone else's job. |
| 6 | Q    You think he committed a crime against you? |
| 7 | A    Yes, he did. |
| 8 | Q    But you never went to any law enforcement agency and |
| 9 | asked them to file a charge against him, did you? |
| 10 | A    Because that's not the way things to be done.  I forgot |
| 11 | about Mr. Risley when I left Jeff City. |
| 12 | Q    That's not the way things get done because you take |
| 13 | care of things on the street with snitches getting stitches, |
| 14 | right? |
| 15 | A    I don't take care of anything but me. |
| 16 | Q    And you're going to take care of you in whatever way is |
| 17 | necessary, right? |
| 18 | A    No, I'm not. |
| 19 | Q    And even though that timeline of events makes no sense |
| 20 | whatsoever, that's your story and you're sticking to it? |
| 21 | A    Until I'm dead. |
| 22 |         MR. PORTER:  May I have just a moment, Your Honor? |
| 23 |         THE COURT:  Yes. |
| 24 |         MR. PORTER:  That's all, Your Honor.  Thank you. |
| 25 | REDIRECT EXAMINATION BY MR. BROWN: |

1  Q    Do you think your cussing everybody out all the way off

2  the fourth floor to the front door, was that wrong?

3  A    I didn't hear you.

4  Q    I'm sorry.  Do you think cussing everybody out from up

5  here on the fourth floor all the way out to the front door, was

6  it wrong?

7  A    Not to me it wasn't.

8  Q    Okay.  You think it was wrong to say those ugly things?

9  A    Yes.  About his family?  Yes, that was terrible.

10  Q    So Mr. Risley wasn't the only person that was wrong

11  that day?

12  A    No.

13  Q    Okay.  Now, Mr. Porter asked you about the statement

14  about snitches on October 12th, some two weeks after the 29th,

15  where you say you'd rather snitches are dead than Mr. Risley,

16  right?

17  A    Yeah, because Mr. Risley never done nothing to me.

18  Q    Well, that wasn't a general statement that all snitches

19  should be --

20  A    Should die?

21  Q    Yeah.

22  A    I felt that way at the time, yes.

23  Q    Well, you've got other family members that were

24  involved?

25  A    Yes, I do.

| 1 | Q | In Scott, right, the U.S. v. Scott? |
| 2 | A | Yes. |
| 3 | Q | And some of them cooperated? |
| 4 | A | Yes. |
| 5 | Q | And you'd consider them snitches? |
| 6 | A | Yes, but it's still my family. |
| 7 | Q | And you don't want to see them dead? |
| 8 | A | I don't want to see any of them dead, but this is |

9  something that's happened even before I was born.

| 10 | Q | Your attitude towards snitches is essentially old |

11  school, right?

| 12 | A | Yes. |
| 13 | Q | Okay. |

14             MR. BROWN:  Nothing further, Your Honor.

15             THE COURT:  Any recross?

16             MR. PORTER:  No, Your Honor.  Thank you.

17             THE COURT:  The jury can utilize their note cards at

18  this point.

19             (Counsel approached the bench and the following

20  proceedings were had:)

21             THE COURT:  So to be clear, I'm not going to require

22  any of these questions to be read unless you want them to be or

23  you strategically think they should be read, so I will direct

24  my questions just to you, Mr. Brown.

25             First off, do you want any of these questions read,

```
 1    or should we go through them one at a time for the appearance

 2    at least?

 3              MR. BROWN:  Let's go through them one at a time.

 4              THE COURT:  The first card is to confirm did -- in

 5    Exhibit 26 Mr. Stephens did say all snitches should die.

 6              MR. BROWN:  I object.

 7              THE COURT:  The question is, "Do you get around

 8    easily, Mr. Stephens?  How many times did you have words

 9    with Mr. Edwards' attorney on the 29th of September?"

10         Any objection -- or any preference, I should say?

11              MR. BROWN:  I don't care about the first two.

12    Obviously the third one I object to.

13              THE COURT:  The third one, for the record, "If your

14    thoughts have changed about snitches being in ditches, please

15    explain or give an example of that."

16              We'll hold this for right now.

17              The next card is, "Where was Dobby when Mr. Stephens

18    was speaking to Mr. Risley on the street?  Could Dobby hear the

19    conversation?"  Those are the two questions.

20              MR. BROWN:  I object to that.

21              THE COURT:  Okay.  Next card is, "Why do you seem to

22    agree in the video of what was said about the threat to kill

23    Mr. Risley?"

24              MR. BROWN:  I object.

25              THE COURT:  Okay.  The next card is, "What did your
```

1  grandson say in the hallway after you made remarks about

2  snitches when Ms. Houston asked who Mr. Risley represented?"

3          MR. BROWN:  I object.

4          THE COURT:  The question is, "Would you feel the

5  same way about snitches if Malcolm, your son, would have chosen

6  to cooperate?"

7          What's your preference?

8          We can set that aside.

9          MR. BROWN:  Let's think about that a minute.

10         THE COURT:  The next card reads, "On September 29th

11 after leaving the building when you, Mr. Stephens, went to

12 sleep in the car, did you have the key to either open the

13 windows or run the air conditioning?"

14         MR. BROWN:  We object.

15         THE COURT:  The next card is, "Why wouldn't the

16 defendant be able to leave at any time and use the restroom?  I

17 notice visitors coming and going throughout this trial."

18         MR. BROWN:  Object.

19         THE COURT:  "How long had he been on prostate meds

20 for infection?"

21         What is your preference?

22         MR. BROWN:  I don't care.

23         THE COURT:  Let's hold that for right now as

24 possibilities.

25         The first question is, "What is the name of the

```
 1   prostate condition?"

 2            MR. BROWN:  I'm objecting to -- he's really not

 3   going to know.

 4            THE COURT:  Fine.  Second question -- and that goes

 5   on that -- that questions goes on, "What is the name of the

 6   physician and what is the name of the medication?"

 7            You object to that line?

 8            MR. BROWN:  Yes.

 9            THE COURT:  The second question, "Did he go to the

10   doctor after he -- if so, what was the treatment and what was

11   the diagnosis?"

12            MR. BROWN:  Objection.

13            THE COURT:  The third question is, "Who is Miles?

14   Is this a nickname for son or nephew?"

15            MR. BROWN:  I don't care.

16            THE COURT:  What is your preference on that?

17   Whatever you want.

18            MR. BROWN:  You can ask him that.

19            THE COURT:  I'm going to let you ask these

20   questions.  So let's circle that for right now.

21            Then the fourth question is, "Were any of the other

22   hearings attended also cooperators?  If so, how many?  Did he

23   talk to any of those family?"

24            MR. BROWN:  I'm going to object because I don't

25   know.
```

```
 1          THE COURT:  Okay.  And then the final card is,

 2   "Where did the female use the bathroom when turned away at old

 3   folks home?"

 4          MR. BROWN:  I think that's been asked and answered

 5   so I'm going to object.

 6          THE COURT:  Okay.  So of the four potentials, I want

 7   you to look them over again, and I'll let the government look

 8   as well.  If there's any objection or any preference, it's to

 9   the discretion of the defense.

10          MR. BROWN:  When they say "Miles," his nickname is

11   Mals, and it's for Marlon.

12          MR. PORTER:  There's also been testimony about

13   another individual named Miles in addition to Mals so I don't

14   know what they're referring to.

15          THE COURT:  Did you want to clarify that at all with

16   your client?  You can word it in any fashion regarding Miles or

17   Mals.

18          MR. BROWN:  So if that's an issue -- I think they're

19   talking about Mals who was the one that was sentenced earlier

20   that day; but if the prosecutor has an issue with that, then I

21   would prefer not to ask.

22          MR. PORTER:  I'm not weighing in one way or another,

23   Judge.  I'm just providing information to who is making the

24   decision to make their decision that there is testimony that

25   would identify both the person that goes by the name of Mals as
```

1   another person that goes by the name of Miles.

 2            MR. BROWN:  And I don't remember Miles.

 3            THE COURT:  I don't remember Miles.  I remember Mals

 4   from reading it on the monitor.  So we won't ask that question.

 5   So are there any questions that you want to ask in any form or

 6   do you want to -- you want to ask any questions on the cards?

 7            MR. BROWN:  I think since we've gone through this,

 8   we at least ought to ask these three.

 9            THE COURT:  And if you would like, you can ask

10   any -- we could have more questions if you would like.

11            MR. BROWN:  I think if we ask these --

12            MR. PORTER:  Your Honor, if we have any questions

13   after the juror questions that have been proposed, it would

14   only be within the scope of those questions and not beyond.

15            THE COURT:  For the government?

16            MR. PORTER:  Yes.

17            THE COURT:  And I'm going to allow -- I'm going to

18   put an asterisk at the bottom right hand of these three cards

19   with my initials and keep these for the record.

20            And, Mr. Brown, you can ask these three questions in

21   any manner you would like and adapt them in any manner.  You do

22   not have to ask them.  This is completely in your discretion.

23            Thank you.

24            Anything else?

25            MR. PORTER:  Nothing else.

```
 1              (The proceedings returned to open court.)

 2              MR. BROWN:  May I, Your Honor?

 3              THE COURT:  You may proceed.

 4   QUESTIONS FROM THE JURY BY MR. BROWN:

 5    Q      Mr. Stephens, would you feel the same way about

 6   snitches if Malcolm, your son, would have chosen to cooperate?

 7    A      Yes.

 8    Q      Do you get around easily, Mr. Stephens?

 9    A      Sometimes.

10    Q      How many times did you have words with Mr. Edwards'

11   attorney, Brian Risley, on the 29th of September?

12    A      Inside or out?

13    Q      All, inside and out.

14    A      Well, about six, seven times or more outside and

15   inside.

16    Q      Can you explain where -- the one at this door here?

17    A      The first door.

18    Q      The one at the second door?

19    A      Yeah.

20    Q      One out in the hallway?

21    A      No.  I never seen him in the hallway.

22    Q      Okay.  He'd gone.  So you don't have words?

23    A      No.

24    Q      The words you had on the street?

25    A      Yes.
```

429

```
1    Q       Any other?

2    A       No.

3    Q       How long had you been on prostate medication for any

4    infection?

5    A       About almost a year or more.

6            THE COURT:  Does that spark any further questions,

7    Mr. Porter?

8            MR. PORTER:  No, Your Honor.  Thank you.

9            THE COURT:  Mr. Brown, do you have any further

10   questions?

11           MR. BROWN:  No, Your Honor.

12           THE COURT:  You may stand down.  Thank you.

13           (Witness excused.)

14           THE COURT:  Do you have any other witnesses or

15   evidence?

16           MR. BROWN:  No, Your Honor.  We'd rest.  We have

17   some housekeeping matters if we could take a short break.

18           THE COURT:  Very well.  We will take a 15-minute

19   recess, and we'll be back at three o'clock.

20           Let me read the admonishment one more time.  We are

21   about to take a recess and I remind you of this instruction I

22   gave you earlier.  During this recess or any other recess, you

23   must not discuss this case with anyone, including the other

24   jurors, members of your family, people involved in the trial,

25   or anyone else.  If anyone tries to talk to you about the case,
```

430

```
 1   please let me know about it immediately.  Finally, keep an open
 2   mind until all the evidence has been received and you have
 3   heard the views of your fellow jurors.
 4                (The following proceedings were had in the courtroom
 5   out of the presence of the jury:)
 6                THE COURT:  Please be seated.
 7                MR. BROWN:  Judge, Mr. Stephens indicates he needs
 8   to go to the restroom.  Could he go while we do that or would
 9   you prefer he's here?
10                THE COURT:  It's his preference.  If he wants to be
11   here, we can let him use the restroom and come back and take
12   this up.
13                MR. BROWN:  You can go now.  Do you care if we go on
14   with my motions and stuff out here while you do that?  You mind
15   if we go on with this?
16                THE DEFENDANT:  Go ahead.
17                MR. BROWN:  Judge, at this time -- let me date it --
18   I tender the defendant's motion for judgment of acquittal at
19   the close of all evidence.  I'm handing that to your clerk and
20   I'm also handing a copy to counsel for the government.
21                THE COURT:  Any further record, Mr. Brown?
22                MR. BROWN:  No, I don't think we need to make any
23   further record.
24                THE COURT:  Your motion will be denied.
25                Does the government have any rebuttal evidence?
```

431

```
 1              MR. PORTER:  No, Your Honor.

 2              THE COURT:  Ms. Perry, Ms. Russell, do you have an

 3    instruction packet prepared to hand to both parties?

 4              Anything else, Mr. Brown, before we take a break and

 5    then come back for closings?

 6              MR. BROWN:  Not that I'm aware of.

 7              MR. PORTER:  Judge, in the packet that's just been

 8    given.

 9              THE COURT:  Yes.

10              MR. PORTER:  The footers at the bottom, some of them

11    don't say court's instruction but they still have the notation

12    of which party submitted them.  I didn't know if that was

13    intentional or not.

14              MR. BROWN:  Well, you're going to get a clean copy.

15    The jury's is clean.

16              MR. PORTER:  Thank you.  Thank you.  Thank you.

17              THE COURT:  What we'll do is show a clean copy on

18    the Elmo as I'm reading it and then we'll have extra clean

19    copies to send back to the jury.

20              Is that correct, Ms. Wheeler?

21              THE COURTROOM DEPUTY:  Yes.

22              MR. PORTER:  And if we might have a clean copy to

23    also use during argument, that would be very helpful.

24              THE COURT:  Absolutely.  We can utilize -- we'll

25    have a copy for you to utilize.
```

1          Let's take a ten-minute break until three o'clock

2    and be ready for instructions and closings at three.

3          MR. PORTER:  Thank you, Judge.

4          (Recess was taken at 2:50 p.m.)

5          (The following proceedings were had in the courtroom

6    out of the presence of the jury:)

7          THE COURT:  Please be seated.

8          Are we ready to bring the jury back in for

9    instructions and closing arguments?

10         MR. BROWN:  Yes, Your Honor.

11         MR. PORTER:  Yes, Your Honor.

12         THE COURT:  Ms. Wheeler.

13         (The following proceedings were had in the presence

14   of the jury:)

15         THE COURT:  Please be seated.

16         Ladies and gentlemen, now that both sides have

17   rested, we are at the stage where the Court will read you

18   instructions of the law, then we will have closing arguments,

19   then you will retire to deliberate.

20         During deliberations I'm going to ask that you stay

21   in the deliberation area.  If you do want to take a smoke break

22   or get some fresh air, I would ask Ms. Wheeler to have the CSOs

23   accompany you.  So that's possible but let's just keep you guys

24   sequestered.

25         Regarding the closing arguments, both sides are

433

1    going to be allowed to have 25 minutes apiece.  The government

2    has the burden of proof.  They go first.  They can divide their

3    time in half, so they will -- they have elected to use 15

4    minutes on the front end, and then the defense will have an

5    opportunity to use their 25 minutes, and then the government

6    can come back and use the remaining time of ten minutes.  Just

7    to give you an idea of the format.

8              Regarding the instructions that I'm now going to

9    read, we have read up to this point Instruction 13.  So I'll

10   start with Instruction 14 and it goes to Instruction 25, then

11   there will be one verdict form.

12             We're going to display the instructions so that you

13   can read along; but when you go back in the jury room, we're

14   going to give you the packets of instructions so that you can

15   review them again starting with Instruction 14 through 25, but

16   I believe we will only submit one verdict form.  Is that what

17   you have prepared?  Yes.  There will only be one verdict form

18   that needs to be signed by the foreperson.

19             Okay.  So let's get started.  This just takes a bit

20   to read the instructions.

21             (The Court reads Instructions Nos. 14 through 25,

22   inclusive.)

23             THE COURT:  Is the government ready to proceed with

24   closing arguments?

25             MR. PORTER:  We are, Your Honor.

1          THE COURT:  Do you have an instruction packet up

2    there for your use if you want it?

3          MR. PORTER:  I do, Your Honor.  Thank you.

4          May it please the Court.

5          THE COURT:  You may proceed.

6          MR. PORTER:  Counsel.  Mr. Stephens.

7                    GOVERNMENT'S CLOSING ARGUMENT

8          MR. PORTER:  And, ladies and gentlemen.  I should

9    have done this at the start of my opening statement.  My mother

10   will not forgive me for not having done it.  But I apologize to

11   you now for the fact that you had to listen to some course and

12   vulgar language during the course of this trial.  We didn't

13   choose to do that because that's how we normally speak.  We had

14   to do that because those are the facts of this case.

15         What we're going to talk about now are the facts,

16   and I'm going to suggest to you that we view them in a

17   particular way.  When a person --

18         JUROR:  I'm sorry.  I need to go to the bathroom.  I

19   feel like I'm going to be sick.

20         THE COURT:  You may proceed.

21         MR. PORTER:  Do you want me to continue, Your Honor?

22         THE COURT:  No.  We'll give the juror about ten

23   minutes.

24         MR. BROWN:  May I approach?

25              (Counsel approached the bench and the following

435

1   proceedings were had:)

2           MR. BROWN:  Mr. Stephens asked if he could go to the

3   bathroom while we're just sitting around.

4           THE COURT:  Do you want me to take the jury out?

5           MR. BROWN:  I don't care.  Use your judgment.

6           THE COURT:  Can he walk out and have the marshals

7   stand by the door?

8           MR. PORTER:  I don't have any problem with him going

9   to the bathroom while the jury is sitting there.  I don't think

10  it will take very long.

11          THE COURT:  I just want him to utilize the

12  restroom -- I just don't want that to --

13          MR. PORTER:  That's fine.  It's in the holding cell.

14          THE COURT:  I just don't want to bring it to the

15  attention of the jurors that he's going to the holding cell.

16          MR. BROWN:  That doesn't matter.  They don't know

17  what's back there.

18          (The proceedings returned to open court.)

19          THE COURT:  Mr. Stephens, would you come up, please.

20  You can use the restroom.  Just go through this door.

21          THE DEFENDANT:  Thank you.

22          THE COURT:  I think we're ready.

23          MR. PORTER:  I'm going to ask you, ladies and

24  gentlemen, to think about from your common sense and your

25  experience in life about what happens when a person is

1    threatened to keep them from telling the truth.  It takes

2    courage to stand up to the person that's making that threat.

3    It's never easy to take on the bully who tries to rule the

4    playground by intimidating and threatening other people.

5    Threatening people is not only wrong, it's a crime.  In this

6    case it's about, in its simplest terms, holding the threatening

7    bully accountable for the threats that he made.

8              Groups engaged in criminal conduct always try to

9    find ways to avoid being held accountable for their criminal

10   conduct.  One tactic the criminal could use to avoid that

11   accountability is saying -- you heard testimony about this --

12   "If nobody talks, everybody walks."  But what does the criminal

13   group do when somebody breaks ranks and does start talking

14   about the crimes of the group?  The criminal group has to make

15   it clear that those who disclose the truth about the criminal

16   activities of the group will be made to suffer for telling the

17   truth.  So that's when the expression we've talked so much

18   about in this trial comes into play, whether it's "snitches

19   belong in ditches" or "snitches get stitches" or any other

20   variation of that that we heard about, that's the threat used

21   by criminal groups to try to maintain order within their group.

22             So how do we know beyond a reasonable doubt and

23   based on the evidence that you've seen and heard during this

24   trial that this defendant threatened bodily harm with the

25   intent to retaliate?  Well, let's first start with his

admission that he did in fact make the threat.  What did the

defendant say when he was speaking to Special Agent Cody Abram

and Mr. Abram reminded the defendant that Brian Risley would

never forget that the defendant had threatened him?  Brian

Risley told you, "I will never forget those words.  I know

exactly what was said.  I never had that happen to me before."

And his response, the defendant's response when being

questioned by Special Agent Abram was very simple and very

powerful.  "It was said."  He didn't deny speaking the words.

He admitted speaking the words.  You heard him say that for

himself.  And in a moment of candor he admitted those were the

words that he spoke.  On that evidence you should not have any

reasonable doubt that he spoke the words, "It was said."

         So now the remaining question that's left for you to

determine is the harder one of the two, Why did he say it?  So

to help us answer that question, we're going to look at

Instruction No. 20, which is the instruction the Court gave you

that tells you what has to be proved beyond a reasonable doubt

before you can find the defendant guilty of the crime charged.

It says, There are two elements.  They're listed there for you.

And those are the only two things that have to be proved in

order for you to find the defendant guilty.

         The first one, Knowingly threatening bodily harm to

another person, specifically Brian Risley.  We just finished

discussing the fact that there's no real doubt.  There's no

reasonable doubt about the fact that that statement was made.
The words alone are sufficient in his own statement that he
spoke the threat. No one, including defense counsel, can stand
up here and credibly tell you anything different.

So now we're back to the question we posed just a
moment ago. The only question you're really left to determine
is, Why did he say it? And that's, again, why Instruction
No. 20 is helpful to you, because that tells you that the
government must prove the defendant spoke the threat with the
intent to retaliate against Vershawn Edwards who was a
cooperating codefendant in the criminal prosecution of the
defendant's son, Malcolm Desean Redmon. How do we know? How
can you as jurors confidently conclude based on the evidence
that you've seen and heard during this trial that that intent
to retaliate element has been proved beyond a reasonable doubt?
And your reason and your common sense is going to aid you more
than anything else in making that decision.

You know that his entire lifestyle is wrapped around
that bully culture where it tells you I'm going to retaliate
against you if you turn me in. He confirmed it even here on
the witness stand today.

Some of the people that committed crimes with
Malcolm Redmon made the decision to cooperate, and in the
defendant's view of the world those persons are now snitches.
They need to be hurt. They deserve to be hurt. They need to

1    be left for dead in ditches.  They broke ranks.  They are

2    targets.

3            And when this defendant came to the courtroom on

4    September 30th, he did not come here only to attend the

5    sentencing hearing of his own son, Malcolm Redmon.  He did not

6    come here only to show by the sentencing judge that he

7    supported Malcolm by being physically present.  He came here

8    also intent on letting the entire world know that those who

9    provided information against his son, those snitches had better

10   watch out because the code was about to be enforced.  The code

11   that says snitches are going to end up in ditches.  The warning

12   was being issued.

13           The defendant told Brian Risley before Vershawn

14   Edwards' sentencing even began, "Snitches belong in ditches."

15   He made it not for Brian Risley's benefit.  Of course he wasn't

16   focused on Brian Risley at that point.  Brian Risley's not the

17   snitch.  He was using Brian Risley as the messenger to

18   communicate that threat knowing that Brian Risley -- or excuse

19   me -- knowing that once he said that to Brian Risley, the

20   lawyer would communicate it to his client.  The word is out.

21   And he wanted to make sure that message was communicated.  The

22   lawyer was the way in which he was making sure that message got

23   communicated.

24           Instruction No. 15 tells you that you use your

25   common sense to decide this case, and it's really

| | |
|---|---|
| 1 | overwhelmingly clear based on nothing more than reason and |
| 2 | common sense that at that point during the sentencing hearing, |
| 3 | the defendant's focus was on retaliating against Vershawn |
| 4 | Edwards, the snitch who had cooperated and provided evidence to |
| 5 | help convict and aggravate the sentence of Marlon [sic] Redmon. |
| 6 | That same intent was what caused him to repeat the phrase that |
| 7 | you heard other people talk about, that snitches belong in |
| 8 | ditches inside the courtroom within earshot of the family |
| 9 | members of Vershawn Edwards. He wasn't targeting them. He |
| 10 | wanted to make sure they too heard that the code was about to |
| 11 | be enforced, that Vershawn Edwards was now targeted for having |
| 12 | provided evidence against Malcolm Redmon. |
| 13 | And when, as you heard Mr. Risley testify, those |
| 14 | family members were identified in the courtroom in open court |
| 15 | by both him and his client, pointed out while Mr. Stephens is |
| 16 | sitting in this courtroom, "That's my family," he was going to |
| 17 | confront them personally. You know what the funny thing is? |
| 18 | By having used just reason and common sense, a lot of other |
| 19 | people in the courtroom knew that's what was going to happen |
| 20 | next, that Mr. Stephens was going to confront them; and as he |
| 21 | headed towards Vershawn Edwards' family members, the |
| 22 | defendant's own family and those with him told him, "Let it |
| 23 | go." They knew him and what he was going to do. He wasn't |
| 24 | going to stop. |
| 25 | As he headed towards Vershawn Edwards' family |

1    members, Brian Risley knew also what was on his mind, and in

2    the words of one of our witnesses, the Good Samaritan instincts

3    kicked in and he wasn't going to let it happen.  And what did

4    the defendant say to him?  Again, course language.  It's not

5    our choice to use these words.  "Get the fuck out of my way."

6    And what did Brian Risley say?  "I'm not going to let you pass.

7    I'm not going to let you have access to them.  I'm good."  No

8    confrontation, no attempt to attack him but just, no, the

9    bully's not going to get his way today.  And what does the

10   bully say?  He says, "I'm going to whip your ass."  And so when

11   Brian Risley stands up on the playground to the bully and won't

12   let him pass, what does the defendant do?  He reacts

13   predictably, just like any other bully.  "I'm going to whip

14   your ass."

15           Now the court security officers intervene, and their

16   message is clear to him as well, You are not going to be a

17   bully on this playground.  You're going to be removed.  So the

18   bully gets kicked out of the courtroom without getting any

19   satisfaction.  And what is his parting shot to the court

20   security officers as he walks out of the courthouse?  "I hope

21   you die and I hope your family dies too," to the court security

22   officers.  Does he give up now?  Of course not.  Because like

23   all bullies, he doesn't know when to stop.

24           Now he goes after Brian Risley on the street.  A

25   fortuitous encounter, not planned by him, not certainly planned

1    by Mr. Risley but the coincidence of the moment brought them

2    together again; and now instead of seeing Vershawn Edwards and

3    using Brian Risley as the messenger to deliver the message to

4    Vershawn Edwards, he has equated Brian Risley with Vershawn

5    Edwards and they're both in the same boat.  Vershawn Edwards

6    was the target.  Now Brian Risley is the intended recipient

7    because Brian Risley prevented him from being able to bully the

8    Edwards' family here in this courtroom.  So in the defendant's

9    eyes Brian Risley is now exactly the same as Vershawn Edwards.

10   And like every other person who helped convict Malcolm Redmon,

11   Brian Risley helped the snitch.  Brian Risley helped the family

12   of the snitch by protecting him in this courtroom.  Now Brian

13   Risley is the same.

14        And how do we know that he was thinking snitch and

15   equating Brian Risley with the whole snitch attitude that he

16   has?  Because those are the words he used.  He said to Brian

17   Risley, "Snitches, you motherfucking snitch.  Fuck you.  I will

18   kill you.  I will kill your wife.  Kill your family."  And

19   Brian Risley remembers those words exactly that way because

20   that's never been spoken to him before.

21        So there you have it.  All the proof that any use of

22   reason and common sense is needed to lead you to the conclusion

23   beyond a reasonable doubt of what the jury instruction tells

24   you is the finding you need to make in this case in order to

25   convict the defendant of the crime charged against him.  That

1  evidence, the defendant's own actions are the best evidence

2  that he spoke the threat with the intent to retaliate in the

3  manner that's listed in Instruction No. 20.

4       Now, the defense answer to why the defendant

5  threatened says anxiety, anger, anguish.  That sounds good.

6  But it doesn't have a ring of truth to it if you examine it

7  through the lens of reason and common sense.  In his own words

8  after he was kicked out of the courthouse he wasn't anguished.

9  He wasn't anxious.  He sat down with his granddaughter.  They

10 took a walk.  They went down State Street.  He went in with his

11 granddaughter.  They came out.  They went to the white Chrysler

12 where he and his granddaughter sat and took a nap.  He woke up.

13 He has a conversation with other family members.  They go back

14 to the courthouse.  And when those other family members go back

15 to the courthouse, he takes a second nap.  He wakes up.  He

16 goes and he sits in another car with some guy who has to leave

17 and go pick up his girlfriend, then he walks with Dobby to

18 where now the defendant confronts Brian Risley on the street.

19 He is so upset.  He is so anguished that he takes not one but

20 two naps.  And he told you today that's what he did too.

21       THE COURTROOM DEPUTY:  You've used 15.

22       MR. PORTER:  So you know from the timeline that that

23 is a lie.  It's not physically possible to have done the things

24 that he did.  It makes far more sense to know that it happened

25 immediately afterwards and that's what's at play here.

1    Ladies and gentlemen, look at Instruction No. 20

2    again.  We don't have to prove, the government's not put to the

3    proof that he intended the outcome of his threat.  You don't

4    see that in there.  We have to prove he did it with the intent

5    to retaliate, that he was trying to send the message, not that

6    he actually intended the outcome but only that what was in his

7    mind was to retaliate.  The message that was sent was that

8    there will be no mercy if you snitch or you help anyone who

9    snitches.  That was the message that was delivered that day by

10   the defendant.  That's why we're here today to hold him

11   accountable for having delivered that message.

12          I will get to speak to you again after you hear

13   defense counsel's closing argument.  I'll yield the floor to

14   him now knowing that no matter what he has to say to you you

15   will follow the Court's instructions to use reason and common

16   sense in arriving at your verdict; and if you do that, you will

17   find this defendant guilty as charged.

18          MR. BROWN:  May it the please Court?

19          THE COURT:  Mr. Brown.  The instructions are up

20   there for your use.

21              DEFENDANT'S CLOSING ARGUMENT

22          MR. BROWN:  Ladies and gentlemen of the jury, you do

23   get to take your common sense and life experiences back to the

24   jury room with you, and we trust that you will use them, and I

25   submit to you if you do, the government's proof has failed, and

you will return a verdict of not guilty.

The full power of the government has been directed against Mr. Stephens. People get letters from the IRS and that's pretty disconcerting, getting arrested on a federal indictment is more. They have the power because they have the responsibility to prove to you beyond a reasonable doubt, to investigate these charges and discover the truth and act on that investigation.

Here we have 14 days they were picking him up on an indictment. What kind of investigation did they do? Now, I suggest Mr. Porter will probably tell you, Oh, we did a thorough investigation and it only took -- we did it quickly and that indictment was brought.

Just like the interview was a search for truth, it was a search for a confession. They had their mind made up when they conducted that interview, and I submit all of you will remember he denied ever threatening Mr. Risley. Now, they want to say, Oh, I asked him specifically after five minutes of talking about his attitude of snitches about that and he said, "It was said." You listen to it. You look at it. Was he talking about threats to Mr. Risley? Ugly comments to Mr. Risley?

And let's talk about ugly comments. It's human nature sometimes to make ugly comments. I mean, I suggest we've all experienced that with this election that we just had.

446

1    We have heard ugly comments.  Our friends and acquaintances
2    have made ugly comments.  It's human nature.  Ugly comments are
3    not threats.
4             I submit to you there is a reasonable doubt that Mr.
5    Stephens ever threatened Mr. Risley.  You're going to have to
6    determine the facts of what happened out on the sidewalk and
7    the street.  Did he say beyond a reasonable doubt, "I'm going
8    to kill you.  I'm going to kill your wife.  I'm going to kill
9    your family"?  Or did he say ugly things?  "I hope when you get
10   home you find your family dead."  Well, use your common sense,
11   your life experiences.  What had he told the CSOs coming out of
12   the courthouse?  Same thing.  Maybe different words.  And ugly
13   thoughts, but not threats, and your common sense tells you he
14   said the same thing to Mr. Risley, and Mr. Risley is sincere in
15   his belief that he heard what he told you.  I'm not up here
16   suggesting to you he's intentionally lying to you, but how many
17   times have we said things or heard things from other people in
18   our life experiences.  And something else.  The other person if
19   something else was said or if something else was heard.
20            Mr. Stephens says, I didn't have this encounter with
21   Mr. Risley ten or 15 minutes after I got thrown out of the
22   courthouse.  It was -- I had walked down to the apartments down
23   here and this and that, come back.  He knows about these time
24   stamps.  He's sincere in his belief that he did take that walk
25   and take a nap and whatever.  That doesn't make him a liar

1    about that as the government would suggest.  And they have the

2    burden of proof beyond a reasonable doubt.  So I submit to you

3    there is a reasonable doubt as to whether any threat was made.

4         Now, you're going to have to determine the facts.

5    You're going to have to reach a conclusion.  But even if you

6    believe the threat was made, then you have to go to two.

7    Unanimously beyond a reasonable doubt was the threat made

8    because he wanted to retaliate against Vershawn Edwards, the

9    codefendant of his son?  Your common sense tells you if you

10   want to retaliate against somebody, you're not going to do it

11   against their court-appointed lawyer.  They're going to do it

12   against somebody that they care about.  It doesn't make common

13   sense.  Well, what's the alternative?  He did it because there

14   was the confrontation in this courtroom.

15        Now, I think we've heard four versions of what

16   occurred in this courtroom, and there are differences in every

17   one of them.  I think CSO Black said there was no confrontation

18   at this door.  Other people say there was a confrontation at

19   this door and at the outer door.  You're going to have to

20   listen to all of those things and decide what the facts are.

21   It's your job.

22        It's the government's job to prove those facts

23   beyond a reasonable doubt.  Whatever was said on the street out

24   here, was it because he wanted to retaliate against Vershawn

25   Edwards or was it because he and Risley got into a kerfuffle up

448

here in the courtroom?  Your common sense tells you it had
nothing to do with Vershawn Edwards.  It had everything to do
with the perceived mistreatment he received from Brian Risley.
He got thrown out of the courthouse.  He was worried about his
son and he wanted to be at his son's sentencing.  You seen the
interview.  You heard him testify.  He wanted to be there and
he was prevented from being there, in his mind anyway, because
Brian Risley treated him poorly.

And both of them agree that the first thing that's
said out on the street is, You want to push me again?  You want
to push me again?  Now, does that sound -- your common sense,
does that sound like, Gee, you represented a snitch and I'm
going to retaliate against the snitch by taking it out on you?
That doesn't pass common sense.

And we're not here about his attitude towards
snitches.  You may not agree with how he thinks.  Lots of
people don't agree with what he thinks about snitches.  But the
only reason that's important is for you to determine whether or
not the retaliation was against Mr. Edwards or against Mr.
Risley.  Common sense tells you he doesn't know Vershawn
Edwards.  He didn't know Mr. Risley.  He's not a bully sending
a message to the group.  What evidence have you heard that Mr.
Stephens is part of any group?  His son may be but what his son
did, what his son pled guilty to, it's not attributable to Mr.
Stephens.  Is he part of that group?  No.  Does he support his

son?  Yes.  But he may have a bad attitude about snitches, but
you haven't heard anything about his lifestyle, and he's not a
bully here.

So what happened in the courtroom?  What happened in
the hallway?  I think that's pretty clear.  He was cussing the
CSOs, making up ugly comments from the fourth floor, down the
elevator, out across the lobby, until they put him out in the
area outside the front door.

And if he's such a threat, why do they let him sit
around?  Why don't they observe him?  Everybody here -- it's
not anybody's fault here that we don't have the video
surveillance tapes.  If we did, it would make your job a lot
easier, but we don't and you have to then make your decision
based on what you've heard happened.  We can.

Mr. Porter characterizes this as Mr. Edwards being
threatened for telling the truth and he's going to be
threatened if he tells the truth.  He was sentenced that day.
There's nothing ongoing about his cooperation, nothing in the
future, and so we're going to threaten him for what he did?
Doesn't pass your common sense, not when we don't know him.

And you heard Agent Abram say he's No. 23 on the
indictment and of the first ten, the most culpable, four or
five had cooperated.  Why are we going to pick poor No. 23 who
doesn't know much and not make any threats towards the main
defendant in that case, his lawyer, his family?  It doesn't --

1   this was not about retaliation for what Vershawn Edwards did.

2   This is anger about being thrown out of the courthouse, being

3   treated unfairly, and blaming, rightly or wrongly, Mr. Risley

4   for this.

5           And, quite honestly, if Mr. Risley had left this to

6   the security officers, we'd know what he was going to do when

7   he went out the courthouse door.  Was he going to the bathroom?

8   Was he going to go harass the family?  We'd know.  And there

9   was plenty of court security.

10          If Mr. Risley had wanted to be a Good Samaritan, he

11  would have gone with the family.  And then when Mr. Edwards

12  approached to harass them, taken some steps.  But, no, that

13  isn't what he did.  He had a sixth sense, kind of like CSO

14  Tyree talked about his sixth sense and he went.  Well, that

15  wasn't how CSO Black explained what occurred.  You all have to

16  decide.  They have to prove it beyond a reasonable doubt.

17          And the government suggests, oh, I'm going to -- I'm

18  going to threaten his lawyer and the word will get back to

19  Vershawn Edwards that he needs to be careful because he was a

20  snitch.  Have you heard any evidence that any word got back to

21  Vershawn Edwards?  None.  We don't have any evidence about

22  that.  And that's because this wasn't about retaliation against

23  Vershawn Edwards.  This was about being unfairly treated in the

24  courthouse and getting thrown out because he was unfairly

25  treated.  The government has not proved beyond a reasonable

```
 1    doubt the elements that they have to.  I suggest they haven't

 2    proved element 1, and they certainly haven't proved element 2.

 3              Full power of the government.  A mini example of

 4    that is for the past three days you sat here in the courtroom,

 5    looked out on the courtroom and you've seen three or four

 6    lawyers and a case agent sitting at this table.  You look over

 7    at the other table and you've got two old men.  That's an

 8    example.  That's why they have the burden of proof.  The -- if

 9    you sit there and say, Gosh, we don't know as a result of the

10    investigation.  It's their investigation and their

11    responsibility to do an investigation that proves to you beyond

12    a reasonable doubt what they're saying, and they haven't done

13    it in this case.  There's reasonable doubt.  You should find

14    him not guilty.

15              Family members.  The uncontested evidence before you

16    is that Mr. Edwards later that day after he had been thrown out

17    of the courthouse saw them leave the courthouse.  The three

18    women nodded, tipped his hat, and they went on and there was

19    absolutely no confrontation.  If there had been a

20    confrontation, if he wanted to retaliate against Vershawn

21    Edwards for being a snitch, you think, A, they wouldn't have

22    sent an escort with those ladies knowing that he's sitting out

23    on the pillar?  B, if there had been a confrontation, you would

24    have heard about it.  The uncontroverted evidence is he did in

25    fact have contact, meet with, walk by Vershawn Edwards' family.
```

1  Nothing.  And I'll tell you this from what we heard about Mr.
2  Stephens, if he wanted to make a kerfuffle over the family, he
3  would have made a kerfuffle.

4        Ladies and gentlemen, the government has failed in
5  its duty to prove these elements beyond a reasonable doubt.
6  You are Mr. Stephens' shield against the power of the
7  government.  You've promised to follow the instructions and do
8  your duty.  We count on you doing that.  And when you do,
9  you're going to return a verdict of not guilty because the
10 government's failed on element 1.

11        THE COURTROOM DEPUTY:  Five minutes remaining.

12        MR. BROWN:  The government has certainly failed on
13 element 2.  Send him home.

14        Thank you.

15            GOVERNMENT'S REBUTTAL CLOSING ARGUMENT

16        MR. PORTER:  Having heard closing argument from the
17 defense, ladies and gentlemen, and the few remaining minutes I
18 have with you, we're going to talk about some of the portions
19 of the judge's instruction we absolutely have to talk about at
20 this point.

21        Instruction 15 before you right now tells you you
22 must follow the judge's instructions on the law even if you
23 think the law is or should be different.  That's very important
24 because even if you think those elements should be something
25 else, even if you think maybe what's been described here is or

is not, should or should not be a crime, it doesn't matter.
You have to follow what the judge tells you because we rely
upon the fact that you took an oath to tell the truth -- or
excuse me -- that you took an oath to follow the law just like
the witnesses took an oath to tell the truth.  And we know that
some of the witnesses who took that oath to tell the truth
didn't honor it.

He, the defendant, did not honor that oath.  He
repeated the same line about the timeline here in this
courtroom that he gave to Cody Abram, and the defense tries to
tell you, Well, he knew about the time stamp.  We saw it in the
evidence.  You know what?  He didn't know about the time stamp
at the time he gave that statement to Special Agent Abram on
October the 12th.  He was concocting the lie on the fly just
like he concocts lies about everything else and then at that
point that's his story and he has to stick to it.  He didn't
know about the time stamp then.  He didn't know that we were
going to catch him in his lie.  He didn't know that what he was
going to have to confront was the reality of that lie because
there was other evidence that proved it to be a lie.

Instruction No. 15 also tells you to not let, you
cannot let sympathy and prejudice influence you in your
deliberation.  The fact that he's an old man, the fact that you
watched him on October 12th in that thing have a cathartic kind
of moment when he realized what a mess his life was, what a

mess he had created through his decision to be a bully, you

can't use that sympathy for him as part of your deliberation.

You can't.

And you also can't under this instruction -- excuse

me -- under Instruction 24 what might happen to him if you find

him guilty, the sentence to be imposed. That is not for you to

have as part of your equation either. You can't. You took an

oath not -- to follow these instructions. So what might happen

to him is not part of your decision.

We trust witnesses to tell the truth, we trust

jurors to honor their oath to follow the law, and we trust

judges with the responsibility of sentencing. You as jurors

have to respect the responsibility of the judge to honor her

oath to make decisions impartially, and that's what's going to

happen after conviction. It's for the Court to decide. It's

not like calling a foul in a basketball game where the referee

has the harm and the foul. No, no, no. There's no sentence

imposed today. This is just to decide if the foul was

committed. What happens after that is to be determined by

someone. You decide what evidence to believe. As Instruction

No. 15 tells you, a just verdict unaffected by anything except

the evidence, your common sense.

Look at Instruction 20 with me as we come to the

close. Instruction No. 20 doesn't tell you, doesn't require

you to find that he acted -- this defendant acted only with the

1    intent to retaliate.  It says you must find that he did so with

         2    the intent to retaliate.  We all know people have multiple

         3    motives for the things they do.  It's certainly possible he

         4    went out there to also retaliate against Brian Risley just

         5    because he didn't like Brian Risley, because Brian Risley got

         6    in his way, but that doesn't mean he couldn't also have the

         7    intent that we've talked about already and that's the intent he

         8    did have.  It was to retaliate.

         9            And, again, how do we know that?  Even the witnesses

        10    that are in his own family -- remember this.  When he's getting

        11    ready to get up to leave the courtroom after Vershawn Edwards,

        12    the snitch, has gotten probation, after he's gotten a lesser

        13    sentence than what Malcolm Redmon is going to get because

        14    Malcolm didn't cooperate, what is his statement according to

        15    Wendy Houston?  "That's bullshit."  The snitch got his reward.

        16    "That's bullshit."  And he's going to do something about it.

        17            And the only evidence about the lack of a

        18    confrontation between this defendant and the Edwards family

        19    came from this defendant, and if he's going to lie to you about

        20    the little details of what he did afterwards, he's darn sure

        21    going to lie to you about whether he had that encounter or not.

        22    That's credible testimony.  Is there anyone else who says it?

        23    They're absolutely right.  He's the only one who says it.  It's

        24    uncontroverted.  But it's not credible.  You can't believe it.

        25    It isn't the truth.

Reasonable doubt is what you're being asked to make
a conclusion based on.  I've lost my pages.  Hang on here.

        THE COURTROOM DEPUTY:  Two minutes remaining.

        MR. PORTER:  A reasonable doubt is a doubt that
would make someone hesitate to act.  Is it proof beyond all
doubt?  No.  But you can't speculate that maybe he's innocent.
That's not a reasonable doubt.  There is no reasonable doubt.
You don't have to be absolutely, 100 percent, without any doubt
convinced.  That's not the standard.  That's what he's arguing
to you.  But that's not the standard.  That's not what the law
says.  It's a reasonable doubt.  There is no reasonable doubt
based on the evidence.  There's no reasonable doubt.

        And so knowing that we don't have to prove that
these elements require you to find proof that he intended the
outcome of the threat but only that he intended to retaliate,
on behalf of the people of the United States, Ms. Orsinger and
I ask you to speak the truth with your verdict and find the
defendant guilty as charged.

        THE COURT:  The alternates in this case are Tara
Smith and Jerome Dubinski.  At this time I would ask Ms.
Wheeler to take the jurors to the deliberation room.  And I
would ask Ms. Smith and Mr. Dubinski to stay seated.

        (The case was given to the jury at 4:23 p.m. on
Wednesday, December 7, 2016, and the jury retired to their room
to deliberate on their verdict.)

```
 1              (The following proceedings were had at 5:48 p.m. in

 2    the courtroom out of the presence of the jury:)

 3              THE COURT:  Please be seated.

 4              We're back in the courtroom.  It's now approximately

 5    5:50 and there's a note from the jury that reads as follows:

 6    To whom did Mr. Stephens make the statement, quote, I'm going

 7    to whip your ass, end quote.  The jury also advised Ms. Wheeler

 8    that they would like to take a break, which I'm assuming they

 9    want to go outside.  So let's address the jury question about

10    Mr. Stephens' statement first.

11              Mr. Brown, how do you propose that we respond?

12              MR. BROWN:  Something to the effect that their

13    collective memory is better than ours.  Unless they want

14    something that's been marked as an exhibit, then we can't find

15    or highlight anything.  Quite honestly, other than Agent Abram,

16    I don't remember who testified about that.

17              THE COURT:  Ms. Orsinger or Mr. Porter, what is your

18    proposed answer from the Court?

19              MR. PORTER:  Well, traditionally, Judge, I think the

20    answer that would be given is something similar to what Mr.

21    Brown suggested that they are to rely on their recollection

22    collectively.  I would like to be able to give them an answer,

23    and I think it would assist them to know that, but I think

24    traditionally the courts have been reluctant to do that.

25              THE COURT:  The Court's response is, "You're
```

1    instructed to rely on your collective memories."

2            When Ms. Wheeler takes the note back, the second

3    issue of them taking a break, I'm going to have them be

4    escorted by the CSO.  I believe that would be the third floor

5    outside balcony where they are permitted to smoke, but they

6    need to stay as a group with you to the balcony.

7            I would also like to have Ms. Wheeler inquire about

8    ordering dinner and if they could -- if Ms. Wheeler could ask

9    them to discuss their preference on dinner, and one option is

10   for the Court to order a meal in; otherwise, they will have to

11   recess for the night.  Is there any objection to that

12   discussion between the jurors and Ms. Wheeler?

13           MR. PORTER:  Your Honor, I don't have any objection,

14   but perhaps even tell them that not what do you want for dinner

15   but we're going to bring you dinner so they know that is going

16   to happen.  I think everyone would be interested in staying

17   here however long it's necessary to try to conclude this today;

18   and if they know that they're not on a time limit for today and

19   dinner will be brought in with the expectation they will

20   continue deliberating, I think at least from the government's

21   perspective we're all for that.  I grew up in the State court

22   system where we had juries sometimes deliberating into nine

23   o'clock, ten o'clock, midnight because the Court was bringing

24   them food to keep them going, and I'm perfectly happy to do

25   that today.

1     THE COURT:  Mr. Brown, do you want to weigh in?

2     MR. BROWN:  That's fine.

3     THE COURT:  Do you think we should ask if they

4  anticipate needing dinner?  Because we are prepared to bring it

5  in.

6     MR. BROWN:  Just say we'll provide you dinner.

7     THE COURT:  Let us know when you want dinner?

8     MR. BROWN:  Yes, something to that effect.

9     THE COURT:  Let's stick Ms. Wheeler with something

10  as simple as, We'll bring you dinner.

11     Anything else, Mr. Brown?

12     MR. BROWN:  No, Your Honor.

13     THE COURT:  Mr. Porter?

14     MR. PORTER:  No, Your Honor.  Thank you.

15     THE COURT:  Very well.  We'll be in recess.

16     (Recess was taken at 5:54 p.m.)

17     (The following proceedings were had at 7:41 p.m. in

18  the courtroom out of the presence of the jury:)

19     THE COURT:  Please be seated.  It is now 7:46 and

20  the jury has the following question:  Is the legal definition

21  of the word "retaliate" available; and, if so, could you

22  provide it to us?

23     Mr. Porter, what is your position?

24     MR. PORTER:  Is the legal definition of the word

25  "retaliate" available and can it be provided to them?

460

1          THE COURT:  Yes.

2          MR. PORTER:  I don't -- well, I believe there is a

3    legal definition.  I have not looked for it.  I wish I had

4    something I could give the Court immediately right now to

5    assist in answering that question.  I guess the harder question

6    perhaps is do we give them an additional instruction on a word

7    of that significance at this stage of the proceedings?  And my

8    answer to that would be if we could agree upon a definition, I

9    have no problem giving it to them if that's acceptable to the

10   Court.  And that's my best response to you off the top of my

11   head.

12         THE COURT:  Mr. Brown, what is your position?

13         MR. BROWN:  Retaliate isn't retaliation.  I don't

14   think we can provide them with the definition.

15         THE COURT:  What do you propose the Court's response

16   to be?

17         MR. BROWN:  Read the question again, if you would,

18   please.

19         THE COURT:  Is a legal definition of the word

20   "retaliate" available; and, if so, could you provide it to us?

21         MR. BROWN:  No.  I think that would be the

22   appropriate response.

23         THE COURT:  Mr. Porter, what do you recommend the

24   response from the Court to be?

25         MR. PORTER:  If we could have an opportunity to see

461

```
1   if there is some definitional language that could be

2   considered, I would ask the Court for that opportunity.  We

3   will not prolong that.  I don't want to impose on the Court or

4   the jury by going for half hour.  I'm thinking about three or

5   four minutes.

6            THE COURT:  Why don't we take 15, 20 minutes and see

7   what you can find.  We'll take a look as well.  We'll be in

8   recess for 15 minutes.

9            (Recess was taken at 7:49 p.m.)

10            (The following proceedings were had at 8:27 p.m. in

11   the courtroom out of the presence of the jury:)

12            THE COURT:  The Court is inclined, after researching

13   not only the Eighth Circuit but across the country, the

14   appropriate response to give is the following:  "The dictionary

15   definition of, quote, retaliate is, quote, to repay, paren, as

16   an injury, paren, in kind, end quote.  The Court finds this

17   Merriam-Webster dictionary definition to be accurate, clear,

18   neutral, and non-prejudicial.

19            Mr. Porter, what is your position with that

20   response?

21            MR. PORTER:  Your Honor, that is consistent with the

22   definition we found in United States v. Calvert, 511 F.3d 1237,

23   Ninth Circuit 2008, and we have no objection.

24            THE COURT:  Mr. Brown, what is your position?

25            MR. BROWN:  I would object to that.  I'm not sure
```

```
 1   that it's particularly responsive to the question, and I
 2   haven't had an opportunity to check out other dictionary
 3   definitions.  So I think the response should be no.  But I
 4   understand and I hope the Court does that.  That's for the
 5   record.
 6            THE COURT:  Do you believe that this definition is
 7   not accurate or not clear or not neutral or is prejudicial?
 8   And if so, which one?
 9            MR. BROWN:  No, but I still object.
10            THE COURT:  Very well.  The Court will respond as
11   indicated.  The dictionary definition of retaliate is, quote,
12   to repay, paren, as an injury, paren, in kind, end quote.
13            We'll be in recess.
14            (Recess was taken at 8:31 p.m.)
15            (The following proceedings were had at 8:50 p.m. in
16   the courtroom out of the presence of the jury:)
17            THE COURT:  We're back on the record.  It's ten till
18   nine and I have asked the attorneys if they have any objection
19   to the courtroom deputy going into the deliberation room and
20   asking the jurors if anyone has a phone number they would like
21   her to call to advise that the jurors are still in
22   deliberations, and neither Mr. Brown nor Mr. Porter had an
23   objection.
24            Is that correct, Mr. Brown?
25            MR. BROWN:  That's correct, Your Honor.
```

```
 1                    THE COURT:  Mr. Porter?

 2                    MR. PORTER:  That's correct, Judge.

 3                    THE COURT:  And a side issue is since it is ten till

 4    nine, the defendant hasn't had his evening medications and so

 5    the marshals have been asked to retrieve those prescribed

 6    medications and bring them over to the courthouse.  Anything

 7    else for the record at this point?

 8                    MR. PORTER:  Nothing for the United States, Your

 9    Honor.

10                    MR. BROWN:  No, Your Honor.

11                    THE COURT:  Thank you.  We'll be in recess.

12                    (Recess was taken at 8:52 p.m.)

13                    (The jury returned into open court with their

14    verdict at 9 p.m.)

15                    THE COURT:  Please be seated.

16                    Ms. Wheeler, will you accept the verdict form.

17                    The verdict form reads, "We, the jury, find the

18    defendant, Bruce Wayne Stephens, guilty of the crime of

19    obstructing justice by threatening to retaliate as charged in

20    the indictment under Instruction No. 20."  Dated today's date

21    and signed by the foreperson.

22                    Ms. Perry, will you poll each juror by their number.

23                    (Each juror, upon being asked, "Is this your true

24    and individual verdict?" responded in the affirmative.)

25                    THE COURT:  Thank you, Ms. Perry.
```

1    The Court accepts the verdict of the jury and it is

2  in proper form.

3        Ladies and gentlemen, you have been together, the 12

4  of you, this week shoulder to shoulder.  And I recently read

5  something that I want to read to you.  "To witness jury service

6  at its best is to see the United States at its best.  Like

7  American democracy itself, the jury represents the best ideals

8  of this country.  Both democratic citizenship and jury service

9  requires participation, deliberation, a respect for equality,

10  fairness, dissent, and a fundamental faith in individual

11  liberty.  The reason why participation in jury service matters

12  has not changed over the years.  The constitutional strength of

13  this country begins with its citizens.  A jury gives ordinary

14  people extraordinary power.  It is a constitutional power."

15        So on behalf of the parties, I want to express my

16  appreciation for your sacrifice.  This imposes a burden and a

17  disruption in your routine, and I appreciate your

18  attentiveness, your faith in the system, and your commitment to

19  the justice system of this country.

20        At this time your jury service has concluded.  I

21  would ask Ms. Wheeler to escort you back to the jury

22  deliberation room where there will be a survey for you to

23  complete before you leave.

24        You are not required to talk with anyone.  It's now

25  your ability to talk to anyone that you want to.  Sometimes the

465

1  attorneys may have questions.  I know it's after nine o'clock

2  at night so that is totally up to you.

3          I'm going to wrap up the proceeding, and I will be

4  back in chambers if you have any questions of the Court or any

5  questions of the parties.

6          Ms. Wheeler, can you take them back to the jury

7  deliberation room?

8          THE COURTROOM DEPUTY:  Yes.

9          (The following proceedings were had in the courtroom

10  out of the presence of the jury:)

11          THE COURT:  Please be seated.

12          The Court will order a presentence investigation

13  report.  The defendant will be remanded back to the custody of

14  the marshals.

15          Are there any other motions or issues at this time?

16          Mr. Porter?

17          MR. PORTER:  No, Your Honor.  Thank you.  Normally

18  it would be my practice to try to visit with jurors.  It's

19  late.  I don't know if I'm going to take advantage of that

20  opportunity tonight or not, but thank you for giving us the

21  opportunity.

22          THE COURT:  Mr. Brown?

23          MR. BROWN:  Nothing further, Your Honor.

24          THE COURT:  Very well.  We'll be in recess.

25          (Adjournment)

CERTIFICATE OF OFFICIAL REPORTER

I, Katherine A. Calvert, Federal Official Court Reporter, in and for the United States District Court for the Western District of Missouri, do hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings in UNITED STATES OF AMERICA, Plaintiff, vs. BRUCE WAYNE STEPHENS, Defendant, No. 16-04068-01-CR-C-RK.

Dated this 12th day of July, 2017.

_____
KATHERINE A. CALVERT, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER